# EXHIBIT 1

Bradley S. Cohen | Is Bradley S. Cohen the Bernie Madoff of real estate?    Page 1 of 3

Case 2:12-cv-01401-JCM-PAL   Document 1-3   Filed 08/08/12   Page 2 of 47

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

## Is Bradley S. Cohen the Next Bernie Madoff?

**The alarming similarities between these two investment firm founders**

BRADLEY S COHEN



BERNIE MADOFF



Founded a real estate investment firm catering to high net worth individuals and institutional investors, in celebrity hot spot Beverly Hills.

Bills himself as "investor to the stars."

Founded a securities investment firm that attracted high net worth individuals and celebrities.

Prided himself on celebrity clientele.

Bradley S. Cohen is Bradley S. Cohen the Bernie Madoff of real estate? Page 2 of 3

Case 2:12-cv-01420-JFW-PJW Document 1-3 Filed 08/08/12 Page 3 of 47

| | |
|---|---|
| Has overall responsibility for management of his firm, strategically directs investment funds. | Had ultimate management authority over the assets of his clients and the ability to direct investments. |
| Has structured his business as an intricate web that is nearly unexplainable by company officials. | Structured his business and transactions in a complex way to conceal fraud and perpetuate a ponzi scheme. |
| Senior company leadership was "uncomfortable" and refused to answer questions about him and his financial dealings. | Employees could not explain his personal or company financial dealings. |
| Has headquartered his business on the prestigious Avenue of the Stars in Los Angeles. | Operated his investment firm from chic New York City and London offices. |
| Lives in a palacious Beverly Hills Mansion valued at over $7,000,000. | Owned expensive homes in prestigious locations, including a lavish Manhattan apartment. |
| Serves or has served on various philanthropic and industry boards and cultivates relationships with many charitable organizations. | Served on numerous industry boards, cultivating relationships with regulators, charities and financial organizations. |
| Serves on the Board of Directors of the National Association of Real Estate Investment Managers (NAREIM). | Served as the Chairman of Nasdaq. |
| Exercises political influence by making political contributions of up to $87,500 per year over many years. | Made regular and substantial political contributions over many years. |

- Bradley S. Cohen has been living a **life of luxury and prestige** for years, actively cultivating his posh outward appearance to attract investors. **Image is everything** when trying to inspire the trust of high net worth individual and institutional investors. Like Bernie Madoff, Cohen has a palacious home in an impressive neighborhood, an office in a celebrity and wealth-filled location, heavy involvement in industry organizations and on influential boards, and a company with an elusive and complex web of financial dealings.
- **Despite losses to his investors**, Cohen has maintained his extravagant lifestyle and image. He has been a contortionist when it comes to keeping the **secret of his**

**true financial picture**, creating a complex web of companies and dealings, but how long can this continue?

- Recently, Cohen's financial status appears to be declining.
    - Political contributions in past years were as much as $88,000, yet this year they have been almost nothing.
    - Likely feeling the financial stress, Cohen just refinanced his lavish Beverly Hills mansion.

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

# Is Bradley S. Cohen the Next Bernie Madoff?

**The alarming similarities between these two investment firm founders**

BRADLEY S COHEN



BERNIE MADOFF



Founded a real estate investment firm catering to high net worth individuals and institutional investors, in celebrity hot spot Beverly Hills.

Bills himself as "investor to the stars."

Founded a securities investment firm that attracted high net worth individuals and celebrities.

Prided himself on celebrity clientele.

| | |
|---|---|
| Has overall responsibility for management of his firm, strategically directs investment funds. | Had ultimate management authority over the assets of his clients and the ability to direct investments. |
| Has structured his business as an intricate web that is nearly unexplainable by company officials. | Structured his business and transactions in a complex way to conceal fraud and perpetuate a ponzi scheme. |
| Senior company leadership was "uncomfortable" and refused to answer questions about him and his financial dealings. | Employees could not explain his personal or company financial dealings. |
| Has headquartered his business on the prestigious Avenue of the Stars in Los Angeles. | Operated his investment firm from chic New York City and London offices. |
| Lives in a palacious Beverly Hills Mansion valued at over $7,000,000. | Owned expensive homes in prestigious locations, including a lavish Manhattan apartment. |
| Serves or has served on various philanthropic and industry boards and cultivates relationships with many charitable organizations. | Served on numerous industry boards, cultivating relationships with regulators, charities and financial organizations. |
| Serves on the Board of Directors of the National Association of Real Estate Investment Managers (NAREIM). | Served as the Chairman of Nasdaq. |
| Exercises political influence by making political contributions of up to $87,500 per year over many years. | Made regular and substantial political contributions over many years. |

- Bradley S. Cohen has been living a **life of luxury and prestige** for years, actively cultivating his posh outward appearance to attract investors. **Image is everything** when trying to inspire the trust of high net worth individual and institutional investors. Like Bernie Madoff, Cohen has a palacious home in an impressive neighborhood, an office in a celebrity and wealth-filled location, heavy involvement in industry organizations and on influential boards, and a company with an elusive and complex web of financial dealings.
- **Despite losses to his investors**, Cohen has maintained his extravagant lifestyle and image. He has been a contortionist when it comes to keeping the **secret of his**

Case 2:12-cv-01401-JCM-PAL   Document 1-3   Filed 08/08/12   Page 7 of 47

**true financial picture**, creating a complex web of companies and dealings, but how long can this continue?

- Recently, Cohen's financial status appears to be declining.
  - Political contributions in past years were as much as $88,000, yet this year they have been almost nothing.
  - Likely feeling the financial stress, Cohen just refinanced his lavish Beverly Hills mansion.

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

# Cohen Asset Management

Bradley Cohen's company, Cohen Asset Management, purports to be a private real estate investment firm that seeks to attract high net worth individual and foreign institutional investors.  With hundreds of millions of dollars in **complex financial transactions and loans** between numerous companies and investors, how can investors guard against a **Ponzi scheme** or **fraud**?



- Recently, the Senior Vice President of Cohen Asset Management, Doreen Ray (pictured right), was asked under oath about the intricacies of company finances. Her response was initially evasive, then ultimately revealed the following ominous facts:
  - She expressed a **complete inability to explain any details of the company's financial transactions**, despite being the highest ranking officer on the Asset Management Team.
  - She stated that she was **uncomfortable answering questions** about Bradley Cohen and his financial dealings.
  - Properties owned by Cohen Asset Management or its related companies have **occupancy rates as low as 28%**.
  - Properties owned by Cohen Asset Management or its related companies are **currently generating operating losses**
  - **Losses continue to mount** as the companies lose tenants.

- She **does not know where the money is coming from to cover the operating losses**, but does know that the companies can dip into a revolving line of credit through which all Cohen Asset Management companies are financed.
- If company officials don't even know how investor funds are managed, how can investors and business partners feel secure?

- Cohen Asset Management has recently **lost tens of millions of dollars** in investor funds, yet Bradley Cohen is clearly living the life of luxury.  Losses of the Cohen Asset Management's CAM Core+ Fund 1 are clear from the company's financial statement below.  How can a company and its owner profit while investors are losing big?







The above preview is taken from the 3rd Quarter Financial Report »

- Some may speculate that company assets have been **looted**. Cohen Asset
  Management's intricate dealings with the **assets of banks, insurance
  companies, other lenders and Cohen's own clients are so complicated an
  army of investigators may be necessary to unravel the web.**

- Investigators have speculated that Cohen Asset Management, in its own capacity or through its subsidiary companies, is actively engaging in lawsuits in an attempt to hold off creditors seeking financial information. Records are closely guarded by the company and even certain documents on this website were obtained only by a fluke discovery.



More about Bradley S. Cohen's intricate business connections »

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

# Cohen's Mansion



■ More information about Bradley S. Cohen's mansion in Beverly Hills Here »

Bradley Cohen lives in a lavish Beverly Hills mansion and surrounds himself with luxury while his clients are losing tens of millions of dollars. Cohen recently refinanced his mansion for approximately $4,000,000.00, perhaps in an attempt to prop up his crumbling empire.

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

## Documents

- 3rd Quarter Financial Report »
  A detailed report showing the 3rd quarter financial earnings.

- Intricate Business Connections
- Political Influence and Contributions

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

# Political Influence and Contributions

**Bradley Cohen Political Campaign Contributions
2008 Election Cycle**

| | |
|---|---|
| 2010 Transaction Count/Amount | 1/$1,000 |
| 2008 Transaction Count/Amount | 24/$87,300 |
| 2006 Transaction Count/Amount | 13/$23,350 |
| 2004 Transaction Count/Amount | 5/$33,000 |
| 2002 Transaction Count/Amount | 5/$3,500 |
| 2000 Transaction Count/Amount | 7/$4,750 |

**Bradley Cohen Contribution List in 2008**

| Name | Location | Employer/Occupation | Amount | Date | Primary/ General | Contributed To |
|---|---|---|---|---|---|---|
| COHEN, BRADLEY MR. | BEVERLY HLLS, CA 90210 | COHEN ASSET MANAGEMENT/INVESTOR | $10,000 | 08/31/2008 | P | MCCAIN VICTORY CALIFORNIA - |
| Cohen, Bradley | LOS ANGELES, | Cohen Asset Management/Real Estate | $1,000 | 07/24/2008 | G | CANTOR FOR CONGRESS - |

| | CA 90067 | | | | | |
|---|---|---|---|---|---|---|
| COHEN, BRADLEY MR. | BEVERLY HLLS, CA 90210 | COHEN ASSET MANAGEMENT/INVESTOR | $10,000 | 06/02/2008 | P | MCCAIN VICTORY CALIFORNIA - |
| COHEN, BRADLEY S | LOS ANGELES, CA | 90077 | $-1,000 | 03/07/2008 | G | RUDY GIULIANI PRESIDENTIAL COMMITTEE INC - |
| Cohen, Bradley Mr. | BEVERLY HLLS, CA 90210 | Cohen Asset Management/Investor | $28,500 | 01/28/2008 | P | NATIONAL COMMITTEE - |
| Cohen, Bradley S. | LOS ANGELES, CA 90067 | Cohen Asset Management/Real Estate | $4,600 | 12/10/2007 | P | FRIENDS OF ROY BLUNT - |
| Cohen, Bradley S. | LOS ANGELES, CA 90067 | Cohen Asset Management/Real Estate | $-2,300 | 12/10/2007 | P | FRIENDS OF ROY BLUNT - |
| COHEN, BRADLEY S. MR. | LOS ANGELES, CA 90077 | COHEN ASSET MANAGEMENT/ASSET MANAGE | $-1,000 | 08/30/2007 | P | RUDY GIULIANI PRESIDENTIAL COMMITTEE INC - |
| COHEN, BRADLEY S | LOS ANGELES, CA 90077 | | $-1,000 | 08/30/2007 | P | RUDY GIULIANI PRESIDENTIAL COMMITTEE INC - |
| COHEN, BRADLEY S. MR. | LOS ANGELES, CA 90077 | COHEN ASSET MANAGEMENT/ASSET MANAGE | $1,000 | 08/21/2007 | P | RUDY GIULIANI PRESIDENTIAL COMMITTEE INC - |
| | LOS ANGELES, | | $-1,000 | 08/21/2007 | P | RUDY GIULIANI |

Case 2:12-cv-01401-JCM-PAL   Document 1-3   Filed 08/08/12   Page 16 of 47

| | | | | | | |
|---|---|---|---|---|---|---|
| COHEN, BRADLEY S. MR. | CA 90077 | COHEN ASSET MANAGEMENT/ASSET MANAGE | | | | PRESIDENTIAL COMMITTEE INC - |
| COHEN, BRADLEY S. MR. | LOS ANGELES, CA 90077 | COHEN ASSET MANAGEMENT/ASSET MANAGE | $1,000 | 08/21/2007 | G | RUDY GIULIANI PRESIDENTIAL COMMITTEE INC - |
| Cohen, Bradley | LOS ANGELES, CA 90024 | Self Employed/Investor | $500 | 06/26/2007 | P | BACHMANN FOR CONGRESS - |
| Cohen, Bradley | LOS ANGELES, CA 90024 | Self Employed/Investments | $500 | 06/14/2007 | P | MCHENRY FOR CONGRESS - |
| COHEN, BRADLEY MR. | LOS ANGELES, CA 90077 | COHEN ASSET MANAGEMENT/ASSET MANAGE | $2,300 | 05/07/2007 | P | RUDY GIULIANI PRESIDENTIAL COMMITTEE INC - |
| COHEN, BRADLEY | BEVERLY HILLS, CA 90210 | COHEN ASSET MANAGEMENT/INVESTOR | $9,200 | 05/04/2007 | P | TEXANS FOR SENATOR JOHN CORNYN INC - |
| COHEN, BRADLEY | BEVERLY HILLS, CA 90210 | COHEN ASSET MANAGEMENT/INVESTOR | $-2,300 | 05/04/2007 | P | TEXANS FOR SENATOR JOHN CORNYN INC - |
| COHEN, BRADLEY | BEVERLY HILLS, CA 90210 | COHEN ASSET MANAGEMENT/INVESTOR | $2,300 | 05/04/2007 | G | TEXANS FOR SENATOR JOHN CORNYN INC - |
| COHEN, BRADLEY | BEVERLY HILLS, CA 90210 | COHEN ASSET MANAGEMENT/INVESTOR | $-4,600 | 05/04/2007 | P | TEXANS FOR SENATOR JOHN CORNYN INC - |
| | | SELF/INVESTOR | $-2,300 | 03/08/2007 | P | |

| COHEN, BRADLEY | BEVERLY HILLS, CA 90210 | | | | | COLEMAN FOR SENATE 08 - |
|---|---|---|---|---|---|---|
| COHEN, BRADLEY | BEVERLY HILLS, CA 90210 | SELF/INVESTOR | $2,300 | 03/08/2007 | G | COLEMAN FOR SENATE 08 - |
| COHEN, BRADLEY | BEVERLY HILLS, CA 90210 | SELF/INVESTOR | $-4,600 | 03/08/2007 | P | COLEMAN FOR SENATE 08 - |
| Cohen, Bradley Mr. | BEVERLY HLLS, CA 90210 | Cohen Asset Management/Investor | $25,000 | 02/28/2007 | P | NATIONAL COMMITTEE - |
| COHEN, BRADLEY | BEVERLY HILLS, CA 90210 | SELF/INVESTOR | $9,200 | 02/23/2007 | P | COLEMAN FOR SENATE 08 - |

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

# Intricate Business Connections

Bradley S Cohen is associated with an intricate web involving a number of companies, including 121 Canyon Office Gp, Inc., 651 East Corporate Drive Industrial Capital LLC and Cohen Asset Management, Inc.. Bradley S Cohen has 3 known relationships including Brandon Delf, Cam Core & Fund I', LLC and Cam Fund Capital I', LLC and is located in Los Angeles, CA.



direct dial: (310) 860-0598

Sources: California Secretary of State last refreshed 11/10/2011
Dun & Bradstreet last refreshed 11/10/2011
Texas Secretary of State last refreshed 11/10/2011

**Connections for Bradley S Cohen**

| | | |
|---|---|---|
| Brandon Delf | Secretary at 121 Canyon Office Gp, Inc. | Los Angeles, CA |
| Cam Core & Fund I', LLC | Governing Person at 651 East Corporate Drive Industrial Capital LLC | Los Angeles, CA |

| Cam Fund Capital I', LLC | Governing Person at 651 East Corporate Drive Industrial Capital LLC | Los Angeles, CA |

**Companies associated with Bradley S Cohen**

| 121 Canyon Office Gp, Inc. | President is an active role held by Bradley S Cohen | Los Angeles, CA |
| 651 East Corporate Drive Industrial Capital LLC | Governing Person is an active role held by Bradley S Cohen | Kerrville, TX |
| Cohen Asset Management, Inc. | President is an active role held by Bradley S Cohen | Los Angeles, CA |
| Freeport Parkway Corporation | President is an active role held by Bradley S Cohen | Los Angeles, CA |

**Possible Political Campaign Contributions** The campaign contributions listed below may be related to Bradley S Cohen. The Federal Election Commission (FEC) maintains these records. The results below are based on a name and ZIP code proximity match and are provided as a possible research tool only.

Contributions to Republicans: $124,650.00          Contributions to Democrats: $27,500.00

| DATE | DONOR | LOCATION | COMMITTEE | AMOUNT | |
|---|---|---|---|---|---|
| 8/31/2008 | Cohen Asset Management/Investor | Beverly Hills, CA | McCain Victory California | $10,000.00 | Source |
| 7/24/2008 | Cohen Asset Management/Real Estate | Los Angeles, CA | Cantor for Congress | $1,000.00 | Source |
| 6/2/2008 | Cohen Asset Management/Investor | Beverly Hills, CA | McCain Victory California | $10,000.00 | Source |

| Date | | Location | Committee | Amount | |
|---|---|---|---|---|---|
| 3/7/2008 | | Los Angeles, CA | Rudy Giuliani Presidential Committee, Inc | $1,000.00 | Source |
| 1/28/2008 | Cohen Asset Management/Investor | Beverly Hills, CA | Republican National Committee | $28,500.00 | Source |
| 12/10/2007 | Cohen Asset Management/Real Estate | Los Angeles, CA | Friends of Roy Blunt | $4,600.00 | Source |
| 12/10/2007 | Cohen Asset Management/Real Estate | Los Angeles, CA | Friends of Roy Blunt | ($2,300.00) | Source |
| 8/30/2007 | Cohen Asset Management/Asset Manage | Los Angeles, CA | Rudy Giuliani Presidential Committee, Inc | ($1,000.00) | Source |
| 8/30/2007 | | Los Angeles, CA | Rudy Giuliani Presidential Committee, Inc | $1,000.00 | Source |
| 8/21/2007 | Cohen Asset Management/Asset Manage | Los Angeles, CA | Rudy Giuliani Presidential Committee, Inc | $1,000.00 | Source |
| 8/21/2007 | Cohen Asset Management/Asset Manage | Los Angeles, CA | Rudy Giuliani Presidential Committee, Inc | ($1,000.00) | Source |
| 8/21/2007 | Cohen Asset Management/Asset Manage | Los Angeles, CA | Rudy Giuliani Presidential | $1,000.00 | Source |

|  |  |  | Committee, Inc |  |  |
|---|---|---|---|---|---|
| 6/26/2007 | Self Employed/Investor | Los Angeles, CA | Bachmann for Congress | $500.00 | Source |
| 6/14/2007 | Self Employed/Investments | Los Angeles, CA | McHenry for Congress | $500.00 | Source |
| 5/7/2007 | Cohen Asset Management/Asset Manage | Los Angeles, CA | Rudy Giuliani Presidential Committee, Inc | $2,300.00 | Source |
| 5/4/2007 | Cohen Asset Management/Investor | Beverly Hills, CA | Texans for Senator John Cornyn Inc | $9,200.00 | Source |
| 5/4/2007 | Cohen Asset Management/Investor | Beverly Hills, CA | Texans for Senator John Cornyn Inc | ($2,300.00) | Source |
| 5/4/2007 | Cohen Asset Management/Investor | Beverly Hills, CA | Texans for Senator John Cornyn Inc | $2,300.00 | Source |
| 5/4/2007 | Cohen Asset Management/Investor | Beverly Hills, CA | Texans for Senator John Cornyn Inc | ($4,600.00) | Source |
| 3/8/2007 | Self/Investor | Beverly Hills, CA | Coleman for Senate 08 | ($2,300.00) | Source |
| 3/8/2007 | Self/Investor | Beverly Hills, CA | Coleman for Senate 08 | $2,300.00 | Source |
| 3/8/2007 | Self/Investor | Beverly Hills, CA | Coleman for Senate 08 | ($4,600.00) | Source |

| 2/28/2007 | Cohen Asset Management/Investor | Beverly Hills, CA | Republican National Committee | $25,000.00 | Source |
| 2/23/2007 | Self/Investor | Beverly Hills, CA | Coleman for Senate 08 | $9,200.00 | Source |
| 9/30/2006 | Cohen Asset Mgmt Inc./President | Los Angeles, CA | Friends of Joe Lieberman | $2,000.00 | Source |
| 9/20/2006 | Cohen Asset Management/Investor | Beverly Hills, CA | Republican National Committee | $10,000.00 | Source |
| 8/31/2006 | Self/Construction | Los Angeles, CA | Friends of George Allen | $1,000.00 | Source |
| 8/24/2006 | Cohen Asset Management/President | Los Angeles, CA | Allen Victory Committee | $1,000.00 | Source |
| 4/26/2006 | Self Cohen Assets Management/Presid | Los Angeles, CA | Gallegly for Congress | $1,000.00 | Source |
| 3/31/2006 | Cohen Asset Mgmt/Investor | Beverly Hills, CA | Mark Kennedy 06 | $1,000.00 | Source |
| 3/29/2006 | Cohen Asset Management/Investor | Beverly Hills, CA | Steele for Maryland Inc | $1,000.00 | Source |
| 11/29/2005 | Cohen Asset Management/Investor | Beverly Hills, CA | Friends of Conrad Burns – 2006 | $400.00 | Source |
| 11/29/2005 | Cohen Asset Management/Investor | Beverly Hills, CA | Friends of Conrad Burns – 2006 | $2,100.00 | Source |

| 5/19/2005 | Cohne Asset Management | Beverly Hills, CA | Talent for Senate Committee | $2,100.00 | Source |
|---|---|---|---|---|---|
| 2/17/2005 | Cohen Asset Management | Beverly Hills, CA | Ensign for Senate | $1,000.00 | Source |
| 8/5/2004 | Cohen Asset Management/Investor | Beverly Hills, CA | Republican National Committee | $25,000.00 | Source |
| 8/3/2004 | Self-Employed/Cohen Asset Managemen | Los Angeles, CA | Kuhl for Congress | $2,000.00 | Source |
| 3/31/2004 | Cohen Asset Management | Los Angeles, CA | John Thune for US Senate | $2,000.00 | Source |
| 3/31/2004 | Cohen Asset Management | Los Angeles, CA | John Thune for US Senate | $2,000.00 | Source |
| 8/8/2003 | Cohen Asset Management Inc./Owner | Los Angeles, CA | Bush-Cheney '04 (Primary) Inc | $2,000.00 | Source |
| 9/27/2002 | Requesting Info | Los Angeles, CA | Friends of Henry F Wojtaszek | $1,000.00 | Source |
| 8/13/2001 | Cohen Asset Management Inc./CEO | Los Angeles, CA | Tipperary Hill Pac | $1,000.00 | Source |
| 8/13/2001 | Cohen Asset Management Inc./CEO | Los Angeles, CA | Tipperary Hill Pac | $500.00 | Source |

| Date | | Location | | Amount | |
|------|------|----------|------|--------|------|
| 10/13/2000 | | Los Angeles, CA | Lazio 2000 Inc | $750.00 | Source |
| 8/29/2000 | Cohen Asset Managment | Los Angeles, CA | Friends of Schumer | $1,000.00 | Source |
| 8/14/2000 | Cohen Asset Management Inc | Los Angeles, CA | Reynolds for Congress | $1,000.00 | Source |

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

# A History of Convictions

In his official biography on Cohen Asset Management's website, Cohen describes his early business history in very vague terms, noting that he "began his career as an entrepreneur." Early investigation has uncovered a criminal history involving fraud and money laundering for *a man with the same name and same approximate age*, in the real estate industry. Is this the reason for Cohen's vague background?

- Both:
    - Have made a fortune in the real estate industry
    - Are from the same geographic area
    - Are named Bradley S. Cohen
    - Are the same age

**News articles about one Bradley S. Cohen:**

- Charges Filed
- Probation Revoked
- Numerous Swindles
- Fraud Charges
- RICO Case

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

# Fraud Charges

**Ex-business Hotshot Admits Fraud And Money Laundering Brad S. Cohen Will Go To Prison, Leaving A Trail Of Suits, Court Judgments And Charges Behind.**
January 06, 1995 | By L. Stuart Ditzen, INQUIRER STAFF WRITER

Brad S. Cohen, who went from business whiz kid to notorious con man in a frenetic swirl of investment deals in the 1980s, pleaded guilty yesterday in U.S. District Court to charges of bankruptcy fraud, perjury and money laundering.

The curly-haired Cohen, 35, admitted to Judge Clarence C. Newcomer that he had committed all the offenses listed in a 344-count federal indictment and, in a separate scam, had bilked a Venezuelan couple of $260,000.

Cohen did not, however, formally plead guilty to all the charges. In an agreement with the U.S. Attorney's Office, he pleaded guilty to five counts in the indictment. He agreed to serve a minimum of five years in prison.
Story continues below.

Cohen entered the plea on the eve of a trial.

He was charged in March with diverting nearly $500,000 from bankrupt partnerships he controlled between 1991 and 1993 and using the money to finance a lavish lifestyle. Cohen drove luxury cars and lived in a $900,000 home in Bryn Mawr.

He was a rising young real estate speculator in the 1980s, but many partners ended up suing him and accusing him of fraud. As lawsuits, millions of dollars in court judgments, and criminal charges accumulated, law enforcement officials came to view him as a flimflam artist extraordinaire.

"It's amazing that one person could handle so many complex bank transactions on a daily basis for so long," said Assistant U.S. Attorney Timothy R. Rice, the prosecutor in Cohen's case.

When the real estate market soured, many of Cohen's partnerships tumbled into bankruptcy. At that point, Rice said, Cohen began feverishly siphoning money from them, at times doing as many as 10 bogus transactions a day through a maze of bank accounts.

An FBI agent, Tom Cortese, investigated Cohen for more than a year, tracing hundreds of checks from the bankrupt partnerships and following the money as it filtered into Cohen's pockets.

Cohen's plea yesterday marked the second time he had pleaded guilty in federal court. In 1990 he admitted defrauding several investors in phony ventures and was sentenced to five years' probation.

In September 1993, he was arrested on a charge of violating his probation. He was accused of defrauding Hector and Diana Carrasco, a Venezuelan couple living in the United States, in several investment deals.

It had been a condition of his 1990 probation that he go straight. Unable to make his $2.5 million bail, Cohen was jailed. He has been in federal custody since his arrest. Cohen admitted the Carrasco fraud in yesterday's plea agreement.

Rice, the prosecutor, said he would seek an additional five-year prison sentence for the Carrasco fraud, which is pending before U.S. District Judge William H. Yohn Jr.

In another case, the District Attorney's Office has charged Cohen with stealing more than $2 million from two Philadelphia businessmen who invested in Cohen's real estate deals. That case is awaiting trial in the Court of Common Pleas.

In yesterday's case, Judge Newcomer spent an hour going over the charges while Cohen and his lawyer, Thomas C. Carroll, stood before him.

Cohen said he understood exactly what he was doing as he entered his plea, but after he said the word "guilty," the judge wanted to be absolutely sure.

"Would you say it one more time?" Newcomer asked.

"Guilty, your honor," Cohen said. A marshal then led him from the courtroom in handcuffs.

Newcomer scheduled the sentencing of Cohen for April 5.

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

# Numerous Swindles

**Charges Mounting For Investor Brad S. Cohen Was Already Accused Of Numerous Swindles. Now He's Accused Of Diverting $500,000.**

March 10, 1994 | By L. Stuart Ditzen, INQUIRER STAFF WRITER

Share on emailShare on printShare on redditMore Sharing Services

Brad S. Cohen, a real estate investor already accused of an assortment of swindles, was charged in U.S. District Court yesterday with systematically diverting nearly $500,000 from several bankrupt enterprises to his personal use.

Cohen, 34, of Bryn Mawr, in prison in an unrelated case, was charged in a 78-page grand jury indictment with fraud, money laundering and perjury.

Assistant U.S. Attorney Timothy R. Rice said Cohen lied in bankruptcy proceedings in 1992, falsely claiming that he was using rent money from several bankrupt apartment complexes and shopping centers to pay the mortgages and real estate taxes.
Story continues below.

In reality, Rice said, Cohen was stealing the rent money and using it to support a lavish lifestyle. Cohen owns a $900,000 home and rides, when not in custody, in a top-of-the-line Mercedes sedan.

Rice said an FBI agent, Tom Cortese, followed a "mammoth paper trail" for more than a year to build the case against Cohen.

The agent had to work his way through a maze of bank accounts and corporate entities and partnerships.

The indictment lists 212 checks ranging from $50 to $17,000 that were traced from Cohen's bankrupt properties to other accounts in non-bankrupt enterprises he controlled.

Then, according to the indictment, Cohen wrote 100 more checks to transfer the funds from the non-bankrupt properties, in a money-laundering step.

Cohen was widely viewed as a real estate whiz kid in the 1980s, but many partners ended up suing him and accusing him of fraud.

The sweeping indictment issued yesterday is just one of Cohen's problems.

He is also awaiting trial in Common Pleas Court on charges that he stole $2 million from two former partners in real estate deals between 1987 and 1990, and that he wrote a bad check for $25,000 to lawyer Richard A. Sprague. Those charges were brought by the District Attorney's Office in September.

The U.S. Attorney's Office started proceedings in September to revoke Cohen's probation in connection with a previous federal conviction. Cohen pleaded guilty in 1990 to defrauding three investors of $326,000 and was sentenced to five years' probation.

But while on probation, federal prosecutors contend, Cohen bilked a Venezuelan citizen of $261,000 in a series of investment scams. Cohen is in the Philadelphia Detention Center, unable to meet $2.5 million bail in connection with those proceedings.

The indictment issued yesterday was a vastly expanded version of a case the U.S. Attorney's Office brought against Cohen in November 1992.

Cohen agreed in 1992 to plead guilty to charges of lying in two bankruptcy proceedings.

On the day he was scheduled to enter his plea, however, he backed out of the agreement. That spurred the U.S. Attorney's Office to take its evidence to a grand jury to seek an indictment. In the process, the investigation of Cohen's activities was broadened.

Among the waves of charges in yesterday's indictment, Cohen was accused of taking advantage of two banks and a law firm in an effort to convince a bankruptcy judge that

he had set aside $500,000 to pay his creditors.

Story continues below.

The indictment outlines events as follows:

- In January 1992, Cohen obtained "starter kits" to open two bank accounts at PSFS. The kits included blank signature cards and several checks.
- Cohen did not complete the signature cards or deposit any funds into the accounts. He held onto the checks. And two months later, he wrote out two of the checks for $250,000 each.
- He then deposited the checks at Continental Bank in the escrow account of the firm of Hepburn, Willcox, Hamilton & Putnam, which was representing him in two bankruptcy cases.
- After that, he went to bankruptcy court March 11, 1992, and testified before Judge David A. Scholl that he had $500,000 in his lawyers' escrow account to cover mortgage payments that were overdue on apartment buildings and shopping centers in Northeast Philadelphia and Glenside.

In fact, the indictment says, there was no $500,000. It was entirely a sham.

That is one of the instances for which Cohen was charged with perjury.

Another was his claim, also under oath in bankruptcy court, that he had access to a $50 million trust fund that he could tap to pay bills of his bankrupt properties.

Cohen claimed that the trust fund had been created by his mother-in-law, a citizen of Mexico, in 1984.

In reality, the indictment says, there was a trust.

But it did not contain $50 million.

Rather, it contained $100.

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

# Probation Revoked

**Probation Revoked In Fraud Case Brad S. Cohen Is Charged With Conning A Venezuelan Businessman Out Of $261,000 While On Probation For Fraud.**

September 18, 1993 | By L. Stuart Ditzen, INQUIRER STAFF WRITER

A federal magistrate judge yesterday revoked the probation of alleged fraud artist Brad S. Cohen and jailed him on $2.5 million bail.

Cohen, 34, was to be placed in the Philadelphia Detention Center.

Cohen was arrested yesterday morning at his home in Bryn Mawr by the FBI and the U.S. Marshal's Service. Assistant U.S. Attorney Timothy Rice said Cohen had pulled an investment scam on a Venezuelan businessman while on probation for prior frauds.

U.S. Magistrate Judge James R. Melinson told the boyish looking Cohen, who has been accused of financial misdealings by partners and investors since the early 1980s, that he was "fortunate" the U.S. Attorney's Office only asked for $2.5 million in bail.

"What troubles me here is a pattern of dishonesty," said Melinson, looking over records in Cohen's case.

When taken into custody yesterday, Cohen was serving a five-year term on probation for defrauding investors of $326,000 in phony deals in the mid- 1980s. He pleaded guilty to federal fraud charges in 1990.

Tracy E. Mellor, Cohen's probation officer, said in a report made public yesterday that Cohen had defrauded yet another investor this year of $261,000 through a series of bogus business deals – one to purportedly sell diamonds in Hong Kong. Mellor asked that Cohen's probation be revoked.

Mellor's report said that Hector Carrasco, a Venezuelan citizen living in the United States, gave Cohen $486,000 between last November and June for investment in a Center City apartment building, the Hong Kong diamond venture and purchase of two shopping centers.

Cohen used Carrasco's money to pay his mortgage, his car lease and bills

from his psychologist, the report said, and Carrasco ended up losing $261,000.

In addition, the report cited a separate criminal case filed Monday by the Philadelphia district attorney's office against Cohen. In that one, he was accused of stealing more than $2 million from two Philadelphia businessmen, Joseph Selig and Allan Oliner, in phony real estate deals.

The district attorney's case also accuses Cohen of writing bad checks, including one for $25,000 to one of the city's best-known lawyers, Richard A. Sprague, a former homicide prosecutor.

"When you're on probation," Melinson told Cohen yesterday, "you're not supposed to get arrested. You're not supposed to get indicted. You're not supposed to get involved in something like that."

While the blue-eyed, curly-haired Cohen sat glumly, his lawyer, Jeremy Gelb, asked that he be given psychiatric treatment and placed on "suicide watch" while in custody.

Melinson directed that Cohen receive mental health counseling.

Cohen's past business ventures included two gold deals in which partners accused him of diverting millions to himself and a host of real estate deals that led to lawsuits and civil judgments against him.

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

# The Properties

### Leasing Practices

Cohen Asset Management controls a web of individual companies that own and lease properties.  Structuring the company into a complex web of affiliates and holding companies adds yet another layer of intricacy and protection for Cohen Asset Management and Bradley Cohen.

Beware of leasing from Cohen Asset Management or from any of its companies, who are known to sue tenants and former tenants based on unfounded accusations and greed. Under Bradley Cohen's stewardship, the company and its properties have been involved in numerous lawsuits. In a current Seattle lawsuit, the company is attempting to scam former tenants out of millions of dollars.  The company has taken several hundred thousand dollars from one former tenant in one lawsuit.  How many millions has it taken from its thousands of other tenants?

Investigation has revealed that a number of these properties are financially underwater. Bradley Cohen appears to be playing a shell game with tenants and investors to cover the losses on the properties.

The many companies controlled by Cohen Asset Management:

- Carmenita Corporate Plaza LLC
  13340 East 183rd Street, Cerritos, CA 90702 (Mid-Counties)

- 2383 Utah Industrial Capital LLC
  2383 Utah Avenue, El Segundo, CA 90245 (Los Angeles MSA)
- 2355 Utah Industrial Capital LLC
  2355 Utah Avenue, El Segundo, CA 90245 (Los Angeles MSA)
- Newark Industrial Capital LLC
  7000 Gateway Boulevard, Newark, CA 94560 (Silicon Valley)
- Pacoima Industrial Capital LLC
  10303 Norris Avenue, Pacoima, CA 91331 (Los Angeles MSA)
- Pacoima Industrial Capital LLC
  12154 Montague Street, Pacoima, CA 91331 (Los Angeles MSA)
- Greenwood Industrial Capital LLC
  700 Commerce Parkway West, Greenwood, IN 46143 (Indianapolis MSA)
- Parkwest Industrial Capital LLC
  1155 Worldwide Boulevard, Hebron, KY 41048 (Cincinnati MSA)
- Parkwest Industrial Capital II LLC
  1500 Worldwide Boulevard, Hebron, KY 41048 (Cincinnati MSA)
- King Manor Drive Industrial Capital LLC
  201 King Manor Drive, King of Prussia, PA 19406 (Philadelphia MSA)
- King Manor Drive Industrial Capital LLC
  221 King Manor Drive, King of Prussia, PA 19406 (Philadelphia MSA)
- 741 Third Avenue Industrial Capital LLC
  741 Third Avenue, King of Prussia, PA 19406 (Philadelphia MSA)
- 780 Third Avenue Industrial Capital LLC
  780 Third Avenue, King of Prussia, PA 19406 (Philadelphia MSA)
- 820 Third Avenue Industrial Capital LLC
  820 Third Avenue, King of Prussia, PA 19406 (Philadelphia MSA)
- 1510 Gehman Road Industrial Capital LLC
  1510 Gehman Road, Kulpsville, PA 19443 (Philadelphia MSA)
- 6670 Grant Way Industrial Capital LLC
  6670 Grant Way, Allentown, PA 18106 (Philadelphia MSA)
- 6690 Grant Way Industrial Capital LLC
  6690 Grant Way, Allentown, PA 18106 (Philadelphia MSA)
- 6810 Tilghman Industrial Capital LLC
  6810 Tilghman Street, Allentown, PA 18106 (Philadelphia MSA)
- 7020 Snowdrift Industrial Capital LLC
  7020 Snowdrift Road, Allentown, PA 18106 (Philadelphia MSA)
- 7055 Ambassador Industrial Capital LLC
  7055 Ambassador Drive, Allentown, PA 18106 (Philadelphia MSA)
- 121 Canyon Office, L.P.
  601, 651, 701, 751 Canyon Drive, Coppell, TX 75019 (Dallas MSA)

- Freeport Parkway Holdings, L.P.
  700 & 800 South Freeport Parkway, 801 Hammond Street Coppell, TX 75019
  (Dallas MSA)
- 651 East Corporate Drive Industrial Capital LLC
  651 East Corporate Drive, Lewisville, TX 75057 (Dallas MSA)
- Auburn Valley Industrial Capital LLC
  1307 West Valley Highway North, Auburn, WA 98001 (Seattle MSA)

# Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

While Cohen lives a life of glamour and luxury

# RICO Case

**918 F.2d 418: Philip Banks, Appellant, v. Donald Wolk, Brad Cohen, Larry Cohen, First Fidelityinsurance Corp., James Weiner, Esquire, Firstfidelity Financial Group**

UNITED STATES COURT OF APPEALS, THIRD CIRCUIT – 918 F 2D 418

Argued Sept. 18, 1990.Decided Nov. 9, 1990

Robert J. Sugarman (argued), Sugarman & Associates, Philadelphia, Pa., for appellant.

Michael P. Coughlin (argued), David N. Bressler, Lesser & Kaplin, Blue Bell, Pa., for appellee Donald Wolk.

Thomas Martin (argued), Philadelphia, Pa., for appellees Brad Cohen, Larry Cohen, First Fidelity Ins. Corp., James Weiner and First Fidelity Financial Group.

Before HIGGINBOTHAM, Chief Judge, SCIRICA and ALDISERT, Circuit Judges.

SCIRICA, Circuit Judge.

1. This case requires us once again to address the question of what constitutes a "pattern of racketeering activity" under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. Secs. 1961-1968 (1984 & Supp.1990)
2. Plaintiff Philip Banks filed an initial complaint against defendants Donald Wolk, Brad Cohen, Larry Cohen, James Weiner, First Fidelity Insurance Corporation ("FFIC"), and First Fidelity Financial Group ("FFFG"). The complaint contained both

RICO and pendent state law claims arising from an alleged real estate fraud. The district court dismissed this complaint under Fed.R.Civ.P. 12(b)(6) for failure to allege a sufficient "pattern" under RICO, and plaintiff sought leave to file an amended complaint containing new allegations. The district court denied this motion on the grounds that the amended complaint would still fail to state a RICO claim, and plaintiff now appeals from this denial. We will affirm the district court's dismissal of the RICO claims against defendants Donald Wolk, James Weiner, FFIC, and FFFG. However, we will reverse the order of the district court with instructions to allow certain claims against Brad Cohen and Larry Cohen to proceed

3. Denials of leave to amend a complaint under Fed.R.Civ.P. 15(a) are reviewed for abuse of discretion. Kiser v. General Elec. Corp., 831 F.2d 423, 426-27 (3d Cir.1987), cert. denied, 485 U.S. 906, 108 S.Ct. 1078, 99 L.Ed.2d 238 (1988). However, reversal is proper when the district court bases its denial on an erroneous rule of law. See, e.g., Centifanti v. Nix, 865 F.2d 1422, 1431 (3d Cir.1989). Here, the district court denied plaintiff's motion for leave to amend on the grounds that the amended complaint would fail to withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(6). Consequently, we must accept as true all factual allegations in the amended complaint and all reasonable inferences that can be drawn from them. The amended complaint must be construed in the light most favorable to the plaintiff, and can be dismissed only if the plaintiff has alleged no set of facts upon which relief could be granted. Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir.1988); Labov v. Lalley, 809 F.2d 220, 221-22 (3d Cir.1987). We note that in RICO actions, "in many cases plaintiffs will be able to withstand a facial attack on the complaint and have the opportunity to have their pattern allegations threshed out in discovery." Swistock v. Jones, 884 F.2d 755, 758 (3d Cir.1989).

4. The allegations in plaintiff's initial complaint pertained solely to a transaction involving the American Patriot Building in Philadelphia ("AP Building"). According to the complaint, Banks and Wolk had been partners in a partnership that owned the AP Building ("Partnership"). On July 28, 1987, the Partnership entered into an agreement to sell the AP Building to Brad Cohen, his brother Larry Cohen, and FFIC. Unknown to Banks, however, Wolk was also an undisclosed partner in the buying enterprise, and was to become a 50% owner of the building upon sale. The buyers delayed the transaction, which was never completed. After Wolk refused to enter into an agreement to pay Partnership debts, a creditor bank foreclosed upon the AP Building.

5. The gravamen of the complaint was that Wolk and the Cohens concealed Wolk's involvement with the buyers in an attempt to gain a favorable price for the AP Building. The complaint also alleged that James Weiner, the attorney for the buyers, participated in this fraud. The RICO claim was based on allegations that all defendants committed two or more unspecified acts of mail and wire fraud in carrying out the scheme. The district court dismissed the RICO count for failure to

allege a "pattern of racketeering activity," since the alleged fraudulent scheme "was a one-time happening without the threat of repetition." See H.J. Inc. v. Northwestern Bell Telephone Co., — U.S. —, 109 S.Ct. 2893, 2901-02, 106 L.Ed.2d 195 (1989) (RICO pattern requires that predicate acts pose threat of continuing criminal activity). Having dismissed the RICO claim, the court then declined to assume jurisdiction over the pendent state law claims.

6. Plaintiff sought leave to file an amended complaint containing six additional specific allegations against Brad and Larry Cohen, which are as follows. First, in 1982 Brad Cohen formed an entity called the Philadelphia Gold Corporation which later was used "to illegally obtain funds from investors via fraudulent sales orders." Amended Complaint at p 50. Second, in 1989 the Cohens signed an illusory sale agreement for the Rittenhouse Club in Philadelphia, for the purpose of lowering the property's value. Id. at p 53(a). Third, in 1987 they misappropriated $1.5 to 2 million in profits from "Securities Trading Commissions [sic]" and invested this money in real estate. Id. at p 53(b). Fourth, in 1986 they misused funds that had been entrusted to them by an investor. Id. at p 53(c). Fifth, in 1984 or 1985 they defrauded another investor of profits that were owed him. Id. at p 53(d). Sixth, sometime between 1986 and 1989 Brad Cohen "illegally financed another party as a strawman in a real estate transaction ... where he was specifically rejected as a potential partner." Id. at p 53 (e).

7. FFIC and FFFG are named as the RICO "enterprises." The amended complaint alleges that FFIC and FFFG were formed and operated with money derived from the Philadelphia Gold Corporation scheme, and were the vehicles through which the other frauds, with the exception of the last, were committed. Again, each defendant was alleged to have committed two or more unspecified acts of mail and wire fraud in carrying out these schemes. There are no allegations that Banks, Wolk, or Weiner were involved in any way in the additional frauds.

8. The district court held that the amended complaint still failed to allege a "pattern of racketeering activity," since the additional allegations were not sufficiently "related" to the AP Building scheme. See H.J. Inc., — U.S. at —, 109 S.Ct. at 2900-01 (RICO pattern requires relationship between predicate acts). The district court stressed that neither Banks nor Wolk were alleged to have participated in the additional schemes, and that "the transactions in themselves bear no relationship to the breach of fiduciary duty in the original complaint."

9. The RICO statute authorizes civil suits by "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. Sec. 1962]." 18 U.S.C. Sec. 1964(c) (1988). Section 1962(a) prohibits "any person who has received any income derived ... from a pattern of racketeering activity" from using that money to acquire, establish or operate any enterprise that affects interstate commerce. Section 1962 (b) prohibits any person from acquiring or maintaining an interest in, or controlling any such enterprise "through a pattern of racketeering activity." Section 1962(c) prohibits any person employed by or associated with an enterprise affecting

interstate commerce from "conduct[ing] or participat[ing] ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." Finally, section 1962 (d) prohibits any person from "conspir[ing] to violate any of the provisions of subsections (a), (b), or (c)." A "pattern of racketeering activity" requires commission of at least two predicate offenses on a specified list. 18 U.S.C.A. Secs. 1961(1), (5) (1984 & Supp.1990).

10. We note that no defendant can be liable under RICO unless he participated in two or more predicate offenses sufficient to constitute a pattern. This participation need not be direct. RICO recognizes liability for those who merely aid and abet the underlying predicate offenses. Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1356-58 (3d Cir.1987). Moreover, a defendant can be liable under RICO's conspiracy provision for agreeing to the commission of a pattern of racketeering activity, even if that defendant does not directly participate in the underlying acts. United States v. Adams, 759 F.2d 1099, 1116 (3d Cir.), cert. denied, 474 U.S. 906, 971, 106 S.Ct. 275, 336, 88 L.Ed.2d 236, 321 (1985); see also Shearin v. E.F. Hutton Group, Inc.,885 F.2d 1162, 1166-67 (3d Cir.1989) (RICO conspiracy requires "agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity.").

11. In this case, defendants Wolk and Weiner are alleged only to have participated in the AP Building fraud, and there is no indication that either was involved, directly or indirectly, in any of the additional schemes. Consequently, we must consider only the AP Building scheme allegations in determining whether a sufficient "pattern" has been alleged against either Wolk or Weiner. Even if the AP Building scheme were part of a pattern of acts committed by the Cohens, the additional schemes cannot affect the liability of Wolk or Weiner, since they neither participated in those frauds nor agreed to their commission. Because the further allegations involve the Cohens, we will consider separately whether a sufficient pattern has been alleged against them.

12. Although no party has raised the issue, we note also that FFIC and FFFG are named both as RICO "enterprises" and as defendants. Such a dual role is permissible in actions based on 18 U.S.C. Sec. 1962(a), Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1360-61 (3d Cir.1987), but not in those based on section 1962(c), B.F. Hirsch v. Enright Ref. Co., 751 F.2d 628, 633 -34 (3d Cir.1984). Banks appears to allege violations of sections 1962(a), (b), and (c). However, he does not allege that he was injured specifically by the use or investment of income in any enterprise, as is required under section 1962(a). See Rose v. Bartle, 871 F.2d 331, 357-58 (3d Cir.1989). In addition, the amended complaint does not allege a specific nexus between control of any enterprise and the alleged racketeering activity, as is required under section 1962(b). See Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1168 n. 2 (3d Cir.1989). Consequently, section 1962(c) is the only available basis for liability. Because FFIC and FFFG are

named as the enterprises upon which this liability is based, they must be dismissed as RICO defendants.

13. In H.J. Inc. v. Northwestern Bell Telephone Co., — U.S. —, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court addressed the standards governing RICO's pattern requirement. The Court stressed that a pattern requires more than the commission of two or more predicate acts. A plaintiff must show also "that the racketeering acts are related, and that they amount to or pose a threat of continued criminal activity." Id. at —, 109 S.Ct. at 2900 (emphasis in original). These are two separate requirements, "though in practice their proof will often overlap." Id.

14. The test for "relatedness" is broad. Borrowing language from another statute, H.J. Inc. states that criminal acts are sufficiently related if they " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " Id. at —, 109 S.Ct. at 2901 (quoting Dangerous Special Offender Sentencing Act, 18 U.S.C. Sec. 3575(e) (1982), repealed by Sentencing Reform Act of 1984, Pub.L. No. 98-473, tit. II, Sec. 212(a)(2), 98 Stat.1987); see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). This statement remains our only guidance in this area.

15. As for the "continuity" requirement, the Court rejected the notion that RICO requires proof that a defendant engaged in multiple criminal "schemes." H.J. Inc., — U.S. at —, 109 S.Ct. at 2901. Predicate offenses committed in furtherance of a single criminal scheme can constitute a RICO pattern if the acts present the threat of future criminal activity. The criminal conduct need not be ongoing. Past conduct will satisfy the continuity requirement if "by its nature [it] projects into the future with a threat of repetition." Id. at —, 109 S.Ct. at 2902 (citing Barticheck v. Fidelity Union Bank/First Nat'l State, 832 F.2d 36, 39 (3d Cir.1987)).

16. The Court stressed that the question of continuity depends on the facts of each case, but noted that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." Id. Although continuity is "centrally a temporal concept," id., this court has questioned whether the length of time over which the criminal activity occurs or threatens to occur should be the decisive factor without reference to the "societal threat" posed by the activity. Marshall-Silver Constr. Co. v. Mendel, 894 F.2d 593, 597 (3d Cir.1990).

17. As we have noted, the amended complaint does not allege that defendants Wolk and Weiner participated in any fraud other than the AP Building scheme. We must examine whether the actions of these defendants meet the separate requirements of relatedness and continuity. Since this alleged scheme involved a single real estate transaction, the relatedness requirement is satisfied. The unspecified predicate acts of mail and wire fraud' are all related to the common goal of obtaining a lower price for the building. Thus, the critical question is whether the

acts "pose a threat of continued criminal activity." We agree with the district court that they do not.

18. The AP Building scheme was an attempt to defraud a single investor of his interest in a single piece of real estate over a relatively short period of time. The essence of the charge is that the defendants failed to disclose Wolk's relationship with the buyers and then somehow used his inside position to drive the Partnership into bankruptcy. It is not clear when the defendants actually formulated their scheme, but the injury to Banks occurred during the eight month period between July 28, 1987, when the sale agreement was signed, and shortly after March 21, 1988, when the creditor bank foreclosed upon the building.

19. In H.J. Inc., by contrast, the Court stressed that the racketeering predicates "occurred with some frequency over at least a 6-year period." — U.S. at —, 109 S.Ct. at 2906. That case involved allegations of long-term bribery of regulators by a telephone company. Unlike H.J. Inc., there is no indication that fraud such as the AP Building scheme is "a regular way of doing business" for Wolk or Weiner. See id. at —, —, 109 S.Ct. at 2902, 2906. Nor is there any suggestion that Wolk or Weiner would have continued to defraud Banks in any way. Cf. id. at —, 109 S.Ct. at 2902 (promise to extort money regularly as part of ongoing "insurance" racket would establish threat of continuity despite small number of predicate acts).

20. Rather, the AP Building scheme more closely resembles that involved in Marshall-Silver Construction Co. v. Mendel, 894 F.2d 593 (3d Cir.1990), in which the defendants were alleged to have destroyed a business by filing a false bankruptcy petition. In that case, we stressed that "the alleged illegal activity posed no threat of additional repeated criminal conduct over a significant period." Id. at 597 (emphasis in original). Similarly, the alleged actions of Wolk and Weiner were directed solely at defrauding Banks of his interest in the AP building, and do not amount to or threaten long-term criminal activity. This case is unlike Swistock v. Jones, 884 F.2d 755 (3d Cir.1989). Although that case centered around a single episode of real estate fraud lasting approximately one year, there were allegations of further misrepresentations by the defendants in regard to other potential transactions with the plaintiffs. Id. at 759. In this case, there is no such indication of possible future misconduct by Wolk or Weiner.

21. We note that H.J. Inc. has not rendered obsolete our prior multi-factor pattern inquiry which focused on "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." Barticheck v. Fidelity Union Bank/First Nat'l State, 832 F.2d 36, 39 (3d Cir.1987). See Marshall-Silver, 894 F.2d at 596 (Barticheck approach entirely consistent with H.J. Inc.). After H.J. Inc., we must focus on these factors as they bear upon the separate questions of continuity and relatedness. Thus, the fact that Wolk and Weiner are alleged to have harmed only one victim in a single scheme is not necessarily dispositive. See Swistock, 884 F.2d at 758. But there is no factor in this case

indicating that the actions of Wolk and Weiner threaten future harm to anyone. The AP Building scheme, considered alone, amounts to nothing more than an isolated incident of "garden variety" real estate fraud.

22. As we have noted, the additional allegations against Brad and Larry Cohen place these defendants in a different situation from Wolk and Weiner. The amended complaint describes fraudulent behavior by the Cohens extending well beyond the AP Building scheme. Construing these allegations in the light most favorable to the plaintiff, we believe the amended complaint sufficiently alleges that the Cohens have engaged in a pattern of racketeering activity.

23. At the outset, we note that two of the six additional specific allegations against the Cohens cannot be considered part of a pattern comprising the AP Building scheme. The amended complaint lists FFIC and FFFG as the RICO "enterprises" upon which liability is based. Under 18 U.S.C. Sec. 1962(c), all predicate acts in a pattern must somehow be related to the enterprise. This nexus requirement is satisfied when " '[o]ne is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise; or the predicate offenses are related to the activities of that enterprise.' " United States v. Provenzano, 688 F.2d 194, 200 (3d Cir.), cert. denied, 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982) (quoting United States v. Scotto, 641 F.2d 47, 54 (2d Cir.1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981)).

24. However, the amended complaint alleges no connection between either enterprise and the charge that Brad Cohen "illegally financed a strawman." Amended Complaint at p 53(e). In addition, the allegation involving the Philadelphia Gold Corporation states only that Brad Cohen invested the profits from that fraud in FFIC and FFFG, in violation of 18 U.S.C. Secs. 1962(a) and (b). Id. at p 51. No other relationship between this scheme and the named enterprises is alleged. Thus, neither of these schemes can form part of a pattern of acts underlying the Sec. 1962(c) violation.

25. The amended complaint does allege that FFIC and FFFG were employed in carrying out the other five schemes. We note that the sufficiency of the pattern may require reassessment should that nexus later prove inadequate. At this stage, however, we find the remaining allegations against the Cohens sufficient to constitute a pattern of racketeering activity under Sec. 1962(c). The element of continuity clearly has been established. In addition to the AP Building scheme, the amended complaint charges the Cohens with using FFIC and FFFG in the commission of four other frauds between 1984 and 1989. Accepting these allegations as true, they indicate that fraudulent behavior is a "regular way of doing business" for the Cohens. See H.J. Inc., — U.S. at —, 109 S.Ct. at 2902. As a consequence, a threat of continuing criminal behavior is present.

26. The main question, therefore, is whether the additional allegations are sufficiently "related" to the AP Building scheme. We believe that they are. As noted above, we

must determine whether the Cohens' alleged criminal acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. at —, 109 S.Ct. at 2901. The Supreme Court recognized that this test is broad, stating that "[w]e have no reason to suppose that Congress had in mind ... any more constrained a notion of the relationships between predicates that would suffice." Id.

27. This test admittedly is difficult to apply. See id. at —, 109 S.Ct. at 2907 (Scalia, J., concurring). In this case, the district court emphasized that neither Banks nor Wolk was involved in any of the additional schemes. However, the fact that Banks was not a victim of the additional frauds should not carry much weight. The reference to "similar victims" in H.J. Inc. cannot be read to require that a plaintiff be injured by more than one predicate act. See, e.g., Town of Kearny v. Hudson Meadows Urban Renewal Corp., 829 F.2d 1263, 1268 (3d Cir.1987) ("Reading into the statute a requirement that a civil plaintiff prove injury from the entire pattern rather than from any predicate act would ... be inconsistent with the core congressional purposes behind its enactment."). The alleged victims in this case were "similar" in the sense that they all were engaged in business dealings with the Cohens through FFIC and FFFG. Likewise, the reference to "similar participants" does not require that Wolk have participated in the Cohens' other schemes. Once the requisite connection with the RICO enterprise is shown, the fact that a defendant employed different associates for different predicate acts should not be of overriding significance.

28. Rather, we focus on the nature of the alleged criminal activity. Cf. Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1168 (3d Cir.1989) (focusing on fact that "the distinctive character of the unlawful activity set out was securities fraud."). The various alleged schemes employed different techniques, but taken together they indicate the Cohens were at least partially in the business of defrauding those who dealt with FFIC and FFFG. There are more specific similarities as well. The Rittenhouse Club and the AP Building schemes both were attempts to drive down the price of real estate. In addition, the AP Building scheme and the allegations of misuse of investment funds all involved breaches of fiduciary duty. We believe the amended complaint adequately alleges criminal episodes that are not "isolated events."

29. The relatedness requirement has received less judicial attention than the continuity requirement, perhaps because most disputed RICO allegations have involved single schemes. See, e.g., Medallion Television Enters. v. SelecTV of California, Inc., 833 F.2d 1360, 1363 (9th Cir.1987) (relatedness seldom at issue), cert. denied, —U.S. —, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989). However, when a plaintiff alleges predicate offenses in furtherance of multiple schemes, we should avoid interpreting the relatedness requirement too narrowly. A single scheme with a limited number of victims often will not project the necessary threat of continuing

criminal activity. Thus, if too close a relationship among multiple schemes is required, cases within RICO's intended ambit may be improperly dismissed. In organized crime cases, where the RICO enterprise exists solely for criminal purposes, the necessary nexus between the predicate acts and the enterprise will often be enough to satisfy the relatedness requirement. Cf. United States v. Indelicato, 865 F 2d 1370, 1383 (2d Cir.) ("In some cases both ... relatedness and continuity ... may be proven through the nature of the RICO enterprise."), cert. denied, — U.S. —-, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). In cases such as this, which allege multiple fraudulent schemes conducted through an otherwise legitimate entity, the relatedness requirement should not insulate defendants who merely vary the methods by which they defraud their victims.

30. Because the amended complaint does not indicate that defendants Wolk or Weiner have engaged in conduct that poses the threat of continued criminal activity, we will affirm the dismissal of the RICO claims against them. We also will affirm the dismissal of the RICO claims against defendants FFIC and FFFG. However, because the amended complaint adequately alleges that Brad Cohen and Larry Cohen have engaged in a "pattern of racketeering activity," we will reverse the order of the district court and remand with instructions to allow the Sec. 1962(c) and state law claims to proceed against these defendants. Since the state law claims against the Cohens remain, we leave it to the district court to reconsider whether it desires to dismiss the pendent state law claims against the other defendants.[3] We stress that our decision is based solely upon the adequacy of the pleadings. It may be that specific issues will be susceptible to resolution by summary judgment. See Swistock v. Jones, 884 F 2d 755, 758 (3d Cir.1989).

31. Each side to bear its own costs.

**Footnotes**

1. Although it was not addressed in the district court or on appeal, we raise the question whether the allegations of mail and wire fraud in the amended complaint are sufficient to satisfy the requirement of Fed.R.Civ.P. 9(b) that fraud be pleaded with particularity. See Saporito v. Combustion Eng'g Inc., 843 F 2d 666, 673-76 (3d Cir.1988), vacated on other grounds, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989) (blanket allegation of mail and wire fraud in RICO case, without indicating who made or received fraudulent representation, is insufficient under Rule 9(b)); see also Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F 2d 786, 791 (3d Cir.1984), cert. denied, 469 U.S. 12^1, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985) (allegations must be such as "to place the defendants on notice of the precise misconduct with which they are charged"). The amended complaint gives a general description of the various fraudulent schemes, but contains only a blanket statement that all defendants committed two or more acts of mail and wire fraud "in connection with their real estate scheme." Amended Complaint at pp 57,

58. The complaint does not specify any correspondence or conversation alleged to constitute mail or wire fraud. We express no opinion of the merits of this issue

2.  We assume without deciding that the allegations against the Cohens state substantive claims of mail or wire fraud, because the issue was not addressed in the district court or on appeal. Should the district court later decide that the AP Building scheme allegations do not state such a claim against the Cohens, then Banks will lack standing to pursue a RICO action against them. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) ("[T]he plaintiff only has standing if ... he has been injured in his business or property by the conduct constituting the violation."). Moreover, the sufficiency of the pattern may require reassessment if the district court determines that any of the additional allegations do not amount to mail or wire fraud as a matter of law

3.  We note that our affirmance of the district court's order dismissing the RICO charges against Wolk, Weiner, FFIC, and FFFG does not preclude Banks from bringing a common law fraud action, in an appropriate forum, against his partner Wolk or other parties