Marc J. Randazza, Esq., NV Bar #12265
Ronald D. Green, Esq., NV Bar #7360
J. Malcolm DeVoy, Esq., NV Bar #11950
Randazza Legal Group
3625 South Town Center Drive, Suite 150
Las Vegas, NV 89135
702-420-2001
702-420-2003 fax
ecf@randazza.com

Dean G. von Kallenbach, Esq., *pro hac vice*
Young deNormandie, P.C.
1191 Second Avenue, Suite 1901
Seattle, WA 98101
206-805-2720
206-623-6923 fax
dgvk@ydnlaw.com

Allen Lichtenstein, Esq., NV Bar #3992
3315 Russell Road, No. 222
Las Vegas, NV 89120
Telephone: (702) 433-2666
allaw@lvcoxmail.com

John P. Aldrich, Esq. NV Bar #6877
ALDRICH LAW FIRM, LTD.
1601 S. Rainbow Blvd., Suite 160
Las Vegas, NV 89146
Telephone: (702) 853-5490
jaldrich@johnaldrichlawfirm.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA – LAS VEGAS

BRADLEY STEPHEN COHEN, an individual; and COHEN ASSET MANAGEMENT, INC., a California corporation,

Plaintiffs,

vs.

ROSS B. HANSEN; NORTHWEST TERRITORIAL MINT, LLC, a Washington limited liability company; and STEVEN EARL FIREBAUGH,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:12-cv-01401-JCM-PAL

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Ross B. Hansen, Northwest Territorial Mint, LLC, and Steven Earl Firebaugh, through counsel, hereby move for summary judgment as follows. Defendants' motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure and based on the following memorandum of law, the attached depositions, declarations and exhibits, the documents on file with the Court in this matter, and any oral argument the Court may allow.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Table of Contents

I.  Introduction ........................................................................................................ 1

II.  Statement of Facts ............................................................................................. 1

    A.  The Parties ................................................................................................. 1

        1.  Defendants ...................................................................................... 1

        2.  Plaintiffs ......................................................................................... 2

    B.  The Auburn Valley Industrial Capital LLC v. Northwest Territorial
Mint Litigation ................................................................................................ 2

    C.  Defendants' Use of the Websites ............................................................... 3

    D.  Damages ..................................................................................................... 3

III.  Legal Standard ................................................................................................. 4

IV.  Argument ......................................................................................................... 5

    A.  California Law, Rather than Nevada Law, Governs Plaintiffs' Claims.................... 5

    B.  Plaintiffs Have Not Established Any Actual Damages, Thus Judgment
Is Proper For Defendants on All Claims Requiring Them. .................................. 6

    C.  Plaintiffs Cannot Hold Defendants Liable for Defamation ............................ 7

        1.  Plaintiffs are Limited Purpose Public Figures, and Cannot Meet
the Standard of Showing Defendants Acted with Actual Malice ...................... 8

            i.  Nevada Law ...................................................................... 8

            ii.  California Law .................................................................. 9

                a.  A Public Controversy Exists Over Private
Investment Funds ................................................................. 9

                b.  Plaintiffs Have Participated Within the Public
Controversy ......................................................................... 9

                c.  Defendants' Statements are Matters of Opinion and
Therefore not Defamatory………………………………..……10

        2.  Viewed Within Their Proper Context, Defendants' Websites Would Be
Interpreted as Non-Defamatory
Opinion………………………………………………………………11

            i.  Comparisons to Bernard Madoff Are Not Automatically
Defamatory and Constitute Statements of Opinion ...................... 12

                a.  Statements Describing Cohen and CAM are
Statements of Opinion ......................................................... 13

ii

b.    Statements About Cohen and CAM's Actions Are Also Expressions of Subjective Opinion ............................... 14

c.    Third Parties Who Viewed the Allegedly Defamatory Statements Did Not Believe They Were Factual .......................................................................... 15

ii.    Defendants' Statements Constitute, In Part, Rhetorical Hyperbole That a Reasonable Person Would not Find to be a Statement of Fact……. ............................................. 16

3.    Defendants' Statements are At Least Substantially True     and Not Defamatory .................................................................................... 18

i.    CAM Cannot Show Statements About Its Financial Condition Are False and Defamatory ........................................... 19

a.    Investors In the CAM Core+ Fund 1 Have Incurred Tens of Millions of Dollars in Paper Losses Over the Fund's Life .............................................. 19

b.    CAM Is Unable to Refute The Websites' Other Charts and Representations of Its Losses ........................ 20

ii.    By Any Measure, Bradley Cohen Lives a Life of Luxury……. ................................................................................. 21

iii..    Many of the Comparisons Between Cohen / CAM and Madoff are Factually Accurate ...................................... 22

iv.    Defendants' Statements About CAM's Business Practices Are Also True or Substantially True ......................... 23

a.    The Web of Companies .................................................. 23

b.    CAM Employees' Knowledge of CAM Operations and Cohen's Finances ................................. 24

c.    CAM's Occupancy Rate and Operating Expenses ........................................................................ 24

d.    CAM's Litigious Nature ................................................. 25

4.    Defendants' Statements Concerning the Criminal History of Bradley S. Cohen Are a Privileged, Fair Report of Judicial Proceedings ...................... 26

5.    If Nevada Law Did Apply, CAM's Defamation Claim Would be Mispled, and Judgment Proper for Defendants ................................................. 27

6.    Plaintiffs Have No Evidence of Reputational Harm, and the Presumption of Harm May Therefore Be Rebutted ........................................ 28

D.    The First Amendment Protections Afforded to Defendants' Speech In the Defamation Context Apply to All of Plaintiffs' Claims ............................................. 29

E.    Defendants Are Not Liable for Invasion of Privacy – False Light .......................... 30

F.   Cohen Cannot Prevail at Trial on His Claim for Intentional Infliction of Emotional Distress ................................................................................ 32

    1.   Defendants' Underlying Conduct Was Not Extreme or Outrageous ........... 32

    2.   Cohen Has Not Sufficiently Demonstrated Emotional Harm Arising from the Defendants' Conduct ........................................ 33

G.   Plaintiffs Cannot Prevail on their Claim for Intentional Interference with Future Expected Business ........................................................... 35

    1.   Defendants Did Not Know of Any Specific Relationships Between Plaintiffs and Potential Investors to Disrupt ........................ 36

    2.   Plaintiffs' Claim is Based on Defendants' Expressive Activity, Which is Subject to the First Amendment's Protections ...................... 36

    3.   Plaintiffs Have Not Identified Business Expectancies That Defendants Disrupted ....................................................... 37

    4.   Plaintiffs' Damages for Intentional Interference are Speculative ............... 37

H.   Injunctive Relief Is A Remedy, Rather Than a Claim; Summary Judgment for Defendants Is Appropriate as to Injunctive Relief as a Cause of Action. ....................................................................................... 38

V.   Conclusion .......................................................................................... 39

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

Table of Authorities

**Cases**

*Adelson v. Smith (In re Smith)*, 397 B.R. 124 (D. Nev. Bankr. 2008)............................................18

*Aetna Cas. & Sur. Co. v. Centennial Ins. Co.*, 838 F.2d 346 (9th Cir. 1988) ............................27

*Agostini v. Strycula*, 231 Cal.App.2d 804, 42 Cal. Rptr. 314 (1965) ........................................32

*Alam v. Reno Hilton Corp.*, 819 F.Supp. 905 (D. Nev. 1993)....................................................33

*Alcorn v. Anbro Eng'g, Inc.,* 2 Cal.3d 493, 468 P.2d 216, 86 Cal. Rptr. 88 n.5 (1970)...............32

*Ampex Corp. v. Cargle*, 27 Cal. Rptr. 863 (Cal. Ct. App. 2005)...........................................8, 9, 10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................4, 5

*Art Movers, Inc. v. Ni West*, 3 Cal. App. 4th 640 (Cal. Ct. App. 1992) .......................................38

*Art of Living Found. v. Does 1-10*, Case No. 10-cv-5022 *2011 WL 2442441898*
    (N.D. Cal. June 15, 2011) ................................................................................12, 13, 14

*Banks v. Wolk* case, 918 F.2d 418 (3d Cir. 1990).................................................................26, 27

*Betsinger v. D.R. Horton, Inc.*, 232 P.3d 433 Nev. Adv. Rep. 17 (2010) ....................................33

*Biro v. Condé Nast*, 883 F. Supp. 2d 441 (S.D.N.Y. 2012).........................................................16

*Blatty v. N.Y. Times Co.*, 728 P.2d 1177 (Cal. 1986) ...............................................................30

*Braunling v. Countrywide Home Loans, Inc.,* 220 F.3d 1154 (9th Cir .2000) ......................32, 33

*Brittingham v. Ayala*, 995 S.W.2d 199 (Tex. Ct. App. 1999) .....................................................38

*Cambridge Filter Corp. v. Int'l Filter Co.*, 548 F. Supp. 1301 (D. Nev. 1982).........................36

*Candelore v. Clark County Sanitation Dist.*, 752 F. Supp. 956 (D. Nev. 1990) ........................33

*Capital Mgmt., LLC v. Lerner Master Fund, LLC*, Case No. 5502-CS *2011 Del. Ch.
    LEXIS 116 2011 WL 3505355* (Del. Chan. Ct. May 25, 2011) ........................................13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................4

*Clark County Sch. Dist. v. Virtual Educ. Software, Inc.*,125 Nev. 374, 213 P.3d 496
    (2009).........................................................................................................27, 28

*Coleman v. Republic Indemnity Ins. Co.*, 132 Cal. App. 4th 403, 33 Cal. Rptr. 3d
    744 (Cal. Ct. App. 2005) .......................................................................................32

*Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967)..................................................................8

*Custom Teleconnect, Inc. v. Int'l Tele-Services, Inc.*, 254 F. Supp. 2d 117 (D. Nev.

2003) ................................................................................................36

*D.A.R.E. America v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, (C.D. Cal. 2000) ...........................................................................................18

*Davis v. Ross*, 107 F.R.D. 326 (S.D.N.Y. 1985) .......................................29

*Denney v. Lawrence*, 22 Cal. App. 4th 927 (Cal. Ct. App. 1994) ................9

*Dictor v. Creative Mgmt. Servs., LLC*, 223 P.3d 332 (Nev. 2010)..............5

*Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749 (1985) ..............28

*Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188 (9th Cir. 1989).........11

*Fellows v. Nat'l Enquirer*, 42 Cal. 3d 234 (Cal. 1986) ..................7, 30, 31

*Fisher v. Prof'l Compounding Ctrs. of Am., Inc.*, 311 F. Supp. 2d 1008, (D. Nev. 2004) .........................................................................................5

*Flowers v. Carville*, 310 F.3d 1118 (9th Cir. 2002) ........................30, 31

*Gardner v. Martino*, 563 F.3d 981 (9th Cir. 2009)...............11, 12, 14, 15

*Gertz v. Robert Welch, Inc.* 418 U.S. 323 (1974)....................7, 8, 10, 26

*Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir 1999) ............13, 16

*Girard v. Ball*, 125 Cal. App. 3d 772 (Cal. App. 1981) ............................34

*Gold v. Harrison*, 962 P.2d 353 (Haw. 1998) ........................................16

*Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6 (1970) .................15, 16

*Hambro v. Shell Oil Co.*, 674 F. 2d 784 (9th Cir. 1982) ..........................36

*Hawran v. Hixson*, 209 Cal. App. 4th 256 (Cal. Ct. App. 2012)..............30

*Hughes v. Pair*, 209 P.3d 963 (Cal. 2009) .............................................34

*Integrated Healthcare Holdings, Inc. v. Fitzgibbons*, 140 Cal. App. 4th 515 (Cal. Ct. App. 2006) ...........................................................................................9

*KEMA, Inc. v. Koperwhats*, 658 F. Supp. 2d 1022 (N.D. Cal. 2009)..........38

*Kennedy v. Carriage Cemetery Services*, 727 F.Supp.2d 925 (D. Nev. 2010)………………………………………………………………..32, 33

*Kinsey v. Macur*, 107 Cal. App. 3d 265 (Cal. Ct. App. 1980)…………….30, 31

*Klaxon v. Stentor Elect. Mfg., Inc.*, 313 U.S. 487 (1941) ........................5

*K-Mart Corp. v. Washington*, 109 Nev. 1180, 866 P.2d 274 (1993).............7

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005)....................................14

*Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235 (9th Cir. 2013)........................................34

*Leavitt v. Leisure Sports, Inc.*, 103 Nev. 81, 734 P.2d 1221 (1987)...........................................7, 35

*Lexalt v. McClatchy*, 116 F.R.D. 438 (D. Nev. 1987) .........................................................6

*Lopez v. UPS, 2009 U.S. Dist. LEXIS 47520* (D. Nev. 2009) .........................................33

*Maduike v. Agency Rent-A-Car*, 114 Nev. 1, 953 P.2d 24 (1998)...........................................33

*Makaeff v. Trump Univ., LLC*, 2010 WL 3341638 (S.D. Cal. Aug. 23, 2010) .........................9

*Masson v. New Yorker Magazine*, 501 U.S. 496 (1991)........................................................18

*McKinzy v. AMTRAK*, 836 F.Supp.2d 1014 (N.D. Cal. 2010) .....................................................32

*Medifast, Inc. v. Minkow*, Case No. 10-cv-382 *2011 U.S. Dist. LEXIS 33412 2011
    WL 1157625* (S.D. Cal. Mar. 29, 2011)........................................................13

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1991).........................................................12

*Miller v. Jones*, 114 Nev. 1291, 970 P.2d 571 (Nev. 1998) .................................................33

Mosesian v. McClatchy Newspapers, 233 Cal.App.3d 1685 (Cal. Ct. App. 1991) ...................10

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)........................................................8, 30

*Nev. Ind. Broadcasting Corp. v. Allen*, 99 Nev. 404, 664 P.2d 337 (1983) .................8, 10, 11

*Nicosia v. De Rooy*, 72 F. Supp. 2d 1093 (N.D. Cal. 1999) ...........................................15, 17

*Obsidian Fin. Group, LLC v. Cox*, 812 F. Supp. 2d 1220
    (D. Ore. 2011)....................................................12, 13, 14, 16, 17

*Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995)...................................................17

*Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 57 P.3d 82
    (2002)....................................................7, 8, 10, 11, 14, 18

*People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd.*, 111 Nev. 615,
    895 P.2d 1269 n.4 (Nev. 1995)........................................................30, 31

*Perati v. Atkinson*, 213 Cal.App.2d 472, 28 Cal. Rptr. 898 (1963)...........................................32

*Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724 (1st Cir. 1992) ...............................17

*Point Ruston, LLC v. Pac. N.W. Reg'l Council of the United Bhd of Carpenters &
    Joiners of Am.*, Case No. C-09-5232 *2010 WL 3732984* (W.D. Wash. Sept.
    13, 2010)........................................................17

*Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717 (7th Cir. 2004)...............................28

*Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449 (9th Cir. 1983) ...............36, 37

*Sahara Gaming v. Culinary Workers*, 115 Nev. 212, 984 P.2d 164 (1999)...................................26

*Sandals Resorts Int'l, Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, (N.Y. App. Div. 2011) ................................................................................................................12, 15

*Sanders v. Hearst Corp.*, 27 Media L. Rep. 1733 (N.D. Cal. 1999) ........................27

*Sanders v. Walsh*, 219 Cal.App.4th 855 (Cal. Ct. App. 2013) ................................7

*Schneider v. TRW, Inc.*, 938 F.2d 986 (9th Cir. 1991) ........................................32

*Selleck v. Globe Int'l*, 166 Cal. App. 3d 1123 (Cal. Ct. App. 1985) ....................30

*Simpson v. Mars, Inc.*, 113 Nev. 188, 929 P.2d 966, 970 (1997) ........................11

*Standing Committee v. Yagman*, 55 F.3d 1430 (9th Cir 1995) ............................16

*Stevenson Real Estate Servs., Inc. v. CB Richard Ellis Real Estate Servs., Inc.*, 138 Cal. App. 4th 1215 (Cal. App. 2d Dist. 2006) ..................................................36

*Sunridge Builders, Inc. v. Old Blue, LLC*, Case No. 56335 *2013 WL 485831* (D. Nev. Feb. 6, 2013) ............................................................................................38

*Talbot v. Mack*, 41 Nev. 245, 169 P.2d 25 (1917) ................................................7

*Tasso v. Platinum Guild Int'l*, No. 94 Civ. 8288, *1998 U.S. Dist. LEXIS 18908* (S.D.N.Y. Dec. 3, 1998) ....................................................................................15

*Thornhill Publishing Co., Inc. v. GTE Corp.*, 594 F.2d 730 (9th Cir. 1979) ..................4

*Troy Group, Inc. v. Tilson*, 364 F. Supp. 2d 1149 (C.D. Cal. 2005) ....................17

*Truck Ins. Exchange v. Tetzlaff*, 683 F. Supp. 223 (D. Nev. 1988) ......................6

*Underwager v. Channel 9 Austl.*, 69 F.3d 361 (9th Cir. 1995) ............................11

*Urbina v. Homeview Lending, Inc.*, 681 F. Supp. 2d 1254 (D. Nev. 2009) ............32

*Wait v. Beck's N. Am., Inc.*, 41 F. Supp. 2d 172 (N.D.N.Y. 2003) ......................15

*Walker v. Boeing Corp.*, 218 F.Supp.2d 117 (C.D. Cal. 2002) ............................32

*Washington Post Co. v. Keogh*, 365 F.2d 965  (D.C. Cir. 1966) ..........................5

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, (Cal. Ct. App. 1996) ................................................................................................7, 35, 38

*Wichinsky v. Mosa*, 109 Nev. 84, 847 P.2d 727 (1993) ....................................7, 35

*Williams v. Univ. Med. Ctr. of S. Nev.*, 688 F. Supp. 2d 1134 (D. Nev. 2010) ..........36, 37

*Wynn v. Smith*, 117 Nev. 6, 16 P.3d 424 (2001) ..............................................26

*Youst v. Lango*, 43 Cal. 3d 64 (Cal. 1987) ......................................................37

*Zepeda v. OneWest Bank FSB*, Case No. 5:CV 11-00777 *2011 WL 6182951* (N.D. Cal. Dec. 13, 2011) ........................................................................................38

1

2 **Statutes**

3 Cal. Civ. Code § 45.................................................................................................30

4 California Civil Code § 47........................................................................................26

5 **Rules**

6 Rule 56 of the Federal Rules of Civil Procedure ....................................................1, 4

7 **Treatises**

8 Restatement (Second) of Conflict of Laws § 150.....................................................5, 6

9 Restatement (Second) of Torts § 912 (1979)............................................................38

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### MEMORANDUM OF POINTS AND AUTHORITIES

I.      **Introduction**

This lawsuit is about the fundamental right to free speech, and one individual's desire to stifle those rights due to his personal dissatisfaction with the Defendants' message.  Plaintiffs Bradley S. Cohen ("Cohen") and his company, Cohen Asset Management, Inc. ("CAM"), (collectively "Plaintiffs") brought a complaint for defamation and other claims based on statements found on an anonymous website created primarily by Defendant Ross Hansen criticizing Cohen and CAM.  All Defendants have done is exercise their constitutional rights to relay unpleasant experiences with Plaintiffs, and share their concerns regarding Plaintiffs' business practices with the public.  In response, Plaintiffs filed this action, suing Defendants for the entire contents of the websites.  Plaintiffs predicate this litigation on the presumption of reputational damages that, after discovery, cannot be credibly proven or found.  Defendants seek to resolve the pending claims against them with judgment in their favor.

II.     **Statement of Facts**

    A.      **The Parties**

        1.      **Defendants**

Defendant Northwest Territorial Mint ("NWTM"), a Washington-based company, is the largest private mint operation in the United States with more than 300 full-time employees.  It primarily manufactures items made from precious metals and services institutions, corporations, and individuals in the United States and around the world, including the United States military and various United States government agencies. Defendant Ross Hansen is the owner and chief executive officer of Northwest Territorial Mint.  Defendant Steven Firebaugh is a web designer and web manager employed by Northwest Territorial Mint.[1]

---

[1] Collectively, these three individual defendants are referred to as the "Defendants."

### 2. **Plaintiffs**

Plaintiff Bradley Cohen is a well-known real estate investor based in Los Angeles. (ECF 40 at 5 ¶ 13).[2]  Cohen is the president and chief executive officer of Cohen Asset Management, Incorporated ("CAM"), a California-based company.  CAM is an operator of real estate, which acquires property on behalf of investors, runs the property and provides returns to those investors. (See Deposition of Scott McGinness at 16:11-14). Cohen Asset Management creates a number of affiliated entities to manage the various properties. (*Id.* at 23:11-23).

As head of a large real estate investment company, Plaintiff Cohen is, by his own admission, a limited-purpose public figure (ECF 40 ¶¶ 1-2).  Bradley Cohen is a well-known and active member of the Los Angeles community and the national real estate community.  Plaintiff frequently appears as a guest speaker at several national and even international real estate conferences and events and has been honored by such organizations such as Boy Scouts of America, Cedars Sinai Medical Center, and Friends of the Israeli Defense Forces. (ECF 40 ¶ 13). He has received numerous awards and recognitions from local, state, and national government officials, including President George W. Bush and Vice-President Al Gore (Exhibit A).  Cohen has also spoken at numerous real estate investing conferences in the last five years. (Cohen Dep. at 33; Exhibit B).

### B. **The Auburn Valley Industrial Capital LLC v. Northwest Territorial Mint Litigation**

Defendants' relationship with Plaintiffs began when Northwest Territorial Mint leased property from an affiliate of CAM, Auburn Valley Industrial Capital, LLC ("AVIC"). (ECF 40 ¶ 28).  The parties' relationship terminated when AVIC sued Defendants, alleging lease violations (ECF 40 ¶ 31).  In the lawsuit, AVIC claimed that Defendants had environmentally contaminated the property they leased, and Plaintiffs were granted a judgment in the amount of $869,746.53.

---

[2] As Mr. Cohen verified the contents of the Complaint under oath (ECF 40 at 40), its factual assertions may be construed as party statements and thus admissible.

1  (ECF 40 ¶ 31).  AVIC's damages, and award of attorneys' fees against NWTM, are currently on

2  appeal. (ECF 40 ¶ 31).

3      After the termination of the lessor/lessee relationship, Hansen created websites about

4  Bradley Cohen and CAM (Hansen Dep. at 31:13-21), and Plaintiffs filed this lawsuit in August

5  2012. (ECF 1)

6      C.    **Defendants' Use of the Websites**

7      In 2012, Hansen developed two websites that feature information and opinions about

8  Plaintiffs (the "Websites"), including asking the hyperbolic question of whether Cohen is "the next

9  Bernie Madoff." (*See* Front Page of <bradleyscohen.com>, Exhibit C at 1; *see* ECF 40-1; Cohen

10  Dep. at 179)   The website, formerly located at <bradley-cohen.com> (Exhibit D; Cohen Dep. at

11  151:20-152:12) and currently located at <bradleyscohen.com> (Exhibit C), feature Hansen's

12  opinions about Plaintiffs and their business practices. (*See* Deposition of Ross B. Hansen at 43)

13  Plaintiffs published information on the Websites based upon Hansen and NWTM's experiences

14  with CAM and Cohen, conversations Hansen had with CAM's employees, and documents Hansen

15  had found through Internet searches. (Hansen Dep. at 85:19-86:7).

16      Hansen's primary purpose in publishing the websites was to inform the public about

17  potential unethical acts he encountered as part of a "public service" to the community. (Hansen

18  Dep. at 34:12-24)  While Hansen did not author all of the content, he was the one who gave final

19  approval of what would be published. (Hansen Dep. at 131:4-132:19).  Defendant Steven

20  Firebaugh's involvement in the website was "minimal." (Hansen Dep. at 132:25-133:2).

21      On or about May 2, 2012, the registrar of <bradley-cohen.com> shut down the website.

22  (ECF 40 ¶ 50).  However, <bradleyscohen.com> is still operational. (ECF 40 ¶ 9).

23      D.    **Damages**

24      Despite filing their First Amended Complaint, Plaintiffs have not alleged actual damages

25  from the operation of the websites. (*See* Exhibit E at 2-5; Exhibit F at 2-6). According to Plaintiffs'

26  First Amended Complaint, Cohen Asset Management and its affiliated entities have industrial and

27  office properties nationally, with a current estimated value of "several hundred million dollars."

28  (ECF 40 ¶ 13).  Throughout the course of this litigation, Plaintiffs have been unable to assert any

1  demonstrable loss of income or other loss of business resulting from the content of Defendants'

2  websites. (McGinness Dep. at 63; Cohen Dep. at 114:6-15; Plaintiffs' Responses to Interrogatories)

3  In 2013, CAM's investments have a higher value than they did five years ago, it has investments in

4  more property than it did five years ago, and more of CAM's employees in 2013 have a salary of

5  more than $150,000 than five years prior. (McGinness Dep. at 47:9-21, 49:11-50:17; Exhibit G).

6  Plaintiffs are on track to have a profitable 2013 – even more profitable than 2012 when the

7  Websites came into existence (McGinness Dep. at 99:7-100:7; ECF 40 ¶ 9; Hansen Dep. at 31:13-

8  21) – and perhaps CAM's most profitable year ever.

9       Although Plaintiff Cohen claims that the websites have caused him emotional distress (ECF

10  40 ¶ 77), Cohen continues to remain active in his community and is in even better physical

11  condition.  Most recently, Cohen has lost weight after the publication of the websites, a change that

12  his close friend described as "positive" and attributes to working out. (See Deposition of Steven

13  Fishman at 38:21-39:4).  Financially, Cohen and CAM are both doing well. (*Id.* at 80).  Meanwhile,

14  Cohen claims to this Court that he has been harmed by this website.  Cohen's claims are baseless.

15  III.   **Legal Standard**

16    A party is entitled to summary judgment as a matter of law upon demonstrating that there is no

17  genuine issue as to any material fact proving – or disproving – a plaintiff's claim. *See* Fed. R. Civ.

18  P 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex Corp. v. Catrett*,

19  477 U.S. 317, 325 (1986).  Conclusory or speculative testimony is insufficient to raise a genuine

20  issue of material fact. *Thornhill Publishing Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.

21  1979).  When the non-movant must prove a claim at trial, the moving party may satisfy its burden

22  by demonstrating the absence of evidence necessary to support or establish the non-movant's

23  claim. *Celotex*, 477 U.S. at 325.  In contrast, claims or affirmative defenses must be proven by

24  admissible and affirmative evidence. *See Id.*

25    The "mere existence of some alleged factual dispute between the parties will not defeat an

26  otherwise properly supported Motion for Summary Judgment; the requirement is that there be no

27  genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.  If the non-moving party's evidence

28  is merely colorable, or is not significantly probative, summary judgment for the movant is proper.

*Id.* at 249.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.  Courts favor the early resolution of disputes based on defamation, as the suit "may be as chilling to the exercise of First Amendment freedoms as the outcome of the lawsuit itself." *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966).

IV.    **Argument**

   A.    **California Law, Rather than Nevada Law, Governs Plaintiffs' Claims**

   A federal court sitting in diversity must apply the law of the forum state, including its choice of law provisions. *Klaxon v. Stentor Elect. Mfg., Inc.*, 313 U.S. 487, 496 (1941); *Fisher v. Prof'l Compounding Ctrs. of Am., Inc.*, 311 F. Supp. 2d 1008, 1015 (D. Nev. 2004).  As this action is based on diversity jurisdiction (ECF 40 ¶¶ 6-8), the Court must look to a more specific section of the Restatement (Second) of Conflict of Laws before applying the "most significant relationship" test. *Dictor v. Creative Mgmt. Servs., LLC*, 223 P.3d 332 (Nev. 2010).  Restatement (Second) of Conflict of Laws § 150 addresses the issue of multistate defamation:

> (2) When a natural person claims that he has been defamed by an aggregate communication, **the state of most significant relationship will usually be the state where the person was domiciled at the time**, if the matter complained of was published in that state.
>
> (3) When a corporation, or other legal person, claims that it has been defamed by an aggregate communication, **the state of most significant relationship will usually be the state where the corporation, or other legal person, had its principal place of business** at the time, if the matter complained of was published in that state.

Restatement (Second) of Conflict of Laws § 150(2), (3) (emphasis added).  The Nevada Supreme Court has indicated that "more specific sections" of the Restatement (Second) of Conflict of Laws should be the "starting point of a choice-of-law analysis." *Dictor*, 223 P.3d at 335 (applying Missouri law to tort action pending in Nevada). Here, both Plaintiffs claim to have been defamed by statements published on the Internet and accessible globally.  As these statements have been seen within California (*see, e.g.*, Fishman Dep. at 13:16-14:22; Cohen Dep. at 108:12-109:2; Stern

1  Dep. at 7:19-24, 25:8-15), they have been published within that state.  Both Cohen and CAM were

2  domiciled in the Central District of California and remain domiciled there (ECF 40 ¶¶ 1-2).  The

3  reasoning of Restatement (Second) of Conflict of Laws § 150 is the most specific law to follow in

4  analyzing this situation.  Nevada law recognizes that "the place of the wrong is recognized as the

5  place where the injury is incurred." *Truck Ins. Exchange v. Tetzlaff*, 683 F. Supp. 223, 225 (D. Nev.

6  1988), *citing Lexalt v. McClatchy*, 116 F.R.D. 438, 447 (D. Nev. 1987).

7        Plaintiffs' alleged harms have been most directly experienced within California, where they

8  reside and conduct the business activities that they claim Defendants have significantly harmed.

9  Even if Plaintiffs suffered some quantum of damage elsewhere, the majority of their damages from

10  alleged Internet defamation would be suffered within their state of domicile. Restatement (Second)

11  of Conflict of Laws § 150 recognizes this reality of interstate defamation and identifies the state of

12  a plaintiff's domicile as the state with the most significant relationship to the underlying tort, and

13  therefore the state whose law should apply.

14        In this instance, the Restatement (Second) of Conflict of Laws' analysis leads to the

15  conclusion that California law controls this dispute.   All of Plaintiffs' claims arise from state law

16  (*see* ECF 40 at 23-25). In conjunction with the other factors discussed in this brief, Nevada's

17  choice-of-law jurisprudence requires the application of California law to this dispute.  However,

18  whether evaluated under Nevada or California law, Defendants' remain entitled to the Court's entry

19  of judgment in their favor as set forth below.

20         B.     **Plaintiffs Have Not Established Any Actual Damages, Thus Judgment Is**
21                **Proper For Defendants on All Claims Requiring Them**.

22        Plaintiffs proudly take the position in this litigation that they "are not seeking, nor have

23  [they] identified" actual damages in this litigation (Exhibit E at 3-4, 5:2-4; Exhibit F at 3-4, 5:26-

24  6:2).  This admission alone is sufficient to enter judgment in Defendants' favor on many of

25  Plaintiffs' claims.  To the extent Plaintiffs' claims seek damages for defamation (and not

26  defamation *per se*) under Nevada law, Plaintiffs are required to show actual damages. *K-Mart*

27  *Corp. v. Washington*, 109 Nev. 1180, 1194, 866 P.2d 274, 283-84 (1993) ("in an ordinary

28  [defamation] action, before any recovery will be allowed the plaintiff," special damages must be

1    proven, which "are quantifiable monetary losses that flow directly from the injury to reputation

2    caused by the defamation, e.g. loss of business"); *see Talbot v. Mack*, 41 Nev. 245, 275, 169 P.2d

3    25, 34 (1917).  Plaintiffs' admission that they neither possess nor know of any such damages

4    precludes them from pursuing any claim for defamation that is not defamation *per se*.

5         Plaintiffs must also have evidence of actual harm to prevail on a claim for intentional

6    interference with expected future business. *Wichinsky v. Mosa*, 109 Nev. 84, 87-88, 847 P.2d 727,

7    729-30 (1993); *Leavitt v. Leisure Sports, Inc.*, 103 Nev. 81, 88, 734 P.2d 1221, 1225 (1987);

8    *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 521-22 (Cal. Ct. App.

9    1996).  Similarly, since Plaintiffs' theory of Defendants' false light invasion of privacy is based on

10   statements that are not defamatory on their face, California law requires Plaintiffs to produce

11   evidence of actual damages. *Fellows v. Nat'l Enquirer*, 42 Cal. 3d 234, 251 (Cal. 1986).  Having

12   failed to do so, the Court may enter judgment in Defendants' favor on this claim as well.

13        C.    **Plaintiffs Cannot Hold Defendants Liable for Defamation**

14        Plaintiffs' case chiefly sounds in defamation.  To prevail on this claim, Plaintiffs must

15   prove Defendants 1) made a false and defamatory statement concerning the plaintiff(s), 2)

16   Defendants made the false and defamatory statement to a third party, 3) Defendants' actions were

17   at least negligent; and 4) Plaintiffs suffered actual or presumed damages. *Pegasus v. Reno*

18   *Newspapers, Inc.*, 118 Nev. 706, 718, 57 P.3d 82, 90 (2002); *Sanders v. Walsh*, 219 Cal.App.4th

19   855, 862 (Cal. Ct. App. 2013) ("the sine qua non of recovery for defamation … is the existence of

20   falsehood") (internal citations omitted); *see also Gertz v. Robert Welch, Inc*. 418 U.S. 323, 350

21   (1974) (requiring a showing of at least negligence for defamation liability).  To prevail on this

22   claim, Plaintiffs must prove Defendants published a false statement of fact, and that it caused

23   damage – real or presumed – to Plaintiffs.

24

25

26

27

28

1.   **Plaintiffs are Limited-Purpose Public Figures, and Cannot Meet the Standard of Showing Defendants Acted with Actual Malice**

Cohen's stature and reach in the real estate investing community is sufficient to make him a limited-purpose public figure.[3]  Individuals whose lives are sufficiently public, and whose actions are significant to the public at large or a significant subset of it, are subject to higher standards for proving defamation.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967).  Specifically, a public figure must prove defendants acted with "actual malice" to recover for defamation.  *Id.*  To meet this standard, a plaintiff must prove by clear and convincing evidence that a defendant's allegedly defamatory statement was made with knowledge that it was false, or reckless disregard for the truth. *Id.*; *see Ampex Corp. v. Cargle*, 27 Cal. Rptr. 863, 870 (Cal. Ct. App. 2005); *Nev. Ind. Broadcasting Corp. v. Allen*, 99 Nev. 404, 414, 664 P.2d 337, 334 (1983).[4]

   i.   *Nevada Law*

Nevada law has followed the standard enunciated in *Gertz* and looked to a plaintiff's participation in a public controversy.  *Pegasus*, 118 Nev. at 719-721.  Nevada's Supreme Court has found that a restaurant, which inserts itself into the public to conduct business, is a limited-purpose public figure for the purpose of the business it conducts.  *Id.*  Cohen, the namesake and CEO of his firm, and CAM, rely on the public to carry on their business and even welcome individual investors (Cohen Dep. at 161:10-21; McGinness Dep. at 39:24-40:4, 71:12-19; Fishman Dep. at 103:12-104:1).  In the past, Cohen has hardly shied away from receiving public recognition for his accomplishments and involvement within the community (Exhibit A; Reha Dep. at 20:16-25:15).  By entering the stream of commerce and offering its investment services to qualifying members of the public, CAM – and Cohen, its public face – have become public figures under Nevada law.

---

[3] A limited purpose public figure is subject to the same standard of proof as a general public figure, and attains such status by "voluntarily inject[ing] himself or [being] drawn into a particular public controversy and thereby becom[ing] a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).

[4] Because of the nuances in this analysis under Nevada and California law, Defendants have addressed both.  While California law governs this dispute, the current ambiguity on this issue compels Defendants to demonstrate the insufficiency of Plaintiff's claims under both states' laws.

1         *ii.  California Law*

2       California law employs a three-part test to determine whether a plaintiff is a public figure.

3    This test requires three elements to be met: 1) the existence of a public figure; 2) the plaintiff

4    undertakes a voluntary act through which he or she sought to influence resolution of the public

5    issue; and 3) the alleged defamation is germane to the plaintiff's participation in the public

6    controversy. *Ampex*, 27 Cal. Rptr. 3d at 870; *accord Makaeff v. Trump Univ., LLC*, 2010 WL

7    3341638, at *4 (S.D. Cal. Aug. 23, 2010).

8         *a.  A Public Controversy Exists Over Private Investment Funds*

9       Ever since the recession beginning in 2008, private investment vehicles have received

10   increased scrutiny from the public.  This controversy has been underscored by the collapse of once-

11   reputable investment firms led by Bernard Madoff and Alan Stanford.  The ongoing crisis of

12   confidence is a public controversy that implicates firms such as CAM and the individuals who run

13   them, such as Cohen.  Because of the misdeeds that were perpetrated by Madoff and Stanford

14   individually that led to the collapse of their unlawfully operated investment firms, the principal of

15   such an investment firm is indivisible from the firm itself in the context of this controversy.  Where

16   the financial health and integrity of institutions whose resources are available to the public are in

17   question, California's courts have found the concerns constitute a public controversy. *Integrated*

18   *Healthcare Holdings, Inc. v. Fitzgibbons*, 140 Cal. App. 4th 515, 524 (Cal. Ct. App. 2006).

19        *b.  Plaintiffs Have Participated Within the Public Controversy*

20      Plaintiffs have been active within the investment community and attempted to reach others

21   regarding the public's skepticism over private investing.[5]  This conduct – and at minimum

22   Plaintiffs' being pulled into the vortex of public controversy over financial institutions – is

23   sufficient to make Plaintiffs public figures. *Denney v. Lawrence*, 22 Cal. App. 4th 927, 933 (Cal.

24   Ct. App. 1994); *Mosesian v. McClatchy Newspapers*, 233 Cal.App.3d 1685, 1689 (Cal. Ct. App.

25

26

27   _____

28   [5] Even independent of this, Cohen has been publicly recognized for his contributions (Exhibit A).

1991).[6]  CAM has been a member of the Pension Real Estate Association and National Association

of Real Estate Investment Managers (NAREIM), and Cohen has been a member of NAREIM's

board (Cohen Dep. at 36:22-37:3, 78:8-12; Exhibit B).  Cohen has traveled across the country to

speak at NAREIM events about real estate investing, and has even traveled to France on

NAREIM's behalf (Cohen Dep. at 79:25-80:2).  Even if CAM and Cohen had not actively

participated in NAREIM and reached out to the group's constituents, precedent supports them

being included in the controversy by virtue of their participation in a publicly scrutinized industry.

> c.  *Defendants' Allegedly Defamatory Statements Relate to Plaintiffs' Participation in the Public Controversy*

Defendants' statements on the Websites squarely address Cohen and CAM's participation

in the ongoing public controversy over financial investing.  Specifically, Defendants' Websites

raise questions regarding the similarities between Plaintiffs' conduct and Bernie Madoff's (Exhibit

C at 1-2; Exhibit D at 1-2).  Defendants' statements also identify questions about the performance

of Plaintiffs' investments for their owners, and question how investors can protect themselves –

and their capital – based on the limited information available to them.  As required under California

law, these statements go to the heart of Plaintiffs' "participation in the [public] controversy."

*Ampex*, 128 Cal.App.4th at 1577.  Defendants' statements fit squarely within the nexus of the

extant public controversy over private investment and Plaintiffs' participation in that controversial

industry.

### 2.  Defendants' Statements are Matters of Opinion and Therefore not Defamatory

Defamation is a tort for remediating false statements of fact, but it does not reach into the

realm of opinions and ideas.  "There is no such thing as a false idea," as "[h]owever pernicious an

opinion may seem, we depend for its correction not on the conscience of judges and juries but on

the competition of other ideas." *Gertz*, 418 U.S. at 339-340.  Statements of mere opinion are not

---

[6] When a plaintiff's conduct makes it impossible for him or her to avoid being included in the controversy, even when he or she does not seek to be part of it, he or she may become an involuntary limited-purpose public figure. *See Dameron v. Washington Magazine*, 779 F.2d 736, 741 (D.C. Cir. 1985).

actionable. *Pegasus*, 118 Nev. at 714; *Nev. Ind. Broadcasting Corp. v. Allen*, 99 Nev. 404, 410, 664 P.2d 337, 342 (1983).  The determination of whether a statement is fact or opinion is a question of law. *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1193 (9th Cir. 1989).

The United States Court of Appeals for the Ninth Circuit uses a three-part test to determine whether a statement contains or implies a provable factual assertion. *Underwager v. Channel 9 Austl.*, 69 F.3d 361, 366 (9th Cir. 1995).  This test evaluates 1) whether in the broad context the general tenor of the entire work, including the subject of the statements, the setting, and the format, negates the impression that Defendants were asserting objective facts, 2) whether the context and content of the specific statements, including the use of figurative and hyperbolic language, and reasonable expectations of the audience, negate that impression, and 3) whether the statement is sufficiently factual to be provable as false. *Id.*; *Gardner v. Martino*, 563 F.3d 981, 987 (9th Cir. 2009). Under these factors, the Defendants' statements are not actionable as defamation.

> i.  *Viewed Within Their Proper Context, Defendants' Websites Would Be Interpreted as Non-Defamatory Opinion*

Allegedly defamatory statements must be read within the context they were made to ascertain their true meaning. *Pegasus*, 118 Nev. at 715.  The "circumstances of communication" may constitute a defense to an action for defamation. *Simpson v. Mars, Inc.*, 113 Nev. 188, 191-92, 929 P.2d 966, 970 (1997).  The test for determining whether a statement is one of fact or opinion is "whether a **reasonable** person would be likely to understand the remark as an expression of the source's opinion or a statement of fact." *Allen*, 99 Nev. at 410 (emphasis added).[7]

Context is crucial in evaluating defamation claims – the entirety of the speech's surroundings may turn a statement that appears out of context to be factual into a statement of opinion. *Pegasus*, 118 Nev. at 717 (finding a statement that a restaurant's food came from a package expressed a non-defamatory opinion, even if not factually accurate).  The "low barrier to speaking online allows anyone with an Internet connection to publish his thoughts," free from

---

[7] Certain statements may also be "mixed" and include both law and fact. *Allen*, 99 Nev. at 411.  However, as set forth below within the motion, statements requiring knowledge of underlying facts are proven to be true, and may therefore be adjudicated non-defamatory. *See Id.*

"editorial constraints" of traditional media leads to readers according less deference to allegedly defamatory remarks found on the Internet. *Sandals Resorts Int'l, Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 415-16 (N.Y. App. Div. 2011).  The use of "loose, figurative, or hyperbolic language" endemic of the Internet and other forms of unedited communication negate the impression that a speaker seriously accused a plaintiff of wrongdoing or criminal conduct. *Martino*, 563 F.3d at 989-990, *citing Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 4-5 (1991).

Indeed, the fact that the Websites express negative views of Cohen and his company, CAM, would make a reasonable person suspicious as to whether they contain statements of fact. *See Martino,* 563 F.3d at 989-990; *Obsidian Fin. Group, LLC v. Cox*, 812 F. Supp. 2d 1220, 1232 (D. Ore. 2011).  Moreover, the fact that the Websites and their domain names were registered and hosted anonymously – even outside of the United States (Firebaugh Dep. at 40:5-41:14; Hansen Dep. at 160:6-9; ECF 40 ¶¶ 56-57) – further indicates that they contain opinions critical of Cohen and CAM, and are in no way affiliated with Plaintiffs or any other trusted entity for information about real estate investing. *See id*.  Even without these factors, statements published on a blog that accepts comments, such as the Websites at issue in this litigation, are inherently less likely to be viewed as statements of fact. *Art of Living Found. v. Does 1-10*, Case No. 10-cv-5022 *2011 WL 2442441898* at *7 (N.D. Cal. June 15, 2011); *see Cox*, 802 F. Supp. 2d at 1223-24 (collecting citations regarding a reasonable person's reaction to alleged defamation over the Internet).

> a.   *Comparisons to Bernard Madoff Are Not Automatically Defamatory and Constitute Statements of Opinion*

Plaintiffs are not the first parties to claim defamation upon their practices being compared to those of Bernard Madoff.  In the past, these comparisons have been dismissed as non-defamatory.  The same is true of this case.

Defendants' statements regarding Bernard Madoff are relatively limited, and much of the Websites' content focuses on the conduct of Cohen and CAM individually.  The comparisons that are drawn between Plaintiffs and Madoff focus on specific facts regarding the activities of both: That Madoff and Cohen were both members of various boards of directors, that they made political

1   contributions, that they both worked in the investment field, and that they were both the

2   eponymous heads of their respective investment firms (Exhibit C at 1-2; Exhibit D at 1-2).

3       Comparison of these discrete similarities is not defamatory. *Medifast, Inc. v. Minkow*, Case

4   No. 10-cv-382, *2011 U.S. Dist. LEXIS 33412* at *39 *2011 WL 1157625* (S.D. Cal. Mar. 29, 2011).

5   In *Minkow*, the United States District Court for the Southern District of California held that

6   comparing a compensation plan to "Madoff's secret trading system," creating "points of similarity

7   between Madoff and Medifast," and observing that both Medifast and Madoff used small

8   accounting firms, was not defamatory. *Id*. at *39-40. As in *Minkow*, Defendants in this case have

9   not accused Plaintiffs of running a Ponzi scheme "simply by using '[Plaintiffs' names]' and

10  'Madoff' in the same breath." *Id*. The Southern District of California explained:

11          [T]he context of Defendants' statements shows that they used Madoff as a
12          contemporary cautionary tale… If any statement of fact can be implied from
            Defendants' statements, it is this: Things at Medifast are not what they seem. Such
13          a statement is too inexact or subjective to support a libel per se claim; no reasonable
            person could construe it to be provably false. *Id*.
14
15      Similarly, the Delaware Court of Chancery held the invocation of Madoff's name when

16  describing a management firm's refusal to provide information about a fund's investments, was not

17  defamatory – the conduct alleged to be defamatory is, in fact, exactly what Madoff did. *Paige*

    *Capital Mgmt., LLC v. Lerner Master Fund, LLC*, Case No. 5502-CS *2011 Del. Ch. LEXIS 116* at
18
19  *147-150 *2011 WL 3505355* (Del. Chan. Ct. May 25, 2011); s*ee Gilbrook v. City of Westminster*,

20  177 F.3d 839, 863 (9th Cir 1999) (holding that comparison of union leader to Jimmy Hoffa was not

21  defamatory). Contrary to Plaintiffs' claims, Defendants' comparison of them to Madoff is not

22  defamatory – least of all using the point-by-point factual comparisons that Defendants employed.

    *See Minkow*, *2011 WL 1157625*. As in the *Minkow* case, Defendants' message is one of
23
24  skepticism; it is not an allegation of criminality, nor would a reasonable person interpret it as such.

25          *b.*     *Statements Describing Cohen and CAM are Statements of
                     Opinion*

26      The more prone a statement is to being proven true or false, the more likely it is to be a

27  statement of fact, rather than opinion. *Cox*, 812 F. Supp. 2d at 1233. However, even statements

28

1 that may be actionable when read in isolation become statements of opinion when placed into their

2 proper context. *Id.*; *Art of Living*, *2011 WL 2441898* at *7. Accusations of criminal activity

3 including lying, pimping, embezzlement, fraud, and abuse, can be statements of opinion, rather

4 than fact, when viewed within their native contexts. *Gardner*, 563 F.3d at 988; *Knievel v. ESPN*,

5 393 F.3d 1068, 1078 (9th Cir. 2005) (holding accusation that plaintiff was a "pimp" was not

6 actionable); *Pegasus*, 118 Nev. at 717 (holding claim that food was packaged and derived from

7 canned items non-defamatory); *Art of Living*, *2011 WL 2441898* at *7. Indeed, a number of

8 Defendants' statements on the Websites, such as "Cohen's financial status appears to be declining"

9 are transparent statements of the writer's impression of Cohen.

10       Many of the statements on the Websites are subjective and incapable of possessing an

11 objective, non-falsifiable meaning. The Defendants' statements that Cohen leads a life of

12 "glamour" and "luxury" invokes terms that defy uniform interpretation (Exhibit C at 1-3, 12;

13 Exhibit D at 1-3, 8, 11). Describing Cohen's home as a "mansion," (Exhibit C at 12; Exhibit D at

14 11) or CAM's network of relationships between and among affiliated companies that include joint

15 ventures and individual LLCs as "intricate," (*see, e.g.*, Exhibit C at 2, 6, 7, 14; Exhibit D at 7, 9,

16 10, 17) is a matter of subjective interpretation. Cohen himself admitted that the complexity of

17 CAM's relationships with affiliated entities lies in the eye of the beholder: while he found the

18 relationships simple to understand, he admits that he did not know someone with a high school

19 education would have trouble understanding the business' operations, and implied that real estate

20 training was necessary to understand the transaction (Cohen Dep. at 262:9-21). The Defendants'

21 Websites are replete with these adjectives as they apply to both Cohen and CAM (Exhibits C and

22 D). These non-falsifiable statements of opinion cannot constitute defamation.

                          c.       *Statements About Cohen and CAM's Actions Are Also*
                                   *Expressions of Subjective Opinion*

25       The Websites also contain statements regarding the actions of Cohen and CAM, rather than

26 mere adjectives. While these statements may appear factual taken in isolation, such as within

27 Plaintiff's Complaint, these statements are also matters of opinion when read within their proper

28

context. *See Cox*, 812 F. Supp. 2d at 1223 (collecting examples of accusations of criminal actions being found to constitute non-defamatory opinion).  As such, they are not actionable as defamation.

In particular, Defendants have stated that Plaintiffs' business is structured as an "intricate web," or "elusive" and "complex web." (Exhibit C at 2, 3, 6; Exhibit D at 2-3, 34).  Defendants have also stated its opinion that CAM and its affiliate company are "attempting to scam former tenants out of millions of dollars." (ECF 40 ¶ 42, Exhs. 1, 3)  Within the context of the Websites, though, these are not statements of fact.  Based on the critical nature of the site, and its inherent nature as an anonymous web presence allowing for third party comment and participation (Exhibit C at 7 (displaying anonymous comment); Hansen Dep. 172:16-25), they would not be interpreted as such. *See Sandals*, 925 N.Y.S.2d at 415-16; *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1104 (N.D. Cal. 1999) (accusing plaintiff of criminal activity found "too loose and hyperbolic to be susceptible of being proved true or false").

This is not a novel position; even accusations of blackmail have been found to constitute opinion in the past. *Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970).  Similarly, claims that plaintiffs acted "unprofessionally," or "unethically," and that a plaintiff was "untrustworthy" or "incompetent" have been found to be statements of the speaker's opinion, rather than fact. *Wait v. Beck's N. Am., Inc.*, 41 F. Supp. 2d 172, 183 (N.D.N.Y. 2003); *Tasso v. Platinum Guild Int'l*, No. 94 Civ. 8288, *1998 U.S. Dist. LEXIS 18908* at *5-6 (S.D.N.Y. Dec. 3, 1998).  Thus, even the Websites' statements stating that Plaintiffs took specific actions do not actually mean, in context, that Plaintiffs actually engaged in improper behavior – the Defendants' statements represent nothing more than their own feelings about Plaintiffs' actions.

                *ii.*     *Third Parties Agree That Criticism Is Not Necessarily Factual*

Plaintiffs' evidence agrees with the position that critical statements may be opinions, and not necessarily factual.  As such, no speculation is needed to determine whether a reasonable person would interpret the Websites' contents as statements of fact or opinion: They are opinion. *Gardner*, 563 F.3d at 987 (holding that determination of a statement's status of fact or opinion is made through the eyes of a "reasonable factfinder").  One of Plaintiffs' own witnesses

1    acknowledged that a speaker could express his or her opinion, without making a statement of fact,

2    for the purpose of criticizing another (Westreich Dep. at 55:5-22) as Defendants have done.

3                 *iii.*      *Defendants' Statements Constitute, In Part, Rhetorical Hyperbole*

4                           *That a Reasonable Person Would not Find to be a Statement of Fact*

5         The Websites' over-description of Cohen and CAM's conduct lead to the conclusion that

6    their contents are not to be, and would not be, interpreted as statements of fact.  Indeed, the kind of

7    overheated language the Defendants used in creating the Websites conveys that an opinion, rather

8    than an objective fact, is being asserted by the words on the screen. *Greenbelt Coop. Pub. Ass'n v.*

9    *Bresler*, 398 U.S. 6, 14 (1970).  The Defendants' use of strong words on the website, to both build

10   up Cohen and CAM's reputation and to question their conduct with equal intensity, are indicative

11   of their use as rhetorical devices, rather than assertions of fact.  Just as quickly as Defendants

12   described Plaintiffs as glamorous, prestigious, wealthy and fortunate, the Websites use equally

13   over-descriptive terms to express their skepticism of Plaintiffs' business – describing their dealings

14   and relationships as complex, elusive, and intricate (Exhibit C at 2-4; Exhibit D at 2-7, 34).

15         The Defendants' choice of language indicates the rhetorical nature of their statements to the

16   reasonable reader.  Comparison of an individual to even a notorious gangster is not automatically

17   defamatory. *Gilbrook*, 177 F.3d at 863 (finding comparison to Jimmy Hoffa to be rhetorical

18   hyperbole).  Even accusations of serious criminal conduct fall within this category – accusing

19   someone of an act as heinous as rape may still be rhetorical hyperbole. *Gold v. Harrison*, 962 P.2d

20   353 (Haw. 1998), *cert. denied* 526 U.S. 1018 (1999) (finding that defendant's description of

21   plaintiff's conduct as "rape" within a property dispute was non-defamatory hyperbole); *Cox*, 812 F.

22   Supp. 2d at 1224 (collecting instances of accusations of misconduct found to be mere rhetorical

23   hyperbole); *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 463 (S.D.N.Y. 2012) (holding that terms

24   "shyster," and "con man" are instances of rhetorical hyperbole understood as a statement of

25   opinion).  An accusation that on its own could be defamatory loses its character when used with

26   other "colorful adjectives" that, taken together, convey "nothing more substantive" than the

27   speaker's subjective, non-falsifiable thoughts. *Standing Committee v. Yagman*, 55 F.3d 1430, 1440

28

1  (9th Cir 1995).  Defendants' use of extreme language should serve – and did serve – as a sign to

2  reasonable viewers that the Websites' statements should not be taken as literal statements of fact.

3      Defendants' use of rhetorical questions further support the conclusion that the Websites'

4  contents are non-defamatory hyperbole.  Rhetorical questions can serve two purposes: to make

5  clear the speaker's lack of definitive knowledge about an issue, or inviting the reader to consider

6  other justifications for the speaker's actions – negating the impression that the statements imply a

7  false assertion of fact. *Cox*, 812 F. Supp. 2d at 1224-25, *citing Point Ruston, LLC v. Pac. N.W.*

8  *Reg'l Council of the United Bhd of Carpenters & Joiners of Am.*, Case No. C-09-5232 *2010 WL*

9  *3732984* at *8 (W.D. Wash. Sept. 13, 2010).  Use of exaggerated terms, such as calling a plaintiff a

10 "crook," lends to the finding that a rhetorical question is not defamatory. *Troy Group, Inc. v.*

11 *Tilson*, 364 F. Supp. 2d 1149, 1156 (C.D. Cal. 2005).  Moreover, use of a rhetorical question

12 "negates the impression that [the] statement implied a false assertion of fact," and instead, "the

13 author's use of a question made clear his lack of definitive knowledge and invited the reader to

14 consider various possibilities." *Partington v. Bugliosi*, 56 F.3d 1147, 1155, 1157 (9th Cir. 1995);

15 *see Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 730 (1st Cir. 1992) (finding

16 rhetorical question non-defamatory because it could reasonably be understood "only as [the

17 author's] personal conclusion about the information presented," and not a statement of fact).

18     Defendants' rhetorical questions in this case are subject to the same analysis.  On the

19 Websites, the Defendants ask:

20     "Is Bradley S. Cohen the Next Bernie Madoff?"
21     "[Cohen] has been a contortionist when it comes to keeping the secret of his true
       financial picture, creating a complex web of companies and dealings, but how long
22     can this continue?"
       "With hundreds of millions of dollars in complex financial transactions and loans
23     between numerous companies and investors, how can investors guard against a
       Ponzi scheme or fraud?"
24     "If company officials don't even know how investor funds are managed, how can
       investors and business partners feel secure?"
25     "How can a company and its owner profit while investors are losing big?"
       "Is this the reason for Cohen's vague background?"
26     "How many millions has it taken from its thousands of other tenants?"

27

28

These statements contain the same heated rhetoric of the rest of the Websites, and would lead a reasonable viewer to construe them as statements of opinion, rather than fact. *Troy Group*, 364 F. Supp. 2d at 1156.  When a speaker outlines facts available to him or her, making it clear that the statements represent his or her own interpretation of those facts – but inviting the reader to draw his or her own conclusions – the resulting statements generally receive First Amendment protection. *Nicosia*, 72 F. Supp. 2d at 1102.  Defendants' use of question marks to signify knowledge they do not possess, ranging from knowledge of Plaintiffs' operations and financial condition to avoiding losses when faced with complex financial transactions (Hansen Dep. at 57:21-58:20), further demonstrates that the questions are not statements of fact. *Bugliosi*, 56 F.3d at 1155, 1157.

3.   **Defendants' Statements are At Least Substantially True and Not Defamatory**

Truth is a defense to defamation, but absolute truth is not needed to defeat such an action – the defense of truthfulness "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine*, 501 U.S. 496, 516 (1991).  For this defense to defeat a claim for defamation, all that is required is that the "substance, the gist, the sting" of the statement be factually correct." *Id*. at 517; *see D.A.R.E. America v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1287-88, 1289 (C.D. Cal. 2000) (finding evidence to support defendants' statements as "substantially true," and holding that it is not a jury question); *Adelson v. Smith (In re Smith)*, 397 B.R. 124, 126 (D. Nev. Bankr. 2008) ("even if [the allegedly defamatory] statements were written without care or other justification, some were nonetheless true," citing *Masson*); *Pegasus*, 118 Nev. at 715 n. 17 ("substantial truth provides that minor inaccuracies do not amount to falsity"). Whether or not a statement is substantially true is a question of law to be decided by the Court. *Pegasus*, 118 Nev. at 715 n. 17; *see D.A.R.E. America*, 101 F. Supp. 2d at 1287-88.  Based on the facts below, many of the statements Defendants made about Plaintiffs, to the extent they were factual at all, were completely or at least substantially true.

//

//

i.   *CAM Cannot Show Statements About Its Financial Condition Are False and Defamatory*

a.   *Investors In the CAM Core+ Fund 1 Have Incurred Tens of Millions of Dollars in Paper Losses Over the Fund's Life*

The Cam Core+ Fund 1 (the "Fund") had incurred significant losses during its lifespan. The Fund was funded with 85 million dollars and used to purchase commercial and industrial real estate (McGinness Dep. at 35:2-36:16).  These individual properties are owned by individual limited-liability companies created for the sole purpose of owning a particular property[8] (McGinness Dep. at 36:17-21); the aggregate value of these properties constitutes the value of the Fund.  The Fund's value was accounted on a fair value accounting basis, where the value of the properties comprising the Fund's assets was calculated based on what they could be sold for on the prevailing market on a regular basis (Cohen Dep. at 186:10-188:5; McGinness Dep. at 25:6-8, 82:2-14, 87:23-88:13; Exhibit H at 3).  By Plaintiffs' own admission, the fair market value of the Fund's assets was "written down," or decreased, by over $45 million between 2008 and 2010 (Exhibit H at 3).  By any common use of the word, this is a "loss" of tens of millions of dollars.

Plaintiffs contend that this is untrue is based on accounting technicalities.  Plaintiffs' position is that because the Fund's assets have not been liquidated, no loss has been *realized*. (McGinness Dep. at 83:4-14, 87:23-88:13, 91:14-92:3; Cohen Dep. at 185:22-186:8)  However, this perspective elevates an accounting technicality over the black-and-white figures of the Fund's fair market value accounting and the plain meaning of the English language.  By late 2010, the real estate assets within the funds had declined $45 million in value (Exhibit H at 3).  Plaintiffs' witnesses recognize that this is equivalent to an individual purchasing a house for $400,000 and having its market value decline to $200,000 while he or she owns it (Cohen Dep. at 185:22-186:8; *see* McGinness Dep. at 83:4-14;).  Yet, Plaintiffs claim that it is defamatory for Defendants to say investors "lost" money because the asset – although valued far below its purchase price – had not

---

[8] In limited cases, one limited-liability company may own more than one piece of property. (McGinness Dep. at 36:17-37:4)

1   been sold, precluding any loss from being "realized." (McGinness Dep. at 83:4-14, 87:23-88:13,

2   91:14-92:4).

3       Plaintiffs' analysis places too fine a point on what is necessary to constitute substantial

4   truth.  Here, the fair market value of the Fund's assets declined by $45 million as of September

5   2010.  This constitutes "tens of millions of dollars," just as the Defendants claimed.  That

6   Plaintiffs' claim for defamation is based on accounting nuances demonstrates the substantial truth

7   and accuracy of Defendants' statements.  Finding Defendants' statements that investors in the Fund

8   lost tens of millions of dollars when the value of the Fund's assets decreased more than $45 million

9   would be antithetical to the entire notion of substantial truth.  Substantial truth does not require

10  perfect accuracy. Instead, it requires only a generally correct statement, even at the expense of

11  some details. Defendants have made a substantially true statement about the Fund's performance.

12  It is not defamation.

13          *b.*     *CAM Is Unable to Refute The Websites' Other Charts and*
                    *Representations of Its Losses*

14      The charts Plaintiffs produced in an effort to refute the Defendants' diagrams of the Fund's

15  performance do not serve their goal.  In fact, the chart titled "Total Return Composition Net of Fees

16  As Of 9/30/2010" is a direct copy from CAM's 3d Quarter Financial Report (*compare* Exhibit C at

17  6, Exhibit D at 9 and ECF 40-1 at 85).  CAM's analysis of its total assets (Exhibit H at 1) and the

18  Defendants' chart depicting the same (Exhibit C at 5; Exhibit D at 8) show the exact same starting

19  and ending points.  If anything, Defendants' rendering of the data through a smoothed trend line is

20  more favorable to Plaintiffs than their own depiction, which shows a more precipitous drop in total

21  assets from the first to the second quarter in 2010 (*compare* Exhibit H at 1 and Exhibit C at 5,

22  Exhibit D at 8).

23      Plaintiffs also attempt to refute Defendants' depiction of their decrease in cash and cash

24  equivalents.  Defendants' chart shows a decline of "cash and cash equivalents" from around $2.75

25  million to under $1 million from January 2009 to January 2010.  Plaintiffs attempt to rebut this

26  with a chart of "Cash & Restricted Cash," without explaining what "restricted cash" is (Exhibit H

27  at 2-3).  The comparison of "cash and cash equivalents" to "cash and restricted cash" is one of

28

apples to oranges; the two categories of cash are not interchangeable by CAM's own admission (Exhibit H at 2).  Regardless, both Defendants' and Plaintiffs' chart show a steep downward slide in both "cash and cash equivalents" and "Cash & Restricted Cash" from January 2009 to January 2010 (*compare* Exhibit H at 1 and Exhibit C at 6; Exhibit D at 9).  The Defendants' chart is an accurate depiction of CAM's declined cash holdings.

*ii.     By Any Measure, Bradley Cohen Lives a Life of Luxury*

Cohen contends that allegations regarding his lifestyle are defamatory (ECF 40 ¶ 9; ECF 40-1 (Exhibit 1)).  To the extent that Defendants' characterizations of his habits as luxurious are not opinions, they are true, or at least substantially true.  Cohen's house is located within Bel Air and estimated to be worth at least 15 million dollars – likely more than 20 million dollars (Cohen Dep. at 82:17-83:5; Fishman Dep. at 82:2-7).  It is "around 11,000 square feet" (Cohen Dep. at 80:21-81:18), and Defendants included a photo of it on the Websites for readers' reference (Exhibit C at 12; Exhibit D at 11).  Notably, that photograph was taken from a website that was already accessible to the general public.  (Firebaugh Dep. at 90:11-91:3).  Additionally, Cohen refinanced his mortgage on the residence in 2009 to take advantage of remarkably low interest rates – around only 1% per year (Cohen Dep. at 83:6-16).  Even if the Defendants' statement that Cohen lives in a "mansion" were interpreted as one of fact, rather than opinion, it would be an accurate statement.

Even since the economic recession that began in 2008, Cohen has made more than one million dollars per year in gross income every year (Exhibit I; Fishman Dep. at 84:11-87:7, 90:10-91:10).  Prior to that downturn, Cohen's annual gross income was as high as over five million dollars per year (*id.*).  Cohen estimates his personal net worth to be more than 50 million dollars (Cohen Dep. at 98:6-25), and he invests in every property managed by CAM (Cohen Dep. at 247:4-7).  Cohen and his wife have given hundreds of thousands of dollars to charity, some of which came in "smaller amounts of 10,000 [or] 25,000" dollars. (Cohen Dep. at 73:9-74:12)

In addition, Cohen employs an undisclosed personal security detail (Cohen Dep. at 56:9-16).  The particulars of Cohen's personal security are unknown, although Steven Fishman described the security presence at the recent wedding of Cohen's daughter as a scene reminiscent of

21

*Motion for Summary Judgment*

the 1992 film *The Bodyguard*. (Fishman Dep. at 24:4-16)  While Defendants' descriptions of Cohen's quality of life are properly statements of opinion, any factual element they may contain is verified by the Plaintiffs' own witnesses.

    *iii.*  *Many of the Comparisons Between Cohen / CAM and Madoff are Factually Accurate*

  The table of similar activities between Cohen and his company, and Bernard Madoff and his, contain numerous facts that have been verified to be true.  Some of these statements, such as the company's structure being a "web" and discussion about the company's leadership's discussion of financial dealings, are addressed elsewhere in this motion.  A number of these statements, though, can be dispatched without particularly detailed analysis.

  Cohen founded CAM, a real estate investment firm (Cohen Dep. at 161:10-16).  CAM investors must be accredited investors under Securities and Exchange Commission Rule 501 of Regulation D,[9] (Cohen Dep. at 161:10-12; McGinness Dep. at 39:24-40:4), individual securities within the companies that own property managed by CAM are sold for $100,000 each (Cohen Dep. at 243:21:-244:18; Exhibit J at 1).  Cohen's own accountant invested – and lost – $50,000 with CAM (Fishman Dep. at 103:12-104:1).  Other CAM investors represent or control institutional investors, such as pension funds, real estate investment companies, and investment funds (Decl. of Westreich ¶¶ 1-2; Decl. of Batkin ¶ 3).  CAM's office is located in Century City (McGinness Dep. at 71:20-22), which is adjacent to Beverly Hills, California.

  Next, the Websites state that Cohen has "overall responsibility for management of his firm, strategically directs investment funds." (Exhibit C at 2; Exhibit D at 2)  This is also true.  Cohen is the CEO of CAM.  He also sits on the investment committee.  This committee makes investments by majority rule, but requires Cohen to be part of the majority vote in order to take action (Exhibit

---

[9] This rule defines what persons or entities may constitute accredited investors who are allowed to purchase or participate in more sophisticated investment vehicles than are available to the general public, such as hedge funds and private equity funds.  This rule allows individuals to participate in such investments as accredited investors if they possess more than $1 million in assets exclusive of their primary residence, or have earned income of more than $200,000 for the past two years with the reasonable expectation of the same income in the future (for married individuals, household income must be in excess of $300,000). (Exhibit J at 6; Cohen Dep. at 243:17-244:16)

1    K; McGinness Dep. at 29:16-30:3).  This process of evaluating and deciding on what investments

2    to make qualifies as "strategically direct[ing] investment funds." (Exhibit K)

3         CAM is headquartered on the prestigious Avenue of the Stars (Cohen Dep. at 171:9-10; *see*

4    ECF 40-4 at 29).  CAM's "neighbors" on the Avenue of the Stars include: 1) Creative Artists

5    Agency, a preeminent talent agency; 2) DLA Piper, a prominent global law firm; 3) McKinsey &

6    Company, an elite management consulting firm; 4) JP Morgan, an premier investment bank; 5)

7    Moelis & Company, an exclusive boutique bank; 6) Susman Godfrey LLP, an elite litigation law

8    firm; and many other well-known business entities (Exhibit L).  Based on CAM's neighbors, the

9    company's headquarters exist within rarified air among other prominent businesses.

10        Personally, Cohen is a member of the Board of Governors at Cedars Sinai Medical Center

11   and served on the National Board of the Friends of the Israeli Defense Forces (ECF 40 ¶ 13; Cheryl

12   Cohen Dep. 12:11-15, 12:24-13:4).  He also previously served on the board of directors for

13   NAREIM (Exhibit B; Cohen Dep. 36:22-37:13).  Cohen has also made political contributions

14   worth tens of thousands of dollars per year in the past (Cohen Dep. at 177:4-178:21).  Based on the

15   evidence adduced in this case, these statements are at least substantially true, if not entirely so.  As

16   such, they cannot constitute defamation.

17              iv.    *Defendants' Statements About CAM's Business Practices Are Also*
18                     *True or Substantially True*

19              a.    *The Web of Companies*

20        Defendants have produced charts showing the connections between Cohen, Brandon Delf,

21   and numerous limited-liability companies on their Websites (Exhibit C at 7, 15; Exhibit D at 10,

22   18).  The Websites describe Cohen's relationship with these companies as a web, describing it as

23   complex and intricate.  Doreen Ray, CAM's Executive Vice President of asset management

24   described the structure of CAM's asset management as "multilayered." (Ray Dep. at 140:9)

25        Cohen himself does not know exactly how many companies he is an officer of (Cohen Dep.

26   at 41:6-42:5), but invests in every deal made by CAM by becoming a member of the limited-

27   liability company used to purchase and own property (Cohen Dep. at 97:1-24, 247:4-7).  The

28   properties owned by these limited-liability companies are managed by a separate company created

by CAM, which receives a 20% promotional interest of the property's revenue and value for managing the property (Cohen Dep. at 245:21-247:3).  This promotional interest in each property CAM manages ultimately is paid to CAM and Cohen himself (Cohen Dep. at 247:2-3).

Thus, there are hundreds of limited-liability companies in which Cohen and other CAM executives (Cohen Dep. at 245:21-247:3) are members.  These numerous limited-liability companies distribute 80% of their earnings to their members, including Cohen and potentially other CAM executives (*id*.).  The remaining 20% of the limited-liability companies' earnings are paid to one of the managing entities that is created to manage it, and which is an affiliate of CAM (*id*.) This 20% promotional interest is then paid to CAM and its executives (*id*.)  This network of cash flows to Cohen directly and through CAM by way of its affiliated companies may be an industry standard practice (Cohen Dep. at 247:8-15).  However, the multiple channels through which money earned by each individual LLC passes to reach Cohen can fairly be described as a web.

> b. *CAM Employees' Knowledge of CAM Operations and Cohen's Finances*

Defendants state on the Websites that Doreen Ray, an Executive Vice President at CAM (Ray Dep. at 142:20-22), was "uncomfortable answering questions" about Cohen and his financial dealings (Exhibit C at 4-5; Exhibit D at 7-8).  Doreen Ray confirmed that this is true, admitting that she was uncomfortable being asked anything about Cohen individually when testifying as the party most knowledgeable for Auburn Valley Industrial Capital. (Ray Dep. at 145:13-146:2)  Based on the context of her deposition, she declined to answer questions about Cohen or CAM beyond Auburn Valley Industrial Capital, and herself stated she was "uncomfortable" answering those questions (Ray Dep. at 144:18-146:2).  Her refusal to answer these questions is substantially identical to an inability to do so, and in any event can be subjectively described as such.

> c. *CAM's Occupancy Rate and Operating Expenses*

CAM and its affiliated companies do have properties with occupancy rates that are around 28%; in fact, some of them are totally vacant. (Ray Dep. at 146:3-10; 149:17-20 ("okay, yes, I have some occupancy rates that are 28 percent, certainly not in the portfolio … it's one property out of 24")). Logically, an unoccupied building generating upkeep costs and annual property taxes

without a tenant to pay rent generates operating losses – a point CAM did not deny, but justified by stating that such a vacancy should be considered in the context of a portfolio of other properties "so the one vacancy is not causing a struggle or a financial problem *on the portfolio*." (Ray Dep. at 147:9-15) (emphasis added)  CAM's vacant properties are not generating revenue while empty (McGinness Dep. at 79:16-17).  While the losses caused by one vacant property may be offset by the whole portfolio, this does not negate the reality that CAM's vacant properties incur operating losses on their own by the very nature of their vacancy, and these losses persist while the property is vacant.

### d.  CAM's Litigious Nature

Defendants have contended that CAM and "any of its companies … are known to sue tenants and former tenants based on unfounded accusations and greed." (ECF 40 ¶ 47; Exhibit D at 34).  Defendants continued:

> Under Bradley Cohen's stewardship, the company and its properties have been involved in numerous lawsuits.  In a current Seattle lawsuit, the company is attempting to scam former tenants out of millions of dollars.  The company has taken several hundred thousand dollars from one former tenant in one lawsuit.

(ECF 40 ¶ 47; Exhibit D at 34). As discussed above, Defendants' commentary on CAM and its related companies' motives for litigation are statements of their subjective opinion.  The factual elements of this statement, though, are provably true.

Since 2009, CAM and its affiliated entities have commenced six known lawsuits against its tenants (Exhibit M; Cohen Dep. at 198:12-201:1).  This litigation has been over spaces as small as 12,500 square feet, and as large as 68,779 square feet (*id*.).  This evidence suggests there may be even more undisclosed litigation: CAM's report reveals only landlord-tenant litigation CAM has filed as a plaintiff, as opposed to other business torts, and only since 2009 (*id*.).[10]  Accepting that this chart provided by CAM represents only a portion of CAM's litigation, it supports the accuracy of Defendants' claims about CAM and its related companies' litigation practices.  In reality, CAM

---

[10] As seen from this lawsuit, also filed by CAM, the company's tendency toward litigation is not limited to landlord-tenant disputes.

has initiated lawsuits, including this one, for matters other than landlord-tenant disputes (Exhibit N).

Additionally, Plaintiff's own allegations verify Defendants' statements.  While Defendants' use of the word "scam" in describing the Seattle litigation is an opinion, that lawsuit is brought by AVIC – an affiliate of CAM – and is on appeal.  (ECF 40 ¶¶ 28, 31; Hansen Dep. at 110:1-6)  AVIC obtained judgments for damages, attorneys' fees and costs in excess of $2 million against NWTM – a former tenant of AVIC's property (ECF 40 ¶ 31).  Plaintiffs' own accounting of events supports the accuracy of the Defendants' statements, demonstrating their truth.

### 4. Defendants' Statements Concerning the Criminal History of Bradley S. Cohen Are a Privileged, Fair Report of Judicial Proceedings

The First Amendment privileges accurate reports of official proceedings.  "Under the fair report privilege, the publication of defamatory matter concerning another in a report of an official action or proceeding of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." *Wynn v. Smith*, 117 Nev. 6, 14, 16 P.3d 424, 429 (2001); *see Sahara Gaming v. Culinary Workers*, 115 Nev. 212, 984 P.2d 164 (1999).  California has memorialized this protection in California Civil Code § 47.  Specifically, California Civil Code § 47(e) confers this privilege on a "fair and true report" of the proceedings of a lawful public meeting or made for the public benefit.

Defendants' statements are within these boundaries.  The only original content Defendants contributed to the extant information regarding Brad S. Cohen was to note Cohen's official biography is vague, and point out that Defendants' investigation has revealed "a criminal history involving fraud and money laundering for *a man with the same name and same approximate age,* in the real estate industry." (Exhibit D at 25) (emphasis in original).  Defendants go on to ask, "Is this the reason for Cohen's vague background?" (*Id.*)  Discharging their duty under *Gertz*, Defendants note that both Cohen and Brad S. Cohen have succeeded in the real estate industry, are from the same geographic area, have the same name, and are about the same age. (*Id.*)

This portion of the Websites consists of news stories from the early 1990s and a full copy of the United States Court of Appeals for the Third Circuit's order in the *Banks v. Wolk* case, 918 F.2d

1  418 (3d Cir. 1990), in which Brad S. Cohen was an appellee (Exhibit D at 37-46).  Defendants

2  added no commentary to the Third Circuit's decision, adding only the title "RICO Case" to that

3  webpage.  The *Banks* decision was, in fact, a RICO case (Exhibit D at 37 ¶ 1).  Defendants'

4  conduct with respect to the additional *Inquirer* articles is identical (Exhibit D at 26-33).

5  Defendants republished a series of stories that *The Inquirer* published in the early 1990s, which are

6  expressly based on judicial events.  Defendants merely added their own titles to the pages where

7  the *Inquirer* articles were found, often less inflammatory than the headlines chosen by the *Inquirer*.

8      For these articles, Defendants' fair report is a report on the report: Defendants have

9  republished the original *Inquirer* articles and added their own title to them. It was the *Inquirer* that

10  conducted the reporting based on judicial proceedings, which Defendants republished. This specific

11  content constitutes either a wholesale republication of a judicial opinion (Exhibit D at 37-46) or

12  articles about judicial activities (Exhibit D at 26-33).  As a fair and accurate report of the Inquirer

13  articles, which are not alleged to be false, Defendants' statements on the Website constitute a fair

14  report.  Consistent with California Civil Code § 47(e)(2), Defendants' publication of these

15  materials were a fair report of judicial proceedings and made for the public's benefit, and sought to

16  determine whether Cohen – a man who operates a lucrative investment firm – was the same Brad S.

17  Cohen identified in the *Banks* decision and *Inquirer* articles. *Sanders v. Hearst Corp*., 27 Media L.

18  Rep. 1733 (N.D. Cal. 1999) (holding that statements made to alert the public to the inaccuracies of

19  FEMA's prior statements was for the public's benefit and a Constitutionally protected fair report).

20  (Hansen Dep. at 34:16-24)

21          5.      **If Nevada Law Applied, CAM's Defamation Claim Would be Mispled,**

22                  **and Judgment Proper for Defendants**

23      In the event Nevada law governs this dispute, Defendants are entitled to judgment on

24  CAM's improper claim for defamation per se.  Nevada law recognizes that claims for harm to a

25  business' goods or services arising from false statements are not properly raised as defamation *per*

26  *se*, but instead are to be pled as "business disparagement." *Clark County Sch. Dist. v. Virtual Educ.*

27  *Software, Inc*.,125 Nev. 374, 384-86, 213 P.3d 496, 504 (2009).  These statements are not directed

28  toward the company itself, but rather the goods and services it offers. *Id*., *citing Aetna Cas. & Sur.*

1   *Co. v. Centennial Ins. Co*., 838 F.2d 346, 351 (9th Cir. 1988).  Defendants' statements go not to the

2   reputation of CAM, but the investing services it provides, raising questions about its stability and

3   transparency (Exhibit C at 1-7; Exhibit D at 1-7).  As such, CAM would have to pursue the alleged

4   wrongs under a theory of business disparagement, rather than defamation.

5          Even if CAM's defamation claim were transmuted into one for business disparagement, it

6   would fail.  The elements of business disparagement materially differ from those for defamation

7   under Nevada law. *Virtual*, 125 Nev. at 386.  To prevail on this claim, CAM must prove that

8   Defendants 1) made a false and disparaging statement about its services; 2) that Defendants'

9   statement was unprivileged; 3) that Defendants acted with malice; and 4) special damages. *Id*.  For

10  the reasons set forth above, CAM has failed to meet this burden.  Defendants' statements were not

11  false; moreover, they are privileged by the First Amendment.  Defendants' statements were not

12  made with malice, whether in the literary (Hansen Dep. at 34:12-24) or Constitutional sense of the

13  word. *See Sullivan*, 264 U.S. at 279-80.  Finally, as CAM admitted, it has no actual damages,

14  which precludes it from satisfying the final element of this tort. (Exhibit E at 3, 4:13-14, 5)  While

15  CAM's failure to plead its cause of action as business disparagement rather than defamation should

16  result in judgment in Defendants' favor on that claim, substantive analysis of the transmuted

17  business disparagement claim leads to the same conclusion.

18              6.     **Plaintiffs Have No Evidence of Reputational Harm, and the**
                       **Presumption of Harm May Therefore Be Rebutted**
19

20         While damages in an action for defamation *per se* are presumed, this presumption may be

21  rebutted, and the existence of damage disproved.  Even presumed damages must ultimately have

22  their basis in admissible evidence and be proven. *See Dun & Bradstreet v. Greenmoss Builders*,

23  472 U.S. 749, 766 (1985) (J. White, concurring) (noting even presumed damages "had to be

24  proved" in defamation actions).[11]  An award of presumed damages must be supported by evidence

25  _____

26  [11] The problem of presumed damages, and the abuse of the First Amendment that they invite, led the Arkansas
    Supreme Court to abolish the presumption of damages in defamation actions within the state based on the
27  "unjustifiable equities" their existence creates. *Burcham v. Murphy*, 691 S.W. 2d 752, 756 (Ark. 1998) (internal
    citations omitted).

28

1    to yield a meaningful recovery. *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 734

2    (7th Cir. 2004). A defendant is permitted to rebut the presumption of reputational harm in

3    defamation cases, and to disprove the existence of damage. *Davis v. Ross*, 107 F.R.D. 326, 330

4    (S.D.N.Y. 1985).  Where the presumption of damages is rebutted upon proof that no damage exists,

5    Plaintiffs' defamation claims logically fail.

6            Plaintiffs do not have evidence of reputational harm, and its absence is sufficient to rebut

7    the presumption of harm accorded by a claim of defamation *per se*. The harms Cohen believe that

8    he and CAM have suffered are purely speculative and based on Cohen's fear that unnamed,

9    unknown other individuals have seen the Websites (Cohen Dep. at 114) – despite the fact that a

10   reasonable viewer would not interpret its contents as factual.  The only loss in reputation Plaintiffs

11   can identify is speculative: Ohio State Teachers have stopped returning its phone calls while doing

12   business with other investment firms (presumably because they have provided services CAM could

13   have).  CAM did a "big deal" with New York Life, but does not know whether the two parties will

14   do another deal – despite not presenting the company, and others, with investment opportunities

15   (Cohen Dep. at 114, 147). CAM's company line regarding its damages from the Websites is that its

16   employees do not know if the phone does not ring. (Ray Dep. at 87:22-88:6; McGinness Dep. at

17   62:24-63:5; Cohen Dep. at 114:12-14)

18           To the contrary, Plaintiffs' financial positions are better than ever.  CAM is on track to have

19   a profitable year in 2013, and perhaps its best ever (McGinness Dep. at 99:22-100:6).  More CAM

20   employees than ever before are earning at least $150,000 per year (McGinness Dep. at 50:1-12;

21   Exhibit G).  Cohen continues to earn more than $1.3 million per year in income (Exhibit I).  While

22   Plaintiffs may receive presumed damages for pleading defamation *per se*, the absence of evidence

23   supporting the existence of any damages, and even evidence of Plaintiffs' exceptional success,

24   rebuts this presumption.

25       D.    **The First Amendment Protections Afforded to Defendants' Speech In the**
26             **Defamation Context Apply to All of Plaintiffs' Claims**

27           The First Amendment protections for Defendants' statements apply not only to Plaintiffs'

28   defamation claims, but to every claim based on Defendants' expressive conduct.  The United States

Supreme Court has held that no cause of action possesses "talismanic immunity from constitutional limitations." *N.Y. Times Co. v. Sullivan*, 376 U.S. at 269.  The First Amendment's protections reach to "all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement." *Blatty v. N.Y. Times Co.*, 728 P.2d 1177, 1184 (Cal. 1986).  This broad protection is necessary to protect the rights of defendants sued by plaintiffs who "simply affix a label other than 'defamation' to their injurious-falsehood claims," such as "false light" invasion of privacy and intentional infliction of emotional distress.[12] *Id*.  The remainder of Plaintiffs' claims, which are not for defamation but nonetheless based on Defendants' expressive conduct, are thus subject to the defenses and analysis identified above.

>    E.    **Defendants Are Not Liable for Invasion of Privacy – False Light**

Plaintiffs' claim for false light is all but duplicative of their defamation claims, and thus the same privileges and defenses apply. *Flowers v. Carville*, 310 F.3d 1118, 1132 (9th Cir. 2002), *citing People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd*., 111 Nev. 615, 895 P.2d 1269, 1274 n.4 (Nev. 1995); *Hawran v. Hixson*, 209 Cal. App. 4th 256, 277 (Cal. Ct. App. 2012) ("to establish a false light invasion of privacy claim, [plaintiff] must meet the same requirements" as pleading defamation); *Selleck v. Globe Int'l*, 166 Cal. App. 3d 1123, 1134 (Cal. Ct. App. 1985) (finding false light "is in substance equivalent to a libel claim").

California's courts have recognized that pleading and proof of special damages – specific instances of financial loss – are required to proceed with a false light claim when a statement is not defamatory on its face. *Fellows*, 42 Cal. 3d at 251 (requiring all statements that are not defamatory on their face and the basis of a false light claim be supported by pleading and proof of "special damages" under Cal. Civ. Code § 45(a)); *see Kinsey v. Macur*, 107 Cal. App. 3d 265, 275 (Cal. Ct. App. 1980).  Such is the case here, where the Websites' statements are allegedly defamatory based on information known to Plaintiffs.  If the Websites' defamatory character were apparent on their

---

[12] The United States Supreme Court has ratified this line of thinking, holding that a public figure must prove actual malice to recover on a claim for intentional infliction of emotional distress. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-51 (1988); *Snyder v. Phelps*, 562 U.S. ___, 131 S. Ct. 1207, 1219 (2011).

1   face, though, Plaintiffs would need to prove only reputational damages under California law.

2   *Kinsey*, 107 Cal. App. 3d at 275; see Flowers, 310 F.3d at 1132-33 ("California … requires injury

3   to reputation for both false light and defamation").  Thus, if Plaintiffs' defamation claims fail under

4   California law, so too do its false light claims.  Nevada requires that damages for invasion of

5   privacy claims, including false light, arise from the general damage of being exposed to the public.

6   *Berosini*, 111 Nev. at 636-37; *Flowers*, 310 F.3d at 1132.

7        Neither Cohen nor CAM have proven the existence of special damages arising from

8   Defendants' alleged invasion of privacy.  In fact, this is a central plank of Plaintiffs' litigation

9   strategy – they have not claimed any actual damages, and have premised this litigation entirely

10  based on the presumed general damages from Cohen's defamation claim (Exhibit E at 3, 4:13-14,

11  5; Exhibit F at 4:12-13, 5-6).  Under California law, this admission alone is sufficient to dismiss

12  both Plaintiffs' false light claims. *Fellows*, 42 Cal. 3d at 251.

13       To the extent CAM can claim any reduced business, its claims are speculative and not based

14  on credible evidence (Stern Dep. at 47:11-48:25, 50:10-15, 51:15-52:4, 52:9-53:17, 55:15-56:10).

15  CAM also cannot show a loss of reputation beyond Cohen's assumptions (Cohen Dep. at 113:18-

16  114:22).  As a purely legal entity, CAM cannot incur general emotional pain and suffering as a

17  matter of logic.  This failure of damages calls for judgment to be entered in Defendants' favor on

18  CAM's false light claim.

19       Cohen himself also has failed to show specific damages or reputational harm as required

20  under California law.  Even Cohen's general damages – namely loss of sleep (Cohen Dep. at 42:19-

21  43:9, 44:14-45:24, 119:4-24) – are inadequately linked to the Websites.  As Defendants' rebuttal

22  expert Dr. Lewis Etcoff points out, numerous other stressors in Cohen's life, ranging from

23  managing CAM's expanding success to the anxiety he experiences managing his family life, are

24  the true sources of his anxiety (Rebuttal Expert Report of Dr. Lewis Etcoff, Exhibit O).  For the

25  same reason Plaintiffs' defamation claims against Defendants are inadequate, and for the additional

26  reason that Plaintiffs have not properly established damages under California law, summary

27  judgment should be entered in Defendants' favor on Plaintiffs' false light claims.

28

F.   **Cohen Cannot Prevail at Trial on His Claim for Intentional Infliction of Emotional Distress**

To prevail on a claim for intentional infliction of emotional distress, Plaintiffs must prove (1) extreme and outrageous conduct with the intent to cause or reckless disregard for emotional distress; (2) that Plaintiffs suffered emotional distress; and (3) actual or proximate causation. *Kennedy v. Carriage Cemetery Services*, 727 F.Supp.2d 925, 933 (D. Nev. 2010); *McKinzy v. AMTRAK*, 836 F.Supp.2d 1014, 1028 (N.D. Cal. 2010).  Plaintiffs cannot satisfy two of these elements.  The underlying conduct Cohen seeks to punish – Defendants' publication of words on the Internet – does not satisfy the requirement of extreme or outrageous conduct.  Moreover, the damages Cohen claims to have suffered, namely his obsession with the case (*See* Expert Report of Dr. Saul Faerstein, Exhibit P at 3) are not severe enough to support a finding of emotional distress, and may not even be attributed to Defendants at all.  Therefore, Plaintiffs cannot show intentional infliction of emotional distress, and judgment should be in favor Defendants.

1.   **Defendants' Underlying Conduct Was Not Extreme or Outrageous**

Extreme or outrageous conduct is conduct that must "go beyond all possible bounds of decency" and must be "intolerable in a civilized community." *Braunling v. Countrywide Home Loans, Inc.,* 220 F.3d 1154, 1158 (9th Cir .2000); *Coleman v. Republic Indemnity Ins. Co.*, 132 Cal. App. 4th 403, 416, 33 Cal. Rptr. 3d 744 (Cal. Ct. App. 2005); *Urbina v. Homeview Lending, Inc.,* 681 F. Supp. 2d 1254, 1261 (D. Nev. 2009).

Under California law, defamatory accusations are not sufficient to give rise to an action for intentional infliction of emotional distress. *Walker v. Boeing Corp.*, 218 F.Supp.2d 1177, 1184 (C.D. Cal. 2002), *citing Alcorn v. Anbro Eng'g, Inc.,* 2 Cal.3d 493, 499, 468 P.2d 216, 86 Cal. Rptr. 88 n.5 (1970); *Agostini v. Strycula*, 231 Cal.App.2d 804, 806-09, 42 Cal. Rptr. 314 (1965); *Perati v. Atkinson*, 213 Cal.App.2d 472, 473-74, 28 Cal. Rptr. 898 (1963).  Conduct exhibiting "mere rudeness and insensitivity" is not enough to show intentional infliction of emotional distress. *Braunling*, 220 F.3d at 1158, *citing Schneider v. TRW, Inc.*, 938 F.2d 986, 992 (9th Cir. 1991). Similarly, Nevada law does not extend liability for emotional distress to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Lopez v. UPS*, *2009 U.S. Dist. LEXIS*

1  *47520* at *14 (D. Nev. 2009), *quoting Candelore v. Clark County Sanitation Dist.*, 752 F. Supp.

2  956, 962 (D. Nev. 1990), *aff'd* 975 F.2d 588 (9th Cir. 1992).  People are "expected and required to

3  be hardened … to occasional acts that are definitely inconsiderate and unkind." *Id., quoting*

4  *Maduike v. Agency Rent-A-Car*, 114 Nev. 1, 4, 953 P.2d 24, 26 (1998).

5          Neither Nevada nor California law creates a finding that Defendants' publication of the

6  websites about Plaintiffs reaches the level of extreme and outrageous conduct required to support a

7  claim for intentional infliction of emotional distress.  Defamatory accusations such as the ones

8  Plaintiffs allege are not "extreme and outrageous conduct."   Particularly, businessmen who run

9  successful companies should be hardened to criticism and questioning about their business tactics,

10  and the hyperbolic comparison to another does not go beyond the bounds of decency. *See*

11  *Braunling*, 220 F.3d at 1158; *Lopez, 2009 U.S. Dist. LEXIS 47520* at *14.  Fundamentally, Cohen

12  seeks to hold Defendants liable for publishing words on the Internet (Cohen Dep. at 272:6-8; ECF

13  40 ¶¶ 9-12).  The act of committing thoughts to words is no different than Defendants writing an e-

14  mail, passing a note, or leaving an anonymous message on a bathroom stall.  While Cohen's

15  umbrage comes from the content of those statements  - which in and of itself is not outrageous –

16  the underlying physical action that caused those words to exist is nothing more than the publication

17  of written words on a computer screen.  This is a far cry from the kind of actions that constitute

18  extreme and outrageous conduct.  Because Defendants' conduct was not extreme and outrageous,

19  Plaintiffs cannot satisfy the first element of intentional infliction of emotional distress.

20          2.     **Cohen Has Not Sufficiently Demonstrated Emotional Harm Arising**
21          **from the Defendants' Conduct**

22          Nevada law requires a physical manifestation to show that a plaintiff has suffered emotional

23  distress. *Kennedy v. Carriage Cemetery Services*, 727 F.Supp.2d 925, 933 (D. Nev. 2010), *citing*

24  *Miller v. Jones*, 114 Nev. 1291, 970 P.2d 571, 577 (Nev. 1998) and *Betsinger v. D.R. Horton, Inc.*,

25  232 P.3d 433, 126 Nev. Adv. Rep. 17 (2010).  "Insomnia and nightmares standing alone will not

26  support at IIED claim in Nevada." *Id.* Feelings of inferiority, headaches, irritability, and weight

27  loss are not sufficient to show emotional distress. *Alam v. Reno Hilton Corp.*, 819 F.Supp. 905, 911

28  (D. Nev. 1993).

Similarly, California law requires a plaintiff to suffer "severe" emotional distress, as "distinguished from trivial or transitory" to sustain a claim for intentional infliction of emotional distress. *Girard v. Ball*, 125 Cal. App. 3d 772, 787 (Cal. App. 1981). Specifically, severe emotional distress means "emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." *Id.* at 788. A plaintiff's discomfort, worry, anxiety, upset stomach, concern, and agitation resulting from a defendant's comments do not rise to the level of "severe" under California law. *Hughes v. Pair*, 209 P.3d 963, 976-77 (Cal. 2009); *see also Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1246 (9th Cir. 2013) (finding anxiety, sleeplessness, upset stomach, and muscle twitches were not severe enough to show emotional distress).

Without damages arising from extreme or outrageous conduct, a claim for intentional infliction of emotional distress cannot succeed. Cohen's evidence demonstrates that he cannot satisfy this standard. Since discovering the Websites, Cohen has had changes in his sleeping pattern and unusual dreams involving Ross Hansen (Exhibit P at 3; Exhibit Q; Faerstein Dep. at 154:20-155:23). These were not a sudden, immediate, and overwhelming effect of discovering the Websites for the first time. In fact, since discovering the Websites, Cohen has improved his health by losing approximately 30 pounds (Cohen Dep. 120:6-7; Fishman Dep. 38:24-39:2). To the extent Cohen has suffered any distress from the Websites, it is his own self-imposed anxiety over others discovering its contents (Cohen Dep. 42:19-43:9, 44:14-45:24, 119:4-24, 120:17-23; *see* Exhibit P at 3-4) despite the Websites' visitation statistics being inflated (Hansen Dep. at 148:7-25; Firebaugh Dep. at 102:2-103:4).

Furthermore, according to Dr. Saul Faerstein's expert report for Plaintiffs, Cohen's distress appears to be limited to his own state of mind. (*See* Exhibit P at 3) The Websites have become an "obsession" of Cohen's, checking the Internet "daily" and becoming "consumed by the lawsuit." (Exhibit P at 3-4) Cohen spends "countless hours working on the case, sending articles and notes to his attorney, reviewing evidence and deposition transcripts," time which the report says Cohen believes "could be spent in more productive activities." (Exhibit P at 3) This obsession is not he direct result of anything Defendants did, but was caused by Cohen's own actions.

It is not clear that these reactions are accurately attributed to the Websites at all. Even if they are, they are too distant, remote, and minute to be the types of damages that may be the basis for an emotional distress claim.  Faerstein failed in his report to consider any potential long-term disorders Cohen may suffer from that could explain his behavior and pre-date Defendants' publication of the websites. (Exhibit O at 2)  Dr. Faerstein also did not adequately assess Cohen's psychological resiliency or non-subject-incident stressors that could have contributed to the symptoms Cohen reports. (Exhibit O at 3).

Even if the Court determines Mr. Cohen's changes in behavior were caused by the website, his conditions do not rise to the level of severity required by either Nevada or California law.  Mr. Cohen's claims of distress fail under Nevada law without a showing of a physical manifestation, as claims of insomnia, sleep and appetite issues, nightmares, and irritability are not enough to show emotional distress in Nevada.  Furthermore, Mr. Cohen's emotional state is not so severe that no reasonable man in civilized society should be expected to endure it.  In fact, these same symptoms could be attributed to his position as head of an asset management company. (Exhibit O at 3)  Accordingly, Cohen's emotional distress claim fails as a matter of law.

G.   **Plaintiffs Cannot Prevail on their Claim for Intentional Interference with Future Expected Business**

Plaintiffs' claim for intentional interference with future expected business is more commonly known as a claim for intentional interference with prospective economic advantage or potential business advantage.  Such a claim has five elements: 1) an economic relationship between the plaintiff and a third party with the probability of a future economic benefit to the plaintiff; 2) the defendant's knowledge of the relationship; 3) defendants' intentional acts to disrupt the relationship; 4) actual disruption of the relationship between plaintiff and a third party; and 5) economic harm to plaintiff proximately caused by the defendant's acts. *Wichinsky*, 109 Nev. at 87-88, 847; *Leavitt*, 103 Nev. at 88; *Westside Ctr.*, 42 Cal. App. 4th at 521-22.  The interference Plaintiffs allege takes the form of Defendants' Internet statements and expressive activities on the Websites and is subject to the defenses afforded to allegedly defamatory speech.

1.   **Defendants Did Not Know of Any Specific Relationships Between Plaintiffs and Potential Investors to Disrupt**

Defendants did not know of any specific entity or entities that Plaintiffs conducted business with or solicited business from.  Rather than specifically contact any existing or potential business contact of Cohen's or CAM's, Defendants' published their concerns about Plaintiffs on the Websites, available on the Internet (Hansen Dep. at 35:14-36:1; Firebaugh Dep. at 73:13-24; 78:8-18; 87:4-88:11).  Where there is no evidence that Defendants knew of specific business relationships their actions sought to disrupt, summary judgment in the defendants' favor is appropriate. *Williams v. Univ. Med. Ctr. of S. Nev.*, 688 F. Supp. 2d 1134, 1140 (D. Nev. 2010); *Stevenson Real Estate Servs., Inc. v. CB Richard Ellis Real Estate Servs., Inc.*, 138 Cal. App. 4th 1215, 1220 (Cal. App. 2d Dist. 2006).

2.   **Plaintiffs' Claim is Based on Defendants' Expressive Activity, Which is Subject to the First Amendment's Protections**

Even if Defendants knew of Plaintiffs' anticipated relationships with third parties and directed their communications to interfere with those potential contracts, Plaintiffs must show Defendants' conduct was improper.  Nevada law requires Plaintiffs prove that Defendants' conduct "was unlawful, improper, or was not fair and reasonable." *Custom Teleconnect, Inc. v. Int'l Tele-Services, Inc.*, 254 F. Supp. 2d 1173, 1181 (D. Nev. 2003).  Lawful conduct may serve as a basis for intentional interference only when it is unjustified. *Cambridge Filter Corp. v. Int'l Filter Co.*, 548 F. Supp. 1301, 1306 (D. Nev. 1982), *citing Hambro v. Shell Oil Co.*, 674 F. 2d 784, 789 (9th Cir. 1982).  A "strong showing" of intent is needed to establish liability. *Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1456 (9th Cir. 1983).  When this standard is not met, summary judgment for the defendant is appropriate. *Williams*, 688 F. Supp. 2d at 1140.

As set forth in this motion, Defendants' conduct is not unlawful, and is a Constitutionally protected exercise of their First Amendment rights. Defendants' statements were made to express their concerns about Plaintiffs based on their negative dealings with them (Hansen Dep. at 35:14-36:1).  Because of Defendants' experience with Plaintiffs, they wished to educate and inform others about their concerns and struggles with Plaintiffs, and provide a "public service" by doing so (Hansen Dep. at 34:12-24).  While Defendant Hansen felt strongly about the need to express his

feelings about Plaintiffs, he ultimately did so to relate his own subjective experiences and feelings about Plaintiffs, without seeking to interfere with any specific (and unknown) relationships Plaintiffs held (Hansen Dep. at 173:6-10).

### 3. Plaintiffs Have Not Identified Business Expectancies That Defendants Disrupted

Plaintiffs' business expectancies have not been affected by the Websites.  Plaintiffs' evidence indicates that its alleged damages consist of the Ohio State Teachers not doing business with CAM, New York Life potentially not pursuing another deal with CAM, and Jeffrey Stern supposedly reducing his investment with CAM (Cohen Dep. at 114:8-15; Stern Dep. at 47:11-48:25, 50:10-15, 51:15-52:4, 52:9-53:17, 55:15-56:10).  These are not concrete, reasonable expectancies that Defendants' conduct could have harmed.  Plaintiffs' evidence must show that the potential relationship be close enough that it is "reasonably probable that the prospective advantage would have been realized but for the defendant's interference." *Youst v. Lango*, 43 Cal. 3d 64, 71 (Cal. 1987).  Where the evidence only demonstrates that some third parties chose not to do business with Plaintiffs, judgment in Defendants' favor is proper. *Rickards v. Canine Eye Registration Found., Inc*., 704 F.2d 1449, 1456 (9th Cir. 1983).

Plaintiffs' beliefs about Ohio State Teachers and New York Life are wholly speculative (Cohen Dep. at 114:8-15).  Stern's reduced investment with CAM is too vague and unspecified to be credible; the funds he invested were reduced by an amount Stern is uncertain of within several million dollars, and for reasons he declined to share (Stern Dep. at 47:11-48:25, 50:10-15, 51:15-52:4, 52:9-53:17, 55:15-56:10).  No reasonable inference can be drawn from Stern's testimony that Defendants are at all implicated in his reduced investments.  Failing to identify a potential contract or other relationship between Plaintiffs justifies entry of judgment for the Defendants. *Williams*, 688 F. Supp. 2d at 1140.

### 4. Plaintiffs' Damages for Intentional Interference are Speculative

Plaintiffs have not sufficiently produced evidence of harm arising from Defendants' allegedly improper conduct.  Liability for improper interference arises "if, but only if, [plaintiff] establishes by proof the extent of the harm and the amount of money representing adequate

compensation." *Sunridge Builders, Inc. v. Old Blue, LLC*, Case No. 56335 *2013 WL 485831* (D. Nev. Feb. 6, 2013), citing Restatement (Second) of Torts § 912 (1979).  To satisfy the requirement of damages, a plaintiff must produce evidence that the relationship "will eventually yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will eventually arise." *KEMA, Inc. v. Koperwhats*, 658 F. Supp. 2d 1022, 1034 (N.D. Cal. 2009) (dismissing intentional interference claim), *citing Westside Ctr.*, 49 Cal. Rptr. 2d 793 (Cal. 1996).

CAM has failed to meet this burden.  Its supposed losses are unsubstantiated and without detail (Stern Dep. at 47:11-48:25, 50:10-15, 51:15-52:4, 52:9-53:17, 55:15-56:10).  Its further claimed losses are based on relationships that either never came into being, such as the Ohio State Teachers, or which were consummated, but may or may not continue in the future, such as New York Life (Cohen Dep. at 114:8-15).  Cohen's claims of damage are even more speculative. The only economic damages even suspected by Cohen related to a potential loss of business for CAM (Cohen Dep. at 114:8-15), rather than a direct lack of business opportunity for Cohen himself.  This element of both Plaintiffs' intentional interference claims fail for remoteness.

H.   **Injunctive Relief Is A Remedy, Rather Than a Claim; Summary Judgment for Defendants Is Appropriate as to Injunctive Relief as a Cause of Action.**

Defendants are entitled to judgment on Plaintiffs' fifth claim, for permanent injunction, which is properly styled as a request for relief rather than cause of action.  "An injunction is an equitable remedy, not a cause of action." *Brittingham v. Ayala*, 995 S.W.2d 199, 201 (Tex. Ct. App. 1999) (collecting citations for same).  "A permanent injunction is merely a remedy for a proven cause of action.  It may not be issued if the underlying cause of action is not established." *Art Movers, Inc. v. Ni West*, 3 Cal. App. 4th 640, 646-47 (Cal. Ct. App. 1992); *Zepeda v. OneWest Bank FSB*, Case No. 5:CV 11-00777 *2011 WL 6182951* (N.D. Cal. Dec. 13, 2011).  To the extent this fifth claim can be credited as a cause of action, judgment in Defendants' favor is appropriate.

//

//

//

1  V.      **Conclusion**

2          There is no genuine question as to the material facts showing that Plaintiffs cannot prove

3  one or more elements of the claims they have asserted against Defendants.   As such, none of

4  Plaintiffs' claims may proceed. For the foregoing reasons, summary judgment on in Defendants'

5  favor is appropriate.

6  Dated: October 30, 2013                    Respectfully submitted,

7                                            */s/ Ronald D. Green*
                                            Marc J. Randazza, NV Bar #12265
8                                            Ronald D. Green, Esq., NV Bar #7360
                                            J. Malcolm DeVoy, Esq., NV Bar #11950
9                                            RANDAZZA LEGAL GROUP
                                            3625 South Town Center Drive, Suite 150
10                                           Las Vegas, NV 89135
                                            (702) 420-2001
11                                           (702) 420-2003 fax
                                            ecf@randazza.com
12
                                            Dean G. von Kallenbach, Esq., admitted pro hac vice
13                                           YOUNG deNORMANDIE, P.C.
                                            Second & Seneca Building
14                                           1191 Second Avenue, Suite 1901
                                            Seattle, WA 98101
15                                            (206) 805-2720
                                             (206) 623-6923 fax
16                                           dgvk@ydnlaw.com

17                                           John P. Aldrich, Esq. NV Bar #6877
                                            ALDRICH LAW FIRM, LTD.
18                                           1601 S. Rainbow Blvd., Suite 160
                                            Las Vegas, Nevada 89146
19                                           (702) 853-5490
                                            (702) 227-1975
20                                           jaldrich@johnaldrichlawfirm.com

21                                           Allen Lichtenstein, Esq., NV Bar #3992
                                            3315 Russell Road, No. 222
22                                           Las Vegas, NV 89120
                                            Telephone: (702) 433-2666
23                                           allaw@lvcoxmail.com

24                                           Attorneys for Defendants,
25                                           ROSS B. HANSEN, NORTHWEST TERRITORIAL
                                            MINT, L.L.C. and STEVEN FIREBAUGH
26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by notice of electronic filing in the CM/ECF system for all parties and counsel of record.

Laura M. Tucker
RANDAZZA LEGAL GROUP
3625 South Town Center Drive, Suite 150
Las Vegas, NV 89135
(702) 420-2001
(702) 420-2003 fax
ecf@randazza.com