1    Robert D. Mitchell (Arizona State Bar No. 011922), *admitted pro hac vice*
     MITCHELL & ASSOCIATES, P.C.
2    1850 North Central Avenue, Suite 2030
     Phoenix, Arizona 85004
3    Telephone: (602) 468-1411
     Facsimile: (602) 468-1311
4    Email: robertmitchell@mitchell-attorneys.com

5    Anthony Michael Glassman (California State Bar No. 37934), *admitted pro hac vice*
     GLASSMAN, BROWNING, SALTSMAN & JACOBS, INC.
6    360 North Bedford Drive, Suite 204
     Beverly Hills, California 90210-5157
7    Telephone: (310) 278-5100
     Facsimile: (310) 271-6041
8    Email: amg@gbsjlaw.com

9    Richard Schonfeld (NSB No. 6815)
     CHESNOFF & SCHONFELD
10   520 South Fourth Street
     Las Vegas, Nevada 89101
11   Telephone: (702) 384-5563
     Facsimile: (702) 598-1425
12   Email: rschonfeld@cslawoffice.net

13   Attorneys for Plaintiffs BRADLEY STEPHEN COHEN
     and COHEN ASSET MANAGEMENT, INC.

14

15                    **UNITED STATES DISTRICT COURT**

                      **STATE OF NEVADA – LAS VEGAS**
16

17   BRADLEY STEPHEN COHEN, an          | Case No. 2:12-cv-01401-JCM-PAL
     individual; and COHEN ASSET
18   MANAGEMENT, INC., a California     | **PLAINTIFFS' RESPONSE
     corporation,                       | IN OPPOSITION TO
19                                       | DEFENDANTS' MOTION
                  Plaintiffs,            | FOR SUMMARY JUDGMENT**
20
            v.
21
     ROSS B. HANSEN, an individual;
22   NORTHWEST TERRITORIAL MINT,
     LLC, a Washington limited liability
23   company; and STEVEN EARL
     FIREBAUGH, an individual,
24
                  Defendants.
25

26         Plaintiffs Bradley Stephen Cohen and Cohen Asset Management, Inc. hereby

27   oppose Defendants' Motion for Summary Judgment ("MSJ") (Doc. No. 119).

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>**TABLE OF CONTENTS**</u>

I.   FACTUAL BACKGROUND.................................................................................. 1

II.  LEGAL ANALYSIS......................................................................................... 1

    A. Defendants Have Not Met High Summary Judgment Standard.......................1

    B.  Nevada Law Governs Plaintiffs' Claims.................................................2

    C.  Plaintiffs Have Suffered Actual Damages................................................8

    D.  Plaintiffs Have Established Defamation...................................................9

       1.   Plaintiffs Are Not Limited-Purpose Public Figures....................................9

          a.  Nevada law..................................................................10

          b.  California law...............................................................11

          c.  Defendants acted with actual malice....................................14

       2.   Defendants' Statements Are Not Opinions..............................................16

          a.  Broad context................................................................18

          b.  Specific context.............................................................20

          c.  Susceptibility to proof.....................................................23

          d.  Defendants' intent relevant to inquiry..................................24

       3.   Defendants' Statements Are Not Substantially True...............................24

       4.   Defendants' Statements Are Not a Privileged Fair Report.......................30

       5.   CAM's Defamation Claim Is Properly Plead..........................................31

       6.   Plaintiffs' Reputational Harm Is Presumed............................................32

    E.  First Amendment Does Not Protect Defendants From Any Claims..............34

    F.  Plaintiffs Have Established False Light Invasion of Privacy........................34

    G. Plaintiffs Have Established IIED........................................................36

    H. Plaintiffs Have Established Intentional Interference With Business..............40

    I.  Plaintiffs Are Entitled to Injunctive Relief.............................................45

III. CONCLUSION................................................................................................45

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

## TABLE OF AUTHORITIES

2

**Cases**

3   <u>Adobe Sys., Inc. v. Christenson</u>, 891 F. Supp. 2d 1194 (D. Nev. 2012)................21

4   <u>Aetna Cas. & Surety Co., Inc. v. Centennial Ins. Co.</u>, 838 F.2d 346

5   (9th Cir. 1988)...............................................................................................32

6   <u>Altera Corp. v. Clear Logic, Inc.</u>, 424 F.3d 1079 (9th Cir. 2005)...........................41

7   <u>Ampex Corp. v. Cargle</u>, 27 Cal. Rptr. 3d 863 (Ct. App. 2005)........................11-12

8   <u>Annette F. v. Sharon S.</u>, 15 Cal. Rptr. 3d 100 (Ct. App. 2004)..............................12

9   <u>Archway Ins. Servs., LLC v. Harris</u>, 2013 U.S. Dist. LEXIS 138550

10   (D. Nev. Sept. 26, 2013) ...............................................................................2

11   <u>Art of Living Found. v. Does 1-10</u>, 2011 U.S. Dist. LEXIS 63507

12   (N.D. Cal. June 15, 2011) .......................................................................19, 22

13   <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007) ..................................................45

14   <u>Biro v. Condé Nast</u>, 883 F. Supp. 2d 441 (S.D.N.Y. 2012) ..................................22

15   <u>Bongiovi v. Sullivan</u>, 122 Nev. 556, 138 P.3d 433 (2006) ...................................11

16   <u>Braunling v. Countrywide Home Loans Inc.</u>, 220 F.3d 1154 (9th Cir. 2000) ........37

17   <u>Brown v Kelly Broad. Co.</u>, 771 P.2d 406 (Cal. 1989) ...........................................18

18   <u>Burns v. Mayer</u>, 175 F. Supp. 2d 1259 (D. Nev. 2001) ........................................38

19   <u>Cambridge Filter Corp. v. Int'l Filter Co., Inc.</u>, 548 F. Supp. 1301

20   (D. Nev. 1982) ............................................................................................41

21   <u>Clark Cnty. Sch. Dist. v. Virtual Educ. Software, Inc.</u>, 125 Nev. 374,

22   213 P.3d 496 (2009) ....................................................................................32

23   <u>Cohen v. Google, Inc. (In re Cohen)</u>, 887 N.Y.S.2d 424 (N.Y. Sup. Ct. 2009)......18

24   <u>Competitive Techs. v. Fujitsu, Ltd.</u>, 286 F. Supp. 2d 1118 (N.D. Cal. 2003) ..........7

25   <u>Crane v. Ariz. Republic</u>, 972 F.2d 1511 (9th Cir. 1992)........................................30

26   <u>D.A.R.E. Am. v. Rolling Stone Magazine</u>, 101 F. Supp. 2d 1270

27   (C.D. Cal. 2000)..........................................................................................25

28   <u>Dameron v. Wash. Magazine, Inc.</u>, 779 F.2d 736 (D.C. Cir. 1985) ..................13-14

1   <u>Davis v. Ross</u>, 107 F.R.D. 326 (S.D.N.Y. 1985)...............................................32-33

2   <u>Deboles v. Nat'l R.R. Passenger Corp.</u>, 2012 U.S. Dist. LEXIS 23558

3   (D. Nev. Feb. 24, 2012) .............................................................................2-3, 6

4   <u>Doe v. Cahill</u>, 884 A.2d 451 (Del. 2005) ..................................................... 18

5   <u>Dun & Bradstreet v. Greenmoss Builders</u>, 472 U.S. 749 (1985) .......................32-33

6   <u>Empire Printing Co. v. Roden</u>, 247 F.2d 8 (9th Cir. 1957) ................................ 1

7   <u>FAA v. Cooper</u>, 132 S. Ct. 1441 (2012)............................................................ 8, 35

8   <u>Fernandez v. Penske Truck Leasing Co., L.P.</u>, 2013 U.S. Dist. LEXIS 77603

9   (D. Nev. May 31, 2013)................................................................................ 36

10  <u>Finney v. Lockhart</u>, 217 P.2d 19 (Cal. 1950) ......................................................33

11  <u>Fletcher v. W. Nat'l Life Ins. Co.</u>, 89 Cal. Rptr. 78 (Ct. App. 1970).....................38

12  <u>Flowers v. Carville</u>, 310 F.3d 1118 (9th Cir. 2002) .............................................35

13  <u>Gardner v. Martino</u>, 563 F.3d 981 (9th Cir. 2009) .........................................19, 22

14  <u>Gen. Motors Corp. v. Eighth Judicial Dist. Ct.</u>, 122 Nev. 466,

15  134 P.3d 111 (2006) ....................................................................................6

16  <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323 (1974) ..........................................8, 16

17  <u>Gilbrook v. City of Westminster</u>, 177 F.3d 839 (9th Cir. 1999) ...........................21

18  <u>Giles v. GE Money Bank</u>, 2011 U.S. Dist. LEXIS 111018

19  (D. Nev. Sept. 27, 2011) ...............................................................................2

20  <u>Gold v. Harrison</u>, 962 P.2d 353 (Haw. 1998).....................................................23

21  <u>Gonzales v. Shotgun Nev. Invs., LLC</u>, 2013 U.S. Dist. LEXIS 107413

22  (D. Nev. July 30, 2013) ................................................................................40

23  <u>Gordon v. Dalrymple</u>, 2008 U.S. Dist. LEXIS 51863 (D. Nev. July 8, 2008)........18

24  <u>Greenbelt Coop. Publ'g Assn., Inc.</u>, 398 U.S. 6 (1970) ........................................22

25  <u>Hamro v. Shell Oil Co.</u>, 674 F.2d 784 (9th Cir. 1982).....................................41-42

26  <u>Harte-Hanks Commc'ns v. Connaughton</u>, 491 U.S. 657 (1989)............................14

27  <u>Healthcare Holdings, Inc. v. Fitzgibbons</u>, 44 Cal. Rptr. 3d 517 (Ct. App. 2006)...12

28

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  Hofmann Co. v. E.I. Du Pont De Nemours & Co., 248 Cal. Rptr. 384

2  (Ct. App. 1988) ........................................................................ 12

3  James v. San Jose Mercury News, Inc., 20 Cal. Rptr. 2d 890 (Ct. App. 1993) .16-17

4  K-Mart Corp. v. Washington, 109 Nev. 1180, 866 P.2d 274 (1993) ............... 22, 33

5  Kaelin v. Globe Commc'ns Corp., 162 F.3d 1036 (9th Cir. 1998) ......................... 14

6  Kapellas v. Kofman, 459 P.2d 912 (Cal. 1969) ..................................................... 17

7  Khawar v. Globe Int'l, Inc., 965 P.2d 696 (Cal. 1998) .................................... 12, 14

8  Knievel v. ESPN, 393 F.3d 1068 (9th Cir. 2005) ................................................ 22

9  Las Vegas Sun, Inc. v. Summa Corp., 1977 U.S. Dist. LEXIS 15774

10  (D. Nev. May 23, 1977) ................................................................ 40

11  Leonardini v. Shell Oil Co., 264 Cal. Rptr. 883 (Ct. App. 1989) ......................... 40

12  Lexalt v. McClatchy, 116 F.R.D. 438 (D. Nev. 1987) ...................................... 3

13  Lopez v. United Parcel Serv., Inc., 2009 U.S. Dist. LEXIS 47520

14  (D. Nev. Mar. 12, 2009) .............................................................. 37

15  Lubin v. Kunin, 117 Nev. 107, 17 P.3d 422 (2001) ....................................18-19, 22

16  Lundell Mfg. Co., Inc. v. Am. Broad. Co., Inc., 98 F.3d 351 (8th Cir. 1996) ........ 25

17  MacLeod v. Tribune Publ'g Co., 343 P.2d 36 (Cal. 1959) .............................. 24, 35

18  Masson v. New Yorker Magazine, Inc., 895 F.2d 1535 (9th Cir. 1989),

19  rev'd, 501 U.S. 496 (1991) ........................................................24-25

20  Masson v. New Yorker Magazine, Inc., 960 F.2d 896 (9th Cir. 1992).................. 14

21  Medifast, Inc. v. Minkow, 2011 U.S. Dist. LEXIS 33412

22  (S.D. Cal. Mar. 29, 2011) ............................................................. 21

23  Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990) ....................................... 16, 21

24  Mkhitaryan v. U.S. Bancorp, 2013 U.S. Dist. LEXIS 111903

25  (D. Nev. Aug. 8, 2013) ............................................................... 36, 40

26  Monex Deposit Co. v. Gilliam, 680 F. Supp. 2d 1148 (9th Cir. 2010).................. 41

27  Mosesian v. McClatchy Newspapers, 285 Cal. Rptr. 430 (Ct. App. 1991) ........... 13

28  Nev. Indep. Broad. Corp. v. Allen, 99 Nev. 404, 664 P.2d 337 (1983).................. 17

1  Nicosia v. De Rooy, 72 F. Supp. 2d 1093 (N.D. Cal. 1999) .............................22-23

2  Norditrack, Inc. v. Wilson, 1994 U.S. Dist. LEXIS 19652

3  (D. Or. May 9, 1994) ..............................................................................5

4  Obsidian Fin. Grp., LLC v. Cox, 2012 U.S. Dist. LEXIS 43125

5  (D. Or. Mar. 27, 2012) .......................................................................... 14

6  Obsidian Fin. Grp., LLC v. Cox, 812 F. Supp. 2d 1220 (D. Or. 2011) . 18-20, 22-23

7  Oja v. U.S. Army Corps of Eng'g, 440 F.3d 1122 (9th Cir. 2006) .......................4-5

8  Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC, 2011 Del. Ch.

9  LEXIS 116 (Del. Chan. Ct. May 25, 2011) ............................................... 21

10  Partington v. Bugliosi, 56 F.3d 1147 (9th Cir. 1995)........................................16, 23

11  Peck v. Maaskant (In re Peck), 295 B.R. 353 (B.A.P. 9th Cir. 2003)....................... 8

12  Pegasus v. Reno Newspapers, Inc., 118 Nev. 706, 57 P.3d 82 (2002) .10, 17, 19, 22

13  People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd.,

14  111 Nev. 615, 895 P.2d 1269 (1995)...................................................... 35

15  Phantom Touring, Inc. v. Affiliated Publ'ns, 953 F.2d 724 (1st Cir. 1992) ........... 23

16  Pitale v. Holestine, 2012 U.S. Dist. LEXIS 24631 (N.D. Ill. Feb. 27, 2012) ........ 18

17  Ramirez v. Clark Cnty., 2011 U.S. Dist. LEXIS 80526

18  (D. Nev. July 22, 2011) ....................................................................... 40

19  Republic Tobacco Co. v. N. Atl. Trading Co., 381 F.3d 717 (7th Cir. 2004)......... 33

20  Rickards v. Canine Eye Registration Found., Inc., 704 F.2d 1449

21  (9th Cir. 1983)...................................................................................... 44

22  Riggs v. Clark Cnty. Sch. Dist., 19 F. Supp. 2d 1177 (D. Nev. 1998)............. 17, 22

23  Roberts v. McAfee, Inc., 660 F.3d 1156 (9th Cir. 2011) ........................................4-5

24  Rosario v. Clark Cnty. Sch. Dist., 2013 U.S. Dist. LEXIS 93963

25  (D. Nev. July 3, 2013) ........................................................................37-38

26  Sandals Resorts Int'l, Ltd. v. Google, Inc., 925 N.Y.S.2d 407

27  (N.Y. App. Div. 2011) ....................................................................... 19, 22

28  Sebastian Int'l, Inc. v. Russolillo, 162 F. Supp. 2d 1198 (C.D. Cal. 2001) ........... 41

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  Selleck v. Globe Int'l, Inc., 212 Cal. Rptr. 838 (Ct. App. 1985) ............................ 35

2  Sentry Ins. v. Estrella Ins. Serv., Inc., 2013 U.S. Dist. LEXIS 83282

3  (D. Nev. June 13, 2013) ...................................................................................... 31-32

4  Sheppard v. Freeman, 79 Cal. Rptr. 2d 13 (Ct. App. 1998) .............................. 36-37

5  Standing Comm. v. Yagman, 55 F.3d 1430 (9th Cir. 1995) ................................... 22

6  Suzuki Motor Corp. v. Consumers Union of U.S., Inc., 330 F.3d 1110

7  (9th Cir. 2003) .................................................................................................... 14-15

8  Switzer v. Rivera, 174 F. Supp. 2d 1097 (D. Nev. 2001) ...................................... 38

9  Transcription Commc'ns Corp. v. John Muir Health, 2009 U.S. Dist. LEXIS

10  25151 (N.D. Cal. Mar. 13, 2009) ........................................................................... 41

11  TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc., 913 F.2d 676

12  (9th Cir. 1990) ........................................................................................................ 41

13  Troy Grp., Inc. v. Tilson, 364 F. Supp. 2d 1149 (C.D. Cal. 2005) ........................ 22

14  Truck Ins. Exch. v. Tetzlaff, 683 F. Supp. 223 (D. Nev. 1988) .............................. 3

15  Unelko Corp. v. Rooney, 912 F.2 1049 (9th Cir. 1990) .......................................... 23

16  Vachet v. Cent. Newspapers, Inc., 816 F.2d 313 (7th Cir. 1987) .......................... 25

17  Van Buskirk v. Cable News Network, Inc., 284 F.3d 977 (9th Cir. 2002) ........ 24-25

18  Vegod Corp. v. Am. Broad. Co., Inc., 603 P.2d 14 (Cal. 1979) ............................ 12

19  Wash. Post Co. v. Keogh, 365 F.2d 965 (D.C. Cir. 1966) ....................................... 2

20  Weller v. Am. Broad. Co., Inc., 283 Cal. Rptr. 644 (Ct. App. 1991) .................... 19

21  Westside Ctr. Assocs. v. Safeway Stores 23, Inc., 49 Cal. Rptr. 2d 793

22  (Ct. App. 1996) ....................................................................................................... 44

23  Williams v. Univ. Med. Ctr. of S. Nev., 688 F. Supp. 2d 1134

24  (D. Nev. Feb. 25, 2010) .......................................................................................... 40

25  Williams v. Univ. Med. Ctr. of S. Nev., 2010 U.S. Dist. LEXIS 76995

26  (D. Nev. July 28, 2010) ............................................................................................ 4

27  Winchinsky v. Mosa, 109 Nev. 84, 847 P.2d 727 (1993) ................................. 40-41

28  Wynn v. Smith, 117 Nev. 6, 16 P.3d 424 (2001) ................................................... 22

Zagg, Inc. v. Catanach, 2012 U.S. Dist. LEXIS 139095
(E.D. Pa. Sept. 27, 2012) ...........................................................................18

**Rules**
Fed. R. Civ. P. 8............................................................................................45
Fed. R. Civ. P. 56.......................................................................................1-2
Fed. R. Evid. 201 .........................................................................................20

**Statutes**
Cal. Civ. Code § 48a....................................................................................33
Nev. Rev. Stat. § 41.334..............................................................................33

**Treatises**
Restatement (Second) of Conflict of Laws § 6 (1971)...........................5-6
Restatement (Second) of Conflict of Laws § 145 (1971).........................6
Restatement (Second) of Conflict of Laws § 150 (1971)......................3-6
Restatement (Second) of Conflict of Laws § 153 (1971)..................3, 5-6
Restatement (Second) of Torts § 46 (1965)..................................36, 38
Restatement (Second) of Torts § 563 (1977)....................................24
Restatement (Second) of Torts § 611 (1977)....................................30
Restatement (Second) of Torts § 766 (1977)....................................41
Restatement (Second) of Torts § 912 (1979)....................................45

## **MEMORANDUM OF POINTS AND AUTHORITIES**

Conspicuously absent from Defendants' MSJ is any law regarding defamation by implication, which courts have long held is the most harmful form of defamation:

> A charge need not be made directly; indeed, the venom and sting of an accusation is usually more effective when made by insinuations. The floating calumny which each reader may affix to any and every official act which his aroused suspicion may lay hold of is capable of inflicting graver injury and injustice than a direct, specific charge, which may be squarely met and refuted, if untrue.

Empire Printing Co. v. Roden, 247 F.2d 8, 14 (9th Cir. 1957) (quoting Sherin v. Eastwood, 190 N.W. 320, 323 (S.D. 1922)). This omission speaks a thousand words.

## I.      FACTUAL BACKGROUND.

This case is about Defendants Ross B. Hansen's ("Hansen"), Northwest Territorial Mint, LLC's ("NWTM") and Steven Earl Firebaugh's ("Firebaugh") (collectively, "Defendants") publication of two websites asserting Plaintiffs Bradley Stephen Cohen ("Cohen"), the founder, sole owner and Chief Executive Officer of Cohen Asset Management, Inc. ("CAM") (collectively, "Plaintiffs"), is the next Bernard Madoff ("Madoff")—the most infamous fraudster in U.S. history—because Plaintiffs are supposedly running a Ponzi scheme, fraud or scam, playing a shell game and looting company assets.  Defendants had no evidence supporting these criminal accusations, but implied otherwise by, for example, using racketeering and fraud convictions of another Brad Cohen.  Defendants' websites ultimately defamed Plaintiffs, invaded their privacy, caused Cohen emotional distress and interfered with their business.  Defendants moved for summary judgment on all of Plaintiffs' claims except their intentional inference with actual contractual relationships claim.

For the sake of brevity, Plaintiffs fully incorporate by reference herein their Statement of Material Facts ("PSOMF").

## II.      LEGAL ANALYSIS.

### A.      **Defendants Have Not Met High Summary Judgment Standard.**

A court may only "grant summary judgment if the movant shows there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord* <u>Archway Ins. Servs., LLC v. Harris</u>, 2013 U.S. Dist. LEXIS 138550, at *3 (D. Nev. Sept. 26, 2013).[1]   As set forth in Plaintiffs' PSOMF and Response to Defendants' Concise Statement of Material Facts Not Genuinely In Dispute ("DSOMF") in support of their MSJ, which are fully incorporated by reference herein, Defendants failed to prove there is no genuine dispute as to any material fact.  Also, as shown below, viewing the facts in Plaintiffs' favor, Defendants failed to prove they are entitled to judgment as a matter of law on Plaintiffs' claims.  Thus, the Court must deny Defendants' MSJ.[2]

**B.   <u>Nevada Law Governs Plaintiffs' Claims.</u>**

A federal court sitting in diversity must apply the forum state's choice of law rules.  <u>Giles v. GE Money Bank</u>, 2011 U.S. Dist. LEXIS 111018, at *6 (D. Nev. Sept. 27, 2011) (citing <u>Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.</u>, 313 U.S. 487, 496 (1941); <u>Abagados v. AT&T, Inc.</u>, 223 F.3d 932, 934 (9th Cir. 2000)).  "Nevada applies the 'most significant relationship test' from the Restatement (Second) of Conflict of Laws § 145 to decide choice of law issues in tort actions, 'unless another, more specific section of the Second Restatement applies to the particular

---

[1] "An issue is genuine . . . if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is material . . . if it could affect the outcome of the suit under governing law." <u>Archway Ins.</u>, 2013 U.S. Dist. LEXIS 138550, at *3 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986)).  "The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact." *Id.* (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  The court must view "the facts in the light most favorable to the nonmoving party" on a summary judgment motion. *Id.* (citing <u>Bagdadi v. Nazar</u>, 84 F.3d 1194, 1197 (9th Cir. 1996)).

[2] Defendants argue courts favor the early resolution of defamation disputes. *See* MSJ at 5.  Defendants' out-of-circuit case is neither precedential nor persuasive authority here as it strictly relates to "libel suits filed by public officials" against persons exercising their "First Amendment rights with respect to the conduct of their government." <u>Wash. Post Co. v. Keogh</u>, 365 F.2d 965, 968 (D.C. Cir. 1966).

tort.'"  Deboles v. Nat'l R.R. Passenger Corp., 2012 U.S. Dist. LEXIS 23558, at *4 (D. Nev. Feb. 24, 2012) (quoting Gen. Motors Corp. v. Eighth Judicial Dist. Ct., 122 Nev. 466, 474, 134 P.3d 111, 117 (2006)).[3]  More specific sections of Restatement (Second) of Conflict of Laws (the "Restatement") apply to Plaintiffs' tort claims.

Restatement § 150 applies to Plaintiffs' defamation and injurious falsehood claims and Section 153 applies to Plaintiffs' invasion of privacy claim.  Restatement § 150 sets forth the following choice of law rules for multistate defamation:

> (1) The rights and liabilities that arise from defamatory matter in any one edition of a book or newspaper, or any one broadcast over radio or television, exhibition of a motion picture, or similar aggregate communication are determined by the local law of the state which, with respect to the particular issue, has the *most significant relationship* to the occurrence and the parties under the principles stated in § 6.

> (2) When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will *usually* be the state where the person was domiciled at the time, *if the matter complained of was published in that state*.

> (3) When a corporation, or other legal person, claims that it has been defamed by an aggregate communication, the state of most significant relationship will *usually* be the state where the corporation, or other legal person, had its principal pace of business at the time, *if the matter complained of was published in that state*.

(Emphasis added).[4]  Accordingly, under Restatement § 150, the state with the most significant relationship will usually (but not always) be the state where the person was domiciled or corporation had its principal place of business at the relevant time, but only if the matter complained of was "published in" that same state.  *Id.*

---

[3] Since Nevada currently applies the most significant relationship test from the Restatement (Second) of Conflict of Laws, Defendants' reliance on antiquated cases applying "the First Restatement's vested rights theory" or "lex loci rule" is misplaced.  *See* MSJ at 6 (citing Truck Ins. Exch. v. Tetzlaff, 683 F. Supp. 223, 225 (D. Nev. 1988); Lexalt v. McClatchy, 116 F.R.D. 438, 447 (D. Nev. 1987)).

[4] Since Section 153 is substantially similar to Section 150, Plaintiffs' analysis of Section 150 applies to Section 153.  *Compare* Restatement § 153 *to id.* § 150.

1    For purposes of Restatement § 150, Defendants argue—without any
2    precedential or persuasive authority—that their defamatory websites were published
3    in California because they were seen in California.  *See* MSJ at 5-6.  Defendants are
4    incorrect.  Defendants' interpretation is contradicted by the controlling (and
5    majority) legal authority holding an Internet publication constitutes one single
6    publication and is published when first made available to the public.  While a
7    website is published *to* persons in multiple states, a website is only "published *in*"
8    one state, and that one state governs the analysis in Restatement § 150(2)-(3).

9    "Internet publication is a form of 'aggregate communication' in that it is
10   intended for a broad, public audience, similar to print media."  <u>Oja v. U.S. Army</u>
11   <u>Corps of Eng'g</u>, 440 F.3d 1122, 1131 (9th Cir. 2006) (citation omitted).  "In both
12   print and Internet publishing, information is generally considered 'published' when
13   it is made available to the public."  *Id.* (citing <u>Firth v. State</u>, 706 N.Y.S.2d 835, 841
14   (N.Y. Ct. Cl. 2000)).  "Once information has been published on a website or print
15   media, there is no further act required by the publisher to make the information
16   available to the public."  *Id.*  Based on these similarities, the Ninth Circuit held the
17   single publication rule applies to Internet publications.  *Id.* at 1129-33.  This is
18   consistent with other federal and state courts, which "have generally concluded that
19   the posting of information on the web should be treated in the same manner as the
20   publication of traditional media . . . that is, that traditional media's 'single
21   publication rule' should apply to postings on the Internet."  *Id.* at 1130 (collecting
22   federal and state court cases applying single publication rule to Internet postings).[5]

23   "Under the single publication rule, 'any one edition of a book or newspaper,

---

24   [5]  *See also* <u>Roberts v. McAfee, Inc.</u>, 660 F.3d 1156, 1166-67 (9th Cir. 2011)
25   (collecting California Court of Appeal cases uniformly applying single publication
     rule to websites); <u>Williams v. Univ. Med. Ctr. of S. Nev.</u>, 2010 U.S. Dist. LEXIS
26   76995, at *11 (D. Nev. July 28, 2010) (concluding "Nevada likely would follow
     other jurisdictions in adopting the single publication rule" and "Nevada likely would
27   follow the Restatement (Second) of Torts § 577A").

28

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

or any one radio or television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication.'" *Id.* at 1130 (quoting Restatement (Second) of Torts § 577A(3) (1977)).   "Information is generally considered 'published' within the meaning of the single-publication rule when it is first made available to the public," like when information is first posted on the subject website.  <u>Roberts</u>, 660 F.3d at 1167 (citing <u>Traditional Cat Ass'n, Inc. v. Gilbreath</u>, 13 Cal. Rptr. 3d 353, 359 (Ct. App. 2004)).   As this Court previously determined from the evidence, "defendants created or published the websites in dispute from Nevada" (Doc. No. 78 at 5).  *See also* PSOMF ¶¶ 1 & 7-29.

Even if, *arguendo*, the Court were to accept Defendants' erroneous interpretation and conclude the websites were "published in" California, Restatement § 150(2) or (3) is "not an absolute rule."  <u>Norditrack, Inc. v. Wilson</u>, 1994 U.S. Dist. LEXIS 19652, at *7 (D. Or. May 9, 1994).  "The rule of this Section [150] calls for application of the local law of the state selected pursuant to provisions of Subsection (2) and (3) *unless*, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties."  Restatement § 150, cmt. b; *accord id.*§ 153, cmt. b.  Therefore, the Court must also consider which state "has the most significant relationship to the occurrence and the parties under the principles stated in § 6."  Restatement § 150(1).

The Restatement § 6 factors are: (a) needs of the interstate and international systems; (b) relevant policies of the forum; (c) relevant policies of other interested states and relative interests of those states in the determination of the particular issue;[6] (d) protection of justified expectations; (e) basic policies underlying the

---

[6] Particular issues in multistate defamation and invasion of privacy for the Court to consider are whether a given communication is defamatory and, if so, whether it constitutes libel or slander, whether proof of special damages is essential to plaintiff's recovery, what persons are protected by the law of defamation, what constitutes the publication of defamatory matter, whether the publisher of defamatory matter is strictly liable or whether he is liable only if he published the (footnote continued)

1    particular field of law; (f) certainty, predictability and uniformity of result; and (g)

2    ease in determination and application of the law to be applied.  "The section 6

3    factors inject flexibility into the choice-of-law analysis . . . analysis of the section 6

4    factors considers the 'content of and the policies behind the [forum and nonforum

5    state's] competing internal laws.'  This is the crux on which an informed decision

6    rests its reasoning."  <u>Gen. Motors</u>, 122 Nev. at 475, 134 P.3d at 117 (citation

7    omitted).  In applying the Section 6 principles, the Court must also take into account

8    the following contacts: (a) the place where the injury occurred; (b) the place where

9    the conduct causing the injury occurred; (c) the domicile, residence, nationality

10   place of incorporation and place of business of the parties; and (d) the place where

11   the relationship, if any, between the parties is centered.  Restatement § 145(2).  *See,*

12   *e.g.*, <u>Deboles</u>, 2012 U.S. Dist. LEXIS 23558, at *4-8 (finding state other than

13   plaintiffs' domicile bears most significant relationship to the occurrence and parties

14   after considering all factors and principles in Restatement §§ 6, 145 and 146).

15        Defendants ignore the foregoing factors and contacts altogether, which

16   analyzed here show Nevada has the most significant relationship to the occurrence

17   and the parties.  While Cohen is domiciled in California and CAM is incorporated in

18   California, Plaintiffs do business nationwide, including in Nevada where they have

19   an investor, and Plaintiffs and their reputations have been injured nationwide by the

20   websites posted on the World Wide Web for all to see.  *See* DSOMF ¶ 6; PSOMF ¶

21   2.  The Google Analytics reports for the second website show the website has been

22   viewed all across the country and overseas.  *See* PSOMF ¶ 3.   As for Defendants,

23   the Court already found from the evidence Firebaugh is a resident of Nevada,

24   Hansen is a part-time resident of Nevada based on his regular physical presence in

25
26   defamatory matter intentionally or negligently, the circumstances under which
     publication of defamatory matter is protected by an absolute or by a qualified
27   privilege, whether truth is a defense and what matters may be considered a partial
     defense in mitigation of damages.  *See* Restatement §150, cmt. b; *id.* § 153, cmt. b.

28

1  Nevada and significant business in Nevada, and NWTM is registered to do and does

2  significant business in Nevada with a physical address and corporate offices in

3  Nevada (Doc. No. 78 at 2 & 4-5).  *See also* PSOMF ¶¶ 4-6.

4       The place where the conduct causing the injury occurred is also Nevada,

5  where Firebaugh and another NWTM employee, Matthew Fiske ("Fiske"), both

6  Nevada residents, did all of the following acts at NWTM's facility *in Nevada*: (1)

7  attended meetings about the websites with Hansen and NWTM's in-house counsel,

8  Catherine Hopkins ("Hopkins"), who regularly sent website content, revisions and

9  requests to Firebaugh and Fiske; (2) researched, purchased, and renewed the

10  websites' domain and hosting services and communicated with such service

11  providers; (3) hosted one website on Fiske's local computer and propagated and

12  uploaded the websites in Nevada; (4) created and managed the websites, *e.g.*, made

13  revisions, created graphs, installed a website counter and a comment section,

14  obtained and uploaded materials relating to Brad Scott Cohen, photos of Madoff,

15  photos of Cohen's home, a CAM financial report and a demand letter, and

16  monitored and reported on the websites' visitors and comments; and (5) performed

17  search engine optimization and link-building for the websites.  *See* PSOMF ¶¶ 7-29.

18  Thus, it is clear the conduct causing the injury occurred in Nevada and any

19  "relationship" existing between the parties as to the websites is centered in Nevada.

20       Lastly, Nevada has a great interest in deciding how much protection, if any, to

21  give to Nevada speakers, *i.e.*, Defendants.  *See* Competitive Techs. v. Fujitsu, Ltd.,

22  286 F. Supp. 2d 1118, 1158 (N.D. Cal. 2003) (quoting Global Relief Found. v. N.Y.

23  Times Co., 2002 U.S. Dist. LEXIS 17081, at *32 (N.D. Ill. Sept. 11, 2002)).

24       Considering all of the factors and principles in Restatement §§ 6, 145(2) and

25  150, the Court must find Nevada bears the most significant relationship to the

26  websites, Plaintiffs and Defendants, and therefore find Nevada law governs this

27  dispute.  Nevertheless, even if, *arguendo*, the Court finds California law governs

28  this dispute, the Court must deny Defendants' MSJ as demonstrated below.

**C.   Plaintiffs Have Suffered Actual Damages.**

Defendants argue Plaintiffs have not established actual damages and therefore summary judgment in their favor is proper on Plaintiffs' claims allegedly requiring actual damages, including defamation, false light invasion of privacy and intentional interference with expected future business. *See* MSJ at 6-7. Defendants are wrong.

The United States Supreme Court wrote actual injury in the context of defamatory falsehood "is not limited to out-of-pocket loss" and customarily includes "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974). Put another way, actual damages are compensatory damages that include nonquantifiable general damages for emotional distress and loss of reputation (*i.e.*, general damages) and pecuniarily measureable special damages for out-of-pocket losses (*i.e.*, special damages). Peck v. Maaskant (In re Peck), 295 B.R. 353, 366 (B.A.P. 9th Cir. 2003) (quoting Konig v. Fair Em't & Hous. Comm'n, 50 P.3d 718, 748 (Cal. 2002)). Plaintiffs stated in their interrogatory answers they are seeking general and presumed damages for their defamation *per se* and false light invasion of privacy claims. *See* MSJ, Ex. E at 3-4 & 9; MSJ, Ex. F at 3-4 & 9. While Plaintiffs stated they were not then seeking "actual damages," as Defendants' interrogatory asked about "actual damages," the parties clearly intended "actual damages" to mean "special damages." Using "actual damages" instead of "special damages" "is not without precedent, as the terms have occasionally been used interchangeably." FAA v. Cooper, 132 S. Ct. 1441, 1445 (2012).

Plaintiffs answered Defendants' interrogatories regarding their damages for defamation *per se* and false light invasion of privacy as follows:

> Plaintiffs have had lenders and equity investors make inquiries and conduct investigations because of the information contained on the subject websites, investors who had inquired or chosen to invest less monies with Plaintiffs because of the information contained on the subject websites, and our insurance company was initially hesitant this year in renewing substantial insurance coverage we maintain solely

1
2
3
4

because of the information contained on the subject websites. The websites have caused Plaintiffs considerable angst and lost productivity and have forced Plaintiffs' to spend many hundreds of thousands of dollars tracking down the perpetrators and pursuing litigation to shut down the defamatory websites.

5
6
7
8
9
10

Plaintiffs have been damaged by the harm to their reputation, shame, mortification, and hurt feelings. Plaintiffs are constantly concerned about others learning of the websites and choosing to shun or not do business with Plaintiffs. Plaintiffs have had to spend time explaining the circumstances to those persons who have brought the websites to their attention. Plaintiffs are equally concerned with those persons who have found the websites, but not discussed it with Plaintiffs thus not affording Plaintiffs the opportunity to respond to the allegations of fraud, scams, Ponzi schemes, looting, and the like on the defamatory websites.

11
12
13

Having the Plaintiff's personal residence put on the internet and connected to him, together with the insinuations and accusations made in the website have caused Plaintiff Bradley Cohen to fear for his and his family's safety, discomfort and distress.

14
15
16
17
18
19
20
21
22
23
24

*See* MSJ, Ex. E at 3-4 & 9; MSJ, Ex. F at 3-4 & 9. Plaintiffs disclosed declarations from the referenced lenders, investors and insurance company. *See* PSOMF ¶ 30. Cohen attests to additional damages he and CAM have suffered, such as incurring thousands of dollars in expenses to attempt, fruitlessly, to make the websites less prevalent in Internet search results. *See id.* ¶ 31. It is also important to note the second website (bradleyscohen.com), which is still active online, has been viewed, according to its counter, by at least 79,000 visitors, including several of Plaintiffs' friends, lenders, investors, tenants, vendors and service providers. *See id.* ¶¶ 32-33. Taking these facts and construing them in the light most favorable to Plaintiffs, it is clear Plaintiffs have suffered actual damages and Defendants are not entitled to summary judgment on any of Plaintiffs' claims for alleged lack of actual damages.

25

    **D.**    **Plaintiffs Have Established Defamation.**

26

        **1.**    **Plaintiffs Are Not Limited-Purpose Public Figures.**

27
28

Defendants argue Plaintiffs are limited-purpose public figures subject to a higher standard for proving defamation. *See* MSJ 8-10. Defendants are incorrect.

**a.     Nevada law.**

Under Nevada law, "[a] limited public figure is a person who voluntarily injects himself or is thrust into a particular public controversy or public concern, and thereby becomes a public figure for a limited range of issues." Pegasus v. Reno Newspapers, Inc., 118 Nev. 706, 720, 57 P.3d 82, 91 (2002) (citing Gertz, 418 U.S. at 351).   In Nevada, "determining whether someone is a limited public figure includes examining whether a person's role in a matter of public concern is voluntary and prominent." Id. (citing Gertz, 418 U.S. at 351-52; Curtis Publ'g Co. v. Butts, 388 U.S. 130, 154-55 & 164 (1967)).   In deciding whether a person is a limited purpose public figure, Nevada adopted the test in Gertz, which stated:

> We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes.  Absent clear evidence of general fame and notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life.  It is preferable to reduce the public-figure position to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.

Id. (quoting Gertz, 418 U.S. at 352).  Based on this test, Plaintiffs doing commercial real estate business does not, in and of it itself, make Plaintiffs limited-purpose public figures.   To hold otherwise would mean anyone engaged in any type of business qualifies as a limited-purpose public figure for that entire business area.

Defendants do not argue Plaintiffs voluntarily injected themselves or were thrust into a public controversy. See MSJ at 7.  Instead, Defendants argue Plaintiffs are limited-purpose public figures based on Pegasus.  In Pegasus, the court followed other jurisdictions to hold a restaurant "is a public figure for the limited purpose of a food review or reporting on its goods and services" because the restaurant "voluntarily entered the public spectrum by providing public accommodation and seeking public patrons."  118 Nev. at 721, 57 P.3d at 92.  This narrow holding in Pegasus is easily distinguishable from this case that does not involve a restaurant,

place of public accommodation, food review or report on a good or service. Plaintiffs' investments are available only to accredited investors, and only through a close-knit group, not the general public. *See* DSOMF ¶ 74; PSOMF ¶ 34.

This case is more analogous to that involving a doctor whom the defendant alleged "was a limited-purpose public figure for speech concerning his role as a plastic surgeon" because the doctor "was well-known, highly regarded, and had a national reputation as a plastic surgeon." Bongiovi v. Sullivan, 122 Nev. 556, 571, 138 P.3d 433, 445 (2006). The court rejected the defendant's argument:

> Consistent with the majority of courts, we conclude that a doctor is not a limited-purpose public figure unless that doctor voluntarily comes to the forefront of a national or local debate concerning medical issues or has 'affirmatively step[ped] outside of [his] private realm[] of practice to attract public attention.' We conclude that [the doctor's] professional achievements are insufficient to render him a limited-purpose public figure. Also, he did not voluntarily thrust himself into a public controversy. Further, [defendant's] statements did not concern a public controversy or issue and were made solely in the individual interest of himself and [another doctor]. [Defendant's] speech was wholly false and damaging to [the doctor's] business reputation, and because [the doctor] is not a public figure and the speech was not a matter of public concern, [defendant's] speech is entitled to no special protection. Lastly, distinguishable from the newspaper in [Pegasus], [defendant] is not a media defendant reporting on the goods and services of a public accommodation. Accordingly, we conclude that the district court properly determined that [the doctor] was not a limited-purpose public figure and properly denied an actual malice instruction.

*Id.* at 573-74, 138 P.3d at 446. All of these same points hold true in this case.

### b.   California law.

California defines a limited-purpose public figure like Nevada and requires the following: (1) a public controversy; (2) the plaintiff undertook some voluntary act by which he or she sought to influence resolution of the public issue; and (3) the alleged defamation is germane to the plaintiff's participation in the public controversy. Ampex Corp. v. Cargle, 27 Cal. Rptr. 3d 863, 870 (Ct. App. 2005).

Defendants have not identified a public controversy, *i.e.*, a publicly debated issue with foreseeable and substantial ramifications for nonparticipants, that existed

11

1   when Defendants published the websites in 2012.  *Id.*  Ponzi schemes and fraud,

2   unlike the death penalty or gun control, are not controversial.  *See also, e.g.*, Annette

3   F. v. Sharon S., 15 Cal. Rptr. 3d 100, 112-14 (Ct. App. 2004) (former lesbian

4   partner in child custody dispute was public figure due to concurrent desire to draw

5   attention to gay rights issues of case); Hofmann Co. v. E.I. Du Pont De Nemours &

6   Co., 248 Cal. Rptr. 384, 392-93 (Ct. App. 1988) (land developer was public figure

7   in seeking public approval for housing construction project near toxic chemical

8   plant).  While Ponzi schemes and fraud are public concerns, the crimes have no

9   advocates and in no way have been publicly debated.  The California Supreme Court

10  squarely addressed and rejected Defendants' attempt to conflate public interest with

11  public controversy.[7]  *See* Vegod Corp. v. Am. Broad. Co., Inc., 603 P.2d 14, 17-18

12  (Cal. 1979) ("The public interest test was expressly rejected [by the United States

13  Supreme Court] . . . in favor of the public controversy test.").

14       Regardless, Plaintiffs likewise have nothing to do with the public interest

15  concern over Ponzi schemes or fraud as Plaintiffs have never been investigated for

16  either crime, quoted by any publication commenting on either crime, or tied in any

17  way to either crime.  *See, e.g.*, Khawar v. Globe Int'l, Inc., 965 P.2d 696, 698 (Cal.

18  1998) (journalist photographed near Robert Kennedy moments before assassination

19  "who was never a suspect in the government's investigation of the assassination,

20  whose views on the assassination were never publicized, and who never sought to

21  influence public discussion about the assassination," was not public figure).  In sum,

22  Plaintiffs have in no way thrust themselves into the public light regarding Ponzi

23       [7] The lone case cited by Defendants does not apply as it interprets the "public
24  issue/issue of public interest" requirement in California's anti-SLAPP statute and
    not the "public controversy" requirement in the limited-purpose public figure test.
25  *See* MSJ at 9 (citing Healthcare Holdings, Inc. v. Fitzgibbons, 44 Cal. Rptr. 3d 517,
    524 (Ct. App. 2006)).  Defendants do not and cannot cite to any precedential or
26  persuasive legal authority holding "the financial health and integrity of institutions
    whose resources are available to the public" constitute a public controversy under
27  the limited-purpose public figure test.  *Id.*  The fact is there is no public controversy
    over Plaintiffs, the commercial real estate business, Ponzi schemes or fraud.

28

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  schemes, fraud or any other financial crimes.  Defendants cannot bootstrap Plaintiffs

2  into the roles of limited-purpose public figures because *Defendants themselves*

3  attempted to inject Plaintiffs into the public concern over Ponzi schemes and fraud,

4  and the statements on Defendants' websites cannot create a public controversy.  *See*

5  Mosesian v. McClatchy Newspapers, 285 Cal. Rptr. 430, 440 (Ct. App. 1991)

6  ("defamation defendant cannot create a defense by creating a controversy from the

7  content of defamatory statements, and . . . a plaintiff does not become a public

8  figure simply by responding to defamatory statements") (citing Hutchinson v.

9  Proxmire, 443 U.S. 111, 135 (1979); Time, Inc. v. Firestone, 424 U.S. 448, 454-55

10  (1976)).  To hold otherwise would mean anyone who has been defamed becomes a

11  limited-purpose public figure at least with respect to the defamatory comments.

12      The lack of a "public controversy" and the lack of Plaintiffs' relation to the

13  issues of Ponzi schemes and fraud is underscored by the fact NWTM's employees

14  could not find a single complaint or pejorative comment about Plaintiffs, and

15  Defendants only received spam comments on their websites.  *See* PSOMF ¶¶ 25 &

16  35.  Defendants do not and cannot explain how Plaintiffs' activities in the real estate

17  industry—like being members of two associations and one board and speaking at a

18  real estate investing event (which in no conceivable way touched on issues relating

19  to financial crimes)—relate to the public concern of Ponzi schemes and fraud.

20      Realizing their lack of evidence, Defendants argue Plaintiffs were "pulled into

21  the vortex of public controversy over financial institutions . . . by virtue of their

22  participation in a publicly scrutinized industry."  While one could "become a public

23  figure through no purposeful action of his own . . . the instances of truly involuntary

24  public figures must be *exceedingly rare*."  Mosesian, 285 Cal. Rptr. at 436 (quoting

25  Gertz, 418 U.S. at 345) (emphasis added).[8]  This is not one of those rare cases.

26  _____

27  [8] *See also* Dameron v. Wash. Magazine, Inc., 779 F.2d 736, 741-42 (D.C. Cir. 1985) ("Supreme Court has recognized that it is . . . difficult and rare to become a limited-purpose public figure involuntarily"); *id.* at 743 ("circumstances in which an

28  (footnote continued)

1    Based on the foregoing, the Court must find Plaintiffs are not limited-purpose

2 public figures and thus, Plaintiffs may need to only prove negligence,[9] but not actual

3 malice, to prevail on their defamation claim under Nevada law or California law.

### c.    Defendants acted with actual malice.

5    Even if, *arguendo*, Plaintiffs are limited-purpose public figures under Nevada

6 or California law, Plaintiffs can prove Defendants acted with actual malice.  "The

7 Supreme Court has defined actual malice as publication with the knowledge that a

8 statement is false, or with a reckless disregard for truth or falsity."  Kaelin v. Globe

9 Commc'ns Corp., 162 F.3d 1036, 1042 (9th Cir. 1998) (citing N.Y. Times Co. v.

10 Sullivan, 376 U.S. 254, 279-80 (1964)).  Reckless disregard means the defendant

11 entertained serious doubts as to the truth of his publication or had a "high degree of

12 awareness of probable falsity."  Harte-Hanks Commc'ns v. Connaughton, 491 U.S.

13 657, 667 (1989).  The Ninth Circuit interpreted those two tests as follows:

> Where the jury has proof that a publisher "actually had a high degree of awareness of probable falsity," that alone will establish that it "in fact entertained serious doubts as to the truth of [its] publication."  Where such direct proof is missing, the jury may nevertheless infer that the publisher was aware of the falsity if it finds that there were "obvious reasons to doubt" the accuracy of the story, and that the defendant did not act reasonably in dispelling those doubts. . . . that failure is . . . a link in the chain of inferences that could . . . lead a jury to conclude that the publisher failed to conduct an investigation because it was already pretty much aware of the falsity. As Harte-Hanks points out, "although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category."

21 Masson v. New Yorker Magazine, Inc., 960 F.2d 896, 900 (9th Cir. 1992) (quoting

22 Harte-Hanks, 491 U.S. at 688, 692).  Like the failure to investigate, financial motive

---

24 involuntary public figure is created will, we are confident, continue to be few and far between."); *accord* Khawar, 965 P.2d at 702.

25    [9] Currently on appeal is the issue of "whether a private figure plaintiff who

26 sues a non-media defendant [like a blogger] regarding allegedly defamatory statements made on a private issue, is required to demonstrate negligence to

27 establish liability."  *See* Obsidian Fin. Grp., LLC v. Cox, 2012 U.S. Dist. LEXIS 43125, at *19-36 (D. Or. Mar. 27, 2012), *on appeal* (9th Cir., Case No. 12-35238).

---

is another relevant factor bearing on the actual malice inquiry.  <u>Suzuki Motor Corp.</u>
<u>v. Consumers Union of U.S., Inc.</u>, 330 F.3d 1110, 1136 (9th Cir. 2003) (citing
<u>Harte-Hanks</u>, 491 U.S. at 668; <u>Kaelin</u>, 162 F.3d at 1042)).

Plaintiffs can satisfy these tests and prove actual malice with the following:

- Defendants published statements, like Plaintiffs being the next Madoff of real estate, running a "scam" or "Ponzi scheme or fraud," "looting" company assets, playing a "shell game," taking millions from tenants, suing tenants based on "unfounded accusations and greed," and suing to "hold off creditors" with little knowledge about Madoff and without any supporting evidence regarding Plaintiffs, even *after* conducting an investigation that revealed not one complaint or pejorative comment about Plaintiffs.  *See* MSJ, Ex. C-D; PSOMF ¶¶ 35-37.

- Defendants conducted no further investigations *after* their initial investigation yielded no evidence supporting their statements even though, for example, Defendants could have easily contacted the parties identified in the articles cited on the websites to learn whether Brad Scott Cohen in Pennsylvania was the same person as Bradley Stephen Cohen in California before implying they were the same person and could have easily researched public records on Plaintiffs' real estate holdings to determine Plaintiffs' valuation and solvency before claiming Plaintiffs were in poor health.  *See id.* ¶¶ 38-39.

- Defendants bought the websites with a prepaid card registered under a false name (the same name of a local U.S. serviceman) and published the websites anonymously, making it more difficult for Plaintiffs to trace the source of the websites and get them taken down.  *See id.* ¶¶ 40-43.  If Defendants believed the statements were true, then they had no reason to take such drastic measures to conceal their identities.

- Defendants engaged in search-engine optimization and link building and installed a website counter to give the website a sense of legitimacy and increase the websites' visibility and traffic.  *See id.* ¶¶ 22 & 28.

- Defendants published the websites with the intent to "inflict pain" and get Plaintiffs to "rollover" in the Auburn lawsuit, and Defendants had previously published at least two other defamatory websites about other businesses to gain leverage in their ongoing disputes.  *See id.* ¶¶ 44-46.

- Defendants communicated about the websites through counsel to shield their communications via the attorney-client privilege.  *See id.* ¶ 47.

- Defendants were told the first website was taken down for violating the webhost's terms and conditions and including defamatory content, did

nothing to evaluate it, and instead they published a second website using a webhost with a more liberal fraud policy. *See id.* ¶¶ 48-49.

- Despite Plaintiffs' repeated requests, Defendants refused to take the second website down, posted Plaintiffs' initial demand letter online, renewed the second website and threatened to expand the second website or set-up a third website based on "facts." *See id.* ¶¶ 21 & 50.

Given all of the foregoing, Defendants clearly acted with actual malice in publishing the websites. Moreover, Defendants continue to act with actual malice as they refuse to take down the remaining website despite learning facts that confirm the falsity of their statements, like Plaintiffs running a Ponzi scheme, fraud, scam or shell game and looting company assets, and the Auburn lawsuit being baseless.

## 2. Defendants' Statements Are Not Opinions.

Defendants claim their statements are opinions, not false statements of fact. Defendants are wrong. They only cite part of <u>Gertz</u>, which continues on to explain:

> [T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . . the erroneous statement of fact is not worthy of constitutional protection.

418 U.S. at 340 (citations omitted). Also, while the First Amendment protects pure opinion, a statement that may imply a false assertion of fact is actionable. <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 19 (1990). "Simply couching such statements in terms of opinion does not dispel these [defamatory] implications," because a speaker may still imply a knowledge of facts that could lead to a defamatory conclusion. *Id.*; *accord* <u>Partington v. Bugliosi</u>, 56 F.3d 1147, 1152-53 (9th Cir. 1995).

"If the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication . . . he [she] may be held responsible for the defamatory implication . . . even though particular facts are correct." <u>James v. San Jose Mercury News, Inc.</u>, 20 Cal. Rptr.

16

2d 890, 896 (Ct. App. 1993) (citations omitted).[10]  "The pertinent question . . . is whether a reasonable fact finder could conclude the publication as a whole, or any of its parts, directly made or sufficiently implied a false assertion of defamatory *fact* that tended to injure [the plaintiff's] reputation."  *Id.* at 897.  "If such a fact finder could so conclude, then summary judgment [is] inappropriate."  *Id.*

Separating a factual statement from an opinion requires the Court to decide "whether a reasonable person would be likely to understand the remark as an expression of the source's opinion or as a statement of existing fact."  Pegasus, 118 Nev. at 715, 57 P.3d at 88 (quoting Nev. Indep. Broad. Corp. v. Allen, 99 Nev. 404, 410, 664 P.2d 337, 342 (1983)).  This distinction is "not simple" and "often a close one."  Riggs v. Clark Cnty. Sch. Dist., 19 F. Supp. 2d 1177, 1180-81 & n.4 (D. Nev. 1998) (citations omitted).  While the fact/opinion issue is ordinarily a question of law for the court, where the statement is "ambiguous" or a "mixed type," *i.e.*, gives rise to the inference the opinion was based on underlying, undisclosed defamatory facts, then the issue is reserved for the jury.  Nev. Indep., 99 Nev. at 410-11, 664 P.2d at 342 (citing Good Gov't, Inc. v. Hogard, 586 P.2d 572, 576 (Cal. 1978)).

In determining whether a statement includes a factual assertion, the Court must consider the following factors: (1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact; (2) whether the defendant used figurative or hyperbolic language that negates the impression; and (3) whether the statement in question is susceptible to being proved true or false.  Pegasus, 118 Nev. at 715 n.19, 57 P.3d at 88 n.19 (citing Flowers v. Carville, 112 F. Supp. 2d 1202, 1211 (D. Nev. 2000)).  Considering these factors, Defendants' statements are factual, not opinion, and thus are actionable defamation.

---

[10] *See also* Kapellas v. Kofman, 459 P.2d 912, 919-20 (Cal. 1969) ("We have long recognized that false inferences or implications raised by the arrangement and phrasing of apparently non-libelous statements can be as injurious as explicit epithets . . . .").

a.    <b>Broad context.</b>

Defendants argue their statements are opinions, not facts, because they were published on an anonymous website that was critical of Plaintiffs and accepted comments.  However, the fact Defendants anonymously published the information on websites is not alone determinative.  *See* Obsidian Fin. Grp., LLC v. Cox, 812 F. Supp. 2d 1220, 1238 (D. Or. 2011) ("use of a blog does not . . . automatically insulate the poster from liability"); Doe v. Cahill, 884 A.2d 451, 467 n.78 (Del. 2005) ("We do not hold as a matter of law that statements made on a blog . . . can never be defamatory."); Cohen v. Google, Inc. (In re Cohen), 887 N.Y.S.2d 424, 429 (N.Y. Sup. Ct. 2009) (rejecting "anonymous blogger's argument that this court should find as a matter of law that Internet blogs serve as a modern day forum for conveying personal opinions").[11]  Courts have found statements on blogs actionable, especially when they claim to give factual background and uncover or communicate facts rather than serve as a platform to express opinion.  *See, e.g.*, Zagg, Inc. v. Catanach, 2012 U.S. Dist. LEXIS 139095, at *9-10 (E.D. Pa. Sept. 27, 2012); Pitale v. Holestine, 2012 U.S. Dist. LEXIS 24631, at *20-22 (N.D. Ill. Feb. 27, 2012); Obsidian Fin., 812 F. Supp. 2d at 1237-39; In re Cohen, 887 N.Y.S.2d at 428-29.

Here, Defendants' websites reference "ominous facts," purport to provide a factual background, such as financial information about CAM and Cohen, a link to a CAM financial report and a link to various articles on a Brad Cohen, and reference "investigators" and an "investigation."  *See* MSJ, Ex. C-D; Gordon v. Dalrymple, 2008 U.S. Dist. LEXIS 51863, at *12-13 (D. Nev. July 8, 2008) ("investigation implies verification of factual matters").  The effect of publishing such words and documentation is to "lend" the statements an "air of accuracy" and indicate the statements are not merely Defendants' opinion, but "they are independently reported

---

[11] *Cf.* Brown v Kelly Broad. Co., 771 P.2d 406, 426 (Cal. 1989) (noting increased need to protect private individuals from defamation due to technology enabling widespread dissemination of information).

and verified facts." <u>Lubin v. Kunin</u>, 117 Nev. 107, 113, 17 P.3d 422, 427 (2001) (quoting <u>Miller v. Jones</u>, 114 Nev. 1291, 1297, 970 P.2d 571, 575 (1978)).  Further, Defendants published the websites to find others who experienced similar business dealings with Plaintiffs.  *See* PSOMF ¶¶ 25 & 45.  This is consistent with two prior defamatory websites Defendants created in which they sought to find others with "horror stories" about the companies' software products.  *See id.* ¶ 46.

Defendants' cited cases are factually distinguishable.  This case involves a website, not a food review or radio show.  *See* <u>Gardner v. Martino</u>, 563 F.3d 981, 988-89 (9th Cir. 2009); <u>Pegasus</u>, 118 Nev. at 717, 57 P.3d at 89-90.  This case does not involve an e-mail, discussion group, message board or chat room that created a forum for a "heated debate" or discussion about Plaintiffs.  *See* <u>Sandals Resorts Int'l Ltd. v. Google, Inc.</u>, 925 N.Y.S.2d 407, 415-16 (N.Y. App. Div. 2011); <u>Obsidian Fin.</u>, 812 F. Supp. 2d at 1232-34; <u>Art of Living Found. v. Does 1-10</u>, 2011 U.S. Dist. LEXIS 63507, at *19 (N.D. Cal. June 15, 2011).  In fact, Defendants did not intend to post the comments, they monitored the comments and received only spam comments so they disabled the function and deleted the comments.  *See* PSOMF ¶ 46.  This further emphasizes the lack of any "heated debate" about Plaintiffs.

The general tone of Defendants' website is also different than their cited cases and suggested they had uncovered some shady (and indeed) criminal dealings.  *See* <u>Weller v. Am. Broad. Co., Inc.</u>, 283 Cal. Rptr. 644, 652 n.11 (Ct. App. 1991). Defendants do not engage in a "freewheeling, anything-goes writing style," do not employ "casual, emotive, and imprecise speech," "looser, more relaxed communication style" or "'stream of consciousness'-like sentences," and their websites do not contain "grammatical and spelling errors," do not use "slang," and do not have "an overall lack of coherence."  *See* <u>Sandals Resorts</u>, 925 N.Y.S.2d at 415-16; <u>Obsidian Fin.</u>, 812 F. Supp. 2d at 1223-25 & 1232-33.  Rather, Defendants, with the assistance of counsel, carefully crafted their websites to appear as professional, credible and factual as possible.  *See* MSJ, Ex. C-D; PSOMF ¶ 51.

1    While Defendants claim the websites' critical views of Plaintiffs would make
2  a reasonable person suspicious as to whether they are factual, the evidence is to the
3  contrary.  Defendants' websites caused Plaintiffs' investors, lenders and vendors to
4  make inquiries and conduct investigations of Plaintiffs, hesitate to do business with
5  Plaintiffs and, in at least one known case, invest several millions less with Plaintiffs.
6  *See* PSOMF ¶ 30. Even the website domain names (bradleyscohen.com and bradley-
7  cohen.com) and headings—which Defendants describe as "less inflammatory" than
8  newspaper articles (*see* MSJ 27)—are not such that a reasonable person would
9  become skeptical of the statements.  *See* <u>Obsidian Fin.</u>, 812 F. Supp. 2d at 1237-38.

10    In short, the general tenor of Defendants' websites, unlike ranting blogs that
11  show a clear personal vendetta and allow visitors to leave unregulated comments,
12  does *not* negate the impression they were asserting objective facts about Plaintiffs.

13                    **b.    Specific context.**

14    While Defendants claim they were just comparing Plaintiffs to Madoff using
15  innocuous statements subject to interpretation, a careful look at the websites reveals
16  their entire purpose is to lead viewers to believe for a fact Cohen, the public face of
17  CAM, is the next Madoff of real estate by: (1) juxtaposing a picture of Cohen with a
18  booking photo of Madoff and drawing an arrow from Madoff to Cohen;[12] (2)
19  identifying alleged "alarming similarities" between the two, such as living a life of
20  "glamour" and "luxury," living in a "palacious" "mansion" and having a "complex,"
21  "elusive" and "intricate web" of companies and dealings that will take an army of
22  investigators to unravel; (4) implying Cohen has a "history of convictions" for
23  serious crimes, like fraud and racketeering; (5) implying Plaintiffs have something
24  to "hide," a "secret" financial picture, and there is something "behind" their business
25  dealings; and (6) accusing Plaintiffs of running a "Ponzi scheme", "fraud" or

26  _____
27  [12] The Court may take judicial notice of the latter image in the banner that is only
     viewable online at: http://bradleyscohen.com.  *See* Fed. R. Evid. 201.
28

1    "scam," "looting" company assets, playing a "shell game," "taking millions" from

2    tenants, suing tenants based on "unfounded accusations or greed." *See* MSJ at C-D;

3    PSOMF, Ex. 8.  These statements, taken in the context of claiming Cohen is the next

4    Madoff, are the type actionable as defamation.  *See* <u>Medifast, Inc. v. Minkow</u>, 2011

5    U.S. Dist. LEXIS 33412, at *39 (S.D. Cal. Mar. 29, 2011) ("If Defendants had said,

6    'Medifast, like Bernie Madoff, is running a Ponzi scheme,' one could scarcely

7    dispute that Defendants would be liable for defamation.  Similarly if Defendants had

8    said 'Medifast runs its business like Bernie Madoff.'") (citation omitted).[13]

9        Defendants' statements, taken together and construed in Plaintiffs' favor as

10   required on summary judgment, plainly allege criminality; Plaintiffs' linguistic

11   expert confirms as much and third parties believe as much.  *See* PSOMF ¶¶ 30 &

12   52.[14]  As noted by Plaintiffs' linguistics expert, the context and phrasing of the

13   websites were designed to cause readers to view the correct answer to the question,

14   "Is Brad Cohen the next Bernie Madoff?" as yes.  *See* PSOMF ¶ 52.  Defendants'

15   statements amount to factual accusations or imputations of criminal activity, not just

16   unethical, unprofessional, untrustworthy or incompetent activity, and as such are

17   actionable.  *See, e.g.*, <u>Milkovich</u>, 497 U.S. at 2 (perjury); <u>Adobe Sys., Inc. v.</u>

18   <u>Christenson</u>, 891 F. Supp. 2d 1194, 1209 (D. Nev. 2012)  (infringement/fraud);

19

20      [13] Defendants' citation to <u>Paige Capital Mgmt., LLC v. Lerner Master Fund,</u>
<u>LLC</u>, 2011 Del. Ch. LEXIS 116, at *147-50 (Del. Chan. Ct. May 25, 2011) is

21   misplaced as that case analyzed whether the statements were substantially true, not
whether they constituted an opinion.  *See* MSJ at 13. As for the comparison to union

22   leader Jimmy Hoffa that one court held was not defamatory, the court concluded as
much because it was made at a contentious public debate and was not susceptible to

23   being proved true or false since some believe Jimmy Hoffa was a criminal while
others believe he was a hero and leader.  *See* <u>Gilbrook v. City of Westminster</u>, 177

24   F.3d 839, 862-63 (9th Cir. 1999).  There is no such debate over Madoff.

25

26      [14] Defendants attempt to spin the words of one investor who Plaintiffs will
call as a witness at trial, Leslie Westreich ("Westreich"), to argue third parties

27   believe Defendants' "criticism" is opinion, not fact.  *See* MSJ at 15-16.  However,
Westreich simply testified that in general a "bad opinion," *i.e.*, false opinion, about

28   someone can harm or malign them.  *See* MSJ, Doc. No. 119-23.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   <u>Obsidian Fin.</u>, 812 F. Supp. 2d at 1237-39 (tax fraud); <u>Nicosia v. De Rooy</u>, 72 F.

2   Supp. 2d 1093, 1104-05 (N.D. Cal. 1999) (perjury); <u>Lubin</u>, 117 Nev. at 113-14, 17

3   P.3d at 426-27 (child abuse); <u>Wynn v. Smith</u>, 117 Nev. 6, 17-18 16 P.3d 424, 431

4   (2001) (organized crime); <u>K-Mart Corp. v. Washington</u>, 109 Nev. 1180, 1193-94,

5   866 P.2d 274, 283 (1993) (overruled on other grounds) (citation omitted) (theft).[15]

6           The cases cited by Defendants are factually distinguishable as Defendants'

7   professional and regulated websites are not a food review, jocular website, casual

8   blog, radio show, public debate or other medium that provides a forum for heated

9   discussion.  The websites are not riddled with slang, name-calling, exaggeration and

10  non-literal language.[16]   While Defendants claim to have used "extreme" or

11  "overheated" language and "strong words" and compare their case to those

12  involving "colorful adjectives," they cite to none.  *See* MSJ at 16-17.  In truth,

13  Defendants were careful not to use such language as that would lower the credibility

14  and lessen the intended impact of their websites.  *See* MSJ, Ex. C-D.  Defendants

15  also did not use criminally-charged terms as figures of speech.  *See, e.g.,* <u>Greenbelt</u>,

16  398 U.S. at 13-14 ("blackmail" used to describe political negotiation of critical

17  proposals); <u>Obsidian Fin.</u>, 812 F. Supp. 2d at 1234 n.4 ("stolen" job); <u>Nicosia</u>, 72 F.

18  
_____

19      [15] *See also* <u>Riggs</u>, 19 F. Supp. 2d at 1181 ("it may be actionable to state an
opinion that plaintiff is a thief, if the statement is made in such a way as to imply the

20  existence of information which would prove plaintiff to be a thief"); *cf.* <u>Gardner</u>,
563 F.3d at 989-90; <u>Art of Living</u>, 2011 U.S. Dist. LEXIS 63507, at *20.

21      [16] *See, e.g.,* <u>Greenbelt Coop. Publ'g Assn., Inc.</u>, 398 U.S. 6, 13-14 (1970);

22  <u>Gardner</u>, 563 F.3d at 988-89; <u>Knievel v. ESPN</u>, 393 F.3d 1068, 1077-78 (9th Cir.
2005); <u>Gilbrook</u>, 177 F.3d at 862-63; <u>Standing Comm. v. Yagman</u>, 55 F.3d 1430,

23  1440-42 (9th Cir. 1995); <u>Obsidian Fin.</u>, 812 F. Supp. 2d at 1223-24 & 1232-34; <u>Art
of Living</u>, 2011 U.S. Dist. LEXIS 63507, at *19-23; <u>Troy Grp., Inc. v. Tilson</u>, 364

24  F. Supp. 2d 1149, 1156 (C.D. Cal. 2005); <u>Nicosia</u>, 72 F. Supp. 2d at 1101-08;

25  <u>Sandals Resorts</u>, 925 N.Y.S.2d at 415-16; <u>Pegasus</u>, 118 Nev. at 717, 57 P.3d at 89-
90.  In <u>Biro v. Condé Nast</u>, 883 F. Supp. 2d 441, 463 (S.D.N.Y. 2012), the court

26  found the terms "shyster" and "con man" were rhetorical hyperbole "more
fundamentally" because the plaintiff did not "allege that any aspect of the

27  description of the underlying events" were false.  That is simply not the case here.

28

1   Supp. at 1102 (litigation "killed" someone); <u>Gold v. Harrison</u>, 962 P.2d 353, 362

2   (Haw. 1998) ("raped" referred to invasion of privacy).  Lastly, Defendants did not

3   disclose the specific facts underlying their criminal accusations, *e.g.*, running a

4   Ponzi scheme, fraud or scam, looting company assets, playing a shell game and

5   taking money, which as noted above converts an ostensible "opinion" into an

6   actionable statement of defamatory facts.  *Contra* <u>Nicosia</u>, 72 F. Supp. at 1103.

7        Defendants' use of question marks and cautionary terms like "appears" is not

8   sufficient to dispel the otherwise plain assertions of fact.  *See* <u>Obsidian Fin.</u>, 812 F.

9   Supp. 2d at *1224-25 ("use of a question mark 'does not automatically insulate [the

10   defendant] from liability for defamation' . . . [i]f . . . the question can be reasonably

11   read as an assertion of false fact, it may be actionable") (citing <u>Point Ruston, LLC v.</u>

12   <u>Pac. N.W. Reg'l Council of the United Bhd. of Carpenters & Joiners of Am.</u>, 2010

13   U.S. Dist. LEXIS 95239, at *19-21 (W.D. Wash. Sept. 13, 2010)).  Here, unlike

14   Defendants' cited cases, Defendants do not explicitly invite viewers to consider

15   other possibilities or draw their own conclusions, and viewers cannot do so as there

16   are no specific facts to draw conclusions from; rather, the websites as a whole lead

17   viewers to believe there is but one conclusion: Cohen is a convicted criminal from

18   Philadelphia and the next Madoff and Plaintiffs are running a Ponzi scheme, fraud,

19   scam or shell game, looting company asset, stealing investor and tenant money and

20   filing meritless lawsuits.  *See* <u>Bugliosi</u>, 56 F.3d at 1157; <u>Phantom Touring, Inc. v.</u>

21   <u>Affiliated Publ'ns</u>, 953 F.2d 724, 730 (1st Cir. 1992); MSJ, Ex. C-D.

22                     **c.**     **Susceptibility to proof.**

23        A statement is susceptible to proof, *i.e.*, provable as true or false, if it "rests

24   on 'a core of objective evidence.'"  <u>Unelko Corp. v. Rooney</u>, 912 F.2 1049, 1055

25   (9th Cir. 1990) (quoting <u>Milkovich</u>, 497 U.S. at 21).  Defendants refer to "ominous

26   facts" and state "not one untrue statement is found on this site," ask why the "truth"

27   is "such a danger" to Plaintiffs and why Cohen will not disclose documents to

28   "disprove" the statements.  *See* MSJ Ex. C-D; PSOMF, Ex. 8.  These are not

1  statements of opinion, but assertions of fact Defendants admit are susceptible to
2  proof.  Defendants also tacitly concede this point by trying to prove their statements
3  are substantially true.  Defendants' statements, like Plaintiffs being in poor financial
4  health, running a Ponzi scheme, fraud, scam or shell game, looting company assets,
5  taking millions from tenants and filing meritless lawsuits against tenants, are
6  susceptible to being proved true or false with financial and litigation records.  The
7  records are discussed below in connection with that equally meritless defense.

8              **d.      Defendants' intent relevant to inquiry.**

9        Defendants' admitted intent to defame Plaintiffs compel finding the websites
10  are actionable defamation instead of opinion.  *See* PSOMF ¶¶ 44-45.  "If the maker
11  of the communication intends to defame the other and if the person to whom it is
12  made so understands it, the meaning so intended and understood is to be attached to
13  it.  That is true although the meaning is so subtly expressed that the ordinary person
14  would not recognize it."   Restatement (Second) of Torts § 563, cmt. b (1977);
15  *accord* MacLeod v. Tribune Publ'g Co., 343 P.2d 36, 44 (Cal. 1959) (intended
16  defamatory meaning actually so understood suffices regardless of possible innocent
17  interpretation).  In Masson v. New Yorker Magazine, Inc., Judge Kozinski wrote in
18  his dissent: "I can see no justification for giving this emotionally loaded term the
19  most innocuous conceivable interpretation contrary to the one in fact intended by the
20  author."  895 F.2d 1535, 1551 (9th Cir. 1989), *rev'd*, 501 U.S. 496 (1991).

21        In all, the totality of circumstances—broad and specific context, susceptibility
22  of proof and Defendants' intent—show the websites asserted facts, not opinions.

23              **3.      Defendants' Statements Are Not Substantially True.**

24        In direct contradiction to their opinion defense, Defendants argue their
25  statements are substantially true facts.  Defendants improperly mislead this Court by
26  addressing only a few statements in insolation from the websites while ignoring the
27  most damaging allegations and their overall effect.  "Statements, although perhaps
28  'true' when viewed in isolation, may create an overall false impression when

1   considered in context." <u>Van Buskirk v. Cable News Network, Inc.</u>, 284 F.3d 977,

2   984-85 (9th Cir. 2002) (citing <u>Crane v. Ariz. Republic</u>, 972 F.2d 1511, 1522 (9th

3   Cir. 1992)).  "Minor inaccuracies do not amount to falsity so long as 'the substance,

4   the gist, the sting, of the libelous charge can be justified.'" <u>Masson</u>, 501 U.S. at 517

5   (citations omitted).   A statement is false if it "'would have a different effect on the

6   mind of the reader from that which the pleaded truth would have produced.'" *Id.*

7          The "gist" or "sting" of the matter means the "heart of the matter in question

8   – the hurtfulness of the utterance." <u>Vachet v. Cent. Newspapers, Inc.</u>, 816 F.2d 313,

9   316 (7th Cir. 1987).  The "gist" or "sting" is determined by "looking at the highlight

10  of the [statement], the pertinent angle of it, and not to items of secondary importance

11  which are inoffensive details, immaterial to the truth of the defamatory statement."

12  <u>Lundell Mfg. Co., Inc. v. Am. Broad. Co., Inc.</u>, 98 F.3d 351, 360 (8th Cir. 1996)

13  (citation omitted).  If "it is evident that the underlying facts as to the gist of the

14  statement are the subject of a reasonable dispute," the issue must go to the jury. *Id.*

15         Here, the "substance, the gist, the sting" and the "effect on the mind of the

16  reader" is Cohen is the next Madoff as Plaintiffs are operating a Ponzi scheme, fraud

17  or scam, playing a shell game, looting company assets, taking investor and tenant

18  money an filing baseless lawsuits. *See* MSJ, Ex. C-D; PSOMF ¶ 52.  Defendants do

19  not and cannot argue this message and the statements supporting it are substantially

20  true.   For this reason alone, the defense must fail on summary judgment. *See*

21  <u>D.A.R.E. Am. v. Rolling Stone Magazine</u>, 101 F. Supp. 2d 1270, 1288 (C.D. Cal.

22  2000) ("when substantial truth is not evident to the court," it is a "triable issue of

23  fact") (citing <u>Maheu v. Hughes Tool Co.</u>, 569 F.2d 459, 465 (9th Cir. 1977);

24  <u>Shumate v. Johnson Publ'g Co.</u>, 293 P.2d 531, 539 (Cal. Ct. App. 1956)).

25         The few select statements or sections Defendants do address were not true

26  when published and continue to be untrue—yet remain on the still-active website.

27         The websites assert Plaintiffs' investors lost tens of millions of dollars.

28  Defendants, in hopes of backing into a defense, now argue substantial truth with

1    respect to the Cam Core+ Fund 1even though Defendants themselves show there is a
2    genuine dispute of material fact as to whether CAM Core+ Fund 1 investors actually
3    incurred tens of millions of dollars in "losses."  *See* MSJ at 19-20. Defendants claim
4    there were such "losses" because of the unrealized returns, but those are not actual
5    or real losses; they are simply returns that have not been realized, are based on fair
6    value accounting, are caused by a variety of factors, like the decline in property
7    values, and do not indicate how well an investment will perform.  *See* PSOMF ¶ 53.
8    Taking these statements in the context of Defendants trying to prove Cohen is the
9    next Madoff and construing them in Plaintiffs' favor, Defendants clearly
10   communicated all investors had incurred real "losses" from a Ponzi scheme, fraud,
11   scam or shell game and looting of company assets as opposed to hypothetical paper
12   losses from a decline in the fair market value of real estate in a down economy.
13   Since there were no realized losses (let alone from a Ponzi scheme, fraud, scam,
14   shell game or looting of company assets), the gist or sting of Defendants' statements
15   about CAM's financial condition is not accurate and therefore not substantially true.
16         Defendants assert their charts showing CAM's losses are substantially true.
17   The gist or sting of the charts is false as they were manipulated and important
18   information omitted so viewers would believe Plaintiffs are running a Ponzi scheme,
19   fraud, scam or shell game and looting company assets.  For example, the chart titled
20   "Total Return Composition Net of Fees As Of 9/30/2010" was reproduced without
21   the footnote discussing the unrealized charges and an explanation that the "drop in
22   total assets" is due to a property sale, not a loss.  *See* PSOMF ¶ 54.  The chart titled
23   "Total Assets" uses months instead of quarters and does not accurately show the
24   quarterly change in total assets over the period with substantially of the decrease,
25   $6,051,499—not tens of millions of dollars—occurring in the second quarter of
26   2010 from a property sale.  *See id.* ¶ 55.  Lastly, the chart titled "Net (Decrease)
27   Increase in cash and cash equivalents" erroneously shows a "steep downward slide"
28   of $2 million rather than the true up and down nature, and the 1/1/2010 cash balance

1    is listed as under $1 million but in truth it was about $4.8 million. *See id.* ¶ 56.

2         Defendants assert Cohen is living an "extravagant lifestyle" and life of

3    "luxury" and "prestige" in a "lavish" and "palacious" Beverly Hills "mansion" and

4    "cultivating his posh outward appearance to attract investors" all the while "keeping

5    the secret of his true financial picture," which includes a "crumbling empire" and

6    "declining" financial status. *See* MSJ, Ex. C-D.  The juxtaposed statements were

7    intended to reveal and demonstrate to readers that Cohen is running a Ponzi scheme,

8    fraud, scam or shell game and looting company assets, *i.e.*, he cannot afford his

9    lifestyle and is stealing investor and tenant money to do so. *See* PSOMF ¶ 52.  This

10   intended and inevitable conclusion is false and in no way substantially true.

11        Likewise the side-by-side chart with the tag line "The alarming similarities

12   between these two investment firm founders" followed by Cohen's picture next to

13   the booking photo of Madoff leads viewers to only one rational conclusion: Cohen

14   is the next Madoff and he is running a Ponzi scheme, fraud, scam or shell game and

15   looting company assets. *See* MSJ, Ex. C-D.  Defendants' attempts to take a few (but

16   not all)[17] of these statements out of context to prove they are substantially true

17   wholly ignore the substance, gist and sting of the supposed "alarming similarities"

18   between Cohen and Madoff, which unavoidably show Cohen is the next Madoff.

19        The websites assert Plaintiffs have a "complex," "elusive" and "intricate"

20   "web" of companies and dealings, which "adds yet another layer of intricacy and

21   protection" for Plaintiffs, there is something "behind" this "web" that Plaintiffs are

22   trying to "hide," and it will take an "army of investigators" to "unravel" it. *See id.*;

23   PSOMF, Ex. 8.  The unmistakable implication of these statements is Plaintiffs are a

24   nefarious corporate spider spinning a "web" of hidden Ponzi schemes, fraud, scams

25   and shell games.   In truth, as Cohen and CAM's employees testified, and as

26   ─────────────────────

27   [17] Defendants do not attempt to show all of the statements in the chart are substantially true, *e.g.*, Cohen allegedly "[b]ills himself as 'investor to the stars.'" *See* MSJ, Ex. C-D.  This statement, like the others, is not true. *See* PSOMF ¶ 57.

28

1 Plaintiffs' expert opined and will testify at trial, CAM's structure—with separate
2 companies with their own bank accounts owning and managing properties and CAM
3 overseeing those entities—stems from prudent judgment and is common business
4 practice, the industry standard, and the antithesis of misconduct. *See* PSOMF ¶ 58.

5 The websites state CAM employee Doreen Ray ("Ray"), when asked "under
6 oath about the intricacies of company financing," was "initially evasive" and then
7 revealed "ominous facts," including: a "complete inability to explain any details of
8 the company's financial transactions," being "uncomfortable answering questions
9 about Bradley Cohen and his financial dealings," and not knowing "where the
10 money is coming from to cover overhead losses." *See* MSJ, Ex. C-D.  Defendants
11 argue with a straight face Ray's "refusal to answer these questions is substantially
12 identical to an inability to do so."  MSJ at 24.  In truth, Ray refused to answer
13 questions about Cohen, CAM and their financial dealings and explained she was
14 "uncomfortable" answering such questions during her deposition as the
15 representative of Auburn Valley Industrial Capital LLC ("Auburn") under Fed. R.
16 Civ. P. 30(b)(6) as she was not designated and authorized to represent and testify
17 about Cohen and CAM, neither of which was a party to the Auburn lawsuit, which
18 Defendants well know.  *See* PSOMF ¶ 59.  Nevertheless, Ray's words were taken
19 out of context and twisted to make website viewers believe "company officials" like
20 Ray, "the highest ranking officer," did not know how investor funds are managed,
21 the effect being Plaintiffs' investors and business partners cannot feel "secure" and
22 should feel the need to "guard against a Ponzi scheme or fraud." *See* MSJ, Ex. C-D.

23 There is a genuine dispute as to the occupancy rates and operating expenses
24 of the properties managed by CAM's affiliated entities.  The websites ignored the
25 portfolio in its entirety and performance over the course of the multi-year
26 investments and instead implied all of the properties have a low occupancy rate, are
27 generating operating losses, that "[l]osses continue to mount," "investors are losing
28 big," investors cannot feel "secure" and they must protect themselves from a "Ponzi

28

1    scheme or fraud." *See id.*  The sting or gist of those statements is undeniably false.

2    The entire portfolio of properties managed by CAM's affiliated entities has a high

3    80% occupancy rate and only two to three single-tenant properties or large industrial

4    properties with two tenants are vacant and not generating income. *See* PSOMF ¶ 60.

5        The websites further claim tenants should "[b]eware" of leasing with CAM

6    because CAM is "actively engaging in lawsuits in an attempt to hold off creditors

7    seeking financial information," "sue[s] tenants and former tenants based on

8    unfounded accusations and greed," is "attempting to scam former tenants out of

9    millions of dollars" in a current Seattle lawsuit, "has taken several hundred thousand

10   dollars from one former tenant in one lawsuit" and taken many millions from its

11   thousands of other tenants.  *See* MSJ, Ex. C-D.  These false statements are not

12   substantially true reports of Plaintiffs' minimal history of landlord-tenant litigation,

13   which comprises only six lawsuits filed by CAM's affiliated entities, not Plaintiffs,

14   since 2009, a significantly low amount over a five-year span and given CAM's

15   breadth of properties.[18]  Indeed, Plaintiffs explained the basis of those six lawsuits,

16   like failure to pay rent, and only one went to trial (the Auburn case).  *See* PSOMF ¶

17   61.  Moreover, the websites' statement that Plaintiffs have taken millions of dollars

18   from thousands of tenants cannot be substantially true as CAM has never had more

19   than 100 tenants at any one time and currently has only about 80 tenants.  *See id.* ¶

20   62.  Lastly, Defendants cannot prove, substantially or otherwise, that Plaintiffs

21   scammed "several hundred thousand dollars" from NWTM d/b/a Hansen or that the

22   Auburn lawsuit was based on "unfounded accusations or greed" given that the Court

23   entered judgments in Auburn's favor totaling $2,451,793.14.  *See id.* ¶ 63.

24       The substance, gist, sting and effect of the select false items that Defendants

25   argue are substantially true do not even begin to approximate substantial truth.

26   _____

27   [18] Defendants argue Plaintiffs filed other types of lawsuits, but they are irrelevant
     as CAM's allegedly litigious nature was raised in the landlord-tenant context only.

28

1

### 4.      Defendants' Statements Are Not a Privileged Fair Report.

2          Defendants claim their statements about the "history of convictions" of Brad

3   Scott Cohen are privileged as a fair report of judicial proceedings.  *See* MSJ at 26-

4   27.  While Brad Scott Cohen in Philadelphia, the subject of the judicial proceedings,

5   may have no claim against Defendants given the fair report privilege, he is not the

6   plaintiff here.  The plaintiff is Bradley Stephen Cohen, who is not the subject of

7   judicial proceedings, and thus his claims are not barred by the fair report privilege.

8   Besides this overarching problem, technical issues exist with Defendants' argument.

9          As Defendants readily admit, Defendants' statements constitute a "report on

10  the report."  *Id.* at 27.  However, Defendants cite to no authority extending the fair

11  report privilege to a "report" on a report rather than a report of official proceedings.

12         Further, Defendants' "report" is not accurate, complete, fair and true as

13  Defendants artfully used the materials and website headings to imply and make

14  readers believe Bradley Stephen Cohen is the same person as Brad Scott Cohen with

15  a history of convictions for serious crimes, like fraud and racketeering.  *See* MSJ,

16  Ex. D at 26.  A report is only "'fair and true' if it captures 'the substance, the gist,

17  the sting of the libelous charge'" and "if the deviation is of such a 'substantial

18  character' that it 'produces a different effect' on the reader," the privilege will "be

19  suspended."  Crane, 972 F.2d at 1519 (citing Hayward v. Watsonville Register-

20  Pajaronian & Sun, 71 Cal. Rptr. 295, 300 (Ct. App. 1968)).[19]  The sting of the

21  statements in the Brad Scott Cohen proceedings is not the same as the sting of

22  Defendants' statements implying they relate to Bradley Stephen Cohen.

23  _____

24         [19] *See also* Restatement (Second) of Torts § 611, cmt. f (1977) ("Not only must
    the report be accurate, but it must be fair.  Even a report that is accurate so far as it

25  goes may be so edited and deleted as to misrepresent the proceeding and thus be
    misleading.  Thus . . . it is necessary that nothing be omitted or misplaced in such a

26  manner as to convey an erroneous impression to those who hear or read it . . . The
    reporter is not privileged under this Section to make additions of his own that would

27  convey a defamatory impression, nor to impute corrupt motives to any one, nor to
    indict expressly or by innuendo the veracity or integrity of any of the parties.").

28

1    Finally, since Defendants' report is not an accurate, complete, fair and true

2  report it follows it is not "for the public benefit."  Defendants' report is also not "for

3  the public benefit" because, as discussed in *supra* Section II.D.1, there is no public

4  controversy about either Plaintiffs or their commercial real estate business.

5    Accordingly, it is clear Defendants' defamatory statements do not fall within

6  the fair report privilege and Defendants are not immune from liability thereunder.

7    **5.     CAM's Defamation Claim Is Properly Plead.**

8    Defendants argue that if Nevada law governs this case (which it does as

9  discussed in *supra* Section II.B,), CAM's claim is one for business disparagement

10  and not defamation.   Defendants' argument is erroneous.   This Court recently

11  analyzed this same issue and differentiated between the two claims as follows:

> Statements accusing an individual of personal misconduct in his or her
> business or attacking the individual's business reputation may be
> brought as an action for defamation per se.  However, if the statements
> are directed towards the quality of the individual's product or services,
> the claim is one for business disparagement.

15  Sentry Ins. v. Estrella Ins. Serv., Inc., 2013 U.S. Dist. LEXIS 83282, at *6 (D. Nev.

16  June 13, 2013) (citing Clark Cnty. Sch. Dist. v. Virtual Educ. Software, Inc., 125

17  Nev. 374, 385-86, 213 P.3d 496, 504 (2009)).  Given these differences, the Court

18  ruled the defendants' allegation and reference to the plaintiff companies as "frauds

19  and/or thieves" was an attack on the plaintiffs' "reputations" and "lack of fitness for

20  trade, business, or profession" and "not an attack on a product or service" of

21  plaintiffs.  *Id.* at *7-8.  This Court also wrote the Nevada Supreme Court would find

22  "a corporation or other business entity can proceed on a theory of defamation per se

23  where communications concern the business's product or injure the business's

24  reputation." *Id.* at *8 (citing Virtual Educ., 125 Nev. at 385, 213 P.3d at 504).

25    Based on Sentry Ins., Defendants' websites—which state Cohen (the public

26  face of CAM) is the next Madoff and CAM is "complex," "an intricate web that is

27  nearly unexplainable," and "a Ponzi scheme," "fraud," "shell game" or "scam"

28

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

whose "company assets have been looted," "is engaging in lawsuits in an attempt to hold off creditors seeking financial information" and is "attempting to scam former tenants out of millions of dollars" (*see* MSJ, Ex. C & D)—are an attack on CAM's business reputation and fitness for trade, business, or profession, and not an attack on a specific product or service of CAM.  *See* <u>Sentry Ins.</u>, 2013 U.S. Dist. LEXIS 83282, at *8 ("statements are not calling plaintiffs' service a 'scam;' instead, the statements are referring specifically to plaintiffs as 'frauds and/or thieves'").  Even Defendants admit they were "raising questions about [CAM's] stability and transparency," which goes to CAM as whole and not to a specific product or service of CAM, unlike Defendants' cases.[20]  MSJ at 28; *see also* PSOMF ¶ 45.  Thus, it is clear CAM as well as Cohen may proceed on a theory of defamation *per se* here.

Nevertheless, even if the Court "transmuted" CAM's defamation claim into a business disparagement claim, CAM can prove all of its elements, including false and disparaging statements (*see supra* Section II.D.2-3), Defendants' statements were not privileged (*see supra* Section II.D.4), Defendants acted with malice (*see supra* Section II.D.1.c) and CAM suffered actual damages (*see supra* Section II.C).

### 6.    Plaintiffs' Reputational Harm Is Presumed.

Defendants rely on a *concurring* opinion from the United States Supreme Court and an out-of-circuit trial court decision relying on that same opinion to argue Plaintiffs must prove presumed damages and Defendants can rebut the presumption. *See* MSJ at 28-29 (citing <u>Dun & Bradstreet v. Greenmoss Builders</u>, 472 U.S. 749, 766 (1985) (J. White, concurring); <u>Davis v. Ross</u>, 107 F.R.D. 326, 330 (S.D.N.Y.

---

[20]  *See* <u>Virtual Educ.</u>, 125 Nev. at 386, 213 P.3d at 504 (finding defamatory statements concerned fitness of plaintiff's product, distance-learning courses, and plaintiff only sought compensation for its economic losses and not injury to its personal reputation); <u>Aetna Cas. & Surety Co., Inc. v. Centennial Ins. Co.</u>, 838 F.2d 346, 351 (9th Cir. 1988) ("gravamen of [plaintiff's] charges against [defendant] is that they 'palmed off' [plaintiff's] products [animal tags] as their own").

1   1985)).[21]   These two isolated opinions are not controlling or persuasive here.

2          Defendants do not and cannot cite to any controlling or persuasive legal

3   authority to support their argument because unlike Arkansas—which Defendants

4   inexplicably cite to (*see* MSJ at 28 n.11)—Nevada and California presume general

5   damages for defamation *per se*, *i.e.*, false statements made "imputing the person's

6   lack of fitness for trade, business, or profession."   *See* K-Mart Corp., 109 Nev. at

7   1192, 866 P.2d at 282 (citation omitted); Finney v. Lockhart, 217 P.2d 19, 31 (Cal.

8   1950).   Such damages include loss of reputation, shame, mortification and hurt

9   feelings.  K-Mart Corp., 109 Nev. at 1194, 866 P.2d at 284 (citing Nev. Rev. Stat. §

10  41.334); Cal. Civ. Code § 48a(4)(a).   Defendants argue Plaintiffs' damages are

11  "speculative" (MSJ at 29), but that is the very point of presumed damages:

12         Such damages are granted without special proof because the judgment
           of history [is] that the content of the publication itself [is] so likely to
13         cause injury and because "in many cases the effect of defamatory
           statements is so subtle and indirect that it is impossible directly to trace
14         the effects thereof in loss to the person defamed."   Proof of the
           defamation itself establishes the fact of injury and the existence of
15         damage to the plaintiff's reputation.   The jury is permitted to assess
           damages considered to be the natural and probable consequences of the
16         defamatory words on proof of the defamation alone.   Damages are
           presumed 'because of the impossibility of affixing an exact monetary
17         amount for present and future injury to the plaintiff's reputation,
           wounded feelings and humiliation, loss of business, and any
18         consequential physical illness or pain.
19

20  K-Mart Corp., 109 Nev. at 1195, 866 P.2d at 284 (citations omitted).[22]   Nonetheless,

21
    _____

22  [21] Defendants cite to another out-of-circuit case, but that case simply states there
    must be "some meaningful limit" on the amount of presumed damages a jury can
23  award.  *See* MSJ at 28-29 (citing Republic Tobacco Co. v. N. Atl. Trading Co., 381
    F.3d 717, 734 (7th Cir. 2004)).   That case does *not* support Defendants' erroneous
24  proposition that "presumed damages must be supported by evidence."  *Id.* at 28-29.

25  [22] *See also* Dun & Bradstreet, 472 U.S. at 760 ("[T]he rationale of the common
    law rules has been the experience and judgment of history that 'proof of actual
26  damage will be impossible in a great many cases where, from the character of the
    defamatory words and the circumstances of publication, it is all but certain that
27  serious harm has resulted in fact.'") (citations omitted).

28

                                          33

1  Plaintiffs explained their presumed damages in excess of $100 million are based on

2  an extrapolation of projected revenues over a twenty-year period.  *See* PSOMF ¶ 64

3         Even if, *arguendo*, Plaintiffs must establish reputational harm, they can easily

4  do so with the websites' traffic and declarations of investors, lenders and vendors

5  who attest Defendants' websites gave them enough concern to make inquiries and

6  conduct investigations about Plaintiffs, hesitate to do business with Plaintiffs, and

7  invest several million dollars less with Plaintiffs.  *See* PSOMF ¶¶ 3, 30 & 32-33.

8  The evidence shows Plaintiffs' financial position would have improved substantially

9  more than it did but for the websites. *See id.* ¶ 30.  Further, Plaintiffs would not have

10  suffered loss of business, loss of reputation, shame, mortification and hurt feelings

11  had the websites not existed.  *See* MSJ, Ex. E at 3-4 & 9; MSJ, Ex. F at 3-4 & 9.

12      **E.**    **First Amendment Does Not Protect Defendants From Any Claims**.

13         As set forth in *supra* Section II.D, the First Amendment does not protect

14  Defendants from Plaintiffs' defamation claim.  Therefore, it follows the First

15  Amendment does not protect Defendants from Plaintiffs' injurious falsehood claims,

16  like false light invasion of privacy and intentional infliction of emotional distress.

17      **F.**    **Plaintiffs Have Established False Light Invasion of Privacy**.

18         Since Defendants' asserted privileges and defenses do not apply to Plaintiffs'

19  defamation claim (*see supra* Section II.D), they do not apply to Plaintiffs' false light

20  invasion of privacy claim.  Defendants portrayed Plaintiffs in a false light and

21  invaded Plaintiffs' privacy by posting two websites claiming Plaintiffs were the next

22  Madoff, running a Ponzi scheme, fraud, shell game or scam, looting company

23  assets, taking investor and tenant money, suing to hold off creditors and suing

24  tenants based on unfounded accusations and greed.  *See* MSJ, Ex. C-D.  Defendants

25  juxtaposed pictures of Cohen next to Madoff, published a picture of Cohen's home

26  and political contributions and information from a confidential CAM report.  *See id.*

27         Defendants argue Plaintiffs have not established damages for false light

28  invasion of privacy under California law.  *See* MSJ at 30-31.  However, Nevada law

34

1   applies to Plaintiffs' claims (*supra* Section II.B).  In Nevada, injury for false light

2   invasion of privacy "is mental distress from having been exposed to public view."

3   <u>Flowers v. Carville</u>, 310 F.3d 1118, 1132 (9th Cir. 2002) (citing <u>People for the</u>

4   <u>Ethical Treatment of Animals v. Bobby Berosini, Ltd.</u>, 111 Nev. 615, 622 n.4, 895

5   P.2d 1269, 1274 n.4 (1995)).   This injury is redressed by general damages.

6   <u>Berosini</u>, 111 Nev. at 636-37, 895 P.2d at 1283. *See also* <u>Cooper</u>, 132 S. Ct. at 1452

7   (citation omitted).  Therefore, unlike California law, a plaintiff need not show injury

8   to reputation under Nevada law and special damages.  <u>Flowers</u>, 310 F.3d at 1132-33.

9       Plaintiffs have established Cohen, the public face of CAM, has suffered and is

10   continuing to suffer, significant mental distress from Defendants' websites.  *See*

11   PSOMF ¶ 65.  Defendants' expert—a psychologist, not a psychiatrist, who never

12   examined Cohen (MSJ, Ex. O)—assumes Cohen's mental distress is caused by other

13   life "stressors," *i.e.*, managing work and family life (MSJ at 31).   However, these

14   alleged "stressors" are typical to Cohen's daily life, existed long before the websites

15   and are vastly different from the distress caused by the websites.  *See* PSOMF ¶ 65.

16   Regardless, Cohen's mental distress and the cause thereof are clearly disputed facts

17   that are not proper on a motion for summary judgment and must be tried by the jury.

18       Even if, *arguendo*, California law applied, Plaintiffs have established

19   reputational damages (*see supra* Section II.D.6) and need not prove special damages

20   as the defamatory language and meaning of Defendants' websites alleging Cohen is

21   the next Madoff and running a Ponzi scheme or fraud are apparent on their face.[23]

---

[23] *See* <u>MacLeod</u>, 343 P.2d at 43 ("language may be libelous on its face even though it may also be susceptible of an innocent interpretation.  The test is whether a defamatory meaning appears from the language itself without the necessity of explanation or the pleading of extrinsic facts."); <u>Selleck v. Globe Int'l, Inc.</u>, 212 Cal. Rptr. 838, 843-44 (Ct. App. 1985) ("The publication in question may not be divided into segments and each portion treated as a separate unit; it must be read as a whole in order to understand its import and the effect that it was calculated to have on the reader, and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning that may be fairly presumed to have been conveyed to those who read it.  Headlines and captions of an allegedly libelous article are regarded as part of the article.").

1    In short, there is a genuine dispute as to material facts and Defendants are not

2    entitled to summary judgment on Plaintiffs' false light invasion of privacy claim.

3        **G.    Plaintiffs Have Established IIED.**

4        In Nevada, the elements of intentional infliction of emotional distress

5    ("IIED") are: (1) extreme and outrageous conduct with either the intention of, or

6    reckless disregard for, causing emotional distress; (2) plaintiff suffered severe or

7    extreme emotional distress; and (3) actual or proximate causation.  Mkhitaryan v.

8    U.S. Bancorp, 2013 U.S. Dist. LEXIS 111903, at *17 (D. Nev. Aug. 8, 2013) (citing

9    Star v. Rabello, 97 Nev. 124, 125, 625 P.2d 90, 91-92 (1981)).    Defendants

10   erroneously assert Plaintiffs cannot meet these IIED elements. *See* MSJ at 32-35.

11       The first element of IIED, "[e]xtreme and outrageous conduct is that which is

12   outside all possible bounds of decency and is regarded as utterly intolerable in a

13   civilized community." *Id.* at *17-18 (quoting Maduike v. Agency Rent-A-Car, 114

14   Nev. 1, 4, 953 P.2d 24, 26 (1998)).    "Generally, the case is one in which the

15   recitation of the facts to an average member of the community would arouse his

16   resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement

17   (Second) of Torts § 46, cmt. d (1965).  "[W]here reasonable people may differ, the

18   jury determines whether conduct was extreme and outrageous enough to result in

19   liability."  Fernandez v. Penske Truck Leasing Co., L.P., 2013 U.S. Dist. LEXIS

20   77603, at *14 (D. Nev. May 31, 2013) (citation omitted).

21       Defendants cite no Nevada law ruling defamatory accusations are insufficient

22   for IIED.   The California cases Defendants use to support that proposition are

23   different as they involve accusations or altercations in the employment context, like

24   name-calling, yelling/screaming, sexual harassment, criticizing work suitability or

25   performance, threatening termination/terminating and refusing promotion. *See* MSJ

26   at 32 (citing cases).  Where defamatory statements "involved interests, beyond those

27   of employer and employee . . . alleged defamation would satisfy the outrageous

28   behavior element of [plaintiff's] cause of action for [IIED]."  Sheppard v. Freeman,

36

79 Cal. Rptr. 2d 13, 21 (Ct. App. 1998) (Kremer, P.J., concurring). Such is this non-employment case in which Defendants: (1) threatened to inflict pain on Plaintiffs; (2) posted two websites available to and visited by people worldwide, with pictures of Cohen and his home, claiming Plaintiffs are the next Madoff, running a Ponzi scheme, fraud, shell game or scam, looting company assets, taking tenant and investor money and filing baseless lawsuits; and (3) Defendants threatened to post a third defamatory website. *See* MSJ, Ex. C-D; PSOMF ¶¶ 3 & 44-45 & 50. In addition, the declarations from Plaintiffs' lenders, investors and vendors that show Defendants' websites arouse the resentment of an average member of the community against Defendants. *See* PSOMF ¶ 30. While Defendants absurdly compare their actions to those with a much smaller and select audience like sending an e-mail, passing a note or scrawling on a bathroom stall, and believe publishing their statements on websites is not outrageous and the website content is not outrageous,[24] this is clearly a genuine issue of dispute barring summary judgment.

Regarding the second element, "being diagnosed as 'situationally depressed' and 'receiving psychiatric treatment and taking medication' could establish a genuine issue of material fact regarding severe emotional distress sufficient to survive summary judgment." <u>Rosario v. Clark Cnty. Sch. Dist.</u>, 2013 U.S. Dist.

---

[24] Defendants claim their statements are not outrageous because businessmen running successful companies should be hardened to criticism and questioning about their business tactics, and hyperbolic comparison to others is not indecent. MSJ at 33. Defendants' cited cases do not state this; they state persons must be hardened to occasional acts that are inconsiderate, unkind, rude or insensitive, like insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *See* <u>Braunling v. Countrywide Home Loans Inc.</u>, 220 F.3d 1154, 1158 (9th Cir. 2000); <u>Lopez v. United Parcel Serv., Inc.</u>, 2009 U.S. Dist. LEXIS 47520, at *14 (D. Nev. Mar. 12, 2009). Defendants' websites published for about 1.5 years and counting stating Plaintiffs are the next Madoff, running a Ponzi scheme, fraud or scam and looting company assets are more than sporadic, trivial acts that are inconsiderate, unkind, rude or insensitive; they are direct, continuing accusations of criminal misconduct made without supporting evidence and with contradictory evidence and are thus clearly beyond all bounds of decency and intolerable in a civilized society.

1   LEXIS 93963, at *27 (D. Nev. July 3, 2013) (quoting <u>Shoen v. Amerco, Inc.</u>, 111

2   Nev. 735, 747, 896 P.2d 469, 477 (1995)).  This Court has also found sufficient

3   emotional distress to survive summary judgment when a plaintiff, such as Cohen,

4   suffered from headaches, stomach aches, sleeplessness, irritability, anxiety, stress

5   and/or depression, underwent psychiatric treatment, was diagnosed with a disorder

6   and prescribed medication, and was forced to change lifestyle, such as taking off

7   days from work, due to fear.  *See* <u>Burns v. Mayer</u>, 175 F. Supp. 2d 1259, 1268-69

8   (D. Nev. 2001); <u>Switzer v. Rivera</u>, 174 F. Supp. 2d 1097, 1108-09 (D. Nev. 2001).

9   It is well-settled severe emotional distress "includes all highly unpleasant mental

10  reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger,

11  chagrin, disappointment, worry, and nausea."  Restatement (Second) of Torts § 46,

12  cmt. j (1965); *accord* <u>Fletcher v. W. Nat'l Life Ins. Co.</u>, 89 Cal. Rptr. 78, 90-91 (Ct.

13  App. 1970) (citing <u>Crisci v. Sec. Ins. Co.</u>, 66 Cal. 2d 425, 433, 426 P.2d 173, 178

14  (1967); Restatement § 46, cmt. j).  Moreover, the "intensity and the duration of the

15  distress are factors to be considered in determining its severity" and "in many cases

16  the extreme and outrageous character of the defendant's conduct is in itself

17  important evidence that the distress has existed."  Restatement § 46, cmt. j.

18       Here, Cohen has suffered and continues to suffer depression, stress, shame,

19  humiliation, embarrassment, fear,[25] anxiety, anger, irritability, chronic fatigue,

20  insomnia, nightmares, nausea, headaches, stomachaches, diarrhea, constipation, loss

21  of appetite and an approximately thirty-pound weight-loss, is being treated by a

22  psychiatrist and has been prescribed medication.  *See* PSOMF ¶¶ 65-66; MSJ Ex. E-

23  F.  The severity of Cohen's emotional distress is compounded by the fact websites

24  are available worldwide 24 hours a day, seven days a week, the second website has

25

26  [25] Due to Hansen's criminal history, history of violence in the home, workplace
    and in prison and Hansen's threat to "inflict pain," Cohen fears for his life and that

27  of his family and thus hired a security detail, which Cohen did not have before, and
    increased security as his home and office.  *See* PSOMF ¶ 66.

28

38

1   been continuously published since May 2012, over 1.5 years and even if and when
2   both the websites are taken down a digital footprint of the websites will always exist
3   through programs such as WayBack Machine that archive images of websites,
4   Defendants have threatened to publish a third website, and Defendants' statements
5   are extreme and outrageous as discussed above. *See* PSOMF ¶¶ 3, 50 & 67. Thus,
6   this case is significantly different from those Nevada and inapplicable California
7   cases cited by Defendants in which there was less extreme outrage (*e.g.*, employee
8   termination, requests for payment, dissatisfaction of work performance), or the
9   plaintiff did not seek any medical or psychiatric assistance and only suffered
10  insomnia, nightmares or general nervousness. *See* MSJ at 33-34 (collecting cases).

11          Defendants argue Cohen cannot meet the third element because his emotional
12  distress is self-imposed and his weight loss is beneficial. *See* MSJ at 34-35. This is
13  absurd. But for Defendants' websites, Cohen would not have suffered any emotional
14  distress.   Any person who has been defamed will experience anxiety over others
15  discovering and believing the defamatory statements and will devote the time,
16  energy and resources necessary to obtain redress and justice.   While Defendants
17  allege they installed a phony counter to inflate visitation statistics, many of
18  Plaintiffs' business partners visited the websites and, if true, the inflation
19  emphasizes Defendants' malicious intent to cause Cohen emotional distress. *See*
20  PSOMF ¶ 33.   Cohen, his wife, co-workers and psychiatrist have all attested
21  Cohen's emotional distress arose after and because of Defendants' two websites and
22  Hansen's insults and threats, like inflicting pain and posting a third website. *See*
23  PSOMF ¶¶ 44-45, 50 & 65; MSJ, Ex. P. Cohen's psychiatrist opined Defendants'
24  actions caused emotional distress to Cohen, who did not have any psychiatric
25  symptoms or disorders before the websites. *See* MSJ, Ex. P. The rebuttal opinions
26  of Defendants' expert, who is not a psychiatrist and did not examine Cohen (MSJ,
27  Ex. O), just show a genuine dispute of material facts precludes summary judgment.
28          The extreme and outrageousness of Defendants' actions, the severity of

39

1   Cohen's emotional distress and causation are not fit for decision on summary
2   judgment and must be left to a jury, which will judge credibility, weigh the
3   evidence, and draw legitimate inferences from the facts. *See, e.g.*, Mkhitaryan, 2013
4   U.S. Dist. LEXIS 111903, at *18; Ramirez v. Clark Cnty., 2011 U.S. Dist. LEXIS
5   80526, at *14 (D. Nev. July 22, 2011) (citing Anderson, 477 U.S. at 242-43).
6   Therefore, the Court must deny Defendants' MSJ on Plaintiffs' claim for IIED.

7   **H.   Plaintiffs Have Established Intentional Interference With Business.**

8   Since Defendants' defenses do not apply to Plaintiffs' defamation claim (*see*
9   *supra* Section II.D), they do not apply to Plaintiffs' business interference claim.

10   Plaintiffs alleged claims for intentional interference with "contractual
11   relationships and business expectancies." *See* First Am. Compl. (Doc. No. 40) ¶¶
12   81-83.[26] These are two separate claims (Las Vegas Sun, Inc. v. Summa Corp., 1977
13   U.S. Dist. LEXIS 15774, at *27 (D. Nev. May 23, 1977) (citation omitted)), with
14   different elements. Williams v. Univ. Med. Ctr. of S. Nev., 688 F. Supp. 2d 1134,
15   1139-40 (D. Nev. Feb. 25, 2010); Gonzales v. Shotgun Nev. Invs., LLC, 2013 U.S.
16   Dist. LEXIS 107413, at *6-8 (D. Nev. July 30, 2013). Defendants moved for
17   summary judgment on Plaintiffs' intentional interference with prospective economic
18   advantage claim, not Plaintiffs' interference with actual contractual relationships
19   claim. *See* MSJ at 36-38. Thus, Plaintiffs need only address the former claim.

20   Intentional interference with prospective economic advantage requires proof
21   of the following elements: (1) a prospective contractual relationship; (2) knowledge
22   by the defendant of the prospective relationship; (3) intent to harm the plaintiff by
23   preventing the relationship; (4) the absence of privilege or justification by the
24   defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct.

25

26   [26] While Plaintiffs' claim is titled "Intentional Interference with Future Expected
27   Business," the "factual allegations of the complaint are controlling over the title or
     label." Leonardini v. Shell Oil Co., 264 Cal. Rptr. 883, 898 (Ct. App. 1989).

28

1    Winchinsky v. Mosa, 109 Nev. 84, 87-88 847 P.2d 727, 729-30 (1993) (citing

2    Leavitt v. Leisure Sports, Inc., 103 Nev. 81, 88, 734 P.2d 1221, 1225 (1987)).

3         First, Defendants argue they did not know of any specific economic

4    relationships between Plaintiffs and third parties, the second element.  However,

5    Defendants did not need to know the identity of the third parties.  *See* Monex

6    Deposit Co. v. Gilliam, 680 F. Supp. 2d 1148, 1162-63 (9th Cir. 2010); Altera Corp.

7    v. Clear Logic, Inc., 424 F.3d 1079, 1092 (9th Cir. 2005); Transcription Commc'ns

8    Corp. v. John Muir Health, 2009 U.S. Dist. LEXIS 25151, at *30 (N.D. Cal. Mar.

9    13, 2009); Sebastian Int'l, Inc. v. Russolillo, 162 F. Supp. 2d 1198, 1203-04 (C.D.

10   Cal. 2001); Restatement (Second) of Torts § 766, cmt. p (1977).  It is sufficient

11   Defendants, as a former tenant, knew Plaintiffs had economic relationships with its

12   investors and tenants, including specific tenants listed in the confidential CAM Core

13   + Fund 1 LLC report Defendants took from Plaintiffs' website.  *See, e.g.*, Monex

14   Deposit, 680 F. Supp. 2d at 1162-63 (finding defendants knew plaintiff had

15   economic relationships with its customers); TransWorld Airlines, Inc. v. Am.

16   Coupon Exch., Inc., 913 F.2d 676, 689-90 (9th Cir. 1990) (finding defendant knew

17   airline had economic relationships with three classes of third parties: program

18   members, nonmember passengers and travel agencies).  Defendants' knowledge of

19   these relationships and intent to disrupt them is the exact reason Defendants falsely

20   stated Plaintiffs' investors were losing tens of millions of dollars and Plaintiffs were

21   suing tenants based on unfounded accusations and greed.  *See* MSJ, Ex. C & D.

22        Second, Defendants argue Plaintiffs cannot prove their interference was

23   improper, *i.e.*, lacked privilege and justification, which is the fourth element.

24   Whether intentional interference is improper or justified depends on a defendant's

25   predominant motive or purpose.  Cambridge Filter Corp. v. Int'l Filter Co., Inc., 548

26   F. Supp. 1301, 1306 (D. Nev. 1982) (citing Hamro v. Shell Oil Co., 674 F.2d 784,

27   790 (9th Cir. 1982)).  Determining "whether a [defendant's] conduct was justified

28   depends upon 'a balancing of the importance, social and private, of the objective

41

1   advanced by the interference against the importance of the interest interfered with,

2   considering all circumstances, including the nature of the actor's conduct and the

3   relationship between the parties.'" <u>Hamro</u>, 674 F.2d at 789 (citation omitted).

4   Here, Hansen freely admits he intended to attract such parties to the websites

5   and convince them not to do business with Plaintiffs. *See* PSOMF ¶ 45. Further,

6   proof of Defendants' motive to harm Plaintiffs include Defendants: (1) hating and

7   insulting Plaintiffs; (2) threatening to inflict pain on Plaintiffs; (3) posting the

8   websites anonymously and using a prepaid card registered under a false name to

9   purchase the domain name and hosting services through separate overseas

10   companies and communicate with such providers, making the websites difficult to

11   trace and prolonging their existence; (4) soliciting comments; (5) claiming Plaintiffs

12   were the next Madoff, running a Ponzi scheme, fraud or scam, playing a shell game

13   and looting company assets without a shred of supporting evidence and

14   investigation that yielded not one complaint or pejorative comment about Plaintiffs;

15   (6) allegedly installing a counter to give the website a sense of legitimacy and lure

16   more visitors all the while making Plaintiffs concerned about the number of visitors;

17   (7) employing search-engine optimization and link building to cause the websites to

18   appear, as they do today, first or close to first in Internet search results of Plaintiffs;

19   (8) monitoring the websites for "persons of interests;" (9) publishing a second

20   website using a webhost with a more liberal fraud policy after the first website was

21   taken down for violating the webhost's terms and conditions and having defamatory

22   content; (10) refusing to take down the remaining website despite Plaintiffs' demand

23   and knowing the statements are false; and (11) threatening a third website. *See id.*

24   ¶¶ 21-22, 25, 27-28, 40-45 & 49-50; MSJ Ex. C-D. The only logical motive for

25   Defendants to engage in such extensive acts and accuse Plaintiffs of serious criminal

26   wrongdoing was to harm Plaintiffs and impede their business, which is improper.

27   While Defendants now conveniently claim the websites expressed their

28   experiences and feelings about Plaintiffs and educated and informed the public

42

about Plaintiffs, this is impossible as Defendants did not identify themselves or any of their specific business dealings with Plaintiffs on the websites.  *See* MSJ, Ex. C-D.  Further, the websites focused on Plaintiffs' actions with respect to investors in addition to tenants, although Defendants only had experiences with Plaintiffs as a tenant.  In truth, Defendants spun their research on Plaintiffs, like Cohen's home, office and political contributions and criminal convictions about a different Brad Cohen and misconstrued information from a confidential report taken off CAM's website and the Auburn lawsuit, so as to compare Plaintiffs to Madoff, the most notorious fraudster in U.S. history.  Such conduct is neither privileged nor justified.  While courts recognize certain privileges or justifications, like free competition that allows the diversion of business in a lawful manner, Plaintiffs and Defendants are not business competitors.  Further, Defendants did not have any financial interest in Plaintiffs, their properties or investments to protect.  Thus, Defendants' cited cases supporting these privileges do not apply here.  *See* MSJ at 36 (collecting cases).

Third, Defendants argue Plaintiffs have not identified business expectancies that Defendants disrupted.  This is not true.  Plaintiffs identified Jeffrey Stern ("Stern"), a real estate developer and investor who invested more than $10 million in various real estate offerings with Plaintiffs and attested in his declaration that:

> [B]ecause of the very negative information contained concerning Mr. Cohen and [CAM] on the aforementioned websites, I have since invested less money since then than I otherwise would have done.  All in all, my investments with [CAM] over the last year have been several million dollars less than I would have otherwise invested but for the negative websites.

> Because of the fact that not only I, but others, have an interest in the money I invest, I am uncomfortable putting as much money into real estate projects with [CAM], even though I believe such allegations in the websites to be untrue, because it puts me in a difficult position of explaining and justifying to others my investment decisions if for any reason the underlying investment does not perform well.

*See* PSOMF ¶ 30 & Ex. 16. Defendants deposed Stern, who affirmed his declaration

1   and testified he turned down at least two to four real estate investment deals and

2   invested at least three to ten million dollars less in the last 12 months with Plaintiffs

3   than what he would have invested due to Defendants' websites.  *See id.* ¶ 68.

4        Accordingly, it is not just "reasonably probable," but certain Plaintiffs would

5   have realized a prospective economic advantage, *i.e.*, several millions dollars, from

6   Stern but for Defendants' interference with their websites.  Further, unlike the case

7   cited by Defendants, the evidence shows Defendants disrupted an "ongoing business

8   relationship" between Plaintiffs and its regular client Stern, who previously invested

9   millions with Plaintiffs but turned down subsequent deals due solely to Defendants'

10  websites.  Rickards v. Canine Eye Registration Found., Inc., 704 F.2d 1449, 1456

11  (9th Cir. 1983).  No speculation or inference is needed for this determination unlike

12  that required for the "interference with the market" or "lost opportunity" theories, in

13  which the plaintiff alleges a relationship with an entire market of all possible yet

14  unidentified clients or opportunities.  *See* Westside Ctr. Assocs. v. Safeway Stores

15  23, Inc., 49 Cal. Rptr. 2d 793, 802-07 (Ct. App. 1996).  Here, Plaintiffs allege

16  Defendants interfered with their existing business relationship with Stern.

17       Fourth and finally, Defendants argue Plaintiffs' damages are speculative.

18  However, construing the facts in Plaintiffs' favor, Plaintiffs can establish with

19  reasonable certainty that Stern invested millions of dollars less with Plaintiffs due to

20  Defendants' websites.  *See* PSOMF ¶¶ 30, 68 & Ex. 16.  Stern explained the range

21  of three to ten million dollars was as far as reasonably possible to estimate as the

22  potential investment amount depended on what his company was looking for in any

23  given month.  *See id.* ¶ 69.  Stern's several million dollar figure is sufficient to send

24  this factual issue to the jury, particularly in light of the following principles:

25       There is . . . no general requirement that the injured person should
         prove with like definiteness the extent of harm that he has suffered as a
26       result of the tortfeasor's conduct.  It is desirable that responsibility for
         harm should not be imposed until it has been proved with reasonable
27       certainty that the harm resulted from the wrongful conduct of the
         person charged.  It is desirable, also, that there be definiteness of proof
28

44

1
2
3
4
5
6

> of amount of damage as far as is reasonably possible.  It is even more desirable, however, that an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he suffered.  Particularly is this true in situations where there can not be any real equivalence between the harm and the compensation of money, as in case . . . where the harm is of such a nature as necessarily to prevent anything approximating accuracy of proof, as when anticipated profits of a business have been prevented.

7    *See* Restatement (Second) of Torts § 912, cmt. a (1979).  Since CAM has been

8    damaged, so has Cohen, CAM's founder, sole owner and Chief Executive Officer.

9        Given the foregoing, it is clear there is a genuine dispute as to material facts

10   and Defendants are not entitled to judgment as a matter of law on Plaintiffs' claim

11   for intentional interference with prospective economic advantage.

12   **I.       Plaintiffs Are Entitled to Injunctive Relief.**

13       Since Plaintiffs demonstrated Defendants are not entitled to judgment as a

14   matter of law on any of Plaintiffs' claims, the Court should not dismiss Plaintiffs'

15   request for injunctive relief, which Plaintiff separately plead to meet the heightened

16   pleading requirements in federal court.  *See* Fed. R. Civ. P. 8; <u>Bell Atl. Corp. v.</u>

17   <u>Twombly</u>, 550 U.S. 544 (2007).  If the Court agrees with Defendants' hyper-

18   technical defense—which they support with Texas and California law, not Nevada

19   law—that an injunction is not an independent cause of action (*see* MSJ at 38),

20   believes Plaintiffs' careful pleading is unnecessary, and finds Plaintiffs sufficiently

21   articulated their injunction request in their Prayer for Relief section to authorize

22   such relief, then Plaintiffs concede to dismissing this separate claim (but not relief).

23   **III.   CONCLUSION.**

24       Based upon the foregoing, Plaintiffs respectfully request the Court deny

25   Defendants' MSJ and allow Plaintiffs' meritorious claims to proceed to a jury trial.

26
27
28

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DATED this 25th day of November, 2013.

MITCHELL & ASSOCIATES, P.C.


By      /s/ Robert D. Mitchell
       ROBERT D. MITCHELL
       Attorneys for Plaintiffs

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify and declare under penalty of perjury that on November 25, 2013, I electronically filed the foregoing with the Clerk of Court for filing and uploading to the CM/ECF system which will send notification of such filing to all parties of record.

/s/ Robert D. Mitchell

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT