John P. Aldrich, Esq. (SBN #6877)
**ALDRICH LAW FIRM, LTD.**
1601 S. Rainbow Blvd., Suite 160
Las Vegas, Nevada 89146
Telephone: (702) 853-5490
Facsimile:  (702) 227-1975
jaldrich@johnaldrichlawfirm.com

Dean G. von Kallenbach, Esq., *pro hac vice*
**YOUNG deNORMANDIE, P.C.**
1191 Second Avenue, Suite 1901
Seattle, Washington 98101
Telephone: (206) 224-9818
Facsimile:  (206) 623-6923
dgvk@ydnlaw.com
**Attorneys for Defendants**

UNITED STATES DISTRICT COURT

STATE OF NEVADA – LAS VEGAS

| | |
|---|---|
| BRADLEY STEPHEN COHEN, an individual; and COHEN ASSET MANAGEMENT, INC., a California corporation,<br><br>        Plaintiffs,<br>     v.<br><br>ROSS B. HANSEN, an individual; NORTHWEST TERRITORIAL MINT, LLC, a Washington limited liability company; and STEVEN EARL FIREBAUGH, an individual,<br><br>        Defendants. | CASE NO. 2:12-CV-01401-JCM-PAL<br><br><br>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Defendants Ross B. Hansen, Northwest Territorial Mint, LLC, and Steven Earl Firebaugh (collectively "Hansen"), move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Hansen bases his motion on the following memorandum of law, the attached depositions, declarations and exhibits, the documents on file with the Court in this matter, and any oral arguments the Court may allow.

**Table of Contents**

**I. INTRODUCTION** ................................................................................ **1**

**II. STATEMENT OF FACTS** ...................................................................... **1**

**A.   The Parties** .................................................................................. **1**

  1.   Defendants. ................................................................................ 1

  2.   Plaintiffs. .................................................................................... 2

**B.   The *Auburn Valley Industrial Capital LLC v. Northwest Territorial Mint* Litigation.** ........ **2**

**C.   Defendants' use of the Website.** ............................................. **3**

**D.   Damages.** ..................................................................................... **4**

**III. LEGAL STANDARD** ........................................................................... **4**

**IV. ARGUMENT** ..................................................................................... **5**

**A.   Actual or special damages are a required element for the torts of ordinary defamation and intentional interference with expected future business. Because Cohen and CAM do not have any actual or special damages, Hansen is entitled to summary judgment on those claims.** **5**

  1.   Actual damages are a required element of an ordinary defamation claim. ...................... 5

  2.   Actual damages are a required element of a claim for intentional interference with expected future business. ................................................................ 6

**B.   False light protects mental and emotional interests. As a corporation, CAM has no privacy interests to protect. Further, Hansen did not portray Cohen in a false light by giving publicity to his business activities or stating true facts about his personal life.** ........ **6**

  1.   As a corporation, CAM does not have a personal right to privacy and cannot suffer mental distress from being shown in a false light. ................................................. 7

2.   Hansen did not make untrue statements that placed Cohen before the public in a false light, nor did Hansen do anything that would be highly offensive to a reasonable person....... 8

**C.   Cohen cannot establish extreme or outrageous conduct by Hansen that caused him to experience extreme or severe emotional distress. ..................................................... 9**

1.   Hansen's conduct was not extreme or outrageous........................................... 10

2.   Hansen's conduct did not cause Cohen to suffer extreme or severe emotional distress. 12

3.   Since Cohen's claim is primarily for defamation, he should not be allowed to maintain a separate claim for IIED. ................................................................................ 14

**D.   CAM's claim for defamation per se is actually one for business disparagement. That claim fails because CAM did not suffer any special damages. ......................................... 15**

**E.   Hansen is not liable on Cohen's claim for defamation *per se*........................................... 16**

1.   Cohen is a limited-purpose public figure, and cannot make the required showing that Hansen acted with actual malice. ............................................................... 17

2.   Hansen's statements are matters of opinion and therefore not defamatory. ................ 18

a.   Viewed within its proper context, the Website is interpreted as non-defamatory opinion............................................................................................. 19

b.   Comparisons to Bernard Madoff are not automatically defamatory and constitute statements of opinion. ............................................................................. 21

c.   Statements describing Cohen and CAM are statements of opinion. ........................ 22

d.   Statements about Cohen and CAM's actions are also expressions of subjective opinion. 23

3.   Hansen's statements constitute, in part, rhetorical hyperbole that a reasonable person would not find to be a statement of fact................................................................ 25

4.   Hansen's statements are at least substantially true and not defamatory. ................... 27

5.   The statements about CAM's financial condition are not false or defamatory. ............... 28

a.   Investors in the CAM Core+ Fund I incurred tens of millions of dollars in paper losses over the Fund's life................................................................................. 28

6.   Hansen's statements concerning the criminal history of Bradley S. Cohen are a privileged, fair report of judicial proceedings ........................................................... 38

7.   Cohen has no evidence of reputational harm, and the presumption of harm may therefore be rebutted ................................................................................................... 39

**F.   The First Amendment protections afforded to Hansen's speech in the defamation context applies to all of Cohen's claims. ............................................................. 41**

**G.   Injunctive relief Is a remedy, rather than a claim; summary judgment for defendants Is appropriate as to injunctive relief as a cause of action. ........................ 42**

**V. CONCLUSION ....................................................................................................... 42**

iii

**Table of Authorities**

**Cases**

*Accord Clark Cnty. Sch. Dist. v. Virtual Educ. Software, Inc.*, 125 Nev. 374, 213 P.3d 496, 503 (2009)........ 6

*Adelson v. Smith (In re Smith),* 397 B.R. 124, 126 (D. Nev. Bankr. 2008) ................................................ 28

*Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 911 (D. Nev. 1993) ...................................................... 12, 14

*Alpha Phoenix Indus. LLC v. SCInternational Inc.*, 2013 U.S. Dist. LEXIS 154964,*17 (D. Ariz. 2013) ........................................................................................................................................ 8

*Anderson  v. Liberty  Lobby, Inc.,* 477  U.S. 242, 247-48, 106 S. Ct. 2505 (1986) .................................... 4

*Art  Movers, Inc. v. Ni West,* 3 Cal. App. 4th 640, 646-47 (Cal. Ct. App. 1992)...................................... 42

*Art of Living Found. v. Does 1-10,* 2011 U.S. Dist. LEXIS 63507 (N.D. Cal. 2011) ....................... 21

*Banks v. Wolk*, 918 F.2d 418 (3rd Cir. 1990) ............................................................................... 39

*Barket v. Clarke*, 2012 U.S. Dist. LEXIS 88097, *12 (D. Nev. 2012) ..................................................... 8

*Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 956 P.2d 1382, 1387 (Nev. 1998) ...................................... 12

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102-03 (9th Cir. 2009) ........................................................ 15

*Biro v. Conde Nast,* 883 F. Supp. 2d 441,463 (S.D.N.Y. 2012)................................................................ 25

*Blatty v. N.Y. Times Co.,* 728 P.2d 1177, 1184 (Cal. 1986) ................................................................... 41

*Brittingham  v. Ayala,* 995 S.W.2d 199, 201 (Tex. Ct. App. 1999) ....................................................... 42

*Burns v. Mayer*, 175 F. Supp. 2d 1259, 1268 (D. Nev. 2001) ............................................................... 10

*Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548 (1986) ...................................................... 4

*Chehade Refai v. Lazaro*, 614 F. Supp. 2d 1103, 1122 (D. Nev. 2009) ................................................. 11

*Cherry v. Clark County Sch. Dist.*, 2014 U.S. Dist. LEXIS 55777, 17-18 (D. Nev. 2014) ........................... 8, 28

*Chowdhry v. NLVH, Inc.*, 109 Nev. 478, 482-83, 851 P.2d 459 (1993) ........................................... 14

*Clark County Sch. Dist. v. Virtual Educ. Software, Inc.,125* Nev. 374, 384-86, 213 P.3d 496, 504 (2009) ........................................................................................................................................ 15

*Conover v. Vons Stores, Inc.*, 2012 U.S. Dist. LEXIS 138041, 9-10 (D. Nev. 2012) ................................ 6

*Cort v. St. Paul Fire & Marine Ins. Cos.*, 311 F.3d 979, 987 (9th Cir. 2002). ....................................... 7

iv

*Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, 320 S.E.2d 70, 83 (W. Va. 1984)................................7

*Curtis Publishing  Co. v. Butts,* 388 U.S. 130, 87 S. Ct. 1975 (1967)........................................17

*D.A.R.E. America v. Rolling Stone Magazine,* 101 F. Supp. 2d 1270, 1287-88, 1289 (C.D. Cal. 2000)...28

*Dannenbring v. Wynn Las Vegas, L.L.C.*, 2012 U.S. Dist. LEXIS 113559, *12-13 (D. Nev. 2012 ................12

*Davis v. Nev. Dep't of Corr.*, 2014 U.S. Dist. LEXIS 99444, *7 (D. Nev. 2014)................................10

*Davis v. Ross,* 107 F.R.D. 326, 330 (S.D.N.Y. 1985) ................................................................40

*Dillard Dept. Stores, Inc. v. Beckwith*, 115 Nev. 372, 989 P.2d 882, 886 (Nev. 1999)................................10

*Dobson v. Sprint Nextel Corp.*, 2014 U.S. Dist. LEXIS 16353, *14-16 (D. Nev. 2014) ....................passim

*Dun & Bradstreet v. Greenmoss Builders,* 472 U.S. 749, 766 (1985)........................................40

*Dworkin v. Hustler Magazine, Inc.*, 668 F. Supp. 1408, 1420-21 (C.D. Cal. 1987)................................14, 19

*Felton v. Schaeffer*, 229 Cal. App.3d 229, 239, 279 Cal. Rptr. 713 (Cal. App. 1991) ................................15

*Ferm v. McCarty*, 2013 U.S. Dist. LEXIS 23711, 24-25 (D. Nev. 2013)........................................7, 15

*Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1104 (9th Cir. 2006) ........................................7

*Flowers v. Carville*, 310 F.3d 1118, 1132 (9th Cir. 2002)........................................7, 8

*Flynn v. Higham*, 149 Cal. App. 3d 677, 681, 197 Cal. Rptr. 145 (Cal App. 1983) ................................15

*Franchise Tax Bd. v. Hyatt*, 335 P.3d 125, 141 (Nev. 2014) ................................................passim

*Gamage v. Bd. of Regents of the Nev. Sys. of Higher Educ.*, 2013 U.S. Dist. LEXIS 184162, *39-40 (D. Nev. 2013) ........................................................6

*Gardner v. Martino*, 563 F.3d 981, 987 (9th Cir. 2009)........................................19, 20, 23

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-340, 94 S. Ct. 2997 (1974)................................19

*Gilbrook v. City of Westminster,* 177 F.3d 839, 863 (9th Cir 1999)................................22, 25

*Gold v. Harrison,* 962 P.2d 353 (Haw. 1998), *cert. denied* 526 U.S. 1018 (1999)................................25

Gordon v. Dalrymple, 2008 U.S. Dist. LEXIS 51863, 2008 WL 2782914, *3 (D. Nev. 2008) ................28

*Greenbelt  Coop. Pub. Ass'n v. Bresler,* 398 U.S. 6, 14, 90 S. Ct. 1537 (1970)................................24, 25

*Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1107 (N.D. Cal. 2011) ................................8

*J.D.H. v. Las Vegas Metro. Police Dep't*, 2014 U.S. Dist. LEXIS 105965, *20 (D. Nev. 2014)................................10

*Kahn v. Morse & Mowbray*, 121 Nev. 464, 478, 117 P.3d 227 (2005) ..................................................... 10

*Kennedy Funding, Inc. v. Chapman*, 2010 U.S. Dist. LEXIS 116038, *13-14 (N.D. Cal. 2010) ...................... 8

*K-Mart Corp. v. Washington*, I09 Nev. 1180, 1194, 866 P.2d 274, 283-84 (1993) ........................................ 6

*Knievel v. ESPN,* 393 F.3d 1068, 1078 (9th Cir. 2005) ............................................................................. 23

*Knight v. Climbing Magazine*, 2012 U.S. Dist. LEXIS 179412, *7-8 (D. Nev. 2012) ............................... 10, 11

*Leavitt v. Leisure Sports, Inc.,* 103 Nev. 81, 88, 734 P.2d 1221, 1225 (1987) ............................................. 6

*Lopez v. UPS, 2009 U.S. Dist. LEXIS* 956, 962 (D. Nev. 1990) ............................................................... 10

*Maduike v. Agency Rent-A-Car*, 114 Nev. 1, 953 P.2d 24, 25 (Nev. 1998) ................................................ 10

*Masson v. New Yorker Magazine,* 501 U.S. 496, 516, 111 S. Ct. 2419 (1991) ........................................... 27

*Medifast, Inc. v. Minkow, 2011 U.S. Dist. LEXIS 33412,* *39 (S.D. Cal. 2011) ........................................ 21

*Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 4-5, 110 S. Ct. 2695 (1991) .................................................. 20

*N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 279-80, 84. S. Ct. 710 (1964) ................................................. 17

*Nelson v. City of Las Vegas*, 99 Nev. 548, 555, 665 P.2d 1141, 1145 (1983) ............................................. 13

*Nev. Ind Broadcasting Corp. v. Allen,* 99 Nev. 404,414, 664 P.2d 337, 334 (1983) .................. 17, 19, 20

*Nicosia v. De Rooy,* 72 F. Supp. 2d 1093, 1104 (N.D. Cal. 1999) ..................................................... 24, 27

*Obsidian Fin. Group, LLC v. Cox*, 812 F. Supp. 2d 1220, 1232 (D. Ore. 2011) ...................................... 20, 24

*Olivero v. Lowe*, 116 Nev. 395, 399, 995 P.2d 1023 (Nev. 2000) ............................................................. 14

*Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC,* Case No. 5502-CS *2011 Del. Ch. LEXIS 116* at
  *147-150 (Del. Chan. Ct. May 25, 201 I) ...................................................................................... 22

*Partington v. Bugliosi,* 56 F.3d 1147, 1155, 1157 (9th Cir. 1995) .................................................... 26, 27

*Pegasus v. Reno Newspapers, Inc.,* 118 Nev. 706, 718, 57 P.3d 82, 90 (2002)............................passim

*People for Ethical Treatment of Animals v. Bobbi Bersconi, Ltd.*, 111 Nev. 615, 895 P.2d at 1273 n. 4
  (1995), ...................................................................................................................................... 7

*Phantom Touring, Inc. v. Affiliated Publ'ns,* 953 F.2d 724, 730 (Ist Cir. 1992)....................................... 26

*Phillips v. Dignified Transition Solutions*, 2014 U.S. Dist. LEXIS 120221, *17 (D. Nev. 2014) ................... 12

*Point Ruston, LLC v. Pac. N.W Reg'/ Council of the United Bhd of Carpenters & Joiners of Am.,* 2010
  U.S. Dist. LEXIS 95239 (W.D. Wash. 2010) ..................................................................................... 26

*Republic Tobacco Co. v. N. Atl. Trading Co.,* 381 F.3d 717, 734 (7th Cir. 2004) ...................................... 40

*Reynolds v. Reynolds*, 294 P.3d 151, 156 (Az. App. 2013)........................................................... 7

*Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983)........................................................... 7

*Ross v. Gallant, Farrow & Co., P.C.*, 27 Ariz. App. 89, 551 P.2d 79, 82 (Ariz. Ct. App. 1976) ..................... 15

*Sahara Gaming  v. Culinary Workers,* 115 Nev. 212, 984 P.2d 164 (1999)............................................. 38

*Sandals Resorts Int'l, Ltd. v. Google, Inc.,* 925 N.Y.S.2d 407, 415-16 (N.Y. App. Div. 2011)................ 20, 24

*Scott v. Corizon Health, Inc.*, 2014 U.S. Dist. LEXIS 65066, *12 (D. Nev. 2014)................................... 11

*Simpson v. Mars, Inc.,* 113 Nev. I88, I91-92, 929 P.2d 966, 970 (1997) ............................................. 19

*Southern Air Transport v. American Broadcasting Cos.,* 670 F. Supp. 38, 42 (D.D.C. 1987) ........ 8

*Standing  Committee  v. Yagman,* 55 F.3d 1430, 1440 (9th Cir 1995) ........................................... 26

*Susko v.Cox Enters.*, 2008 U.S. Dist. LEXIS 69901, * 3 (N.D.W. Va. 2008) ........................................ 8

*Tasso  v. Platinum Guild  Int'l,* 1998 U.S. Dist. LEXIS 18908, *5-6 (S.D.N.Y.  1998) ..................... 24

*Thornhill  Publishing Co., Inc. v. GTE Corp.,* 594  F.2d 730, 738 (9th Cir. 1979) ............................. 4

*Troy Group,  Inc. v. Tilson,* 364 F. Supp. 2d 1149, 1156 (C.D. Cal. 2005)........................................ 26, 27

*Truta v. Las Vegas Metro. Police Dep't*, 2014 U.S. Dist. LEXIS 66922, *21 (D. Nev. 2014) ...................... 12

*Underwager v. Channel 9 Austl.*, 69 F.3d 361, 366 (9th Cir. 1995) ............................................... 19

*United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S. Ct. 357, (1950) ..................................... 7

*Vail v. Pioneer Mut. Life Ins. Co.*, 2010 U.S. Dist. LEXIS 107994, *5-6 (D. Nev. 2010)......................... 8

*Villagomes v. Lab. Corp. of Am.*, 783 F. Supp. 2d 1121, 1126 (D. Nev. 2011) ............................... 10

*Wait v. Beck's  N. Am., Inc.,* 41 F. Supp. 2d 172, 183 (N.D.N.Y. 2003) ........................................... 24

*Washington  Post Co. v. Keogh,* 365  F.2d 965, 968 (D.C. Cir. 1966 ............................................... 5

*Watson v. Las Vegas Valley Water Dist.*, 378 F. Supp. 2d 1269, 1278 (D. Nev. 2005)...................... 10, 12

*Wichinsky v. Mosa,* 109 Nev. 84, 87-88, 847 P.2d 727, 729-30 (1993) .......................................... 6

*Wilson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 111 A.D.2d 807, 808, 490 N.Y.S.2d 553 (N.Y. App. 1985) .................................................................................................................................... 14

*Wynn  v. Smith,*  117  Nev. 6, 14, 16 P.3d 424, 429 (2001) ........................................................ 38

*Zepeda v. OneWest Bank FSB,* 2011 U.S. Dist. LEXIS 143298 (N.D. Cal. 2011) ................................42

**Rules**

Fed. R. Civ. P 56(c) ....................................................................................................................4

**Authority**

Prosser, Handbook of the Law of Torts, 737-801 (4th ed. 1971)................................................15

Restat 2d of Torts, § 652D ............................................................................................................8

Restatement (Second) of Torts § 46 cmt. j (1977) ......................................................................13

Restatement (Second) of Torts § 46 cmt. k (1977) ......................................................................13

Restatement (Second) of Torts § 652A (1977) .............................................................................6

Restatement (Second) of Torts, § 652I ........................................................................................7

## I. INTRODUCTION

This lawsuit is about the fundamental right to free speech, and one individual's desire to stifle those rights due to his personal dissatisfaction with the Defendants' message. Plaintiffs Bradley S. Cohen ("Cohen") and his company, Cohen Asset Management, Inc. ("CAM"), brought a complaint for defamation and other claims based on statements found on an anonymous website created by Hansen that criticizes Cohen and CAM. All Hansen has done is exercise his constitutional right to relay his unpleasant experiences with Cohen and CAM and share with the public his personal concerns regarding their business practices. In response, Cohen and CAM filed this action, suing Hansen for the entire contents of the websites. Cohen and CAM predicate this litigation on the presumption of reputational damages that are not credibly proven or found. Hansen seeks to resolve the pending claims against him with judgment in his favor.

## II. STATEMENT OF FACTS

**A.      The Parties**

      1.      Defendants.

Defendant Northwest Territorial Mint ("NWTM"), a Washington-based company, is the largest private mint operation in the United States with more than 300 full-time employees. It primarily manufactures items made from precious metals for sale to institutions, corporations, and individuals in the United States and around the world, including the United States military and various United States government agencies. Defendant Ross Hansen ("Hansen") is the owner and chief executive officer of NWTM. Defendant Steven Firebaugh is a web designer and web manager employed by NWTM.

2.     Plaintiffs.

Cohen is a well-known real estate investor based in Los Angeles.[1] Cohen is CAM's president and chief executive officer. CAM acquires property on behalf of investors, operates the property and provides returns to those investors.[2] CAM creates a number of affiliated entities to own and manage the various properties.[3]

As head of a large real estate investment company, Cohen is a limited-purpose public figure.[4] Cohen is a well-known and active member of the Los Angeles community and the national real estate community. Cohen frequently appears as a guest speaker at national and international real estate conferences and events. He has been honored by such organizations as the Boy Scouts of America, Cedars Sinai Medical Center, and Friends of the Israeli Defense Forces.[5] Cohen has received numerous awards and recognitions from local, state, and national government officials, including President George W. Bush and Vice-President Al Gore.[6] Cohen has also spoken at numerous real estate investing conferences in the last five years.[7]

B.     The *Auburn Valley Industrial Capital LLC v. Northwest Territorial Mint* Litigation.

Hansen's relationship with Cohen and CAM began when NWTM leased property from

---

[1] Plaintiffs' First Amended Complaint ("Complaint") (ECF 40), ¶ 1. Cohen verified the contents of the Amended Complaint under oath, so its factual assertions may be construed as party statements and thus admissible.

[2] *See* Deposition of Scott McGinness ("McGinness Dep."), at 16:11-14.

[3] *Id.* at 23:11-23.

[4] Complaint, ¶ 1.

[5] *Id.*, ¶ 13.

[6] Exhibit A.

[7] Deposition of Bradley Cohen ("Cohen Dep."), at 33:1-25; Exhibit B.

Auburn Valley Industrial Capital, L.L.C. ("Auburn"), a CAM affiliate.[8] The parties' relationship terminated when Auburn sued Hansen and NWTM, alleging lease violations.[9] In the lawsuit, Auburn claimed that Hansen and NWTM environmentally contaminated the leased property. Auburn eventually obtained a judgment against Hansen and NWTM.

After the termination of the lessor/lessee relationship with Auburn, Hansen created websites about Cohen and CAM.[10] Cohen and CAM filed this lawsuit in August 2012.[11]

**C.    Defendants' use of the Website.**

In 2012, Hansen developed two websites (collectively, "Website") that feature information and opinions about Cohen and CAM, including asking the exaggerated question of whether Cohen is "the next Bernie Madoff."[12] The Website, originally located at www.bradley-cohen.com and currently located at www.bradleyscohen.com, features Hansen's opinions about Cohen and CAM and their business practices.[13] Hansen published information on the Website based upon his experiences with Cohen and CAM, conversations he had with CAM's employees, and documents Hansen found through Internet searches.[14]

Hansen's primary purpose in publishing the websites was to perform a "public service" to the community by informing the public about potential unethical acts he encoun-

---

[8] Complaint, ¶ 28.

[9] *Id.,* ¶ 31.

[10] Deposition of Ross Hansen ("Hansen Dep."), at 31:13-21.

[11] ECF 1.

[12] *See* first page of www.bradleyscohen.com, Exhibit C at I; Complaint, ¶ 12; Cohen Dep. at 179.

[13] *See* Exhibit's C and D; Hansen Dep. 43:1-25.

[14] Hansen Dep. at 43:18-23; 85:19-86:7.

tered in dealing with Cohen and CAM.[15] While Hansen did not author all of the Website's content, he was the one who gave final approval of what would be published.[16] Defendant Steven Firebaugh's involvement in the website was "minimal."[17]

On or about May 2, 2012, the registrar of www.bradley-cohen.com shut down the website.[18] However, www.bradleyscohen.com is still operational.[19]

### D.    Damages.

Cohen and CAM are only seeking to recover presumed damages in this lawsuit. In a May 7, 2014 order, the Magistrate Judge precluded Cohen and CAM from claiming or introducing any evidence of quantifiable economic harm attributable to Hansen's alleged conduct for any purpose in this case, including motion practice and trial.[20]

### III.   LEGAL STANDARD

A party is entitled to summary judgment as a matter of law upon demonstrating that there is no genuine issue as to any material fact proving or disproving a plaintiff's claim.[21] Conclusory or speculative testimony is insufficient to raise a genuine issue of material fact.[22] When the non-movant must prove a claim at trial, the moving party may satisfy its burden by demonstrating the absence of evidence necessary to support or establish the non-movant's

---

[15] *Id.* at 34:12-24.

[16] *Id.* at 131:4-132:19.

[17] *Id.* at 132:25-133:2.

[18] Complaint, ¶ 50.

[19] *Id.*, ¶ 9.

[20] Doc. # 180.

[21] *See* Fed. R. Civ. P 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548 (1986).

[22] *Thornhill Publishing Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

claim.[23] In contrast, claims or affirmative defenses must be proven by admissible and affirmative evidence.[24]

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported Motion for Summary Judgment; the requirement is that there be no genuine issue of material fact."[25] If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment for the movant is proper.[26] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."[27] Courts favor the early resolution of disputes based on defamation, as the suit "may be as chilling to the exercise of First Amendment freedoms as the outcome of the lawsuit itself."[28]

## IV.  ARGUMENT

**A.**  **Actual or special damages are a required element for the torts of ordinary defamation and intentional interference with expected future business. Because Cohen and CAM do not have any actual or special damages, Hansen is entitled to summary judgment on those claims.**

1.  Actual damages are a required element of an ordinary defamation claim.

Cohen and CAM are not seeking and have not identified any actual or special damages in this litigation. The Court has also precluded them from claiming or introducing any evidence of quantifiable economic harm.

---

[23] *Celotex,* 477 U.S. at 325.

[24] *See Id.*

[25] *Anderson,* 477 U.S. at 247-48.

[26] *Id* at 249.

[27] *Id.* at 248.

[28] *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C. Cir. 1966).

Cohen and CAM have asserted a claim for ordinary defamation (separate from their claim for defamation *per se*). Under Nevada law, actual or special damages are a required element of ordinary defamation claims.[29] Because Cohen and CAM do not have any actual or special damages, the Court should grant summary judgment against them on their claims for ordinary defamation.

2.   <u>Actual damages are a required element of a claim for intentional interference with expected future business.</u>

Cohen and CAM have asserted claims for intentional interference with expected future business. Under Nevada law, actual or special damages are a required element for this claim. Because Cohen and CAM do not have any actual or special damages, the Court should grant summary judgment against them on their claims for intentional interference with expected future business.[30]

**B.   False light protects mental and emotional interests. As a corporation, CAM has no privacy interests to protect. Further, Hansen did not portray Cohen in a false light by giving publicity to his business activities or stating true facts about his personal life.**

Nevada courts recognize false light invasion of privacy as a valid cause of action.[31] "The tort of false light/invasion of privacy is 'an odd hybrid of defamation and intentional infliction of

---

[29] *K-Mart Corp. v. Washington,* 109 Nev. 1180, 1194, 866 P.2d 274, 283-84 (1993) ("in an ordinary [defamation] action, before any recovery will be allowed the plaintiff," special damages must be proven, which "are quantifiable monetary losses that flow directly from the injury to reputation caused by the defamation, *e.g*. loss of business"). *Accord Clark Cnty. Sch. Dist. v. Virtual Educ. Software, Inc.*, 125 Nev. 374, 213 P.3d 496, 503 (2009); *Gamage v. Bd. of Regents of the Nev. Sys. of Higher Educ.*, 2013 U.S. Dist. LEXIS 184162, *39-40 (D. Nev. 2013); *Conover v. Vons Stores, Inc.*, 2012 U.S. Dist. LEXIS 138041, 9-10 (D. Nev. 2012).

[30] *Wichinsky v. Mosa,* 109 Nev. 84, 87-88, 847 P.2d 727, 729-30 (1993); *Leavitt v. Leisure Sports, Inc.,* 103 Nev. 81, 88, 734 P.2d 1221, 1225 (1987).

[31] *Franchise Tax Bd. v. Hyatt*, 335 P.3d 125, 141 (Nev. 2014) ("The tort of invasion of privacy embraces . . . publicity that unreasonably places the other in a false light before the public.'") (quoting the Restatement (Second) of Torts § 652A (1977)).

emotional distress.'"[32] Defamation law seeks to protect an objective interest in one's reputa-

tion, "either economic, political, or personal, in the outside world."[33] By contrast, false light in-

vasion of privacy protects one's subjective interest in freedom from injury to the person's right

to be left alone.[34] Nevada requires that damages for false light claims arise from the general

damage of being exposed to the public.[35]

1.      <u>As a corporation, CAM does not have a personal right to privacy and
cannot suffer mental distress from being shown in a false light.</u>

A false light claim requires the invasion of some type of privacy interest.[36] The claimant

must also demonstrate that he or she suffered "mental distress" from being shown in a false

light.[37] While CAM has legal personhood as a corporation, it has no personal right to privacy

and cannot suffer mental distress. The Court should grant summary judgment on CAM's claim

for the tort of false light/invasion of privacy.[38]

---

[32] *Ferm v. McCarty*, 2013 U.S. Dist. LEXIS 23711, 24-25 (D. Nev. 2013) (quoting *Flowers v. Carville*, 310 F.3d 1118, 1132 (9th Cir. 2002).

[33] *Franchise Tax Bd.,* 335 P.3d at 141 (quoting *Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, 320 S.E.2d 70, 83 (W. Va. 1984)).

[34] *Id. See People for Ethical Treatment of Animals v. Bobbi Bersconi, Ltd.*, 111 Nev. 615, 895 P.2d at 1273 n. 4 (1995), overruled in part on other grounds, 113 Nev. 644, 940 P.2d 134 (Nev. 1997) ("The false light privacy action differs from a defamation action in that the injury in privacy actions is mental distress from having been exposed to public views, while the injury in defamation actions is damage to reputation.") (quoting *Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983)). *Accord Dobson v. Sprint Nextel Corp.*, 2014 U.S. Dist. LEXIS 16353, *14-16 (D. Nev. 2014); *Barket v. Clarke*, 2012 U.S. Dist. LEXIS 88097, *12-13 (D. Nev. 2012).

[35] *Flowers,* 310 F.3d at 1132; *People for the Ethical Treatment of Animals v. Bobbi Bersconi, Ltd.,* 111 Nev. at 622 n.4.

[36] *Cort v. St. Paul Fire & Marine Ins. Cos.*, 311 F.3d 979, 987 (9th Cir. 2002). *See Reynolds v. Reynolds*, 294 P.3d 151, 156 (Az. App. 2013) ("Unlike defamation, false light does not protect reputation or good name, but rather protects mental and emotional interests.").

[37] *Flowers,* 310 F.3d at 1132 (citing *People for the Ethical Treatment of Animals,* 111 Nev. at 622 n.4).

[38] See *Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1104 (9th Cir. 2006) ("[C]orporations can claim no equality with individuals in the enjoyment of a right to privacy.") (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S. Ct. 357, (1950)); Restatement (Second) of Torts, § 652I, comment c ("A corporation, partnership or unincorporated association has no personal right of privacy. It has therefore no cause of action for any of the four forms of invasion covered by §§ 652B to 652E."). *See, e.g., Alpha Phoenix Indus. LLC v. SCInternational Inc.,*

2.   <u>Hansen did not make untrue statements that placed Cohen before the public in a false light, nor did Hansen do anything that would be highly offensive to a reasonable person.</u>

To prevail on his claim for false light, Cohen must establish that (1) Hansen gave publicity to a matter concerning Cohen that placed him before the public in a false light; (2) that the false light would be highly offensive to a reasonable person; and (3) Hansen had knowledge of, or acted in recklessly disregard as to, the falsity of the publicized matter and the false light in which Cohen would be placed.[39] Cohen must also prove that Hansen made at least an implicit false statement of objective fact and acted with actual malice.[40]

A person's privacy is not invaded "when the defendant gives publicity to a business or activity in which the plaintiff is engaged in dealing with the public."[41] Ever since the recession beginning in 2008, private investment vehicles have received increased scrutiny from the public. This controversy has been underscored by the collapse of once-reputable investment firms led by Bernard Madoff and Alan Stanford. The ongoing crisis of confidence is a public controversy that implicates firms such as CAM and the individuals who run them, such as Cohen.

---

2013 U.S. Dist. LEXIS 154964,*17 (D. Ariz. 2013) (finding no damages for a false light claim brought by a corporation because "as a matter of law, a corporation has no mental or emotional interests to vindicate."); *Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1107 (N.D. Cal. 2011) ("("False light implicates an invasion of privacy . . . [which] is a right reserved exclusively for actual persons."); *Kennedy Funding, Inc. v. Chapman*, 2010 U.S. Dist. LEXIS 116038, *13-14 (N.D. Cal. 2010) (a corporation "is not susceptible to the injured 'feelings' associated with invasion of privacy torts"); *Susko v.Cox Enters.*, 2008 U.S. Dist. LEXIS 69901, * 3 (N.D.W. Va. 2008) (holding that a limited liability corporation could not assert a claim for false light invasion of privacy); *Southern Air Transport v. American Broadcasting Cos.*, 670 F. Supp. 38, 42 (D.D.C. 1987) (dismissing a corporation's false light claims based on the Restatement (Second) of Torts§ 652I, which states that a corporation cannot be offended).

[39] *Cherry v. Clark County Sch. Dist.*, 2014 U.S. Dist. LEXIS 55777, 17-18 (D. Nev. 2014); *Barket,* 2012 U.S. Dist. LEXIS 88097, *12; *Vail v. Pioneer Mut. Life Ins. Co.*, 2010 U.S. Dist. LEXIS 107994, *5-6 (D. Nev. 2010).

[40] *Flowers*, 310 F.3d at 1131; *Cherry,* 2014 U.S. Dist. LEXIS 55777, *17-18; *Dobson*, 2014 U.S. Dist. LEXIS 16353, *14-16.

[41] Restat 2d of Torts, § 652D, Comment b.

Because the misdeeds that Madoff and Stanford perpetrated led to the collapse of their unlawfully operated investment firms, principals of similar investment firms have become indivisible from the firms themselves in the context of this controversy. Cohen, the namesake and CEO of CAM, relies on the public to carry on his business and welcomes qualified individual investors. [42] Hansen did not portray Cohen in a false light by giving publicity to his business activities.

The things that Hansen posted on the Website—information pertaining to Cohen's business activities, political contributions, and house—are true and thus cannot be a basis for a claim of false light invasion of privacy.

Cohen has not shown by any "objectively verifiable indicia" that he actually suffered mental distress because of the Website.[43] Cohen claims that, since discovering the Website, he experienced changes in his sleeping patterns and had unusual dreams involving Hansen.[44] These generalized complaints do not rise to the level of mental distress necessary to support a false light claim.

### C.   Cohen cannot establish extreme or outrageous conduct by Hansen that caused him to experience extreme or severe emotional distress.

To establish his claim for intentional infliction of emotional distress ("IIED"), Cohen must show (1) extreme or outrageous conduct by Hansen; (2) that Hansen intended to cause emotional distress or had a reckless disregard for causing emotional distress; (3) that Cohen actually

---

[42] Cohen Dep. at 161:10-21; McGinness Dep. at 39:24-40:4, 71:12-19; Fishman Dep. at 103:12-104:1. Cohen made sizeable political donations and lives in the house the Website depicts. Cohen Dep. at 50:25-51:I, 51:21-22, 177:4-178:21.

[43] *Franchise Tax Bd.,* 335 P.3d at 147 (quoting *Miller,* 114 Nev. at 1300, 970 P.2d at 577).

[44] Faerstein Dep. at 154:20-155:23.

suffered extreme or severe emotional distress; and (4) causation.[45] Cohen cannot satisfy these elements. The underlying conduct Cohen seeks to punish—Hansen's publication of words on the Internet—does not satisfy the requirement of extreme or outrageous conduct. Moreover, the damages Cohen claims to have suffered are not severe enough to support a finding of emotional distress, and were not caused by Hansen's conduct.

       1.      <u>Hansen's conduct was not extreme or outrageous.</u>

Extreme and outrageous conduct is that which is "outside all possible bounds of decency" and is intolerable in civil life.[46] The question of whether conduct is outrageous or extreme is objective, rather than subjective.[47] The Court determines whether Hansen's conduct was "extreme and outrageous" as a matter of law.[48]

Nevada law does not extend liability for IIED to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."[49] People are "expected and required to be hardened to occasional acts that are definitely inconsiderate and unkind."[50] Particularly, businessmen who run successful companies should be hardened to criticism and questioning

---

[45] *Dobson,* 2014 U.S. Dist. LEXIS 16353, *14-16; *Franchise Tax Bd.,* 335 P.3d at 147; *Dillard Dept. Stores, Inc. v. Beckwith*, 115 Nev. 372, 989 P.2d 882, 886 (Nev. 1999).

[46] *Knight v. Climbing Magazine*, 2012 U.S. Dist. LEXIS 179412, *7-8 (D. Nev. 2012) (quoting *Maduike v. Agency Rent-A-Car*, 114 Nev. 1, 953 P.2d 24, 25 (Nev. 1998)). *Accord Dobson,* 2014 U.S. Dist. LEXIS 16353, *14-16; *Villagomes v. Lab. Corp. of America*, 783 F. Supp. 2d 1121, 1126 (D. Nev. 2011).

[47] *Villagomes*, 783 F. Supp. 2d at 1126. *Accord Dobson,* 2014 U.S. Dist. LEXIS 16353, *14-16; *Knight,* 2012 U.S. Dist. LEXIS 179412, *7-8.

[48] *Davis v. Nev. Dep't of Corr.*, 2014 U.S. Dist. LEXIS 99444, *7 (D. Nev. 2014). *See J.D.H. v. Las Vegas Metro. Police Dep't*, 2014 U.S. Dist. LEXIS 105965, *20 (D. Nev. 2014) ("Unless reasonable people could differ, the court determines whether the defendant's conduct may be regarded as extreme and outrageous so as to permit recovery").

[49] *Lopez v. UPS, 2009 U.S. Dist. LEXIS* 956, 962 (D. Nev. 1990), *aff'd 915* F.2d 588 (9th Cir. 1992). *Accord Watson v. Las Vegas Valley Water Dist.*, 378 F. Supp. 2d 1269, 1278 (D. Nev. 2005) ("Liability for emotional distress generally does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.") (quoting *Burns v. Mayer*, 175 F. Supp. 2d 1259, 1268 (D. Nev. 2001)).

[50] *Id.* (*quoting Maduike,* 953 P.2d at 26. *Accord Kahn v. Morse & Mowbray*, 121 Nev. 464, 478, 117 P.3d 227 (2005).

about their business tactics, and the hyperbolic comparison of one to another does not go beyond the bounds of decency.[51] "Major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough."[52]

Hansen's publication of the Website about Cohen does not reach the level of the extreme and outrageous conduct that Nevada law requires for an IIED claim. Defamatory accusations such as the ones Cohen alleges are not "extreme and outrageous conduct." For example, in *Knight v. Climbing Magazine*, the plaintiff alleged that an article published in the defendant magazine presented him in a bad light and that he received ridicule from the climbing community as a result. The court found these allegations insufficient to state an IIED claim because the defendant did not act "in a manner that was outside all possible bounds of decency in publishing an article concerning Knight's activities carried out in a public space including a public restaurant[.]"[53] The court also found "that the publishing of such an article" was not "extreme or outrageous conduct that cannot be condoned in civil life."[54]

Fundamentally, Cohen seeks to hold Hansen liable for publishing words on the Internet.[55] The act of committing thoughts to words is no different than Hansen writing an e-mail, passing a note, or leaving an anonymous message on a bathroom stall. While Cohen's umbrage comes from the content of those statements—which are not themselves outrageous—

---

[51] *See Lopez, 2009 U.S. Dist. LEXIS 47520* at *14.

[52] *Scott v. Corizon Health, Inc.*, 2014 U.S. Dist. LEXIS 65066, *12 (D. Nev. 2014) (quoting *Chehade Refai v. Lazaro*, 614 F. Supp. 2d 1103, 1122 (D. Nev. 2009)).

[53] *Knight*, 2012 U.S. Dist. LEXIS 179412, *8.

[54] *Id.*

[55] Cohen Dep. at 272:6-8; Complaint, ¶¶'s 9-12.

the underlying physical action that caused those words to exist is nothing more than the publication of written words on a computer screen. There is no evidence that Hansen's conduct "even came close to the requisite level of outrageous and extreme. Liability is only found in extreme cases where the actions of the defendant goes beyond all possible bounds of decency, is atrocious and utterly intolerable."[56] Because Hansen's conduct was not extreme and outrageous, Cohen cannot satisfy the first element of his IIED claim.

   2.   Hansen's conduct did not cause Cohen to suffer extreme or severe emotional distress.

Cohen must set forth "objectively verifiable indicia" to establish that he "actually suffered extreme or severe emotional distress."[57] To prevail on his claim for IIED, Cohen must demonstrate that he suffered some physical manifestation of emotional distress.[58] This distress must have been "so severe and of such intensity that no reasonable person could be expected to endure it."[59] General physical or emotional discomfort is insufficient to demonstrate severe emotional distress.[60]

In *Franchise Tax Board*, the Nevada Supreme Court adopted a sliding scale approach to

---

[56] *Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 911 (D. Nev. 1993).

[57] *Franchise Tax Bd.*, 335 P.3d at 147 (quoting *Miller*, 114 Nev. at 1300, 970 P.2d at 577). See *Dobson*, 2014 U.S. Dist. LEXIS 16353, *14-16 (an IIED claim requires evidence of an "objectively verifiable physical injury or illness.")

[58] *Dobson*, 2014 U.S. Dist. LEXIS 16353, *16-18. *Accord Phillips v. Dignified Transition Solutions*, 2014 U.S. Dist. LEXIS 120221, *17 (D. Nev. 2014) (Nevada courts required the plaintiff in an IIED claim "to demonstrate that he or she has suffered some physical manifestation of emotional distress in order to support an award for emotional damages."); *Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 956 P.2d 1382, 1387 (Nev. 1998) ("[I]n cases where emotional distress damages are not secondary to physical injuries, but rather, precipitate physical symptoms, either a physical impact must have occurred or, in the absence of physical impact, proof of 'serious emotional distress' causing physical injury or illness must be presented.") .

[59] *Watson,* 378 F. Supp.2d at 1279 (D. Nev. 2005) (quoting *Alam,* 819 F. Supp. at 911). *Accord Truta v. Las Vegas Metro. Police Dep't,* 2014 U.S. Dist. LEXIS 66922, *21 (D. Nev. 2014).

[60] *Dannenbring v. Wynn Las Vegas, L.L.C.*, 2012 U.S. Dist. LEXIS 113559, *12-13 (D. Nev. 2012) (citing *Watson*, 378 F. Supp. 2d at 1279.

proving a claim for IIED. "Under this sliding-scale approach, while medical evidence is one acceptable manner in establishing that severe emotional distress was suffered for purposes of an IIED claim, other objectively verifiable evidence may suffice to establish a claim when the defendant's conduct is more extreme, and thus, requires less evidence of the physical injury suffered."[61] With the "sliding-scale approach," the "increased severity of the conduct will require less in the way of proof that emotional distress was suffered in order to establish an IIED claim."[62]

In *Franchise Tax Board*, the plaintiff (Hyatt) presented testimony that his mood changed dramatically, that he became distant and much less involved in various activities, started drinking heavily, suffered severe migraines and had stomach problems, and became obsessed with the legal issues involving his case. Having found the defendant's conduct to be "at the more extreme end of the scale,"[63] the court said that this evidence, "in connection with the severe treatment experienced by Hyatt, provided sufficient evidence from which a jury could reasonably determine that Hyatt suffered severe emotional distress."[64]

Cohen claims in our case that, since discovering the Website, he has experienced changes in his sleeping pattern and unusual dreams involving Hansen.[65] Cohen actually improved

---

[61] *Franchise Tax Bd.*, 335 P.3d at 148.

[62] *Id.* (citing Restatement (Second) of Torts § 46 cmt. j (1977) ("The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.") and Restatement (Second) of Torts § 46 cmt. k (1977) (stating that "if the enormity of the outrage carries conviction that there has in fact been severe emotional distress, bodily harm is not required"). *See also Nelson v. City of Las Vegas*, 99 Nev. 548, 555, 665 P.2d 1141, 1145 (1983) ("the less extreme the outrage, the more appropriate it is to require evidence of physical injury or illness from the emotional distress.").

[63] *Id.*

[64] *Id.* at 149.

[65] Faerstein Dep. at 154:20-155:23.

his health by losing approximately 30 pounds.[66] To the extent Cohen has suffered any distress from the Websites, it is his own self-imposed anxiety over others discovering its contents.[67]

If Hansen's conduct fits anywhere on the IIED "sliding scale," it is at the "less extreme" end. That makes this case more like the situation in *Dobson*, where the plaintiff claimed to "have endured stress, anxiety, disparagement of character, fear, emotional distress, and pain and suffering[.]"[68] In dismissing the complaint, the court found that "[t]hese claims are not objectively verifiable and will not support emotional distress damages in Nevada for a tort arising out of a purely emotionally upsetting situation, as opposed to a physical injury."[69]

Cohen's emotional state is not so extreme or severe that a reasonable man in civilized society should not be expected to endure it. In fact, these same symptoms could be attributed to Cohen's position as head of an asset management company. Accordingly, the Court should grant summary judgment on Cohen's claim for IIED.

        3.      <u>Since Cohen's claim is primarily for defamation, he should not be allowed to maintain a separate claim for IIED.</u>

Where the gravaman of a claim is defamation, many jurisdictions do not permit separate causes of action for mental and/or emotional distress.[70] In *Dworkin*, the Ninth Circuit rec-

---

[66] Cohen Dep. 120:6-7; Fishman Dep. 38:24-39:2.

[67] *Id.* at 42:19-43:9,44:14-45:24, 119:4-24, 120:17-23.

[68] *Dobson,* 2014 U.S. Dist. LEXIS 16353, *16-18.

[69] *Id.* See *Alam,* 819 F. Supp. at 911 (feelings of inferiority, headaches, irritability and the loss of weight are insufficient to satisfy the physical impact requirement); *Olivero v. Lowe*, 116 Nev. 395, 399, 995 P.2d 1023 (Nev. 2000) (insomnia and general physical or emotional discomfort are insufficient to satisfy the physical impact requirement) (citing *Chowdhry v. NLVH, Inc.*, 109 Nev. 478, 482-83, 851 P.2d 459 (1993)).

[70] *See Dworkin v. Hustler Magazine, Inc.*, 668 F. Supp. 1408, 1420-21 (C.D. Cal. 1987), aff'd, 867 F.2d 1188 (9th Cir. 1989) (applying California law) (citing *Wilson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 111 A.D.2d 807, 808, 490 N.Y.S.2d 553 (N.Y. App. 1985)).

ognized that without such a rule, pleading an IIED claim could revive a defective defamation claim.[71] As one California state court explained, allowing an emotional distress claim based on facts underlying a defamation claim would be "a step toward swallowing up and engulfing the whole law of public defamation."[72]

Similarly, many jurisdictions do not permit separate negligence-based actions where the crux of a plaintiff's claim is defamation.[73] A number of state courts in the Ninth Circuit have held that permitting a plaintiff to sue in negligence for claims arising out of defamatory speech allows plaintiffs to "evade the strictures of libel law and avoid the applicable defenses by framing all libel actions as negligence causes of action, merely by pleading the defendant was negligent."[74] This District has found the reasoning in this line of cases to be "persuasive."[75]

> **D.**   **CAM's claim for defamation per se is actually one for business disparagement. That claim fails because CAM did not suffer any special damages.**

CAM asserts a claim for defamation *per se*. However, Nevada law recognizes that claims for harm to a company's goods or services arising from false statements are not properly raised as defamation *per se,* but instead are to be pled as "business disparagement."[76] As this Court observed in *Sentry Ins. v. Estrella Ins. Service*, "[s]tatements accusing an individual of personal misconduct in his or her business or attacking the individual's business reputation may be brought as an action for defamation *per se*. However, if the statements are

---

[71] *Id.*

[72] *Flynn v. Higham*, 149 Cal. App. 3d 677, 681, 197 Cal. Rptr. 145 (Cal App. 1983).

[73] *See Felton v. Schaeffer*, 229 Cal. App.3d 229, 239, 279 Cal. Rptr. 713 (Cal. App. 1991).

[74] *Id.* (applying California law); *see also Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102-03 (9th Cir. 2009) (applying Oregon law); *Ross v. Gallant, Farrow & Co., P.C.*, 27 Ariz. App. 89, 551 P.2d 79, 82 (Ariz. Ct. App. 1976) (citing Prosser, Handbook of the Law of Torts, 737-801 (4th ed. 1971)).

[75] *Ferm,* 2013 U.S. Dist. LEXIS 23711, *26-27.

[76] *Virtual Educ. Software, 125* Nev. at 384-86.

directed towards the quality of the individual's product or services, the claim is one for business disparagement.[77]

Hansen's statements in the Website do not go to CAM's reputation; rather, they go to the investing services that CAM provides and raise questions about CAM's stability and transparency. As such, CAM must pursue the alleged wrongs under a theory of business disparagement, rather than defamation.

The elements of business disparagement materially differ from those for defamation.[78] To prevail on a business disparagement claim, CAM must prove that (1) Hansen made a false and disparaging statement about its services; (2) the statement was unprivileged; (3) Hansen acted with malice; and (4) CAM incurred special damages.[79] It is unnecessary for the Court to even consider the first three elements because, as discussed *supra*, CAM did not suffer any special damages. The Court should grant summary judgment on CAM's improperly pled claim for defamation *per se*.

**E.      Hansen is not liable on Cohen's claim for defamation *per se*.**

At the core of this lawsuit is Cohen's claim for defamation *per se*. To prevail on this claim, Cohen must prove that (1) Hansen made a false and defamatory statements concerning Cohen; (2) Hansen published the false and defamatory statements to a third party; (3) Hansen's actions were at least negligent; and (4) Cohen suffered actual presumed damages.[80]

---

[77] 2013 U.S. Dist. LEXIS 83282 (D. Nev. 2013) (citations omitted).

[78] *Virtual Educ. Software,* 125 Nev. at 386.

[79] *Id.*

[80] *Pegasus  v. Reno Newspapers, Inc.,* 118 Nev. 706, 718, 57 P.3d 82, 90 (2002).

1.    <u>Cohen is a limited-purpose public figure, and cannot make the required showing that Hansen acted with actual malice.</u>

Cohen's stature and reach in the real estate investing community is sufficient to make him a limited-purpose public figure.[81] Individuals whose lives are sufficiently public, and whose actions are significant to the public at large or a significant subset of it, are subject to higher standards for proving defamation.[82] Specifically, a public figure must prove defendants acted with "actual malice" to recover for defamation.[83] To meet this standard, Cohen must prove by clear and convincing evidence that Hansen made his allegedly defamatory statements with knowledge that they were false, or with reckless disregard for the truth.[84]

Nevada follows the standard enunciated in *Gertz* and looks to a plaintiff's participation in a public controversy.[85] Nevada's Supreme Court has found that a restaurant, which inserts itself into the public to conduct business, is a limited-purpose public figure for the purpose of the business it conducts.[86] Cohen, the namesake and CEO of his firm, relies on the public to carry on his business and welcomes qualified individual investors.[87] In the past, Cohen has not shied away from receiving public recognition for his accomplishments and involvement

---

[81] A limited purpose public figure is subject to the same standard of proof as a general public figure, and attains such status by "voluntarily inject[ing] himself or [or] being drawn into a particular public controversy and thereby becom[ing] a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S. Ct. 2997 (1974).

[82] *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84. S. Ct. 710 (1964); *see also Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S. Ct. 1975 (1967).

[83] *Id.*

[84] *Id.; see Nev. Ind Broadcasting Corp. v. Allen*, 99 Nev. 404,414, 664 P.2d 337, 334 (1983).

[85] *Pegasus*, 118 Nev. at 719-721.

[86] *Id.*

[87] Cohen Dep. at 161:10-21; McGinness Dep. at 39:24-40:4, 71:12-19; Fishman Dep. at 103:12-104:1.

within the community.[88] By entering the stream of commerce and offering CAM's investment services to qualifying members of the public, Cohen has become a public figure under Nevada law.

Cohen has been active within the investment community and attempted to reach others regarding the public's skepticism over private investing. CAM has been a member of the Pension Real Estate Association and National Association of Real Estate Investment Managers (NAREIM), and Cohen has been a member of NAREIM's board.[89] Cohen has traveled across the country to speak at NAREIM events about real estate investing, and has even traveled to France on NAREIM's behalf.[90] Even if Cohen had not actively participated in NAREIM and reached out to the group's constituents, precedent supports him being included in the controversy by virtue of his participation in a publicly scrutinized industry.[91]

Hansen's statements on the Websites squarely address Cohen's participation in the ongoing public controversy over financial investing. Specifically, the Website raises questions regarding the similarities between Cohen and Bernie Madoff. Hansen also raises questions about CAM's investments and questions how investors can protect themselves—and their capital—based on the limited information available to them.

2.  <u>Hansen's statements are matters of opinion and therefore not defamatory.</u>

Defamation is a tort for remediating false statements of fact, but it does not reach in-

---

[88] Exhibit A; Reba Dep. at 20:16-25:15.

[89] Cohen Dep. at 36:22-37:3, 78:8-12; Exhibit B.

[90] Cohen Dep. at 79:25-80:2.

[91] When a plaintiff's conduct makes it impossible for him or her to avoid being included in the controversy, even when he or she does not seek to be part of it, he or she may become an involuntary limited-purpose public figure. *See Dameron v. Washington Magazine*, 779 F.2d 736, 741 (D.C. Cir. 1985).

to the realm of opinions and ideas. "There is no such thing as a false idea," as "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."[92] Statements of mere opinion are not actionable.[93] The determination of whether a statement is fact or opinion is a question of law.[94]

The United States Court of Appeals for the Ninth Circuit uses a three-part test to determine whether a statement contains or implies a provable factual assertion.[95] This test evaluates (1) whether in the broad context the general tenor of the entire work, including the subject of the statements, the setting, and the format, negates the impression that Hansen was asserting objective facts; (2) whether the context and content of the specific statements, including the use of figurative and hyperbolic language, and reasonable expectations of the audience, negate that impression; and (3) whether the statement is sufficiently factual to be provable as false.[96] Under these factors, Hansen's statements are not actionable as defamation.

a.   *Viewed within its proper context, the Website is interpreted as non-defamatory opinion.*

Allegedly defamatory statements must be read within the context they were made to ascertain their true meaning.[97] The "circumstances of communication" may constitute a defense to an action for defamation.[98] The test for determining whether a statement is one of

---

[92] *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-340, 94 S. Ct. 2997 (1974).

[93] *Pegasus,* 118 Nev. at 714;  *Allen,* 99 Nev. at 410.

[94] *Dworkin,* 867 F.2d at 1193.

[95] *Underwager v. Channel 9 Austl.*, 69 F.3d 361, 366 (9th Cir. 1995).

[96] *Id.*; *Gardner v. Martino*, 563 F.3d 981, 987 (9th Cir. 2009).

[97] *Pegasus,* 118 Nev. at 715.

[98] *Simpson v. Mars, Inc.,* 113 Nev. 188, 191-92, 929 P.2d 966, 970 (1997).

fact or opinion is "whether a *reasonable* person would be likely to understand the remark as an expression of the source's opinion or a statement of fact."[99]

Context is crucial in evaluating defamation claims—the entirety of the speech's surroundings may turn a statement that appears out of context to be factual into a statement of opinion.[100] The "low barrier to speaking online allows anyone with an Internet connection to publish his thoughts," and the fact that online comments are free from the "editorial constraints" of traditional media leads to readers according less deference to allegedly defamatory remarks found on the Internet.[101] The use of "loose, figurative, or hyperbolic language," endemic of the Internet and other forms of unedited communication, negate the impression that a speaker seriously accused a plaintiff of wrongdoing or criminal conduct.[102]

Indeed, the fact that the Website expresses negative views about Cohen and CAM would make a reasonable person suspicious as to whether they contain statements of fact.[103] Moreover, the fact that the Website and its domain names are registered and hosted anonymously—outside of the United States—further indicates that it is not affiliated with Cohen, CAM, or any other trusted entity for information about real estate investing.[104] Even without these factors, statements published on a blog that accepts comments, such as the Website at

---

[99] *Nev. Ind. Broadcasting,* 99 Nev. at 410 (emphasis added.) Certain statements may also be "mixed" and include both law and fact. *Id.* at 411. However, as set forth below within the motion, statements requiring knowledge of underlying facts are proven to be true, and may therefore be adjudicated non-defamatory. *Id.*

[100] *Pegasus,* 118 Nev. at 717 (finding a statement that a restaurant's food came from a package expressed a non-defamatory opinion, even if not factually accurate).

[101] *Sandals Resorts Int'l, Ltd. v. Google, Inc.,* 925 N.Y.S.2d 407, 415-16 (N.Y. App. Div. 2011).

[102] *Gardner,* 563 F.3d at 989-990, citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 4-5 (1991))..

[103] *See Id.*; *Obsidian Fin. Group, LLC v. Cox,* 812 F. Supp. 2d 1220, 1232 (D. Ore. 2011).

[104] *See Id.*

issue in this litigation, are inherently less likely to be viewed as statements of fact.[105]

> **b.** *Comparisons to Bernard Madoff are not automatically defamatory and constitute statements of opinion.*

Cohen is not the first person to claim defamation upon their practices being compared to those of Bernard Madoff. In the past, these comparisons have been dismissed as non-defamatory. The same is true of this case. Hansen's statements regarding Bernard Madoff are relatively limited, and much of the Website's content focuses on the conduct of Cohen and CAM individually. The comparisons that are drawn between Cohen and Madoff focus on specific facts regarding the activities of both: That Madoff and Cohen were both members of various boards of directors, made political contributions, worked in the investment field, and were the eponymous heads of their respective investment firms.[106]

Comparison of these discrete similarities is not defamatory.[107] In *Minkow*, the United States District Court for the Southern District of California held that comparing a compensation plan to "Madoff s secret trading system," creating "points of similarity between Madoff and Medifast," and observing that both Medifast and Madoff used small accounting firms, was not defamatory.[108] As in *Minkow,* Hansen did not accuse Cohen of running a Ponzi scheme "simply by using '[Cohen's name]' and 'Madoff' in the same breath."[109] As the court explained:

---

[105] *Art of Living Found. v. Does 1-10,* 2011 U.S. Dist. LEXIS 63507 (N.D. Cal. 2011); *see Obsidian Fin. Group,* 802 F. Supp. 2d at 1223-24 (collecting citations regarding a reasonable person's reaction to alleged defamation over the Internet).

[106] Exhibit C at 1-2; Exhibit D at 1-2.

[107] *Medifast, Inc. v. Minkow,* 2011 U.S. Dist. LEXIS 33412, *39 (S.D. Cal. 2011).

[108] *Id*. at *39-40.

[109] *Id.*

[T]he context of Defendants' statements shows that they used Madoff as a contemporary cautionary tale... If any statement of fact can be implied from Defendants' statements, it is this: Things at Medifast are not what they seem.  Such a statement is too inexact or subjective to support a libel per se claim; no reasonable person could construe it to be provably false.[110]

Similarly, the Delaware Court of Chancery held the invocation of Madoff's name when describing a management firm's refusal to provide information about a fund's investments was not defamatory—the conduct alleged to be defamatory was, in fact, exactly what Madoff did.[111] Hansen's comparison of Cohen to Madoff is not defamatory—least of all using the point-by-point factual comparisons that Hansen employed.[112] As in the *Minkow* case, Hansen's message is one of skepticism; it is not an allegation of criminality, nor would a reasonable person interpret it as such.

                        *c.*      *Statements describing Cohen and CAM are statements of opinion.*

The more prone a statement is to being proven true or false, the more likely it is to be a statement of fact, rather than opinion. However, even statements that may be actionable when read in isolation become statements of opinion when placed into their proper context.[113] Accusations of criminal activity—including lying, pimping, embezzlement, fraud, and abuse—can be statements of opinion, rather than fact, when viewed within their native con-

---

[110] *Id.*

[111] *Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC,* 2011 Del. Ch. LEXIS 116, *147-150 (Del. Chan. Ct. May 25, 2011); *see Gilbrook v. City of Westminster,* 177 F.3d 839, 863 (9th Cir 1999) (holding that comparison of union leader to Jimmy Hoffa was not defamatory).

[112] *See Minkow,* 2011 U.S. Dist. LEXIS 33412, *39.

[113] *Id.; Art of Living,* 2011 U.S. Dist. Lexis 63507 .

texts.[114] Indeed, a number of Hansen's statements on the Website, such as "Cohen's financial status appears to be declining," are transparent statements of the writer's impression of Cohen.

Many of the statements on the Websites are subjective and incapable of possessing an objective, non-falsifiable meaning. Hansen's statements that Cohen leads a life of "glamour" and "luxury" invokes terms that defy uniform interpretation.[115] Describing Cohen's home as a "mansion," or CAM's network of relationships between and among affiliated companies (including joint ventures and individual L.L.C.'s) as "intricate," is a matter of subjective interpretation.[116] Cohen himself admitted that the complexity of CAM's relationships with affiliated entities lies in the eye of the beholder: while he found the relationships simple to understand, he admits that he did not know if someone with a high school education would understand the company's operations, and implied that real estate training was necessary to understand the transactions.[117] The Website is replete with these adjectives as they apply to both Cohen and CAM. These non-falsifiable statements of opinion cannot constitute defamation.

> d.   *Statements about Cohen and CAM's actions are also expressions of subjective opinion.*

The Website also contains statements regarding the actions of Cohen and CAM, rather than mere adjectives. While these statements may appear factual when taken in isola-

---

[114] *Gardner,* 563 F.3d at 988; *Knievel v. ESPN,* 393 F.3d 1068, 1078 (9th Cir. 2005) (holding accusation that plaintiff was a "pimp" was not actionable); *Pegasus,* 118 Nev. at 717 (holding claim that food was packaged and derived from canned items non-defamatory).

[115] Exhibit C at 1-3, 12; Exhibit D at 1-3, 8, 11.

[116] *See, e.g.,* Exhibit C at 2, 6, 7, 14; Exhibit D at 7, 9, 10, 11, 17)

[117] Cohen Dep. at 262:9-21.

tion, such as within Cohen's Complaint, these statements are also matters of opinion when read within their proper context.[118] As such, they are not actionable as defamation.

In particular, Hansen stated that Cohen's business is structured as an "intricate web," or an "elusive" and "complex web."[119] Hansen also stated his opinion that CAM and its affiliate companies are "attempting to scam former tenants out of millions of dollars."[120] Within the context of the Website, though, these are not statements of fact. Based on the critical nature of the site, and its inherent nature as an anonymous web presence allowing for third party comment and participation,[121] they would not be interpreted as such.[122]

This is not a novel position—even accusations of blackmail have been found to constitute opinion.[123] Similarly, claims that plaintiffs acted "unprofessionally," or "unethically," and that a plaintiff was "untrustworthy" or "incompetent," have been found to be statements of the speaker's opinion, rather than fact.[124] Thus, even the Website's statements stating that Cohen took specific actions do not actually mean, in context, that Cohen actually engaged in improper behavior—Hansen's statements represent nothing more than his own feelings about Cohen's actions.

---

[118] *See Obsidian Financial,* 812 F. Supp. 2d at 1223 (collecting examples of accusations of criminal actions being found to constitute non-defamatory opinion).

[119] Exhibit C at 2, 3, 6; Exhibit D at 2-3, 34.

[120] Complaint, ¶ 28.

[121] Exhibit C at 7. (displaying anonymous comment); Hansen Dep. 172:16-25.

[122] *See Sandals,* 925 N.Y.S.2d at 415-16; *Nicosia v. De Rooy,* 72 F. Supp. 2d 1093, 1104 (N.D. Cal. 1999) (accusing plaintiff of criminal activity found "too loose and hyperbolic to be susceptible of being proved true or false").

[123] *Greenbelt Coop. Pub. Ass'n v. Bresler,* 398 U.S. 6, 14, 90 S. Ct. 1537 (1970).

[124] *Wait v. Beck's N. Am., Inc.,* 41 F. Supp. 2d 172, 183 (N.D.N.Y. 2003); *Tasso v. Platinum Guild Int'l,* 1998 U.S. Dist. LEXIS 18908, *5-6 (S.D.N.Y. 1998).

3.   Hansen's statements constitute, in part, rhetorical hyperbole that a reasonable person would not find to be a statement of fact.

The Website's over-description of Cohen and CAM's conduct lead to the conclusion that its contents are not to be, and would not be, interpreted as statements of fact. Indeed, the kind of overheated language the Hansen used in creating the Website conveys that an opinion, rather than an objective fact, is being asserted by the words on the screen.[125] Hansen's' use of strong words on the Website—both to build up Cohen and CAM's reputations and to question their conduct with equal intensity—are indicative of his use of the language as a rhetorical device, rather than assertions of fact. Just as quickly as the Website describes Cohen as glamorous, prestigious, wealthy and fortunate, it uses equally over-descriptive terms to express skepticism regarding Cohen's business—describing his and CAM's dealings and relationships as complex, elusive, and intricate.[126]

Hansen's choice of language indicates the rhetorical nature of his statements to the reasonable reader. Comparison of an individual to even a notorious gangster is not automatically defamatory.[127] Even accusations of serious criminal conduct fall within this category—accusing someone of an act as heinous as rape may still be rhetorical hyperbole.[128] An accusation that on its own could be defamatory loses its character when used with other "colorful adjectives" that, taken together, convey "nothing more substantive" than the speaker's

---

[125] *Greenbelt Coop. Pub. Ass'n v. Bresler,* 398 U.S. 6, 14 (1970).

[126] Exhibit C at 2-4; Exhibit D at 2-7, 34.

[127] *Gilbrook,* 177 F.3d at 863 (finding comparison to Jimmy Hoffa to be rhetorical hyperbole).

[128] *Gold v. Harrison,* 962 P.2d 353 (Haw. 1998), *cert. denied* 526 U.S. 1018 (1999) (finding that defendant's description of plaintiffs conduct as "rape" within a property dispute was non-defamatory hyperbole); *Cox,* 812 F. Supp. 2d at 1224 (collecting instances of accusations of misconduct found to be mere rhetorical hyperbole); *Biro v. Conde Nast,* 883 F. Supp. 2d 441, 463 (S.D.N.Y. 2012) (holding that terms "shyster," and "con man" are instances of rhetorical hyperbole understood as a statement of opinion).

subjective, non-falsifiable thoughts.[129] Hansen's use of extreme language should serve—and did serve—as a sign to reasonable viewers that the Website's statements should not be taken as literal statements of fact.

Hansen's use of rhetorical questions further support the conclusion that the Website's contents are non-defamatory hyperbole. Rhetorical questions can serve two purposes: to make clear the speaker's lack of definitive knowledge about an issue, or inviting the reader to consider other justifications for the speaker's actions—negating the impression that the statements imply a false assertion of fact.[130] Use of exaggerated terms, such as calling a plaintiff a "crook," lends to the finding that a rhetorical question is not defamatory.[131] Moreover, use of a rhetorical question "negates the impression that [the] statement implied a false assertion of fact," and instead, "the author's use of a question made clear his lack of definitive knowledge and invited the reader to consider various possibilities."[132]

Hansen's rhetorical questions in this case are subject to the same analysis. On the Website, Hansen asks:

- "Is Bradley S. Cohen the Next Bernie Madoff?"

- "[Cohen] has been a contortionist when it comes to keeping the secret of his true financial picture, creating a complex web of companies and dealings, but how long can this continue?"

---

[129] *Standing Committee v. Yagman,* 55 F.3d 1430, 1440 (9th Cir 1995).

[130] *Obsidian Financial,* 812 F. Supp. 2d at 1224-25, *citing Point Ruston, LLC v. Pac. N.W Reg'/ Council of the United Bhd of Carpenters & Joiners of Am.,* 2010 U.S. Dist. LEXIS 95239 (W.D. Wash. 2010).

[131] *Troy Group, Inc. v. Tilson,* 364 F. Supp. 2d 1149, 1156 (C.D. Cal. 2005).

[132] *Partington v. Bugliosi,* 56 F.3d 1147, 1155, 1157 (9th Cir. 1995); *see Phantom Touring, Inc. v. Affiliated Publ 'ns,* 953 F.2d 724, 730 (1st Cir. 1992) (finding rhetorical question non-defamatory because it could reasonably be understood "only as [the author's] personal conclusion about the information presented," and not a statement of fact).

- "With hundreds of millions of dollars in complex financial transactions and loans between numerous companies and investors, how can investors guard against a Ponzi scheme or fraud?"

- "If company officials don't even know how investor funds are managed, how can investors and business partners feel secure?"

- "How can a company and its owner profit while investors are losing big?"

- "Is this the reason for Cohen's vague background?"

- "How many millions has it taken from its thousands of other tenants?"

These statements contain the same heated rhetoric of the rest of the Website, and would lead a reasonable viewer to construe them as statements of opinion, rather than fact.[133] When a speaker outlines facts available to him or her, making it clear that the statements represent his or her own interpretation of those facts—but inviting the reader to draw his or her own conclusions—the resulting statements generally receive First Amendment protection.[134] Hansen's use of question marks to signify knowledge he did not possess, such as the specific details of CAM's operations and financial condition, further demonstrates that his questions were not statements of fact.[135]

        4.     <u>Hansen's statements are at least substantially true and not defamatory.</u>

Truth is a defense to defamation, but absolute truth is not required to defeat such an action—the defense of truthfulness "overlooks minor inaccuracies and concentrates upon substantial truth."[136] Defeating a claim for defamation requires only that the "substance, the

---

[133] *Troy Group,* 364 F. Supp. 2d at 1156.

[134] *Nicosia,* 72 F. Supp. 2d at 1102.

[135] *Partington,* 56 F.3d at 1155, 1157.

[136] *Masson v. New Yorker Magazine,* 501 U.S. 496, 516, 111 S. Ct. 2419 (1991).

gist, the sting" of the statement be factually correct.[137] Whether a statement is substantially

true is a question of law for the Court to decide.[138] Based on the facts below, many of the

statements Hansen made about Cohen, to the extent they were factual at all, were complete-

ly or at least substantially true.

"'There can be no liability for defamation without proof of falsity,' and the plaintiff

bears the burden of proof regarding the statement's falsity."[139] "[A] statement is not de-

famatory if it is an exaggeration or generalization that could be interpreted by a reasonable

person as 'mere rhetorical hyperbole.'"[140] Nor can a statement be defamatory if it is sub-

stantially, although not absolutely, true.[141]

> 5.     <u>The statements about CAM's financial condition are not false or defama-</u>
> <u>tory.</u>

> a.     *Investors in the CAM Core+ Fund I incurred tens of millions of dol-*
> *lars in losses over the Fund's life.*

The CAM Core+ Fund 1 (the "Fund") incurred significant losses during its lifespan.

The Fund used its initial funding of $85 million to purchase commercial and industrial real es-

tate.[142] CAM created individual limited-liability companies for the sole purpose of owning a

---

[137] *Id.* at 517; *see D.A.R.E. America v. Rolling Stone Magazine,* 101 F. Supp. 2d 1270, 1287-88, 1289 (C.D. Cal. 2000) (finding evidence to support defendants' statements as "substantially true," and holding that it is not a jury question); *Adelson v. Smith (In re Smith),* 397 B.R. 124, 126 (D. Nev. Bankr. 2008) ("even if [the allegedly defamatory] statements were written without care or other justification, some were nonetheless true," citing *Masson); Pegasus,* 118 Nev. at 715 n. 17 ("substantial truth provides that minor inaccuracies do not amount to falsity").

[138] *Pegasus,* 118 Nev. at 715 n. 17; *see D.A.R.E. America,* 101 F. Supp. 2d at 1287-88.

[139] *Gordon v. Dalrymple*, 2008 U.S. Dist. LEXIS 51863, 2008 WL 2782914, *3 (D. Nev. 2008) (quoting *Allen*, 99 Nev. at 412 (emphasis added).

[140] *Pegasus,* 118 Nev. at 715.

[141] *Id. Accord Cherry,* 2014 U.S. Dist. LEXIS 55777, *12.

[142] McGinness Dep. at 35:2-36:16.

particular property.[143]   The aggregate value of these properties constitutes the value of the Fund. CAM accounted for the Fund's value on a fair value accounting basis, calculating the value of the properties comprising the Fund's assets based on what they could be sold for on the prevailing market on a regular basis.[144] By CAM's own admission, the fair market value of the Fund's assets was "written down," or decreased, by over $45 million between 2008 and 2010.[145] By any common use of the word, this is a "loss" of tens of millions of dollars.

Cohen contends this is untrue based on accounting technicalities. Cohen's position is that because the Fund has not liquidated its assets, no loss has been *realized*.[146] However, this perspective elevates an accounting technicality over the black-and-white figures of the Fund's fair market value accounting and the plain meaning of the English language. By late 2010, the real estate assets within the funds had declined $45 million in value.[147] Cohen's witnesses recognize that this is equivalent to an individual purchasing a house for $400,000 and having its market value decline to $200,000 while he or she owns it.[148] Yet, Cohen claims it was defamatory for Hansen to say that investors "lost" money because the asset—although valued far below its purchase price—had not been sold, precluding any loss from being "realized."[149]

Cohen's analysis places too fine a point on what is necessary to constitute substantial

---

[143] *Id.* at 36:17-21. In some cases, one limited liability company owns more than one piece of property. *Id.* at 36:17-37:4.

[144] Cohen Dep. at 186:10-188:5; McGinness Dep. at 25:6-8, 82:2-14, 87:23-88:13; Exhibit Hat 3.

[145] Exhibit H at 3.

[146] McGinness Dep. at 83:4-14,87:23-88:13, 91:14-92:3; Cohen Dep. at 185:22-186:8.

[147] Exhibit H at 3.

[148] Cohen Dep. at 185:22-186:8; *see* McGinness Dep. at 83:4-14.

[149] McGinness Dep. at 83:4-14, 87:23-88:13, 91:14-92:4.

truth. Here, the fair market value of the Fund's assets declined by $45 million as of September 2010. This constitutes "tens of millions of dollars," just as Hansen claimed.  That Cohen bases his defamation claim on accounting nuances demonstrates the substantial truth and accuracy of Hansen's statements. Substantial truth does not require perfect accuracy. Instead, it requires only a generally correct statement, even at the expense of some details. Hansen made a substantially true statement about the Fund's performance that was not defamatory.

> b.     *CAM is unable to refute the Website's other charts and representations of its losses.*

The charts Cohen produced in an effort to refute Hansen's diagrams concerning the Fund's performance do not serve their goal. In fact, the chart titled "Total Return Composition Net of Fees as of 09/30/2010" is a direct copy from CAM's 3d Quarter Financial Report.[150] CAM's analysis of its total assets and Hansen's chart depicting the same show the exact same starting and ending points.[151] If anything, Hansen's rendering of the data through a smoothed trend line is more favorable to Cohen than his own depiction, which shows a more precipitous drop in total assets from the first to the second quarter in 2010.[152]

Cohen also attempts to refute Hansen's depiction of their decrease in cash and cash equivalents. Hansen's chart shows a decline of "cash and cash equivalents" from around $2.75 million to under $1 million from January 2009 to January 2010. Cohen attempts to rebut this with a chart of "cash & restricted cash," without explaining what he means by the

---

[150] *Compare* Exhibit C at 6 and Exhibit D at 9 with Complaint, Exhibit 3, pg. 85.

[151] Compare Exhibit C at 5 and Exhibit D at 8 with Exhibit H at 1.

[152] *Compare* Exhibit H at 1 and Exhibit C at 5, Exhibit D at 8.

phrase "restricted cash."[153] The comparison of "cash and cash equivalents" to "cash and re-stricted cash" is one of apples to oranges; CAM admits the two categories of cash are not in-terchangeable.[154] Regardless, the charts of both Hansen and Cohen show a steep downward slide in both "cash and cash equivalents" and "cash & restricted cash" from January 2009 to January 2010.[155] Hansen's chart is an accurate depiction of CAM's declined cash holdings.

### c.    By any measure, Bradley Cohen lives a life of luxury.

Cohen contends that allegations regarding his lifestyle are defamatory.[156] To the ex-tent that Hansen's characterizations of Cohen's lifestyle as luxurious are not opinions, they are true, or at least substantially true. Cohen's residence is located within Bel Air and has an esti-mated value of $15 to $20 million dollars.[157] Cohen's house is "around 11,000 square feet",[158] and Hansen included a photo of the house on the Website for the readers' reference.[159] No-tably, that photograph was taken from a website already accessible to the public.[160] Addi-tionally, Cohen refinanced his mortgage on the residence in 2009 as the Website states.[161] Even if we interpret Hansen's statement that Cohen lives in a "mansion" as one of fact, rather than opinion, it would be an accurate statement that cannot be construed as defamatory.

Since the economic recession began in 2008, Cohen has made more than $1 million in

---

[153] Exhibit H at 2-3.

[154] Exhibit H at 2.

[155] *Compare* Exhibit H at 1 and Exhibit C at 6; Exhibit D at 9.

[156] Complaint, ¶ 9.

[157] Cohen Dep. at 82:17-83:5; Fishman Dep. at 82:2-7.

[158] Cohen Dep. at 81:15-18.

[159] Exhibit C at 12; Exhibit D at 11.

[160] Firebaugh Dep. at 90:11-91:3.

[161] Cohen Dep. at 83:6-16.

gross income every year.[162] Before the downturn, Cohen's annual gross income was as high as $5 million per year. Cohen estimates his personal net worth to be more than $50 million,[163] and he invests in every property managed by CAM.[164] Cohen and his wife have given hundreds of thousands of dollars to charity, some of which came in "smaller amounts of 10,000 [or] 25,000" dollars.[165] Additionally, Cohen employs a personal security detail.[166] The particulars of this personal security are unknown, although his friend Steven Fishman described the security present at the recent wedding of Cohen's daughter as a scene reminiscent of the 1992 film *The Bodyguard.*[167] While Hansen's descriptions of Cohen's quality of life are properly statements of opinion, Cohen and his own witnesses have verified any factual elements they may contain.

> d.    The comparisons between Cohen and Madoff are factually accurate.

The table of similar activities between Cohen and CAM, and Bernard Madoff and his company, contain numerous facts that have been verified as true. Some of these statements, such as CAM's structure being a "web" and the company's leadership discussing CAM's financial dealings, are addressed elsewhere in this motion. A number of the statements, though, can be dispatched without a particularly detailed analysis.

Cohen founded CAM, a real estate investment firm.[168] CAM investors must be accred-

---

[162] Exhibit I; Fishman Dep. at 84:11-87:7, 90:I0-91:10.

[163] Cohen Dep. at 98:6-25.

[164] *Id.* at 247:4-7.

[165] *Id.* at 73:9-74:12.

[166] *Id.* at 56:9-16.

[167] Fishman Dep. at 24:4-16.

[168] Cohen Dep. at 161:10-16.

ited investors under Securities and Exchange Commission Rule 501 of Regulation D.[169]   Individual securities within the companies that own property managed by CAM are sold for $100,000 each.[170]  Cohen's own accountant invested—and lost—$50,000 with CAM.[171]  Other CAM investors represent or control institutional investors, such as pension funds, real estate investment companies, and investment funds.[172]

Next, the Website states that Cohen has "overall responsibility for management of his firm, strategically directs investment funds."[173]  This is also true.  Cohen is CAM's CEO. He also sits on CAM's investment committee. This committee makes investments by majority rule, but requires Cohen to be part of the majority vote in order to take action.[174]  This process of evaluating and deciding on what investments to make qualifies as "strategically direct[ing] investment funds."[175]

CAM's office is located in Century City, which is adjacent to Beverly Hills, California. CAM is headquartered on the prestigious Avenue of the Stars.[176] CAM's "neighbors" on the Avenue of the Stars include: (1) Creative Artists Agency, a preeminent talent agency; (2) DLA Piper, a prominent global law firm; (3) McKinsey & Company, an elite management consulting firm; (4) JP Morgan, an premier investment bank; (5) Moelis & Company, an exclusive

---

[169] *Id*. at 161:10-12, 243:17-244:16; McGinness Dep. at 39:24-40:4.

[170] *Id*. at 243:21-244:18; Exhibit J at 1.

[171] Fishman Dep. at 103:12-104:1.

[172] Decl. of Westreich ¶ 12; Decl. of Batkin ¶ 3.

[173] Exhibit C at 2; Exhibit D at 2.

[174] Exhibit K; McGinness Dep. at 29:16-30:3.

[175] Exhibit K.

[176] McGinness Dep. at 71:20-22; Cohen Dep. at 171:9-10.

boutique bank; and (6) Susman Godfrey LLP, an elite litigation law firm.[177] Based on CAM's neighbors, the company's headquarters exist within rarified air among other prominent businesses.

Personally, Cohen is a member of the Board of Governors at Cedars Sinai Medical Center and served on the National Board of the Friends of the Israeli Defense Forces. He also previously served on the board of directors for NAREIM. Cohen has also made political contributions worth tens of thousands of dollars per year in the past.[178] Based on the evidence adduced in this case, these statements in the Website are at least substantially true, if not entirely so. As such, they do not constitute defamation.

> e.    *Hansen's statements about CAM's business practices are true or substantially true.*

> i.    *The web of companies.*

Hansen produced charts in the Website showing the connections between Cohen and numerous limited-liability companies.[179] The Website describes Cohen's relationship with these companies as a complex and intricate web. Doreen Ray, CAM's Executive Vice President of asset management, described the structure of CAM's asset management as "multi-layered." [180]

Cohen does not know exactly how many companies for which he is a corporate officer. [181] Cohen invests in every deal made by CAM by becoming a member of the limited-

---

[177] Exhibit L.

[178] Cohen Dep. at 177:4-178:21.

[179] Exhibit C at 7, 15; Exhibit D at 10, 18.

[180] Ray Dep. at 140:9.

[181] Cohen Dep. at 41:6-42:5.

liability company used to purchase and own the property.[182] The properties owned by these limited-liability companies are managed by a separate company created by CAM, which receives a 20% promotional interest of the property's revenue and value for managing the property.[183] This promotional interest is ultimately paid to CAM and Cohen personally.[184]

Thus, there are hundreds of limited-liability companies in which Cohen and other CAM executives are members.[185] These numerous limited-liability companies distribute 80% of their earnings to their members, including Cohen.[186] The remaining 20% of the limited-liability companies' earnings are paid to one of the managing entities created to manage them, and which are affiliates of CAM.[187] This 20% promotional interest is then paid to CAM and its executives.[188] The multiple channels through which this cash flows to Cohen and CAM can fairly be described as an intricate or complicated web.

        ii.      *The knowledge of CAM's employees regarding CAM's operations and Cohen's finances.*

Hansen states on the Website that Doreen Ray ("Ray"), an Executive Vice President at CAM, was "uncomfortable answering questions" about Cohen and his financial dealings.[189] Ray confirmed this was true, admitting that she was uncomfortable being asked anything

---

[182] *Id.* at 97:1-24, 247:4-7.

[183] *Id.* at 245:21-247:3.

[184] *Id.* at at 247:2-3.

[185] *Id.* at 245:21-247:3.

[186] *Id.*

[187] *Id.*

[188] *Id.*

[189] Exhibit C at 4-5; Exhibit D at 7-8.

about Cohen individually when testifying as the party most knowledgeable for Auburn.[190] Ray declined to answer questions about Cohen or CAM beyond their relationship with Auburn, and stated that she was "uncomfortable" answering those questions.[191] Her refusal to answer questions about CAM's operations and finances is substantially identical to an inability to do so, and in any event can be subjectively described as such.

### iii.   *CAM's occupancy rate and operating expenses.*

As stated in the Website, CAM and its affiliated companies have properties with occupancy rates that are around 28%; in fact, some of the properties are vacant.[192] CAM's vacant properties are not generating revenue while empty.[193] Logically, an unoccupied building that requires maintenance and incurs annual property taxes without a tenant to pay rent results in an operating loss—a point CAM does not deny, but justifies by stating that such a vacancy should be considered in the context of a portfolio of other properties.[194] While the entire portfolio may offset the losses one vacant property causes, this does not negate the reality that CAM's vacant properties incur operating losses on their own by the very nature of their vacancy, and these losses persist while the property is vacant.

### iv.   *CAM's litigious nature.*

Hansen contends in the Website that CAM and "any of its companies … are known to

---

[190] Ray Dep. at 145:13-146:2.

[191] *Id*. at 144:18-146:2.

[192] *Id*. at 146:3-10; 149:17-20 ("[O]kay, yes, I have some occupancy rates that are 28 percent, certainly not in the portfolio … it's one property out of 24.")

[193] McGinness Dep. at 79:16-17.

[194] Ray Dep. at 147:9-15 ("[T]he one vacancy is not causing a struggle or a financial problem *on the portfolio.*") (emphasis added).

sue tenants and former tenants based on unfounded accusations and greed."[195] The Web-site continued:

> Under Bradley Cohen's stewardship, the company and its properties have been involved in numerous lawsuits. In a current Seattle lawsuit, the company is attempting to scam former tenants out of millions of dollars. The company has taken several hundred thousand dollars from one former tenant in one lawsuit.[196]

As discussed above, Hansen's commentary regarding CAM and its related companies' motives for litigation are statements of his subjective opinion. The factual elements of this statement, though, are probably true.

Since 2009, CAM and its affiliated entities have commenced at least six lawsuits against its tenants.[197] This litigation has been over spaces as small as 12,500 square feet and as large as 68,779 square feet.[198] The evidence suggests that there may be even more undisclosed litigation: CAM's report reveals only landlord-tenant litigation that CAM filed as a plaintiff, as opposed to other business torts, and only since 2009.[199] Accepting that this chart provided by CAM represents only a portion of CAM's litigation, it still supports the accuracy of Hansen's claims about CAM and its related companies' litigation practices. In reality, CAM has initiated lawsuits, including this one, for matters other than landlord-tenant disputes.[200]

Additionally, Cohen's own allegations verify Hansen's statements. While Hansen's use of the word "scam" in describing the Seattle litigation was an opinion, it was Auburn (a

---

[195] Complaint, ¶ 27; Exhibit D at 34.

[196] *Id.*

[197] Exhibit M; Cohen Dep. at 198:12-201:1.

[198] *Id.*

[199] *Id.*

[200] Exhibit N.

CAM affiliate) that brought the lawsuit.[201] Auburn obtained judgments for damages, attorneys' fees and costs in excess of $2 million against NWTM—a former tenant of Auburn's property.[202] Cohen's own accounting of events supports the accuracy of the Hansen's statements, demonstrating their truth.

> 6.   Hansen's statements concerning the criminal history of Bradley S. Cohen are a privileged, fair report of judicial proceedings.

The First Amendment privileges accurate reports of official proceedings. "Under the fair report privilege, the publication of defamatory matter concerning another in a report of an official action or proceeding of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported."[203]

Hansen's statements are within these boundaries. The only original content Hansen contributed to the extant information regarding Brad S. Cohen was to note that Cohen's official biography is vague, and point out that his investigation revealed "a criminal history involving fraud and money laundering for *a man with the same name and same approximate age,* in the real estate industry."[204] Hansen goes on to ask, "Is this the reason for Cohen's vague background?"[205] Discharging his duty under *Gertz,* Hansen notes that both Cohen and Brad S. Cohen have succeeded in the real estate industry, are from the same geographic

---

[201] Complaint, ¶ 27, 31; Hansen Dep. at 110:1-6.

[202] Complaint, ¶ 31.

[203] *Wynn v. Smith,* 117 Nev. 6, 14, 16 P.3d 424, 429 (2001); *see Sahara Gaming v. Culinary Workers,* 115 Nev. 212, 984 P.2d 164 (1999).

[204] Exhibit D at 25 (emphasis in original).

[205] *Id.*

area, have the same name, and are about the same age.[206]

This portion of the Website consists of news stories from the early 1990s and a full copy of the United States Court of Appeals for the Third Circuit's order in the *Banks v. Wolk* case,[207] in which Brad S. Cohen was an appellee.[208] Hansen did not comment on the Third Circuit's decision, adding only the title "RICO Case" to that webpage. The *Banks* decision was, in fact, a RICO case.[209] Hansen's conduct with respect to the additional *Inquirer* articles is identical.[210] Hansen republished a series of stories that *The Inquirer* published in the early 1990s, which were expressly based on judicial events. Hansen merely added his own titles to the pages where the *Inquirer* articles were found; indeed, Hansen's titles were often less inflammatory than the *Inquirer's* headlines.

For these articles, Hansen fairly reported on the original report: he simply republished the original *Inquirer* articles and added his own title to them. The *Inquirer* conducted the reporting based on judicial proceedings. Hansen's republishing of this specific content constitutes either a wholesale republication of a judicial opinion or articles about judicial activities.[211] Hansen's accurate reproduction of the *Inquirer* articles, which Cohen does not allege were false, constitutes a fair report.

7.   <u>Cohen has no evidence of reputational harm, so the presumption of harm is rebutted.</u>

While damages are presumed in an action for defamation *per se*, this presumption

---

[206] *Id.*

[207] 918 F.2d 418 (3rd Cir. 1990).

[208] Exhibit D at 37-46.

[209] *Id.* at 371.

[210] *Id.* at 26-33.

[211] *Id.* at 26-46.

may be rebutted and the existence of damage disproved. Even presumed damages must ultimately have their basis in admissible evidence and be proven.[212] Evidence must support an award of presumed damages to yield a meaningful recovery.[213] A defendant is permitted to rebut the presumption of reputational harm in defamation cases, and to disprove the existence of damage.[214] Where the presumption of damages is rebutted upon proof that no damage exists, a defamation *per se* claim logically fails.

Cohen does not have evidence of any reputational harm, and the absence of this evidence is sufficient to rebut the presumption of harm accorded by a claim of defamation *per se*. The harm Cohen believes he suffered is purely speculative and is based on Cohen's fear that unnamed and unknown persons have seen the Website—despite the fact that a reasonable viewer would not interpret the Website's contents as factual.[215] The only loss in reputation Cohen can identify is speculative. Cohen says that Ohio State Teachers has stopped returning his phone calls while doing business with other investment firms (presumably because the other firms provide the same services as CAM). Cohen claims that CAM did a "big deal" with New York Life, but is concerned the two parties might not do another deal—despite not having presented the company, and others, with investment opportunities.[216] CAM's company line regarding its damages from the Website is that CAM's employees do

---

[212] *See Dun & Bradstreet v. Greenmoss Builders,* 472 U.S. 749, 766 (1985) (J. White, concurring) (noting even presumed damages "had to be proved" in defamation actions).

[213] *Republic Tobacco Co. v. N. Atl. Trading Co.,* 381 F.3d 717, 734 (7th Cir. 2004).

[214] *Davis v. Ross,* 107 F.R.D. 326, 330 (S.D.N.Y. 1985).

[215] Cohen Dep. at 114.

[216] *Id.* at 114, 147.

not know if the phone does not ring.[217]

Despite Cohen's unfounded concerns, his financial position is better than ever. CAM is profitable and might have had its best financial performance in 2013.[218] More CAM employees than ever before are earning at least $150,000 per year.[219] Cohen continues to earn more than $1.3 million per year in income.[220] While Cohen is entitled to a presumption of damages on his defamation *per se* claim, the absence of evidence supporting the existence of any damages—indeed, the positive evidence of Cohen's exceptional success—rebuts this presumption.

### F.    The First Amendment protections afforded to Hansen's speech in the defamation context applies to all of Cohen's claims.

The First Amendment's protections for Hansen's statements apply not only to Cohen's defamation claims, but to every claim based on Hansen's expressive conduct. The United States Supreme Court has held that no cause of action possesses "talismanic immunity from constitutional limitations."[221] The First Amendment's protections reach to "all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement."[222] This broad protection is necessary to protect the rights of defendants sued by plaintiffs who "simply affix a label other than 'defamation' to their injurious-falsehood claims," such as

---

[217] Ray Dep. at 87:22-88:6; McGinness Dep. at 62:24-63:5; Cohen Dep. at 114:12-14.

[218] McGinness Dep. at 99:22-1 00:6. Hansen took this discovery in June 2013, so he does not have information regarding CAM's financial performance for the second half of 2013 and for 2014.

[219] *Id.* at 50:1-12; Exhibit G.

[220] Exhibit I. Hansen took Cohen's deposition in June 2013, so he does not have information regarding Cohen's income for the second half of 2013 and for 2014.

[221] *N.Y. Times Co. v. Sullivan, 316* U.S. at 269.

[222] *Blatty v. N.Y. Times Co.,* 728 P.2d 1177, 1184 (Cal. 1986).

"false light" invasion of privacy and intentional infliction of emotional distress.[223] Cohen's remaining claims, which are not for defamation but are nonetheless based on Hansen's expressive conduct, are subject to the defenses and analysis identified above.

### G. Injunctive relief is a remedy, not a claim; summary judgment for defendants is appropriate as to injunctive relief as a cause of action.

Hansen is entitled to judgment on Cohen's fifth claim, for permanent injunction, which is properly styled as a request for relief rather than cause of action. "An injunction is an equitable remedy, not a cause of action."[224] "A permanent injunction is merely a remedy for a proven cause of action. It may not be issued if the underlying cause of action is not established."[225] To the extent this claim can be credited as a cause of action, judgment in Hansen's favor is appropriate.

### V. CONCLUSION

There is no genuine question as to the material facts showing that Cohen and CAM cannot prove one or more elements of the claims they have asserted against Hansen. As such, none of Cohen and CAM's claims may proceed. For the foregoing reasons, summary judgment in Hansen's favor is appropriate.


Dated: December 19, 2014                          Respectfully submitted,


                                        **ALDRICH LAW FIRM, LTD.**

---

[223] *Id. See Ferm*, 2013 U.S. Dist. LEXIS 23711, 26-27.

[224] *Brittingham v. Ayala,* 995 S.W.2d 199, 201 (Tex. Ct. App. 1999) (collecting citations for same).

[225] *Art Movers, Inc. v. Ni West,* 3 Cal. App. 4th 640, 646-47 (Cal. Ct. App. 1992); *Zepeda v. OneWest Bank FSB,* 2011 U.S. Dist. LEXIS 143298 (N.D. Cal. 2011).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

      /s/ Dean G. von Kallenbach

Dean G. von Kallenbach, Esq., *pro hac vice*

**YOUNG deNORMANDIE, P.C.**

Second & Seneca Building

1191 Second Avenue, Suite 1901

Seattle, Washington 98101

Telephone: (206) 224-9818

Facsimile:  (206) 623-6923

dgvk@ydnlaw.com

***Attorneys for Defendants***

CERTIFICATE OF SERVICE

I hereby certify and declare under penalty of perjury that on December 19, 2014, I electronically filed the foregoing with the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to all parties of record.

s/s Janice M. Helde

M:\Clients\Northwest Territorial Mint LLC (4562.000)\Bradley Stephen Cohen (4562.008)\Pleadings\ECF\12.19.MSJ\NW Mint Cohen MSJ Final 12 19 14.doc