1
2
3
4
5
6

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

7

BRADLEY STEPHEN COHEN, et al.,

Case No. 2:12-CV-1401 JCM (PAL)

8

Plaintiff(s),

ORDER

9

v.

10

ROSS B. HANSEN, et al.,

11

Defendant(s).

12
13
14
15
16

Presently before the court is defendants Ross B. Hansen, Northwest Territorial Mint, LLC, and Steven Earl Firebaugh's motion for summary judgment. (Doc. # 205). Plaintiffs Bradley Stephen Cohen and Cohen Asset Management filed a response (doc. # 213), and defendants filed a reply (doc. # 220-1).

17

**I.      Background**

18
19
20
21

Plaintiff Bradley Stephen Cohen ("Cohen") resides in California. (Doc. # 40, first amended compl. at ¶ 1). He is the president and chief executive officer of Cohen Asset Management ("CAM"), a privately held California corporation. (*Id.* at ¶ 1–2). CAM acquires, finances and operates industrial properties across the United States. (*Id.* at ¶ 2).

22
23
24
25
26
27

Defendant Ross B. Hansen ("Hansen") is a resident of the state of Washington and a part-time resident of Nevada. (*Id.* at ¶ 3). Defendant Northwest Territorial Mint, LLC ("NW Mint") is a Washington limited liability company. (*Id.* at ¶ 4). NW Mint is registered to do business in Nevada and maintains a physical address and corporate offices at 80 East Airpark Vista Boulevard, Dayton, Nevada. (*Id.* at ¶ 4). Defendant Steven Earl Firebaugh ("Firebaugh") is a resident of Nevada.

28

James C. Mahan
U.S. District Judge

In April 2012, plaintiffs discovered allegedly defamatory and malicious websites—http://bradley-cohen.com and http://bradleyscohen.com—containing intentionally false and disparaging publications about plaintiffs. (*Id.* at ¶ 9). The websites, among other things, compared plaintiff Cohen to Bernie Madoff and displayed a picture with plaintiff Cohen allegedly photoshopped with a picture of Bernie Madoff. (*Id.* at ¶ 12). The websites contained allegedly false and scandalous allegations against plaintiffs Cohen and CAM.

Plaintiffs allege that defendants secretly created and established the websites and intended to conceal any involvement with the websites' creation. (*Id.* at ¶ 29). Defendants allegedly created the websites in retaliation for two lawsuits regarding business leases, which defendants lost, in Washington state court. (*Id.* at ¶ 31).

Based on the foregoing, plaintiffs filed an amended complaint alleging the following causes of action against all defendants: (1) defamation and defamation per se; (2) invasion of privacy/false light; (3) intentional infliction of emotional distress by plaintiff Cohen; (4) intentional interference with future expected business; and, (5) injunctive relief. (Doc. # 40). Plaintiffs also requested general, presumed, or assumed damages, punitive damages, attorneys' fees and costs, injunctive relief, and other relief as the court deems proper. (*Id.* at 26).

Discovery has been contentious. Magistrate Judge Leen has ordered both parties to produce or supplement discovery that they have resisted providing. Plaintiffs have consistently stated, throughout the discovery process, that they are seeking only general and presumed damages. Plaintiffs refused to produce financial information or information regarding specific monetary damages because they claimed they were not alleging actual damages.

On July 25, 2013, the court entered a written order directing plaintiffs to produce documents supporting all of their theories regarding damages. (Doc. # 91). The court also directed plaintiffs to provide supplemental written responses to certain discovery requests. (*Id.*). The court explained to plaintiffs numerous times that they would be precluded from using any undisclosed evidence of actual damages for any purpose. Again, plaintiffs represented that they did not have, were not alleging, and knew of no actual damages.

**James C. Mahan**
**U.S. District Judge**

- 2 -

On October 30, 2013, defendants filed a motion for summary judgment as to the claims requiring actual damages.  (Doc. # 119).  Plaintiffs then argued, for the first time, that they suffered actual damages; therefore, summary judgment was not appropriate.  (Doc. # 135).  Defendants filed a motion to exclude evidence regarding plaintiffs' actual damages. [1]  (Doc. # 150).  The magistrate judge granted defendants' motion and ordered sanctions precluding plaintiffs from claiming or introducing any evidence of actual damages attributable to defendants' alleged conduct for any purpose in the case, including motion practice and trial. (Doc. # 178).

Plaintiffs filed an objection, asking this court to reconsider the magistrate judge's order.  (Doc. # 180).  The court denied plaintiffs' objection.  (Doc. # 195).  Accordingly, plaintiffs are precluded from claiming or introducing any evidence of actual damages.

Defendants filed the instant motion for summary judgment requesting summary judgment be granted in their favor as to each of plaintiffs' claims.  (Doc. # 205).

## II.    Legal Standard

The Federal Rules of Civil Procedure provide for summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

---

[1] The parties have used special damages, actual damages, quantifiable damages, and quantifiable economic harm interchangeably in the majority of their pleadings.  For the purpose of clarity, this court will use "actual damages" when referring to all of these terms.

1    In contrast, when the nonmoving party bears the burden of proving the claim or defense,

2  the moving party can meet its burden in two ways:  (1) by presenting evidence to negate an

3  essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party

4  failed to make a showing sufficient to establish an element essential to that party's case on which

5  that party will bear the burden of proof at trial.  *See Celotex Corp.*, 477 U.S. at 323–24.  If the

6  moving party fails to meet its initial burden, summary judgment must be denied and the court need

7  not consider the nonmoving party's evidence.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

8  159–60 (1970).

9    If the moving party satisfies its initial burden, the burden then shifts to the opposing party

10  to establish that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith

11  Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the

12  opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient

13  that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

14  versions of the truth at trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626,

15  631 (9th Cir. 1987).

16    In other words, the nonmoving party cannot avoid summary judgment by relying solely on

17  conclusory allegations that are unsupported by factual data.  *See Taylor v. List*, 880 F.2d 1040,

18  1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the

19  pleadings and set forth specific facts by producing competent evidence that shows a genuine issue

20  for trial.  *See Celotex Corp.*, 477 U.S. at 324. At summary judgment, a court's function is not to

21  weigh the evidence and determine the truth, but to determine whether there is a genuine issue for

22  trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The evidence of the

23  nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at

24  255.  But if the evidence of the nonmoving party is merely colorable or is not significantly

25  probative, summary judgment may be granted.  *See id.* at 249–50.

26  . . .

27  . . .

28  . . .

**James C. Mahan**
**U.S. District Judge**

- 4 -

### III.    Discussion

### (1) Defamation and defamation per se by CAM and Cohen against all defendants

*A. Defamation*

In Nevada, "the general elements of a defamation claim require a plaintiff to prove: '(1) a false and defamatory statement by [a] defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages.'" *Pegasus v. Reno Newspapers*, 57 P.3d 82, 90 (2002) (citing *Chowdhry v. NLVH, Inc.*, 851 P.2d 459, 462 (1993)).

Plaintiffs argue that, due to the magistrate judge's ruling excluding any evidence of actual damages, they withdraw their claim for defamation.  (Doc. # 200 at 4–5; doc. # 213 at 36). Accordingly, plaintiffs assert that defendants' motion for summary judgment regarding defamation is now moot.  Defendants request that the court grant summary judgment in spite of plaintiffs' attempt to argue that they withdraw the claim.  (Doc. # 220-1 at 8).

Federal Rule of Civil Procedure 41(a)(1) establishes two methods for the voluntary dismissal of an action without a court order or a motion.  First, the plaintiff may file a notice of dismissal before an answer or summary judgment motion has been served. Fed. R. Civ. P. 41(a)(1)(A)(i).  Second, the plaintiff may at any time file a stipulation of dismissal signed by all the parties. Fed. R. Civ. P. 41(a)(1)(A)(ii).

Plaintiffs' statement to the court that they withdraw their claim for defamation does not properly remove the claim from this court's consideration.   Defendants filed an answer to plaintiffs' amended complaint on July 11, 2013.  (Doc. # 85).  Plaintiffs first mentioned their intent to "withdraw" on December 9, 2014, in a response to defendants' motion to extend time to file dispositive motions—nearly a year and a half after defendants' answer.  (Doc. # 200).  The parties did not stipulate to remove this claim, and defendants have not filed a motion requesting this court's permission to dismiss particular claims.  *See* Fed. R. Civ. P. 41(a)(2).  Accordingly, defendants are entitled to summary judgment on this issue.

. . .

. . .

James C. Mahan
U.S. District Judge

- 5 -

**B.  *Defamation per se***

Nevada has recognized statements tending to injure the plaintiff in his or her business or profession as defamatory per se. [2] *Chowdhry v. NLVH, Inc.*, 851 P.2d 459, 484–84 (Nev. 1993). If the defamatory communication "imputes a 'person's lack of fitness for trade, business, or profession,' or tends to injure the plaintiff in his or her business, it is deemed defamation per se and damages are presumed." *Id.* (quoting *K-Mart Corp. v. Washington,* 866 P.2d 274, 282 (Nev. 1993), *overruled on other grounds by Pope v. Motel 6*, 114 P.3d 277 (Nev. 2005)).

In determining whether a statement constitutes defamation per se, words "are to be taken in their plain and natural import according to the ideas they convey to those to whom they are addressed; reference being had not only to the words themselves but also to the circumstances under which they were used." *Talbot v. Mack,* 169 P. 25, 29 (Nev. 1917).  A statement that directly imputes to the plaintiff "dishonesty, lack of fair dealing, want of fidelity, integrity, or business ability," even in general terms and without supporting details, is considered defamation per se. *Id.* at 30.

At issue are multiple websites, which plaintiffs assert defendants published for the sole purpose of smearing plaintiffs.  The websites include statements that plaintiffs are guilty of crimes similar to those committed by Bernie Madoff, that plaintiff Cohen was convicted of fraud, that plaintiffs and their related companies had been incurring and continued to incur losses, that investigators had speculated CAM was actively engaging in lawsuits in an attempt to hold off creditors, that plaintiffs "scammed" tenants out of millions of dollars, and that CAM is known to sue tenants and former tenants because of greed.  (Doc. # 40 at 9).

Defendants assert that plaintiffs' claims cannot succeed for a number of reasons, including that: (1) CAM's claim is actually for business disparagement, which it cannot prove; (2) Cohen is a limited-purpose public figure, and is subject to an actual malice showing; and (3) the websites

---

[2] Defamation is divided into slander (spoken defamation) and libel (written defamation). Restatement (Second) of Torts § 568.  All of the statements contained in plaintiffs' complaint are libel, because they were published online on a website; therefore, the law of defamation by libel is the pertinent law in this case.  *See Flowers v. Carville*, 292 F. Supp. 2d 1225, 1232 (D. Nev. 2003) *aff'd*, 161 F. App'x 697 (9th Cir. 2006) (statements spoken on a television show and written in a published book considered under libel law).

1    are not defamatory per se because they are statements of opinion.  The court will address each in

2    turn.

3              *1.   CAM's claim is properly asserted as defamation per se*

4              The Supreme Court of Nevada has differentiated between defamation *per se* and business

5    disparagement.  *Clark Cty. Sch. Dist. v. Virtual Educ. Software, Inc.,* 213 P.3d 496, 504 (Nev.

6    2009).   Statements accusing an individual of personal misconduct in his or her business or

7    attacking the individual's business reputation may be brought as an action for defamation *per se.*

8    *Id.*  However, if the statements are directed towards the quality of the individual's product or

9    services, the claim is one for business disparagement.  *Id.*

10             Defendants assert that CAM's claim for defamation per se is actually a claim for business

11   disparagement.  Accordingly, defendants assert that, because CAM cannot prove that it suffered

12   actual damages—a requirement to assert business disparagement—the court should dismiss

13   CAM's business disparagement claim.

14             Both plaintiffs and defendants cite this court's decision in *Sentry Insurance v. Estrella*

15   *Insurance Service, Inc.*, No. 2:13-CV-169-JCM-GWF, 2013 WL 2949610, at *1 (D. Nev. June 13,

16   2013), to support their positions.  In *Sentry* plaintiffs Sentry Insurance, et al. ("Sentry") underwrote

17   insurance policies that defendant Estrella Insurance Service, Inc. ("Estrella") issued.  2013 WL

18   2949610 at *1.  At some point plaintiffs terminated the underwriting agreement with Estrella.  *Id.*

19   Plaintiffs then replaced Estrella with other underwriters.  *Id.*  Plaintiffs alleged that, when the

20   replacement underwriters contacted plaintiffs' insureds, the insureds stated that Estrella

21   representatives told them that "Sentry Plaintiffs and/or insurance agencies whom Sentry Plaintiffs

22   had assigned their policies to were frauds and/or thieves."  *Id.*

23             This court found that the alleged statement implicated an attack on the individuals'

24   reputations and their lack of fitness for trade, business, or profession—not an attack on a product

25   or service.  Therefore, defamation per se was the appropriate claim.  *Id.* at *3.

26             In contrast, in *Clark County School District v. Virtual Education Software, Inc.*, the Clark

27   County School District ("CCSD") reviewed several of Virtual Education's courses because of

28   concerns about their academic rigor.  *Virtual Educ.*, 213 P.3d at 500.  CCSD decided the courses

**James C. Mahan**
**U.S. District Judge**

- 7 -

did not meet its standards, and in a letter sent to Virtual Education's vice president, stated that "some of the courses can be completed in three to five hours," "tests can be successfully passed without reading the material," that there is "no safeguard to determine that the candidate is the one who actually takes the tests," and the courses did "not require the analysis, synthesis and application levels usually required for graduate coursework." *Id.* at 504. These statements attacked a product the business offered, and the Nevada Supreme Court held that business disparagement was the appropriate claim. *Id.*

Defendants cite a non-controlling case, *Aegis Council, LLC v. Maldonado, et al.*, 3:10-cv-00756-RCJ-WGC, 2011 U.S. Dist. LEXIS 36572, at *1 (D. Nev. Mar. 30, 2011). In *Aegis*, the plaintiff did not specifically identify a cause of action. *Id.* at *3. Defendants allegedly posted on RipoffReport.com that a service the plaintiff offered was a "tax avoidance scam," that "[t]his group of people is bilking millions of dollars from unsophisticated and sophisticated investors nationally selling this tax avoidance scheme," and that the company was a "fraud," "not legal," and "scammers." *Id.* at *2–3. The court found the complaint asserted a business disparagement claim, because the statements against Aegis were directed at the service offered. *Id.* at *3, 14.

The *Aegis* court focused on the difference between accusing an *individual* of personal misconduct (defamation per se) versus accusing an individual's *business* of misconduct (business disparagement). While the Nevada Supreme Court has not "clearly stated whether a corporation or other business entity can proceed on a theory of defamation per se where communications concern the business's product or injure the business's reputation," *Virtual Educ.,* 213 P.3d at 504, this court anticipates that the Nevada Supreme Court would find this claim viable under the instant facts. *See Sentry*, 2013 WL 2949610, at *3.

Unlike in *Virtual Educ.*, which focused solely on the product offered and whether it stacked up to industry standards, the defendants in the instant case are not just alleging an inferior product from Cohen Asset Management. Defendants are alleging, as in *Sentry*, that the business itself is a complete fraud and organized for the purpose of perpetrating Cohen's illegal and corrupt activities.

Most of the allegedly defamatory statements are made against Cohen. However, defendants attack the fraudulent and illegal nature of the business by not just its connection to and

management by Cohen, but also the company's allegedly illegal and fraudulent operations and "evasive" tactics necessitating an "army of investigators" to "unravel the web." (Doc. # 206-3 at 7). Important in the instant case is that the company itself is the means by which Cohen supposedly perpetrated his frauds and illegal activity. Cohen's alleged frauds and illegal activities are intrinsically tied to the company's operation and business dealings.

Further, attacks on Cohen are necessarily attacks against the company. CAM's investment committee makes its decision by majority vote. (Doc. # 119-26 at 3). However, for the committee to approve an investment, Cohen must be in the majority. (*Id.* at 4). Therefore, while Cohen's vote alone cannot approve a particular investment, he must vote for an investment or else it cannot pass. (*Id.*) Therefore, all of CAM's investment decisions are contingent on Cohen's support. By calling into question Cohen's fitness for trade, business, or profession, defendants are necessarily calling into question CAM's fitness for trade, business, or profession.

This court finds defendants' statements on the websites to be clear attacks on the reputations of the company and its employees. Defendants' statements attack CAM's fitness for trade, business, or profession, not the products it offers. CAM's claim against defendants is properly construed as one for defamation per se and not business disparagement.

### 2. *Cohen is not a limited-purpose public figure*

Defendants assert that Cohen is a limited-purpose public figure who cannot make the required showing that defendants acted with actual malice. (Doc. # 205 at 26). If a plaintiff is a public figure, whether general or limited, he or she also bears the burden of proving by clear and convincing evidence that the defendant acted with actual malice, meaning knowledge of or reckless disregard with respect to the statement's falsity. *Pegasus v. Reno Newspapers, Inc.,* 57 P.3d 82, 90–91 (Nev. 2002). A limited public figure is an individual who has "achieved fame or notoriety based on [his or her] role in a particular public issue." *Id.* at 91 (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351–52 (1974)). "A limited purpose public figure is a person who voluntarily injects himself or is thrust into a particularly public controversy or public concern, and thereby becomes a public figure for a limited range of issues." *Id.*

James C. Mahan
U.S. District Judge

1    Defendants argue that Cohen is a limited-purpose public figure who is subject to a higher

2   defamation standard.  (Doc. # 205 at 26).  Defendants rely on *Pegasus*, which held that a restaurant

3   was a public figure "for the limited purpose of a food review or reporting on its goods and services"

4   because it "voluntarily entered the public spectrum by providing public accommodation and

5   seeking public patrons."  *Id.* at 92.

6    Defendants assert that Cohen's "stature and reach in the real estate investing community is

7   sufficient to make him a limited-purpose public figure."  (Doc. # 205 at 26).  Defendants assert

8   that Cohen, the namesake and CEO of his firm, relies on the public to carry on his business and

9   welcomes qualified individual investors.  (*Id.*).  Therefore, defendants assert that, "[b]y entering

10   the stream of commerce and offering CAM's investment services to qualifying members of the

11   public, Cohen has become a public figure under Nevada law."  (*Id.* at 27).

12    In *Bongiovi v. Sullivan*, 138 P.3d 433 (Nev. 2006), the Nevada Supreme Court held that a

13   doctor was not a limited-purpose public figure.  *Id.* at 445.  The doctor held a national reputation

14   as a skilled surgeon, published numerous articles and abstracts, contributed to multiple books and

15   textbooks, belonged to specialized medical groups, and had been the subject of newspaper articles

16   because of a successful surgery he had performed on an infant.  *Id.* at 443.  The court held that,

17   though the doctor voluntarily entered the public spectrum by providing public services and seeking

18   public patrons, he did not inject himself into the thrust of a particular public controversy or public

19   concern by means of his professional accomplishments and activities.  *Id.* at 445.  Participation in

20   professional organizations, publications, and the newspaper article were not enough to show that

21   the doctor "affirmatively stepped outside of his private realm of practice to attract public

22   attention."  *Id.* at 446.

23    The court finds that Cohen's alleged nationwide business and reputation, speaking

24   engagements at investment associations, and membership on various boards do not equate with

25   Cohen "voluntarily inject[ing] himself or [being] thrust into a particular public controversy or

26   public concern."  *Id.* at 445.  The court further finds that these factors also do not show that Cohen

27   "affirmatively stepped outside of his private realm of practice to attract public attention."  *Id*.

28   Defendants identify no public controversy connected with Cohen or his business beyond financial

investing generally being "a publicly scrutinized industry." (Doc. # 205 at 27).  Just as publications and participation in professional organizations are standard in the medical industry, speaking engagements among colleagues and association memberships are standard in the investment industry and do not bring Cohen out of the private realm of his practice.  Like *Bongiovi*, Cohen's activity in the investment community and membership on various boards and associations does not qualify him as a limited-purpose public figure.

### 3.  A factfinder must determine whether the websites assert opinion or fact

Defendants assert that their statements against Cohen and CAM are matters of opinion and are, therefore, not defamatory.  (Doc. # 205 at 27).  Though the general rule provides that "only assertions of fact, not opinion, can be defamatory[,] . . . expressions of opinion may suggest that the speaker knows certain facts to be true or may imply that facts exist which will be sufficient to render the message defamatory if false."  *Wynn v. Smith*, 16 P.3d 424, 431 (Nev. 2001) (citing *K-Mart Corporation v. Washington,* 866 P.2d 274, 281 (Nev. 1993), *overruled on other grounds by Pope v. Motel 6*, 114 P.3d 277 (Nev. 2005)).  Further, "statements of belief are defamatory if they imply the existence of defamatory facts that are not disclosed to the listener . . . for example, the statement I think he must be an alcoholic is actionable because a jury might find that it implied that the speaker knew undisclosed facts justifying his opinion."  Restatement (Second) Torts, § 556; *see also Gordon v. Dalrymple*, No. 3:07-CV-00085-LRH-RA, 2008 WL 2782914, at *4 (D. Nev. July 8, 2008) ("Any statement which presupposes defamatory facts unknown to the interpreter is defamatory.").

The determination of whether a statement is capable of a defamatory construction is a question of law.  *Branda v. Sanford*, 637 P.2d 1223, 1225–26 (Nev. 1981).  "In reviewing an allegedly defamatory statement, the words must be viewed in their entirety and in context to determine whether they are susceptible of a defamatory meaning."  *Lubin v. Kunin,* 17 P.3d 422, 425–26 (Nev. 2001) (internal quotations omitted).  In Nevada, in order to determine if a statement is one of fact or opinion, "the court must ask whether a reasonable person would be likely to understand the remark as an expression of the source's opinion or as a statement of existing fact."  *Pegasus v. Reno Newspapers, Inc.,* 57 P.3d 82, 87 (Nev. 2002); *see also Wynn*, 16 P.3d at 431.  If

James C. Mahan
U.S. District Judge

1    a statement is susceptible to different constructions, resolution of any ambiguity is a question of

2    fact for the jury. *Branda*, 637 P.2d at 1225–26.

3         The Nevada Supreme Court has noted that a federal district court, applying Nevada law,

4    enunciated three factors for determining whether an alleged defamatory statement includes a

5    factual assertion: (1) whether the general tenor of the entire work negates the impression that the

6    defendant was asserting an objective fact; (2) whether the defendant used figurative or hyperbolic

7    language that negates that impression; and (3) whether the statement in question is susceptible to

8    being proved true or false. *Pegasus*, 57 P.3d at 88 n.19 (citing *Flowers v. Carville,* 112 F. Supp.

9    2d 1202, 1211 (D. Nev. 2000)).

10        The websites at issue appear to be identical.  The title at the top of each page reads:

11   "Bradley S. Cohen | Is Bradley S. Cohen the Bernie Madoff of real estate?"  (*See* docs. ## 119-3;

12   119-4).  The first page reads, "Bradley S. Cohen's Investors Lose Tens of Millions of Dollars

13   While Cohen lives a life of glamor and luxury.  The alarming similarities between these two

14   investment firm founders."  (Docs. ## 119-3 at 2; 119-4 at 2).  The websites proceed to compare

15   Cohen and Madoff by posting Cohen's and Madoff's photos next to one another and detailing a

16   list of superficial comparisons, include statements such as:

17
18   -    [Cohen] [h]as structured his business as an intricate web that is nearly unexplainable by

          company officials.

19
20   -    [Madoff] [s]tructured his business and transactions in a complex way to conceal fraud and

          perpetuate a ponzi scheme.

21

22
23   -    Senior company leadership was "uncomfortable" and refused to answer questions about

          [Cohen] and his financial dealings.

24
25   -    Employees could not explain [Madoff's] personal or company financial dealings.

26
27   -    [Cohen] [h]as overall responsibility for management of his firm, strategically directs

          investment funds.

28

**James C. Mahan**
**U.S. District Judge**

- 12 -

1   -   [Madoff] [h]ad ultimate management authority over the assets of his clients and the ability to

2       direct investments.

3

4   -   [Cohen] [l]ives in a palacious Beverly Hills Mansion valued at over $7,000,000.

5   -   [Madoff] [o]wned expensive homes in prestigious locations, including a lavish Manhattan

6       apartment.

7

8   (Docs. ## 119-3 at 3; 119-4 at 3).

9       The websites also contained statements that, "[r]ecently, the Senior Vice President of

10  Cohen Asset Management, Doreen Ray (pictured right) was asked under oath about the intricacies

11  of company finances."  (Docs. ## 119-3 at 8; 119-4 at 8).  The websites states that "her response

12  was initially evasive, then ultimately revealed the following ominous facts . . . ."  (Docs. ## 119-

13  3 at 8; 119-4 at 8).  The websites then recite the following "facts" from Ray's "under oath"

14  testimony during a separate, unconnected lawsuit:

15
    •   "[Ray] expressed a **complete inability to explain any details of the company's**
16
        **financial transactions**, despite being the highest ranking officer on the Asset
17
        Management Team."
18
    •   "She stated that she was **uncomfortable answering questions** about Bradley Cohen and
19
        his financial dealings."
20
    •   "Properties owned by Cohen Asset Management or its related companies have
21
        **occupancy rates as low as 28%.**"
22
    •   "Properties owned by Cohen Asset Management or its related companies are **currently**
23
        **generating operating losses**."
24
    •   "**Losses continue to mount** as the companies lose tenants."
25
    •   "She **does not know where the money is coming from to cover the operating losses**,
26
        but does know that the companies can dip into a revolving line of credit through which all
27
        Cohen Asset Management companies are financed."
28

**James C. Mahan**
**U.S. District Judge**

- 13 -

- Cohen Asset Management has recently **lost tens of millions of dollars** in investor funds, yet Bradley Cohen is clearly living the life of luxury.  Losses of the Cohen Asset Management's CAM Core+ Fund 1 are clear from the company's financial statement below. [Graph is attached.]"

(Docs. ## 119-3 at 8-9; 119-4 at 8-9) (emphasis in original).

Further, the websites allege to have posted the company's third quarter financial report and graphs detailing the company's losses.  (Docs. ## 119-3 at 13; 119-4 at 13).  The websites include copies of a Third Circuit opinion reversing the dismissal of civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claims against "Brad Cohen" of Philadelphia, who plaintiffs point out is a different individual—Brad Scott Cohen—and not plaintiff Brad Stephen Cohen.  (Doc. # 119-4 at 38-47).  The websites post the full opinion in conjunction with numerous news articles discussing "Brad Cohen's" fraud charges, conviction and sentencing, "numerous swindles," and revocation of probation under a section titled "A History of Convictions."  (Docs. ## 119-3 at 26; 119-4 at 26).

Defendants assert that the statements on the websites, when read in context, demonstrate that the statements are purely opinion.  (Doc. # 205 at 29).  Defendants assert that the fact that the websites "express[] negative views about Cohen and CAM would make a reasonable person suspicious as to whether they contain statements of fact."  (*Id.*).  Further, defendants assert that they do not make factual assertions, but merely pose questions to encourage readers to think critically.  Defendants also assert that the fact that the websites and their domain names are registered and hosted anonymously outside of the United States also indicates that they are not affiliated with any trusted entity for information about real estate investing.  Finally, defendants argue that, even without these comments, statements published on a blog that accepts comments like the websites at issue are inherently less likely to be viewed as statements of fact.  (*Id.* at 29–30).

Plaintiffs respond that the general tones of defendants' websites are different from their cited cases and attempt convince the reader that defendants have actually uncovered shady and criminal dealings.  (Doc. # 213 at 20).  Plaintiffs assert that defendants have carefully crafted their

James C. Mahan
U.S. District Judge

- 14 -

1    websites to appear as professional, credible, and factual as possible.  (*Id.*).  Plaintiffs further assert

2    that defendants' websites actually caused plaintiffs' investors, lenders and vendors to make

3    inquiries and conduct investigations of plaintiffs, hesitate to do business with plaintiffs, and in at

4    least two known cases, not invest millions of dollars with plaintiffs.  (*Id.*).

5        Throughout the website, defendants are careful to include small notes to hedge their

6    accusations.  For example, with respect to the Third Circuit case and various web articles

7    addressing the illegal activities and conviction of "Brad Cohen," defendants note that they are

8    suggesting that plaintiff Cohen, based on his vague career history on CAM's website, might be the

9    "Brad Cohen" in these articles.[3]  (Docs. ## 119-3 at 26; 119-4 at 26).  Defendants also posit their

10   accusations in the form of questions.

11       A question mark is a "rhetorical device" which can serve two purposes: (1) making clear

12   the author's lack of definitive knowledge about an issue; and (2) inviting the reader to consider the

13   possibility of other justifications for the defendant's actions, thereby negating the impression that

14   the statement implies a false assertion of fact.  *Partington v. Bugliosi,* 56 F.3d 1147, 1157 (9th Cir.

15   1995).  If the question can be reasonably read as an assertion of a false fact, it may be actionable.

16   *Id.*

17       In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), the court found that "[s]imply

18   couching a statement—"Jones is a liar"—in terms of opinion—"In my opinion Jones is a liar"—

19   does not dispel the factual implications contained in the statement.  *Id.* at 19.  In the same manner

20   that the *Milkovich* court rejected the concept that adding "in my opinion" before an assertion of

21   defamatory fact insulates the speaker from a defamation action, this court rejects the idea that

22   defendants putting what may be defamatory fact in the form of a question counteracts the

23   impression that the speaker is communicating an actual fact.

---

24
25       [3] The court does not accept defendants' assertions that the fair reporting of judicial
     proceedings protects their use of the Third Circuit case reporting on a different Brad Cohen's
26   illegal activities from being considered defamatory.  The fair report privilege is premised on the
     theory that members of the public have a manifest interest in observing and being made aware of
27   public proceedings and actions. *Wynn v. Smith*, 16 P.3d 424, 429 (2001).  While Brad Cohen of
     Philadelphia, the subject of the judicial proceedings, may have no claim against defendants given
28   the fair reporting privilege, he is not plaintiff Cohen here.

**James C. Mahan**
**U.S. District Judge**

1    Further, the general tenor of the websites is precise with allegedly accurate graphs, earnings

2   statements of employees, and quarterly reports that invite readers to draw specific conclusions

3   regarding CAM and Cohen's activities.  The websites are not ranting blogs or free flow, stream-

4   of-consciousness musings.  The careful weaving of "facts" that were testified to "under oath,"

5   newspaper articles, graphs, earning statements, and the like into the defendants' gently questioning

6   narrative are designed to bring doubt into the minds of investors regarding plaintiffs and their

7   activities.  (*See, e.g.*, docs. ## 119-3; 119-4).  Defendants boldly asserted on their websites—in

8   response to a letter from plaintiffs threatening legal action—that "not one untrue statement is found

9   on this site," and that "Cohen [won't] disclose the company's financial documents to disprove the

10   alleged 'defamatory statements' here [on the websites]."  (Doc. # 214-1 at 255).

11    Defendants' argument that the anonymous registry and hosting of the domain names

12   outside the United States would weigh in any way against the website's credibility to the average

13   user is wholly unconvincing.  The court does not believe that the average internet user would check

14   the domain registry or host unless the web browser notified the user that a certain website posed a

15   security risk.  Further, the court questions whether the average internet user would even know how

16   to check the domain registry or hosting country of a website or whether the average user would

17   know what that information means.

18    Additionally, the domain names do not give any indication of bias.  They are merely two

19   separate variations of Cohen's name, which weighs against defendants' assertion that a reasonable

20   person would see the websites as opinion.  *Cf. Obsidian Fin. Grp., LLC v. Cox*, 812 F. Supp. 1220,

21   1230 (D. Or. 2011) (obsidianfinancesucks.com clearly demonstrated website's bias).  The court

22   also does not find that the language used by defendants was figurative or hyperbolic.  Defendants

23   make specific accusations and imputations of criminal activity and unethical activity and provide

24   supporting information, described as "facts" to attempt to bolster those accusations for readers.

25    Finally, the court finds that the statements alleged in defendants' websites are indeed

26   susceptible to being proved true or false.  In this case, the truth of the defendants' assertions on the

27   websites is disputed.  Viewing the evidence in the light most favorable to plaintiffs, defendants'

28

**James C. Mahan**
**U.S. District Judge**

- 16 -

accusations are therefore capable of defamatory meaning. *See, e.g.*, *Flowers v. Carville*, 310 F.3d 1118, 1129 (9th Cir. 2002).

Accordingly, because the published statements could be construed as defamatory statements of fact, and are therefore actionable, Nevada law instructs that the factfinder should resolve the matter. *See Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 88 (2002). The court will deny defendants' motion for summary judgment with respect to Cohen's and CAM's claim for defamation per se against defendants.

**(2) Invasion of privacy/false light by all plaintiffs against all defendants**

*A. CAM*

Defendants assert that the court should grant summary judgment with respect to CAM's claim for false light invasion of privacy because a corporation cannot possess privacy rights. (Doc. # 205 at 6–7). Plaintiffs state that CAM withdraws its claim for false light/invasion of privacy against defendants, because Nevada's adoption of the false light/invasion of privacy tort followed the Restatement (Second) of Torts § 652A, *et seq.* (1977), which precludes privacy/false light claims by corporations. (Doc. # 213 at 4–5). Plaintiffs assert that they "indicated, and the Court recognized, they would withdraw CAM's false light invasion of privacy claim in connection with defendants' requested extension to file their MSJ." (Docs. ## 200 at 4–5, 207 at 2–3). Therefore, plaintiffs assert that defendants' motion for summary judgment on CAM's false light invasion of privacy claim was unnecessary and is now moot. (Doc. # 213 at 38). Defendants request that the court grant summary judgment in spite of plaintiffs' attempt to argue that they withdrew CAM's claim. (Doc. # 220-1 at 8).

According to the *Restatement (Second) of Torts* § 652I, a corporation has no privacy rights; such rights are personal and can be held only by human beings. As discussed previously, plaintiffs' statement to the court that CAM is "no longer pursuing a claim for false light invasion of privacy" does not properly remove the claim from this court's consideration. *See* Fed. R. Civ. P. 41(a). The parties did not stipulate to dismiss this claim, nor did plaintiffs move for the court to dismiss the claim. *Id.* Accordingly, defendants are entitled to summary judgment on this issue.

James C. Mahan
U.S. District Judge

*B.  Cohen*

The Supreme Court of Nevada expressly recognized false light invasion of privacy as a valid and separate cause of action in 2014.  *See Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 141 (Nev. 2014), *reh'g denied* (Nov. 25, 2014), *petition for cert. filed* (Mar. 25, 2015) ("[W]e, like the majority of courts, conclude that a false light cause of action is necessary to fully protect privacy interests, and we now officially recognize false light invasion of privacy as a valid cause of action in connection with the other three privacy causes of action that this court has adopted."). The court clarified that, under Nevada law, defamation law seeks to protect an objective interest in one's reputation—either economic, political, or personal—in the outside world.  *Id.* at 141 (citations omitted).  Conversely, false light invasion of privacy protects one's subjective interest in freedom from injury to the person's right to be left alone.  *Id.* (citations omitted).

For example, situations such as being falsely portrayed as a victim of a crime, such as sexual assault, or being falsely identified as having a serious illness, or being portrayed as destitute, may place a person in a harmful false light without rising to the level of defamation.  *Id.* (citations omitted).

In Nevada "the injury in privacy actions is mental distress from having been exposed to public view, while the injury in defamation actions is damage to reputation."  *Flowers v. Carville,* 310 F.3d 1118, 1132 (9th Cir. 2002) (citation omitted).  Like defamation, false light requires actual malice.  *Id.*  However, courts place less emphasis on public reputation in the false light tort than in defamation.  The thrust of a false light action is the subjective "privacy" of the subject.  False light also requires an implicit false statement of objective fact.  *Id.*

Defendants assert that they did not portray Cohen in a false light by giving publicity to his business activities or stating true facts about his personal life.  (Doc. # 205 at 15).  Defendants assert that they did not make untrue statements, and also that they did not do anything that would be highly offensive to a reasonable person.  (*Id.* at 17).

Plaintiffs assert that defendants did not publicize Cohen's true business activities.  (Doc. # 213 at 36).  Instead, plaintiffs assert that defendants' websites falsely claimed Cohen was (1) the next Madoff; (2) running a Ponzi scheme, fraud, shell game or scam; (3) looting company assets;

James C. Mahan
U.S. District Judge

(4) taking investor and tenant money; (5) suing to hold off creditors; and (6) suing tenants based on unfounded accusations and greed.  (*Id.*).  Further, plaintiffs assert that defendants published a picture of Cohen's home, political contributions, and misconstrued information from a confidential financial report.  (*Id.* at 36–37).

Defendants respond by asserting that Cohen attempts to bootstrap his false light claim onto the websites' comments concerning CAM as a company.  (Doc. # 220-1 at 14).  Defendants assert that the websites do not contain the statements that plaintiffs cite.  Defendants further assert that, even assuming the websites included the statements plaintiffs cite, these alleged statements concern CAM's activities, not Cohen's.  (*Id.*).  Therefore, defendants argue that Cohen cannot hold plaintiffs liable for portraying CAM in a false light.  (*Id.*).

Defendants' bootstrap argument is a clever attempt to parse the language of the statements. Though Cohen and CAM are technically separate entities, the court has previously discussed that Cohen has ultimate veto power over investments and control in shaping and directing company decisions.  Therefore, Cohen and CAM are nearly one and the same.  The court finds that the defendants have not met their burden to negate an essential element of plaintiffs' case.  The court will deny defendants' motion for summary judgment with respect to Cohen's false light claim.

**(3) Intentional infliction of emotional distress by Cohen against all defendants**

To establish a claim of intentional infliction of emotional distress ("IIED"), plaintiff must prove: (1) defendant engaged in "extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress; (2) [plaintiff] suffered severe or extreme emotional distress; and (3) actual or proximate causation."  *Posadas* v. *City of Reno,* 851 P.2d 438, 444 (Nev. 1993).

*A.  Extreme or outrageous conduct*

Nevada courts look to the Restatement (Second) of Torts for guidance in interpreting claims for intentional infliction of emotional distress ("IIED").  *Quinn v. Thomas*, No. 2:09-cv-00588-KJD-RJJ, 2010 WL 3021795, at *5 (D. Nev. July 28, 2010) (citing *Star v. Rabello*, 625 P.2d 90, 92 (Nev. 1981); *Olivero v. Lowe*, 995 P.2d 1023, 1027 (Nev. 2000)).  According to Restatement (Second) Torts § 46, cmt. d, behavior that is "tortious or even criminal" is not

1   necessarily extreme and outrageous.  "Liability has been found only where the conduct has been

2   so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

3   decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.*;

4   *see also Welder v. Univ. of S. Nev.*, 833 F. Supp. 2d 1240, 1245 (D. Nev. 2011).  Liability does not

5   extend "to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."

6   Comment d of Restatement (Second) of Torts § 46 (1965).

7       Determination of whether a defendant's conduct amounts to an extraordinary transgression

8   of the bounds of socially tolerable conduct is a fact-specific inquiry.  *See, e.g.*, *Norman v. Gen.*

9   *Motors Corp.,* 628 F. Supp. 702, 704–05 (D. Nev. 1986).  Courts consider a defendant's conduct

10   on a case-by-case basis and in light of the totality of the circumstances.  *See id.* (considering

11   "totality of the circumstances" in determining whether conduct is extreme and outrageous).

12       Extreme and outrageous conduct may arise "from the actor's knowledge that the other is

13   peculiarly susceptible to emotional distress, by reason of some physical or mental condition or

14   peculiarity."  Restatement (Second) of Torts § 46 cmt. f. "[H]owever, . . . major outrage is essential

15   to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting,

16   or will have his feelings hurt, is not enough."  *Id.*  Extreme and outrageous conduct also "may arise

17   from an abuse by the actor of a position, or a relation with the other, which gives him actual or

18   apparent authority over the other, or power to affect his interests."  *Id.* cmt. e (stating as an example

19   that police officers have been held liable for extreme abuse of their position).

20       Defendants assert that Cohen cannot establish extreme or outrageous conduct by Hansen

21   because publishing comments comparing Cohen to Bernie Madoff on websites is not extreme or

22   outrageous.  Defendants assert that Hansen's conduct was not extreme and outrageous and did not

23   cause Cohen to suffer extreme or severe emotional distress.  (Doc. # 205 at 19, 21).  Further,

24   defendants assert that, since the gravamen of Cohen's claim is defamation, he should not be

25   allowed to maintain a separate claim for IIED.  (Doc. # 205 at 23).

26       Plaintiffs respond that defendants' websites, which assert that Cohen runs a Ponzi scheme,

27   is the next Bernie Madoff, and loots company assets, constitutes extreme and outrageous conduct

28

**James C. Mahan**
**U.S. District Judge**

1    "beyond all bounds of decency and intolerable in a civilized society."  (Doc. # 213 at 39 n.2).

2    Plaintiffs allege that the websites have been active for over two and a half years.  (*Id.*).

3         Neither the parties nor this court have identified any Nevada case that has addressed an

4    analogous factual scenario to the present case.  In *Card v. Pipes*, 398 F. Supp. 1126 (D. Or. 2004),

5    a university professor brought an action against operators of a think tank's website alleging claims

6    for defamation and IIED.  *Id.* at 1130.  The think tank had published statements in a newspaper

7    and later on an internet website stating that the professor had called Israel a "terrorist state," Israelis

8    "baby killers," and insisted in his final exam that students agree with his view that Israel "stole

9    land."  *Id.* at 1135.  The professor further alleged that the think tank operators had attempted to

10   coerce him to undertake certain actions with the threat of continued publication of the allegedly

11   defamatory statements.  *Id.* at 1136.

12        The operators moved to dismiss.  The court found that, considering the totality of the

13   allegations, the alleged conduct was not sufficiently outrageous to state a claim for IIED.  *Id.*

14   Specifically, the court noted that no special relationship existed between the parties, that

15   defendants' conduct merely involved "conversations between defendants and plaintiff as well as

16   publication on defendants' website and in one issue of the Jewish Review[,]" and that, despite

17   alleging that "defendants' motive was to defame and injure him[,]" plaintiff was "not a particularly

18   vulnerable individual."  *Id.*

19        Here, the websites at issue discuss Cohen, place his photo next to Bernie Madoff's, make

20   superficial comparisons between Cohen and Bernie Madoff, and include statements such as:

21

22   -   Is Bradley S. Cohen the Next Bernie Madoff?  The alarming similarities between these two

23       investment firm founders.  (Docs. ## 119-3 at 2; 119-4 at 2).

24   -   Bradley S. Cohen's Investors Lose Tens of Millions of Dollars While Cohen lives a life of

25       glamour and luxury.  (Docs. ## 119-3 at 2; 119-4 at 2).

26   -   Like Bernie Madoff, Cohen has a palacious home in an impressive neighborhood, an office

27       in a celebrity and wealth-filled location, heavy involvement in industry organizations and on

28

**James C. Mahan**
**U.S. District Judge**

- 21 -

1    influential boards, and a company with an elusive and complex web of financial dealings.

2    (Docs. ## 119-3 at 11; 119-4 at 11).

3    -   Despite losses to his investors, Cohen has maintained his extravagant lifestyle and image.  He

4        has been a contortionist when it comes to keeping the secret of his true financial picture,

5        creating a complex web of companies and dealings, but how long can this continue?  (Docs.

6        ## 119-3 at 11–12; 119-4 at 11–12).

7    -   Cohen recently refinanced his mansion for approximately $4,000,000.00, perhaps in an

8        attempt to prop up his crumbling empire.  (Docs. ## 119-3 at 13; 119-4 at 13).

9        The websites also posted copies of a Third Circuit opinion reversing the dismissal of civil

10   Racketeer Influenced and Corrupt Organizations Act ("RICO") claims against "Brad Cohen" of

11   Philadelphia.  (Doc. # 119-4 at 38–47).  Plaintiffs point out the Brad Cohen in the Third Circuit

12   case is a different individual—Brad Scott Cohen—and not plaintiff Brad Stephen Cohen.  (*Id.*).

13       The court finds that, as a matter of law, Cohen cannot state a claim for IIED.  Like *Card*,

14   the allegedly defamatory statements at issue here were published online.  Though the accusations

15   at issue in the instant case include criminal implications, as opposed to the potentially unpopular

16   and incendiary statements in *Card*, the totality of the circumstances, including the tenuous

17   comparisons to Bernie Madoff, that Cohen is not a particularly vulnerable individual, and the lack

18   of a special relationship between Cohen and defendants (i.e. where defendants have a position of

19   power over Cohen), the court concludes that defendants statements cannot meet the threshold to

20   be considered extreme and outrageous.  The court will grant summary judgment in favor of

21   defendants.

22       The court notes that defendants also argue that where the gravamen of a claim is

23   defamation, many jurisdictions do not permit separate causes of action for mental and/or emotional

24   distress.  *See Dworkin v. Hustler Magazine, Inc.*, 668 F. Supp. 1408, 1420–21 (C.D. Cal. 1987),

25   *aff'd,* 867 F.2d 1188 (9th Cir. 1989) (applying California law) (citing *Wilson v. Merrill Lynch,*

26   *Pierce, Fenner & Smith, Inc.*, 111 A.D. 2d 807, 808 (N.Y. App. 1985)).

27       In *Dworkin*, the Ninth Circuit recognized that without such a rule, any defective defamation

28   claim could be revived by pleading an IIED claim.  *Id.*  As explained by one California state court,

James C. Mahan
U.S. District Judge

- 22 -

to allow an emotional distress claim based on facts underlying a defamation claim would be "a step toward 'swallowing up and engulfing the whole law of public defamation.'" *Flynn v. Higham*, 149 Cal. App. 3d 677, 681 (Ct. App. 1983). Nevada has not adopted this position, nor has it given any indication of its inclination to do so. *See, e.g.*, *Woods v. Kings Row Trailer Park*, No. 63190, 2015 WL 2329289, at *1 (Nev. May 13, 2015) (finding that the lower court should have construed appellant's complaint as seeking relief for intentional infliction of emotional distress and defamation and holding that appellant stated claims for both). Accordingly, the court does not find this argument persuasive. The court will grant summary judgment in favor of defendants with respect to Cohen's claim of IIED.

**(4) Intentional interference with future expected business by all plaintiffs against all defendants**

Liability for the tort of intentional interference with future expected business requires proof of the following elements: (1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct. *Wichinsky v. Mosa*, 847 P.2d 727, 729–30 (Nev. 1993) (citing *Leavitt v. Leisure Sports, Inc.,* 734 P.2d 1221, 1225 (Nev. 1987)).

Actual harm, i.e., actual damages, is a required element of this claim. Due to the magistrate judge's ruling excluding any evidence of actual damages, plaintiffs assert that they withdraw their claim for intentional interference with prospective business advantage (Doc. # 213 at 36). Accordingly, plaintiffs assert that defendants' motion for summary judgment regarding this issue is now moot. Defendants request that the court grant summary judgment in spite of plaintiffs' attempt to argue that they withdraw the claim. (Doc. # 220-1 at 8).

Plaintiffs' statement to the court that they withdraw their claim for intentional interference with future expected business does not properly remove the claim from this court's consideration. *See* Fed. R. Civ. P. 41(a). The parties did not stipulate to dismiss this claim, nor did plaintiffs

move for the court to dismiss the claim.  *Id.*  Accordingly, defendants are entitled to summary judgment on this issue.

**(5) Injunctive relief by all plaintiffs against all defendants**

Under Nevada law, injunctive relief is not a cause of action, but rather a type of remedy. *See In re Wal-Mart Wage & Hour Emp't Practices Litig.*, 490 F. Supp. 2d 1091, 1130 (D. Nev. 2007).  In this case, plaintiffs request that the court "enter a final and permanent injunction enjoining any republication of the offending [defamatory and false] statements and compelling Defendants to take down permanently the offending statements from the websites."  (Doc. # 40 at 26).

Under Nevada law, plaintiffs' request is for relief and not a separate cause of action.  Based on this interpretation, plaintiffs concede to dismiss injunctive relief as a separate claim, but not the relief as a remedy.  Accordingly, plaintiffs' claim for injunctive relief is dismissed.  Plaintiffs may still obtain the remedy of injunctive relief as appropriate under the other claims for relief.

**IV.   Conclusion**

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendants Ross B. Hansen, Northwest Territorial Mint, LLC, and Steven Earl Firebaugh's motion for summary judgment (doc. # 205) be, and the same hereby is, GRANTED with respect to plaintiffs' claim for defamation, CAM's claim of invasion of privacy/false light, and plaintiffs' claim for intentional interference with future expected business, and DENIED with respect to all other claims. Plaintiffs' claim for defamation per se and Cohen's claim for false light invasion of privacy shall proceed.

IT IS FURTHER ORDERED that Cohen and CAM's claim for injunctive relief against defendants be, and the same hereby is, DISMISSED.

DATED June 9, 2015.

_____
UNITED STATES DISTRICT JUDGE

James C. Mahan
U.S. District Judge