Robert D. Mitchell (Arizona State Bar No. 011922), *admitted pro hac vice*
Sarah K. Deutsch, (Arizona State Bar No. 026229), *admitted pro hac vice*
TIFFANY & BOSCO, P.A.
Camelback Esplanade II, Seventh Floor
2525 East Camelback Road
Phoenix, Arizona 85016-4229
Telephone (602) 255-6000
Fax (602) 255-0103
E-mails: rdm@tblaw.com; skd@tblaw.com

Anthony Michael Glassman (California State Bar No. 37934), *admitted pro hac vice*
GLASSMAN, BROWNING, SALTSMAN & JACOBS, INC.
360 North Bedford Drive, Suite 204
Beverly Hills, California 90210-5157
Telephone: (310) 278-5100
Facsimile: (310) 271-6041
Email: amg@gbsjlaw.com

Richard Schonfeld (NSB No. 6815)
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
Facsimile: (702) 598-1425
Email: rschonfeld@cslawoffice.net

Attorneys for Plaintiffs BRADLEY STEPHEN COHEN
and COHEN ASSET MANAGEMENT, INC.

# UNITED STATES DISTRICT COURT

## STATE OF NEVADA – LAS VEGAS

| | |
|---|---|
| BRADLEY STEPHEN COHEN, an individual; and COHEN ASSET MANAGEMENT, INC., a California corporation, | Case No. 2:12-cv-01401-JCM-PAL **PLAINTIFFS' TRIAL BRIEF** |
| Plaintiffs, | |
| v. | |
| ROSS B. HANSEN, an individual; NORTHWEST TERRITORIAL MINT, LLC, a Washington limited liability company; and STEVEN EARL FIREBAUGH, an individual, | |
| Defendants. | |

Pursuant to the Court's May 21, 2015 Joint Pretrial Order (Doc. No. 226) and October 5, 2015 Order Regarding Trial (Doc. No. 253), Plaintiffs Bradley Stephen Cohen ("Cohen") and Cohen Asset Management, Inc. ("CAM") (together, "Plaintiffs") hereby submit their Trial Brief in this action against Defendants Ross B. Hansen ("Hansen"), Northwest Territorial Mint, LLC ("NW Mint") and Steven Earl Firebaugh ("Firebaugh") (collectively, "Defendants").

## I.    INTRODUCTION.

This is an action for defamation *per se* and false light invasion of privacy arising from two websites Defendants created and anonymously published on the Internet comparing Cohen and his real estate investment firm CAM to notorious fraudster Bernard Madoff ("Madoff") and Madoff's securities investment firm, while also portraying Cohen as a criminal by publishing the criminal history of a *different* Brad Cohen.  Defendants' websites falsely claim Cohen is the Madoff of the real estate industry as Cohen's investors lose tens of millions of dollars while Cohen lives a life of glamour and luxury.  Defendants published the websites to gain leverage in an unrelated action in Washington, where a CAM-affiliated entity sued Hansen and NW Mint for contaminating its property.  Plaintiffs need only prove their claims by a preponderance of evidence with fault amounting to mere negligence.  Plaintiffs seek general and presumed damages, punitive damages, attorneys' fees and costs, and to require Defendants to take down the remaining website and to permanently enjoin Defendants from republishing the website statements.

## II.    FACTUAL BACKGROUND.

Cohen is 59 years old.  Cohen has been married to his wife Cheryl for 36 years. The Cohens have three children, one of whom is a lawyer, one of whom works in the real estate industry, and one of whom works for CAM.  Cohen resides in Bel Air, California and has resided in the Los Angeles, California area his entire life.  Cohen is an active member in the Los Angeles, California community and has

been honored by numerous charitable and government organizations.  Cohen has no criminal record.  As Cohen's family, friends and colleagues will all testify, Cohen holds himself to the highest of ethics.

Cohen left college early to start a business career.  Cohen is a self-made man and entrepreneur, having owned various businesses such as a flower business, a trimming and textile business, and a real estate investment firm, CAM, for approximately 25 years.  When Cohen purchased his first property as a young man the loan officer was so impressed with Cohen that he co-signed the loan.  Since that date Cohen on behalf of CAM or its affiliated companies has been involved in the acquisition and/or sale of more than 200 real properties (mostly industrial buildings such as warehouses, distribution centers, and manufacturing facilities), involving approximately 30 million square feet and more than $1 billion dollars in value.

Cohen is currently the President and Chief Executive Officer of CAM.  CAM is a privately held real estate investment firm that Cohen built from the ground up over many years.  CAM is a California corporation that has been incorporated for approximately 25 years and is located in Century City, California.  It has an established nation-wide history and excellent reputation, and its investors and joint venture partners include some of the most recognizable insurance companies, financial institutions, and pension plans in the United States.

CAM is in the business of acquiring, owning, developing and managing industrial properties across the United States.   CAM uses nationally-based companies and professionals to facilitate its business, including appraisers (such as Blake Global), certified public accountants (such as Deloitte& Touche LLP), third-party zoning experts (such as PZR), environmental professionals, civil and mechanic engineers, title companies (such as First American Title), mortgage brokers (such as Holiday Fowler & Fenoglio), real estate brokers (such as Jones Lang LaSalle and Lee & Associates), prominent law firms, institutional equity partners (such as Hartford Insurance Company, New York Life Insurance Company, and Oaktree

Capital Management LLC) and various institutional lenders, all of whom do their own significant due diligence. Many of CAM's entities, which hold real estate assets, are audited annually by nationally renowned accounting firms like Deloitte & Touche LLP and Marcum LLP. Plaintiffs' real estate expert, Webster A. Collins, MAI, CRE, FRICS, will testify that the quality of CAM's management stands out in many ways, many of which are "Best in Class."

CAM's clients are institutional investors and high net worth individuals who qualify as accredited investors under federal and state securities laws and come to CAM by word of mouth and referral only based on CAM's reputation. Cohen personally invests his own money in each of CAM's investments. Hansen and NW Mint have never invested with CAM and have no experience as investors with CAM. Rather, Hansen and NW Mint are disgruntled former tenants of Auburn Valley Industrial Capital LLC ("Auburn"), an affiliated entity of CAM.

Each industrial property CAM invests in is owned by a separate legal entity with a separate bank account, which Plaintiffs' investment fund management expert, Jennifer Bellah Maguire, Esq., will testify is the legal and industry "Best in Class" standard way of structuring such a business. One industrial property in Auburn, Washington was owned during the relevant time period by CAM's affiliated entity Auburn. When Auburn purchased the property, part of the property was leased to Hansen and his company, NW Mint.

NW Mint is a Washington limited liability company with large facility in Nevada. In 2010, Hansen and NW Mint vacated the Washington property and Auburn sued Hansen and NW Mint for contaminating the property with hazardous substances in breach of the lease and in violation of Washington environmental law (the "Environmental Contamination Lawsuit"). The trial was set to begin on July 30, 2012. On January 31, 2012, Auburn's counsel deposed Hansen, who testified under oath that he was "going to inflict lots of pain on your client," "start ratcheting up the pain" and as a result "[y]our client will roll over on the lawsuit."

In early April 2012 (three months **_before_** the trial of the Environmental Contamination Lawsuit), Defendants published the website http://bradley-cohen.com (the "First Website") comparing Cohen and CAM to Madoff and Madoff's investment securities firm, claiming Cohen is the next Madoff of real estate as Cohen's investors lose tens of millions of dollars while Cohen lives a life of glamour and luxury, and including criminal information about a *different* Brad Cohen. As Plaintiffs' Madoff/Ponzi scheme expert, Steven N. Garfinkel, CPA, CFF, CAM (lead FBI Agent in the Madoff case), will testify, Madoff is widely known and hated for committing the largest Ponzi scheme in history involving approximately $50 billion dollars and was sentenced to the maximum sentence of 150 years in prison. Billions of dollars were lost, retirements and life savings were wiped out, charities, pension funds and trusts were severely damaged if not destroyed and people committed suicide, including Madoff's son and the son of Madoff's accountant. Defendants and NW Mint employees admitted under oath that they knew very little about Madoff, his crimes and sentence, and did not do any specific research on Madoff for the Websites.

In short, the First Website claims Cohen is the next Madoff of real estate by: (1) juxtaposing a picture of Cohen with a booking photograph of Madoff and drawing an arrow from Madoff to Cohen; (2) juxtaposing a picture of Cohen with a booking photograph of Madoff above a table with alleged "alarming similarities" between Cohen and Madoff that are based on their alleged clientele, business structures and locations, lifestyles and professional, philanthropic and political affiliations, which amount to no more than "superficial" or "tenuous" comparisons as found by this Court (Doc. No. 228); (3) stating Cohen has a "history of convictions" for serious crimes, like fraud and racketeering, while publishing articles about a convicted criminal named Brad S. Cohen and making the readers think this is the same Brad Cohen because they allegedly have the same name, are the same age and are both involved in the real estate industry, when they actually

relate to a different Brad Cohen, the convicted criminal; (4) implying Plaintiffs have something to "hide," a "secret" financial picture and "crumbling empire," and there is something "behind" their business dealings, which are structured as an "intricate," "elusive" and "complex" web that are "so complicated an army of investigators may be necessary to unravel the web;" and (5) accusing Plaintiffs of running a "Ponzi scheme", "fraud" and "scam," "looting" company assets, playing a "shell game," "taking millions" from tenants, and suing tenants based on "unfounded accusations or greed."  The First Website bases its claims on an "investigation" conducted by "investigators," "ominous facts" taken from a deposition by Auburn's Rule 30(b)(6) representative, Doreen Ray ("Ray"), which were taken out of context and misconstrued, and a confidential financial report for one CAM entity that Defendants pilfered from CAM's website and then misconstrued.

Defendants claim they merely posed whether Cohen was the next Madoff of real estate as a question.  However, under the applicable law expressly recognized by this Court in denying summary judgment, a statement posed as a question may constitute defamation.  Further, Plaintiffs' linguistics expert, Edward Finegan, Ph.D., will testify that based on the Website structure, language used and information provided therein or lack thereof, Website readers are led to believe that only the correct answer to the question "Is Bradley S. Cohen the Next Bernie Madoff?", is yes.  As found by this Court (Doc. No. 228), Cohen and CAM are intrinsically tied and nearly one and the same, and all attacks on Cohen are necessarily attacks against CAM and their damages are necessarily intertwined.

In publishing the Website, Defendants used anonymizer software to give themselves a "legitimate location" in a different state and hide their IP address. Defendants also published the First Website anonymously to make it more difficult to trace who was behind the First Website and get it taken down.  Firebaugh, an NW Mint employee in Nevada, researched and registered the domain name and hosted the First Website using a company overseas, Azudo, which offers anonymous

webhosting services.  Firebaugh also paid for the First Website with "untraceable funds" using a prepaid debit card obtained by another NW Mint employee in Washington using a NW Mint American Express card.  Defendants, through NW Mint's employees Firebaugh and Matt Fiske ("Fiske"), published the First Website from the NW Mint facility in Nevada using the NW Mint's IP address and NW Mint's computers in Nevada.

Hansen directed and approved all of the content of the First Website, which was researched and provided by Hansen and several NW Mint employees, including Firebaugh, Fiske and Roger Samboer ("Samboer"), who provided the booking photograph of Madoff, the photograph and biography of Cohen, information about and a photograph of Cohen's house, Cohen's political contributions, the pilfered financial report for a CAM entity and articles about a convicted criminal named Brad S. Cohen in Philadelphia, Pennsylvania.  Defendants could have easily researched public records on CAM's real estate holdings to find CAM's valuation and solvency, but did not do so.  Hansen was in a hurry to get the First Website up.

Prior to publishing the First Website, Hansen had NW Mint employee Dan Proctor ("Proctor") research Cohen and CAM.  Proctor testified under oath that he was unable to find any complaints or negative or pejorative information about Cohen and CAM.  Many of the items Proctor searched for were actually issues that had plagued NW Mint, such as accusations of sexual harassment and RipOff Reports.

None of the NW Mint employees involved with the Websites were ever aware of any negative information or complaints about Cohen and CAM.  Hansen testified under oath during his deposition that he had no evidence that Cohen ran a Ponzi scheme like Madoff.  Defendants did not conduct background investigations on Cohen and CAM using legal resources, such as LexisNexis and PACER, until May 30, 2012 and July 23, 2012, many months ***after*** the Websites were published.

The First Website linked Cohen to a picture of his house, and that link was

not publicly available information.  Notably, Hansen did not want to provide his address to Plaintiffs during his deposition and requested that it be kept confidential, but he published Cohen's home on the Internet for all to see.  The First Website also contained a CAM financial report, which was a document marked as confidential and intended only for CAM's investors that Defendants hacked from CAM's secured investor reporting website or what Defendants referred to on the Websites as a "fluke discovery."  The First Website referred to newspaper articles about criminal convictions of Brad S. Cohen, who was from Philadelphia, Pennsylvania and was two and a half years younger than Cohen.  Defendants did not call anyone related to the Brad S. Cohen cases or attempt to obtain a picture of Brad S. Cohen to determine his relationship, if any, to Cohen.  Brad S. Cohen of Philadelphia, Pennsylvania (Brad Scott Cohen) is entirely different from and unrelated to Plaintiff Cohen of Los Angeles, California (Bradley Stephen Cohen).  Notably, Defendants did not call any law enforcement authorities regarding their alleged concerns of criminal misconduct regarding Cohen and CAM posted on the First Website.

Plaintiffs suspected Defendants were behind the First Website because many statements on the First Website paralleled statements made by Hansen during his deposition in the Environmental Contamination Lawsuit, referenced alleged statements made by Ray during her deposition in the Environmental Contamination Lawsuit, referenced the Environmental Contamination Lawsuit and cautioned others from leasing from Plaintiffs.  In late April 2012, Plaintiffs' counsel contacted the disclosed registrant of the First Website, Namecheap, Inc. ("Namecheap"), and the disclosed webhost of the First Website, LeaseWeb B.V., and appealed for more information and the identity of the author.   As a result, Namecheap contacted Azudo and in early May 2012, Azudo took down the First Website and advised Defendants that the First Website violated Azudo's terms and conditions and included "defamatory content."

1    Despite such adverse findings, Defendants were in a hurry to put up another

2  website.  Firebaugh and Samboer researched and read the fraud policies for other

3  webhosting services and ultimately decided to use separate overseas companies with

4  more liberal fraud policies for the domain name and webhosting services to make it

5  more difficult to trace and less likely to be taken down again.  In early May 2012,

6  Defendants published the website http://bradleyscohen.com (the "Second Website").

7  The Second Website contained the same contents as the First Website, except the

8  criminal conviction information regarding Brad Scott Cohen of Philadelphia,

9  Pennsylvania was omitted from the Second Website.

10    Firebaugh registered the Second Website's domain name using a company

11  overseas, AnonymousSpeech, and hosted the Second Website using a separate

12  company overseas, Vindo International, which offers anonymous webhosting

13  services.  Firebaugh paid for the Second Website using a PayPal account registered

14  to a "Steve Finch," Firebaugh's old mailing address, a fictional telephone number

15  and the e-mail address 80teasel@gmail.com.  Defendants, through Firebaugh and

16  Fiske, published the Second Website from the NW Mint facility in Nevada using the

17  NW Mint's IP address and NW Mint's computers in Nevada.

18    At Hansen's request, a comment section was added to the Second Website.

19  The Second Website did not receive any substantive or negative comments about

20  Plaintiffs.  The Second Website only received spam comments.  Due to the spam,

21  Defendants had to install a spam filter, Askimet, in late June 2012, and later

22  disabled the comment section and deleted the comments.

23    At Hansen's request, a page counter (which Defendants contend is fake) was

24  also added to the Second Website to create an illusion that the site is busy and

25  popular, increase its credibility, legitimacy and rate of return visitors and cause more

26  distress to Cohen.  Firebaugh regularly monitored and reported on the visitors to the

27  Second Website and any "firms" or "persons of interest," such as Cohen, CAM, law

28  firms, investment firms or investors, to NW Mint personnel.   Many of the

communications regarding the Websites were sent through NW Mint personnel in an attempt to shield them from discovery.

On May 11, 2012, Namecheap's counsel sent a letter to Plaintiffs' counsel identifying Azudo as the webhost of the First Website.  Plaintiffs then hired an international law firm to subpoena records from Azudo.  On July 2, 2012, Plaintiffs received the subpoenaed records from Azudo that revealed a "Steve Finch" at the e-mail address 80teasel@gmail.com was behind the First Website.  On July 10, 2012, Plaintiffs' counsel sent a demand letter to Steve Finch to take down the Website. Firebaugh received, redacted and posted the demand letter on the Second Website, which boldly stated: "not one untrue statement is found on this site.  One can't help but wonder: Why is the truth such a danger to Cohen and his business?"

After hiring cyber intelligence investigators and Internet specialists, Plaintiffs eventually linked Firebaugh to the 80teasel@gmail.com e-mail address since he used that same e-mail address for his membership profile on a sadomasochistic bondage pornographic website, which Firebaugh accessed while at work at NW Mint multiple times.

In 2012 and 2013, Plaintiffs and Plaintiffs' counsel, in both writing and verbally, repeatedly asked Defendants to take down the Second Website but Defendants ignored or refused their requests.   Instead, on April 12, 2013, Defendants renewed the Second Website.  Defendants also renewed the Second Website in 2014.  The Second Website remained active online until approximately May 2015 when it expired.  Then, approximately two months later in July 2015, Defendants renewed the Second Website and it remains active online to date. Cohen received communications from third parties regarding these changes, so the Second Website is clearly being monitored and carefully followed.

Presently, the page counter shows there have been more than 161,000 visitors to the Second Website.  Based upon Cohen's discussions with others and the Google Analytics reports produced by Defendants, it is known that visitors to the Second

Website have included Plaintiffs' family, friends, business colleagues, tenants, lenders, investors, insurers, business partners, vendors and service providers. Not all of the visitors to the Second Website are known because some of the visitors are only identified by a generic internet service provider on the Google Analytics reports. It is unknown how many people visited the First Website and the identities of those visitors since no Google Analytics reports were produced for the First Website. It is also unknown how many times either of the Websites were copied, circulated and discussed by others.

There is also a permanent digital footprint of both Websites, which can still be viewed through Internet archives. For example, after the First Website had been taken down over a year earlier, Cohen received a telephone call from a Glen Stevens in Philadelphia, Pennsylvania about the First Website, which was very distressing to Cohen. Another example is that all of the pages of the Second Website are fully accessible through the Wayback Machine, an internet archiving service.

Cohen spent more than $100,000.00 merely trying to counteract the Websites, but was unsuccessful. As Plaintiffs' Internet expert, Peter Kent, will explain, the Websites remained in the top of the Google search engine results due to the search engine optimization (SEO) and link building done by Samboer and Fiske on WordPress, Squidoo and HubPages to give the Websites greater exposure and increase visitors to the Websites.

In the Environmental Contamination Lawsuit in Washington, on October 15, 2012, the judge entered 155 findings of fact and 31 conclusions of law, all in Auburn's favor and against Hansen and NW Mint jointly. On November 14, 2012, the judge entered a judgment in Auburn's favor and against Hansen and NW Mint jointly in the amount of $869,746.53 and later awarded Plaintiffs their attorneys' fees and costs that resulted in a total judgment of $2,451,793.14 with interest, which resulted in a total of about $3 million being awarded and collected against Hansen and NW Mint jointly. Hansen and NW Mint appealed the judgment. On July 14,

PLAINTIFFS' TRIAL BRIEF

2014, a three-judge panel of the Washington Court of Appeals unanimously affirmed the judgment.   On January 7, 2015, five justices of the Washington Supreme Court denied Hansen and NW Mint's petition for review and awarded Auburn its attorneys' fees.   In short, nine different judges or justices ruled in Auburn's favor.   While Hansen in his deposition has suggested chicanery and untruths in the Environmental Contamination Lawsuit, Defendants are barred by the doctrines of res judicata and collateral estoppel from any attempt at re-litigating the claims and issues in that lawsuit during the trial of this case, and their attempts to discredit the outcome in the Environmental Contamination Lawsuit are belied by 155 findings of fact and 31 conclusions of law against Hansen and NW Mint, and the number of judges and justices who have considered the case at trial or on appeal.

NW Mint's employees have admitted under oath during their depositions that the comparison to Madoff and his investment securities firm was a negative and pejorative portrayal of Cohen and CAM.   As confirmed by the timing of the Websites and Firebaugh's deposition testimony, Hansen was hoping the Websites would have an effect on the Environmental Contamination Lawsuit.   That was not a new strategy for Hansen.   In 2008 and 2009, NW Mint and Hansen posted critical and pejorative websites about two other companies, ShopTech and SAP, related to business disputes over their computer software to gain leverage in the disputes and it ultimately resulted in NW Mint and Hansen resolving the disputes in its favor and not having to pay for the companies' software and services.

Samboer and Proctor testified under oath that they were uncomfortable with the Websites, which was known at NW Mint as the "special project."   Samboer and Proctor testified that they told other NW Mint employees about their unease and view that the Websites were unethical.   Samboer felt especially uncomfortable with the Websites because he was involved in a case in which NW Mint had sued a former employee, Carl Larson, in January 2013 for allegedly defaming NW Mint online by planting links to various outdated newspaper articles that were critical of

NW Mint and discussed NW Mint's run-ins with government authorities.  NW Mint settled that case as soon as Larson's counsel learned of this case.

During his deposition under oath, Fiske cried and expressed remorse for his involvement with the Websites.  Hansen, on the other hand, has shown no remorse. During his deposition, Hansen repeated called Cohen derogatory names (*e.g.*, rat, scum bag, retro bate, liar, thief, cheat, crook, snake in a bush), expressed his contempt and hatred for Cohen, and indicated he did not care if the Websites caused damage to Cohen.  During his deposition, Hansen threatened to expand the Second Website or put up a third website regarding Plaintiffs.

Hansen was convicted of two federal felonies and served 42-months in federal prison, which included various facilities due to Hansen getting in fights with staff and other inmates at the facility.  Hansen has had a restraining order entered against him by his former spouse.  Hansen is known at NW Mint to have a hot temper, rolled a grenade into the office of employee Jim Curnow and talked about burying bodies in the desert where they will never be found.  Hansen has a history of contempt for the law, having violated a preliminary injunction issued in the Environmental Contamination Lawsuit and refused to cooperate with an investigation of NW Mint by the Washington Department of Ecology.  NW Mint has had various complaints lodged against it with the Better Business Bureau and had a case brought against it by the Washington Attorney General, which resulted in a settlement that required NW Mint to follow certain guidelines with its business practices and to pay the State's attorneys' fees and costs.  NW Mint has been sued by Provident Precious Metals related to a trademark dispute over the manufacturing of ammunition-like products (and NW Mint ultimately lost that lawsuit with a finding that its alleged copyright, trademark and trade dress rights were invalid and unenforceable).  Due to Hansen's criminal history, history of violence in the home, workplace and prison, contempt for the law, knowledge of Cohen's residence, professed hatred of Cohen, threats to inflict pain on Cohen and manufacturing of

ammunition-like products, Cohen fears for the safety of himself, his family and his co-workers, and has increased the security at his home and office and hired a security detail when needed.  The "pain" that Hansen threatened to inflict upon Cohen and ratchet up is both shame and humiliation through the false allegations on the Websites, and the fear caused to Cohen and his family members about whether Hansen is unstable and a risk to their safety.

Due to the Websites, Cohen has avoided business, professional, social, charitable and personal functions.  Due to the distress from the Websites, Cohen is being treated by a psychiatrist and has been prescribed medication.  Due to the Websites, Cohen has suffered and continues to suffer mental distress and emotional distress, including depression, stress, shame, humiliation, embarrassment, fear, anxiety, anger, irritability, chronic fatigue, insomnia, nightmares, nausea, headaches, stomachaches, diarrhea, constipation, loss of appetite and an approximately thirty-pound weight-loss.  Cohen is distressed about the effect the Websites will have on his wife, children, friends, colleagues, CAM's employees, investors and business partners as well as the tenants of CAM's entities.  For example, Cohen's son is also in the real estate industry and has been contacted by friends about the Second Website.  Plaintiffs' psychiatric expert, Saul J. Faerstein, M.D., as well as Cohen's wife, co-workers and friends, will testify that Cohen's distress is the result of Defendants' Websites.

The Websites have caused concern by Plaintiffs' investors, lenders, insurers and others and have triggered them to investigate Plaintiffs before continuing to do business with them.  Plaintiffs did not hear back from potential investors, such as a multi-million dollar fund, after they did their standard and obligatory due diligence on Plaintiffs before investing.  Two identified investors, Jeffrey Stern and Olympus Ventures, LLC, decided not to invest millions of dollars due to their fiduciary role and not wanting to have to justify and defend the investment to their investors in light of the Websites and get caught up in the controversy.  Plaintiffs will never

know how many others read the Websites, formed negative conclusions about Plaintiffs and decided to avoid doing business with Plaintiffs, let alone spreading information about the Websites through their day-to-day communications. Plaintiffs will not know the full effect of the Websites on their business for many years given the nature of Plaintiffs' business and real estate investment projects. Plaintiffs seek $50 million in general and presumed damages, and to require Defendants to take down the remaining Second Website and to permanently enjoin Defendants from republishing the Website statements. If Plaintiffs succeed, they must incur substantial expense to have any websites, blogs, links, images, archives, etc. related to the Websites removed from the Internet.

## III.   LEGAL BACKGROUND.

The parties do not dispute that Nevada law applies to Plaintiffs' claims, each of which is analyzed in turn below.

### A.   **Plaintiffs' Defamation *Per Se* Claim.**

Plaintiffs have a valid claim for defamation *per se* against Defendants if there is: (1) a false and defamatory statement of fact by Defendants concerning Plaintiffs; (2) an unprivileged publication to a third party; (3) fault amounting to negligence; and (4) presumed damages. *See* Pope v. Motel 6, 121 Nev. 307, 315, 114 P.3d 277, 282 (2005) (citing Simpson v. Mars, Inc., 113 Nev. 188, 190, 929 P.2d 966, 967 (1997)). A statement is defamatory if it would tend to lower the subject in the estimation of the community, excite derogatory opinions about the subject, and hold the subject up to contempt. *See* K-Mart Corp. v. Washington, 109 Nev. 1180, 1191, 866 P.2d 274, 281-282 (1993).

In determining whether a statement is defamatory *per se*, words "are to be taken in their plain and natural import according to the ideas they convey to those to whom they are addressed; reference being had not only to the words themselves but also to the circumstances under which they were used." Talbot v. Mack, 169 P. 25, 29 (Nev. 1917). A statement that directly imputes to the plaintiff "dishonesty, lack

1  of fair dealing, want of fidelity, integrity, or business ability," even in general terms
2  and without supporting details, is considered defamation *per se*. *Id.* at 30.

3        Defendants' statements imputed that Plaintiffs engaged in criminal behavior
4  and injured Plaintiffs' trade, business or profession or imputed a lack of fitness
5  thereof, and therefore it is considered defamation *per se* and Plaintiffs are entitled to
6  presumed damages in an amount reasonably calculated to compensate Plaintiffs for
7  injury to reputation, loss of business, shame, mortification, hurt feelings, and any
8  consequential physical illness or pain.  *See* <u>Pope</u>, 121 Nev. at 315, 114 P.3d at 282;
9  <u>K-Mart</u>, 109 Nev. at 1192-95, 866 P.2d at 282-84; <u>Chowdhry v. NLVH, Inc.</u>, 109
10 Nev. 478, 483-84, 851 P.2d 459, 462 (1993).

11       "In reviewing an allegedly defamatory statement, the words must be viewed
12 in their entirety and in context to determine whether they are susceptible of a
13 defamatory meaning." <u>Lubin v. Kunin</u>, 17 P.3d 422, 425–26 (Nev. 2001).
14 Regarding this first element, Plaintiffs will prove that looking at the Websites as a
15 whole in the context of the Websites that used Cohen's name (<u>http://bradley-</u>
16 <u>cohen.com</u> and <u>http://bradleyscohen.com</u>), it was false and defamatory for
17 Defendants to compare Plaintiffs to Madoff and his investment firm and claim
18 Cohen is the next Madoff of real estate who is running a Ponzi scheme, scam fraud
19 or shell game, looting company assets, and taking investor and tenant money, when
20 Plaintiffs have legitimate real estate holdings, the company has historically done
21 very well and profitably on its real estate acquisitions, and Cohen does not have a
22 history of criminal convictions.  *See* <u>Medifast, Inc. v. Minkow</u>, 2011 U.S. Dist.
23 LEXIS 33412, at *39 (S.D. Cal. Mar. 29, 2011) ("If Defendants had said, 'Medifast,
24 like Bernie Madoff, is running a Ponzi scheme,' one could scarcely dispute that
25 Defendants would be liable for defamation. Similarly if Defendants had said
26 'Medifast runs its business like Bernie Madoff.'") (citation omitted); <u>Chambers v.</u>
27 <u>Scutiere</u>, 2013 N.J. Super. Unpub. LEXIS 760, at *33 (Apr. 4, 2013) (finding
28 defamatory content where defendant accused plaintiff of committing crimes and

compared plaintiff to Madoff).  While Defendants may have stated Cohen is the next Madoff in the form of a question, they are still liable for defamation since the question can be reasonably read as an assertion of fact, as will be confirmed by Plaintiffs' linguistics expert, Edward Finegan, Ph.D.  *See* <u>Partington v. Bugliosi</u>, 56 F.3d 1147, 1157 (9th Cir. 1995); <u>Obsidian Fin. Grp., LLC v.</u> Cox, 812 F. Supp. 2d 1220, 1224-25 (D. Or. 2011).

Defendants argue that the Websites represent their opinions, not facts.  This is false.  In Nevada, in determining if a statement is one of fact or opinion, "the court must ask whether a reasonable person would be likely to understand the remark as an expression of the source's opinion or as a statement of existing fact" and apply the following three factors: (1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact; (2) whether the defendant used figurative or hyperbolic language that negates that impression; and (3) whether the statement in question is susceptible to being proved true or false.  <u>Pegasus v. Reno Newspapers, Inc.</u>, 57 P.3d 82, 87-88 & n.19 (Nev. 2002).

Whether Plaintiffs are running a Ponzi scheme, scam, fraud or shell game, looting company assets, taking investor and tenant money, suing based on unfounded accusations and greed or to hold off creditors, and whether Cohen has a history of criminal convictions are all examples of objectively verifiable facts, not subjective opinions or rhetorical hyperbole as would be found on a blog, message board or other forum to offer opinions and engage in a heated debate.  This Court agreed in denying summary judgment on the defamation *per se* (Doc. No. 228):

> [T]he general tenor of the websites is precise with allegedly accurate graphs, earnings statements of employees, and quarterly reports that invite readers to draw specific conclusions regarding CAM and Cohen's activities.  The websites are not blogs or free flow, steam-of-consciousness musings.  The careful weaving of "facts" that were testified to "under oath," newspaper articles, graphs, earning statements and the like into the defendants' gently questioning narrative are designed to bring doubt into the minds of investors regarding plaintiffs and their activities . . . The court also does not find that the language used by defendants was figurative or hyperbolic.  Defendants make specific accusations and imputations of criminal activity and provide

supporting information, described as "facts" to attempt to bolster those accusations for readers.  Finally, the court finds that the statements alleged in defendants' websites are indeed susceptible to being proved true or false.

Indeed, Defendants tried to make their Websites appear as professional and credible as possible and even consulted and obtained input and contribution from a team of personnel at NW Mint.  Moreover, the Websites claim that they are based on facts, like an "investigation" conducted by "investigators," "ominous facts" taken from a deposition by Ray, Auburn's Rule 30(b)(6) representative, and a confidential financial report for one CAM entity.  The Second Website also states: "not one untrue statement is found on this site.  One can't help but wonder: Why is the truth such a danger to Cohen and his business?"  In other words, the Websites themselves indicate they are based on provable facts and not subjective opinions.  *See* K-Mart, 109 Nev. at 1192, 866 P.2d at 282 ("expressions of opinion may suggest that the speaker knows certain facts to be true or may imply that facts exist which will be sufficient to render the message defamatory if false").  Also, since Defendants never invested in CAM, they do not and cannot have any opinions to communicate about being investors in CAM, as they are simply disgruntled former tenants of Auburn.

Defendants also claim that certain small details on the Websites are true (contrary to its opinion argument), like that Cohen lives in a palacious mansion. While that may be true by someone's standards, Defendants' defamatory message is not that Cohen lives in a mansion, but that Cohen lives in a mansion and leads a life of glamour and luxury by looting company assets and taking investor and tenant money all the while investors are losing tens of millions dollars, *i.e.*, Cohen is running a Ponzi scheme, scam, fraud or shell game.  Defendants do not and cannot prove that this overall message they were conveying on the Websites is true, and Defendants cannot take a few statements out of context to prove they are true.

With respect to the second element, Defendants made an unprivileged publication to a third party by publishing the Websites on the World Wide Web,

which is accessible by anyone 24 hours a day, seven days a week. While Defendants claimed one small part of their First Website, their statements about the "history of convictions" of Brad Scott Cohen in Philadelphia, Pennsylvania, were privileged as a fair reporting of judicial proceedings, this Court has already rejected that argument (Doc. No. 228). Defendants claim no other privilege.

As for the third element, fault, Plaintiffs need only provide negligence since Defendants are not the media, Plaintiffs are not limited purpose public figures as already determined by this Court (Doc. No. 228), and the Websites do not involve a matter of public concern and Defendants have never argued as much. Negligence is easily proven since Hansen did not have any evidence of Plaintiffs committing a Ponzi scheme (indeed, the CAM report Defendants pilfered from CAM's website showed CAM's entity had legitimate assets with unrealized losses), and NW Mint employees could not find any negative research on Plaintiffs, yet Defendants anonymously published the First Website anyway comparing Cohen to Madoff and implying Cohen has a history of criminal convictions, and then when the First Website was taken down for containing defamatory content, they published the Second Website using separate, overseas domain registrant and webhost with a more liberal fraud  policy and refused to take the Second Website down and renewed it despite Hansen and NW Mint markedly losing the Environmental Contamination Lawsuit that started it all.

Regarding the fourth and final element, damages, Plaintiffs do not seek special damages and instead seek only presumed damages, which may include loss of business, as well as injury to reputation, shame, mortification, hurt feelings and any consequential physical illness or pain. *See* K-Mart, 109 Nev. at 1192-95, 866 P.2d at 282-84. Plaintiffs can quickly show the jury with just two examples that their loss of business alone is at least $13 million to $25 million, as one investor, Jeffrey Stern, decided to invest $3 million to $10 million less with Plaintiffs and one potential investor, Olympus Ventures, LLC, decided not to invest $10 million to $15

18

1  million due to Defendants' Websites and their fiduciary duties to their investors.

2  Plaintiffs are entitled to present such evidence to support their presumed damages.

3  *See* Sunward Corp v. Dun & Bradstreet, Inc., 811 F.2d 511, 539 (10th Cir. 1987);

4  Cook v. Safeway Stores, Inc., 266 Ore. 77, 82-83, 511 P.2d 375, 378 (1973); New

5  York Woman, Inc. v. New York Evening Journal, Inc., 14 N.Y.S.2d 916, 918 (Sup.

6  Ct. 1939).

7      Other evidence Plaintiffs will present includes potential investors who

8  Plaintiffs never heard from after they went to do their due diligence, business

9  partners who became concerned, conducted investigations and hesitated to do

10 business with Plaintiffs (and only continued to do business with Plaintiffs because

11 they were so far into the deal or knew Cohen or someone who vouched for Cohen)

12 and the number of visitors to the Second Website and fact that they included

13 Plaintiffs' friends, business colleagues, tenants, lenders, investors, insurers, business

14 partners, vendors and service providers.  Cohen, his wife and his co-workers will

15 also testify to Cohen's substantial shame, mortification, hurt feelings and physical

16 illnesses and pain that he suffered from Defendants' Websites.

17         **B.    Cohen's False Light Invasion of Privacy Claim.**

18      Cohen has a valid claim for false light invasion of privacy against Defendants

19 if: (1) Defendants gave publicity to a matter concerning Cohen that placed him

20 before the public in a false light; (2) the false light in which Cohen was placed

21 would be highly offensive to a reasonable person; and (3) Defendants acted with

22 fault amounting to negligence.  *See* Franchise Tax Bd. V. Hyatt, 335 P.3d 125 (Nev.

23 2014) (quoting Restatement (Second) of Torts § 652E (1977)); West v. Media Gen.

24 Convergence, Inc., 53 S.W.3d 640, 647-48 (Tenn. 2001); Restatement (Second) of

25 Torts § 652E (1977), cmt. d.  The injury for false light invasion of privacy is mental

26 distress, anguish and embarrassment from being exposed to public view, which is

27 redressed by general damages.  *See* People for the Ethical Treatment of Animals v.

28 Bobby Berosini, Ltd., 111 Nev. 615, 622 n.4, 636-37, 895 P.2d 1269, 1274 n.4,

1   1283 (1995).

2       Defendants' Websites falsely claimed Cohen was the next Madoff of real

3   estate, running a Ponzi scheme, fraud, shell game or scam, looting company assets,

4   taking investor and tenant money, suing to hold off creditors, and suing tenants

5   based on unfounded accusations and greed despite having no evidence in support

6   thereof and instead having evidence to the contrary, like having the financial report

7   showing CAM had legitimate real estate holdings with unrealized losses and losing

8   the Environmental Contamination Lawsuit.  Defendants published a picture of

9   Cohen's home, Cohen's political contributions, and misconstrued information from

10  a ***confidential*** financial report intended only for investors that Defendants pilfered

11  from CAM's website and private deposition testimony of Auburn's Rule 30(b)(6)

12  representative, Ray, from the Environmental Contamination Lawsuit to claim Cohen

13  was living a life of glamour and luxury while his investors lost tens of millions of

14  dollars, just like Madoff, and Cohen kept his true financial picture and crumbling

15  empire a secret by using a complex, intricate and elusive web of entities that would

16  take an army of investigators to unravel.  Defendants also juxtaposed pictures of

17  Cohen next to a booking photograph of Madoff, the most notorious fraudster in U.S.

18  history, and implied Cohen had a history of serious criminal convictions for fraud

19  and racketeering that related to a convicted criminal named Brad S. Cohen, who

20  Defendants knew was of a different age, from a different geographical location and

21  had a different middle name than Cohen.  This content clearly portrayed Cohen in a

22  false light and would be highly offensive to any reasonable person.  *See, e.g.*, Ferm

23  v. McCarty, 2014 U.S. Dist. LEXIS 171624, at *13-14 (D. Nev. Dec. 9, 2014)

24  (allowing false light invasion of privacy claim where defendants stated plaintiff was

25  convicted felon and he or his business was a scam).

26       Defendants argue they did not portray Cohen in a false light and simply gave

27  publicity to Cohen's business activities.  This is false.  The fact of the matter is that

28  Defendants did not publicize Cohen's ***true*** business activities.

Defendants also try to argue that Cohen is attempting to bootstrap his false light invasion of privacy claim onto the Websites' comments concerning CAM as a company, which does not have privacy rights and therefore cannot bring such a claim. This Court already rejected Defendants' bootstrap argument and also found that Cohen and CAM are intrinsically tied and nearly one and the same (Doc. No. 228).

As will be objectively verified by Plaintiffs' psychiatric expert, Saul J. Faerstein, M.D., Cohen has suffered and continues to suffer significant mental distress from Defendants' Websites that have resulted in physical ailments, including depression, stress, shame, humiliation, embarrassment, fear, anxiety, anger, irritability, chronic fatigue, insomnia, nightmares, nausea, headaches, stomachaches, diarrhea, constipation, loss of appetite and an approximately thirty-pound weight-loss, has become distant and less sociable, is being treated by a psychiatrist and has been prescribed medication.

Thus, it is much more than just changes in sleeping patterns and unusual dreams as Defendants erroneously claim. Many nights Cohen has awoken and his first impulse was to go to the computer and see if the Website was still there. Cohen has endured that for the last three years of his life. The severity of Cohen's mental distress is also compounded by the fact the Websites were available worldwide 24 hours a day, seven days a week, the Second Website has been continuously published for three years (1,180 days with approximately 180,000 hits), a digital footprint of the Websites will always exist through programs such as the WayBack Machine that archive images of websites, and Defendants have threatened to expand the Second Website or publish a third website.

Defendants argue Cohen's mental distress is self-imposed and his weight loss is beneficial. This is absurd. But for Defendants' Websites, Cohen would not have suffered any for the foregoing mental distress. Any person who has been defamed will experience anxiety over others discovering and believing the Websites'

defamatory statements and will devote the time, energy and resources necessary to obtain redress and justice.  Cohen, his wife, co-workers and Plaintiffs' psychiatric expert, Saul J. Faerstein, M.D., have all attested Cohen's distress arose after and because of Defendants' two Websites and Hansen's insults and threats, like inflicting and ratcheting up the pain on Cohen, expanding the Second Website and posting a third website.  Defendants argue the distress is from Cohen's position as head of CAM, but that position is typical to Cohen's daily life, existed long before the Websites and is vastly different from the distress caused by the Websites.

### C.   Plaintiffs' Punitive Damages Claim.

Punitive damages are awardable based on the clear and convincing evidence of malice, fraud and oppression that Defendants exhibited in publishing and repeatedly renewing the Websites that defamed Plaintiffs *per se*, invaded Cohen's privacy and placed Cohen in a false light as discussed hereinabove, and furthered Hansen's express purpose of inflicting and ratcheting up "pain" on Plaintiffs.  *See* N.R.S. §§ 42.001 and 42.005.  Hansen, a criminal himself who has also failed to file his tax returns over the last few years and has no regard for the law, was not using the Websites as a public service to notify other of Plaintiffs' criminality.  Hansen wanted to get back at and harm Plaintiffs, plain and simple.

RESPECTFULLY SUBMITTED this 28th day of October, 2015.

TIFFANY & BOSCO, P.A.

By ____/s/ Robert D. Mitchell_____
ROBERT D. MITCHELL
Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify and declare under penalty of perjury that on October 29, 2015, I electronically filed the foregoing with the Clerk of Court for filing and uploading to the CM/ECF system which will send notification of such filing to all parties of record.


/s/ Robert D. Mitchell